George Brandon (No. 017947) george.brandon@squirepb.com
Gregory A. Davis (No. 025976) gregory.davis@squirepb.com
Gregory S. Schneider (No. 029660) gregory.schneider@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 528-4000
Facsimile: (602) 253-8129
Attorneys for Defendants Financial Industry Regulatory Authority, Inc.
and Scott M. Andersen

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife; Investment Services Corporation, an Arizona corporation, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>Financial Industry Regulatory Authority, Inc., a Delaware corporation, Scott M. Andersen, a natural person, et al.,<br><br>　　　　　Defendants. | Case No. 14-cv-02490-PHX-ROS<br><br>**REPLY IN SUPPORT OF FINRA AND ANDERSEN'S MOTION TO DISMISS ALL PLAINTIFFS' CLAIMS** |

## Introduction

Eight of the 14 claims asserted by plaintiffs (collectively referred to herein as the "Hurrys" or "Plaintiffs") are predicated on quasi-governmental actions that FINRA took under the authority delegated to it by the Securities Exchange Act of 1934 (the "Exchange Act"). As such, FINRA and its employee, defendant Andersen, are absolutely immune from those claims. *See Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1213 (9th Cir. 1998) ("a self-regulatory organization [("SRO")] is immune from liability based on the discharge of its duties under the Exchange Act."). In an effort to avoid dismissal of their claims—the obvious result when the controlling case law is applied to the facts they plead—plaintiffs (1) erroneously suggest that the determination of FINRA's immunity is

1    governed by an antiquated test that has not been used in the Ninth Circuit for nearly 20

2    years, and (2) craft supposed exclusions to FINRA's absolute immunity that have been

3    expressly rejected by numerous courts and would, if accepted, lead to absurd results.

4         Those eight claims, and all the remaining claims in plaintiffs' complaint, fail for

5    the additional reason that plaintiffs have not stated a claim upon which relief can be

6    granted.  Indeed, their claims fail as a matter of law for the numerous and varied reasons

7    discussed in FINRA's motion to dismiss, nearly all of such reasons plaintiffs simply

8    ignore, and none of which plaintiffs refute with citations to applicable authority.  All of

9    plaintiffs' claims should be dismissed.

10   **Argument**

11   **I.    THE ABSOLUTE IMMUNITY OF FINRA AND ANDERSEN DEFEATS
12         CLAIMS I–VI, IX, AND XIV**

13        FINRA and its employee, defendant Andersen, are absolutely immune from

14   plaintiffs' claims for violation of the Computer Fraud and Abuse Act (Claims I & II),

15   trespass upon chattel (Claim III), intrusion on seclusion (Claim IV), conversion (Claim

16   V), misappropriation of trade secrets (Claim VI), defamation (Claim IX), and conspiracy

17   to violate civil rights (Claim XIV).

          **A.    FINRA's Immunity Is Absolute, Not Qualified**

18        Plaintiffs suggest in their response (at 7–8) that the question of whether the

19   immunity afforded to FINRA and its employees, like defendant Andersen, is absolute or

20   qualified is open to reasonable dispute.  It is not.  Since FINRA's predecessor, the

21   National Association of Securities Dealers, Inc. ("NASD"), was first held to have absolute

22   immunity 30 years ago in *Austin Municipal Securities, Inc. v. National Ass'n of Securities

23   Dealers, Inc.*, 757 F. 2d 676, 692 (5th Cir. 1985), the law has always been that when

24   SROs such as FINRA are immune from suit, that immunity is absolute.  *See, e.g.*, *Austin

25   Municipal*, 757 F. 2d at 692 (FINRA "requires absolute immunity from civil liability . .

26   ."); *Barbara v. New York Stock Exch.*, 99 F.3d 49, 59 (2d Cir. 1996) ("We think that

27   absolute immunity is particularly appropriate in the unique context of the self-regulation

28   of the national securities exchanges."); *Partnership Exch. Sec. Co. v. NASD*, 169 F.3d

606, 608 (9th Cir. 1999) (FINRA is "protected by absolute immunity . . ."); *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007) ("SROs are protected by absolute immunity . . ."); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 115 (D.C. Cir. 2008) ("Where courts accord immunity to SROs, the protection has been absolute."); *Std. Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1093 (U.S. Jan. 17, 2012) ("There is no question that an SRO and its officers are entitled to absolute immunity . . .").

### B.  The Applicable Test Is Whether Plaintiffs' Claims Arise Out Of FINRA's Actions Taken Under The Aegis Of The Exchange Act

Even after conceding that FINRA enjoys absolute immunity in certain circumstances (a point which was never in doubt), plaintiffs erroneously conclude (at 8) that such circumstances are limited to when FINRA is "performing duties akin to those of prosecutors or judges."  For that proposition, plaintiffs cite only a law review article.  But that article, and the case law cited in FINRA's motion to dismiss, makes plain that whether the alleged offending conduct arises from quasi-prosecutorial or quasi-judicial functions has not been dispositive of the immunity analysis in the context of SROs since at least the Ninth Circuit Court of Appeals' 1998 ruling in *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998).  *See* Rohit A. Nafday, *From Sense to Nonsense and Back Again*, 77 U. Chi. L. Rev. 847, 865 (2010).  As explained in the article,

> The Ninth Circuit's decision in *Sparta Surgical* . . . envisioned a different scope of protection, one premised on the doctrine of sovereign immunity.  . . . [I]n drawing comparison to *regulatory* rather than *judicial* activities, the Ninth Circuit shifted the conceptual basis of SRO immunity from absolute to sovereign immunity, which protects a wider swath of government activity.

*Id.* (emphasis in original).

The applicable rule, as set forth in *Sparta*, is thus "that a self-regulatory organization is immune from liability based on the discharge of its duties under the Exchange Act."  *See Sparta*, 159 F.3d at 1213.  Stated another way, the Ninth Circuit in *Sparta* explained that it was "expanding immunity [to include all instances] when a self-regulatory organization is exercising quasi-governmental power" because doing so "is consistent with the structure of the securities market as constructed by Congress."  *See id.*

- 3 -

Other circuit courts of appeal considering the scope of an SRO's immunity have adopted the framework of *Sparta*, and those courts have held that FINRA and other SROs have absolute immunity in the exercise of their quasi-governmental functions that, in the absence of the Exchange Act, would otherwise be performed by the Securities and Exchange Commission ("SEC") with sovereign immunity. *See, e.g.*, *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001) ("A SRO . . . may be entitled to immunity from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions . . . [and] should be entitled to the same immunity enjoyed by the SEC when it is performing functions delegated to it under the SEC's broad oversight authority."); *DL Capital Group, LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 97 (2d Cir. 2005) ("[A] self-regulatory organization when acting in its capacity as a SRO, is entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder.") (quotation omitted); *In re Series 7*, 548 F.3d at 114 ("When an SRO acts under the aegis of the Exchange Act's delegated authority, it is absolutely immune from suit for the improper performance of regulatory, adjudicatory, or prosecutorial duties delegated by the SEC."); *Weissman*, 500 F.3d at 1296 ("Because they perform a variety of vital governmental functions, but lack the sovereign immunity that governmental agencies enjoy, SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions."); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007) (Sotomayor, J.) ("[A]bsolute immunity attaches where the activity relates to the proper functioning of the regulatory system . . . Thus, so long as the alleged misconduct falls within the scope of the quasi-governmental powers delegated to [the SRO], absolute immunity attaches.") (quotation omitted), *cert. denied*, 552 U.S. 1291 (U.S. March 24, 2008).

Under the *Sparta* framework, SROs (which are private corporations despite primarily conducting quasi-governmental functions) are denied immunity only "[w]hen conducting private business." *See Sparta*, 159 F.3d at 1214; *see also Weissman*, 500 F.3d at 1297 ("[A]bsolute immunity must be coterminous with an SRO's performance of a governmental function. When an SRO is . . . acting in its own interest as a private entity,

absolute immunity from suit ceases to obtain.").  Plaintiffs have not alleged, and they cannot allege, that when FINRA performed the onsite examination and inspection of the Copied Computers at issue it was somehow "conducting private business" or "acting in its own interest as a private entity."

**C.**      **Claims I–VI, IX, And XIV Arise Out Of FINRA's Actions Taken Under The Aegis Of The Exchange Act, And FINRA And Andersen Are Therefore Absolutely Immune From Those Claims**

Claims I-VI and XIV in plaintiffs' complaint each arise out of FINRA's onsite examination and its inspection of the Copied Computers.  There can be no dispute that such an examination and inspection are quasi-governmental functions performed under the aegis of the Exchange Act.  Indeed, but for the governmental functions delegated to FINRA by the Exchange Act, neither FINRA, nor any of its employees, including defendant Andersen, would have had any reason to engage in the purportedly overbroad examination and inspection.  FINRA and Andersen are therefore absolutely immune from those claims.  *See Sparta*, 159 F.3d at 1213; *see also Partnership Exch.*, 169 F.3d at 608 (dismissing claims arising out of allegedly improper investigation by FINRA's predecessor, NASD); *Conover v. FINRA*, 2014 U.S. Dist. LEXIS 121368, *2 (N.D. Cal. 2014) (dismissing claim against FINRA on immunity grounds and noting that "[a]s part of its regulatory duties, FINRA conducts inquiries and investigations based on investor complaints and suspicious activity.").

Furthermore, the only purported defamatory publications expressly alleged in plaintiffs' complaint are those alleged (at ¶ 151) to have been made by FINRA during on-the-record interviews with SCA employees.  Because the taking of such interviews is within the "bounds of the government functions delegated to [FINRA]" under the aegis of the Exchange Act, FINRA and Andersen are also absolutely immune from plaintiffs' defamation claim (Claim IX).  *See In re NYSE Specialists Sec. Litig.*, 503 F.3d at 98.

That plaintiffs allege FINRA and Andersen exceeded the scope of their regulatory authority is irrelevant.  As Justice Sotomayor explained when she was on the Second Circuit Court of Appeals, "immunity protects the power to regulate, not the mandate to perform regulatory functions in a certain manner.  Thus, the immunity depends only on

*whether* specific acts and forbearances were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions." *Id*. (emphasis in original).  Were it otherwise, Justice Sotomayor continued, "the immunity doctrine would be effectively subverted.  After all, individuals characteristically do not bring suit alleging an SRO is obeying its statutory and legal obligations; they bring suit alleging an SRO is violating the law or acting inconsistently with its legal obligations." *Id.*

The fact that some of the plaintiffs are not regulated by FINRA is also of no consequence, and plaintiffs provide no authority (at 9) for recognizing such a distinction.  FINRA's absolute immunity is not a sword to defeat the claims of those persons and entities that have agreed to be bound by its Rules; FINRA's absolute immunity is a shield that (1) gives FINRA the "breathing room to exercise [its] powers without fear that [its] discretionary decisions may engender endless litigation," and (2) ensures that FINRA "will not be excessively timid in [its] regulatory decisions." *See id*. at 97.  The shield of absolute immunity would be illusory if it were only effective to prevent claims asserted by the relatively small group of people that have expressly agreed to be bound by FINRA's Rules.  Unsurprisingly, courts considering the issue have held that an SRO is absolutely immune from suit regarding the exercise of its regulatory authority irrespective of whether the SRO had regulatory authority over the individual plaintiff.  *See DL Capital Group*, 409 F.3d at 99 (dismissing claims by an unregulated individual investor regarding the cancellation of trades, and noting that "this Court has never suggested that the identity of the plaintiff is what drives the absolute immunity analysis.  Rather, we have made clear that it is the SRO's *function* as a quasi-governmental authority that entitles it to absolute immunity.") (emphasis in original); *see also Sparta*, 159 F.3d at 1211 (NASD immune from claim of unregulated medical products manufacturer); *Dexter v. Depository Trust and Clearing Corp.*, 406 F. Supp. 2d 260, 264 (S.D.N.Y 2005), *aff'd,* 219 Fed.Appx. 91 (2d Cir. 2007) (NASD immune from claim of unregulated investor).

Plaintiffs' argument (at 9–10) that absolute immunity somehow does not attach to FINRA's alleged conduct because it occurred before official disciplinary action was commenced against the Hurrys or their entities is likewise without merit.  Indeed, the Ninth Circuit Court of Appeals in *Partnership Exch. Sec. Co. v. NASD*, 169 F.3d 606 (9th

Cir. 1999) has squarely rejected the same argument the Hurrys raise now:  "[Plaintiff] claims that some of [FINRA's] actions taken before charges were brought . . . were investigatory and administrative in nature and thus should fall outside the bounds of the absolute immunity doctrine.  However, *Sparta* admits of no exceptions:  if the action is taken under the aegis of the Exchange Act's delegated authority, [FINRA] is protected by absolute immunity from money damages." *Partnership Exch.*, 169 F.3d at 608 (quotation omitted).

Moreover, even under the pre-*Sparta* framework, which plaintiffs erroneously argue still applies, FINRA's onsite examination and inspection of the Copied Computers would be entitled to absolute immunity as they were part of FINRA's pre-prosecutorial investigation.  In *Zandford v. NASD*, 30 F. Supp. 2d 1 (D.D.C. 1998), the District Court for the District of Columbia considered whether two investigators employed by FINRA's predecessor, the NASD, were entitled to absolute immunity.  Because the opinion in *Sparta* had yet to be issued (or adopted in the D.C. Circuit as it later was), the court in *Zandford* analyzed the assertion of absolute immunity under the old *Butz v. Economou* tripartite function test, which required examining the conduct at issue and comparing it to customary judicial and prosecutorial functions.  *See Zandford*, 30 F. Supp. 2d at 10–18.

The *Zandford* Court rejected the argument that plaintiffs make here, which is that absolute immunity only attaches when formal disciplinary proceedings begin.  *See id*. at 12–14.  Instead, the court recognized that absolute immunity attaches when the investigative function transforms from "a broad-scale investigation of illegal activity" to an investigation "directed toward a determination of whether the initiation of formal proceedings would be appropriate . . . [h]aving genuinely focused upon a particular defendant and a particular wrong." *Id*. at 14 (quotations omitted).  The court then dismissed the claims against the NASD investigators on the ground that "they are entitled to absolute prosecutorial immunity for their alleged actions." *Id*. at 18.

Here, like in *Zandford*, the onsite examination and inspection of the Copied Computers were not part of a mere "broad-scale investigation of illegal activity."  Rather, the onsite examination and inspection of the Copied Computers were directed toward the determination of whether to bring disciplinary action against SCA and/or the Hurrys for

- 7 -

potentially serious regulatory violations.  Accordingly, even under the more restrictive pre-*Sparta* framework, FINRA and Andersen are absolutely immune for Claims I–VI, IX, and XIV in plaintiffs' complaint.

## II.   ALL OF PLAINTIFFS' CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6)

### A.   Plaintiffs' Computer Hacking Claims (Claims I & II) Fail Because FINRA Was Authorized To Access The Computers

The Hurrys concede that the ISC Computers were within their control, yet contend (at 2–3) that the current version of Rule 8210 is substantively different than the version in effect in 2012, and that the 2012 rule did not require the Hurrys to permit FINRA to examine all documents within their possession, custody or control.  They are wrong.  As the regulatory notice released in January 2013 states, the rule was amended as a mere stylistic clarification, and it did not change the scope of FINRA's authority under the rule. *See FINRA's Information and Testimony Requests*, Regulatory Notice 13-06 at n.3 (Feb. 25, 2013), attached hereto as **Appendix A**.  Thus, FINRA had the same authority under Rule 8210 to seek the same documents in 2012 as it does now.

That rule "requires firms, associated persons and other persons over whom FINRA has jurisdiction to provide records that they have the legal right, authority or ability to obtain upon demand."  *Id.* at 2.  And that is what FINRA explicitly sought here in 2012. [*See* FAC (Doc. #37) at ¶ 84 ("FINRA demanded of SCA in the 8210 Request 'immediate access to inspect and copy . . . information in the possession, custody, or control of [SCA] and its subsidiaries, affiliates, predecessor corporations, principals, employees, and any other affiliated persons.").]  Moreover, the Hurrys admit in their own allegations that the ISC Computers contained SCA emails, which they do not contest FINRA had a right to examine.  [*See* FAC at ¶ 92 ("Andersen was informed that, to the extent the ISC Computers contain any SCA-related material, that material likely comprises emails to or from John or Justine at their respective SCA-email addresses . . . .").]  The ISC computers were therefore squarely within FINRA's jurisdiction, and FINRA cannot be held to have accessed them without authorization.

The Hurrys suggest (at 6) that any consent they gave to FINRA's search was invalid because they were threatened with being issued a Wells Notice when they refused to comply.  This argument hinges by analogy to a case in which a party obtained a "patently unlawful" subpoena which was eventually quashed, though not before a non-party responded to it.  *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1071 (9th Cir. 2004).  *Theofel* is wholly inapplicable because here FINRA was acting within the scope of its regulatory authority both when it conducted its onsite examination of SCA and when it allegedly threatened to issue Wells Notices if the Hurrys and SCA refused to comply.  Additionally, as discussed at length in FINRA's opening brief on this motion to dismiss, the Hurrys explicitly agreed to FINRA's rules, the exercise of which they cannot now legitimately contest.  [*See* FINRA's Motion (Doc. #46) at 5–6.]

### B.   Trespass Upon Chattel (Claim III) Requires a Loss

The Hurrys attempt (at 18) to conflate expenses incurred defending against FINRA's investigation with non-existent "damages" resulting from FINRA's copying of ISC's hard drives.  The Hurrys do not allege that they lost data, business opportunities, or anything else specific that would constitute an actual loss caused by the purported deprivation.  *See Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 331, 762 P.2d 609, 618 (App. 1988) ("For a deprivation of use caused by a trespass to chattel to be actionable, the time must be so substantial that it is possible to estimate the loss that is caused.")  Instead, they attempt to transform trespass upon chattel into a tort of strict liability with no requirement of harm.  This is not the law.  *See id.* ("[P]roof of actual damage [is required] for an actionable trespass to chattel claim.").  The Hurrys have not alleged harm proximately caused *by the deprivation*.  Whatever they incurred "responding to the offenses" was caused by their desire to defend against FINRA regulatory enforcement, not any harm caused by the deprivation itself.  This claim must fail.

### C.   Plaintiffs' Intrusion Claim (Claim IV) Fails Because They Did Not Seclude Their Private Affairs Or Show The Access Would Be Highly Offensive

The Hurrys concede (at 19) they intermingled documents relating to matters subject to examination by FINRA with many other of their personal and business

documents.  [*See* FAC at ¶¶ 62, 71–72, 92; Hurrys' Response at 19.]  Indeed, it appears the Hurrys lumped all of their personal and business affairs, including the business affairs of SCA, onto the ISC computers.  They cite no authority whatsoever for the proposition that an individual can place documents he knows are subject to on-demand examination— by his own agreement—among his personal and business affairs, on computers located in the office of a business entity outside his home, and still retain a reasonable expectation that he has maintained a "private seclusion . . . about his person or affairs."  *See Hart v. Seven Resorts*, 190 Ariz. 272, 279, 947 P.2d 846, 853 (App. 1997).

Such a rule would undermine FINRA's ability to conduct surprise examinations— to which its members and associated persons agree—by allowing those entities and members to mix all FINRA-related documents with personal documents, and then object to the search of the location where those documents are stored.

The Hurrys' argument that the ISC computers were located in a totally separate office is specious at best.  The complaint makes plain that ISC had an office within the same suite as SCA.  [FAC at ¶¶ 58–59, 62.]  Thus, the Hurrys provided neither spatial nor logical division between the affairs of SCA and ISC.  Moreover, the ISC computers were themselves subject to surprise examinations, as they are plainly within the Hurrys' "possession, custody or control."  *See* FINRA Rule 8210(a).

**D.   Conversion (Claim V) Does Not Exist for Copying Information**

The Hurrys cite no Arizona law (at 18–19) for their novel theory that duplicating electronic data can give rise to the tort of conversion.  Indeed, they would ignore the central reasoning of directly-controlling Arizona authority.  *See Miller v. Hehlen*, 209 Ariz. 462, 473, 104 P.3d 193, 203 (App. 2005) (A "conversion claim could not lie for . . . [a] copied list of names and information; . . . conversion and trover only lie for specific tangible personal chattels or . . . tangible evidence of title to intangible or real property.") (quotation omitted).  Nor do they contend that the electronic data that was copied somehow qualifies as tangible personal property.  *See id.*  Thus, their reliance on authority interpreting the laws of North Carolina and Florida is inapposite.  This claim must fail.

**E.   Misappropriation of Trade Secrets (Claim VI) Requires Improper Access**

The Hurrys concede (at 15) that FINRA has not disclosed any purported trade

secrets contained on the Copied Computers.  Thus, they rely solely on FINRA acquiring alleged trade secrets by purportedly "improper means" under A.R.S. § 44-401(2)(a).  As discussed above, however, FINRA was authorized by Rule 8210 to acquire the information the Hurrys now claim contain trade secrets because such information was in the Hurrys' "possession, custody or control."

**F.  Plaintiffs' "Prima Facie Tort" Claim (Claim VII) Does Not Exist In Arizona**

Inexplicably, the Hurrys contend (at 13) that "no Arizona authority rejecting prima facie tort as a viable claim" exists.  Yet as FINRA pointed out in its motion, the Arizona courts have flatly rejected the application of this principle.  *See Lips v. Scottsdale Healthcare Corp.*, 222 Ariz. 346, 352 n.8, 214 P.3d 434, 440 n.8 (App. 2009) ("Arizona has not adopted this principle.").  Plaintiffs' "prima facie tort" claim therefore fails.

**G.    The Privacy Act (Claim VIII) Does Not Apply To FINRA**

The Hurrys base their Privacy Act arguments (at 16–17) on the wholly unsupported notion that FINRA qualifies as a federal agency for purposes of the Administrative Procedures Act.  They urge this Court to ignore decisions uniformly contrary to their position because such cases are persuasive authority and not binding authority.  *See Lucido v. Mueler*, 2009 U.S. Dist. LEXIS 89775, *18–19 (E.D. Mich 2009) (dismissing plaintiff's Privacy Act claim against FINRA because "FINRA is not [an] 'agency' for purposes of the Act.").  The Hurrys do not cite a single case to support their assertion that FINRA is somehow a federal agency as defined by the Privacy Act.

Moreover, they ignore that the Privacy Act does not reach individuals, which precludes their claims against Andersen (s*ee Hewitt v. Grabicki*, 794 F.2d 1373, 1377 n.2 (9th Cir. 1986)), that corporations are not "individuals" as defined by the Privacy Act and therefore all the corporate plaintiffs lack standing to assert a Privacy Act claim (*see St. Michael's Convalescent Hosp. v. California*, 643 F.2d 1369, 1373 (9th Cir. 1981)), and that they have not alleged that FINRA or Andersen subsequently disclosed any of their records, which is a prerequisite to liability under the plain language of the Privacy Act (*see* 5 U.S.C. § 552a(b), (g)(1)(D)).  For at least all of these reasons, this claim fails.

## H. **Plaintiffs' Defamation Claim (Claim IX) Fails Because They Allege No False Publication By FINRA**

The Hurrys have the burden of alleging provably false publications by FINRA.  *See Turner v. Devlin*, 174 Ariz. 201, 205, 848 P.2d 286, 290 (1993) ("A statement regarding matters of public concern must be provable as false before a defamation action can lie.") (citation omitted).  They have not alleged any such publications, and for that additional reason their defamation claim fails.

The Hurrys argue only (at 13–14) that FINRA's alleged publication can be implied by the content of Bill Meagher's four[1] articles.  That argument, however, is proven false by the articles themselves.  Indeed, three of the articles state that neither FINRA nor its agents made contributions or comments to Mr. Meagher.  [*See* Bill Meagher March 20, 2014 Article (Doc. #46, Appx. C) at 3 ("[r]epresentatives of . . . Finra . . . declined to comment."); Bill Meagher December 6, 2013 Article (Doc. #46, Appx. D) at 2 ("Finra and SEC officials declined to comment for this story."); Bill Meagher April 16, 2014 Article at 5 ("[FINRA] did not make anyone available to comment for this story."), attached hereto as **Appendix B**.[2]]  The remaining article discusses a general investor alert issued by FINRA, and has nothing to do with any of the plaintiffs to this action or with non-parties SCA or Alpine Securities. [*See* Bill Meagher September 17, 2013 Article, attached hereto as **Appendix C**.[3]]  This Court can accordingly disregard plaintiffs' arguments regarding any publication by FINRA to Meagher (which facts were in any

---

[1] FINRA did not contend, as the Hurrys suggest, that only two articles existed.  Rather, given the difficulty in parsing their lengthy complaint, it appeared the only allegations of defamatory statements against the plaintiffs to this case existed in two of the four articles referenced.  Because the Hurrys now clarify that they consider these part of their defamation claim, they are discussed herein.

[2] The April 16, 2014 article from Bill Meagher was expressly referenced in plaintiffs' complaint (at ¶ 216), and therefore can be considered without converting this motion to dismiss to one for summary judgment. *See Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 775 (D. Ariz. 2009).

[3] The September 17, 2013 article from Bill Meagher was expressly referenced in plaintiffs' complaint (at ¶¶ 177, 190), and therefore can also be considered without converting this motion to dismiss to one for summary judgment. *See Teamsters Local 617 Pension*, 633 F. Supp. 2d at 775.

- 12 -

event not alleged in the complaint) because such arguments are demonstrably false from the face of the articles in question themselves.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.").

**I.  Plaintiffs' Interference Claim (Claim X) Fails Because They Have Not Alleged Knowing Or Intentional Interference With Their Banking Relationships**

The Hurrys argue (at 14) that "[w]hether [FINRA]'s statements to Meagher as incorporated into his published articles caused the banks to cease doing business with Plaintiffs presents a classic question of fact."  There is no question of fact, however, because the articles themselves flatly contradict any notion that FINRA spoke with Meagher at all.  [*See* Bill Meagher March 20, 2014 Article (Doc. #46-3) at 4 ("[r]epresentatives of . . . Finra . . . declined to comment."); Bill Meagher December 6, 2013 Article (Doc. #46-4) at 3 ("Finra and SEC officials declined to comment for this story."); Bill Meagher April 16, 2014 Article (Appendix B) at 5 ("[FINRA] did not make anyone available to comment for this story.").]  Because the Hurrys' entire argument hinges on FINRA's purported (but unalleged) comments to Meagher, this claim must fail. *See Sprewell*, 266 F.3d at 988.

**J.  Plaintiffs' Public Disclosure Claim (Claim XI) Fails Because Any Disclosed Fact Was Not Private And Was A Matter Of Legitimate Public Concern**

The Hurrys fail (at 20–21) to cite a single case to support their contention that reporting on a regulatory investigation of a publicly-traded company and a company subject to FINRA's regulatory authority somehow is not a matter of legitimate public concern.  Moreover, the Hurrys baldly assert (at 20), without citation even to their own complaint, that "[m]uch of the information disclosed by [FINRA] was private and confidential."

But the test is not whether a party *subjectively* considered information to be confidential; the test is whether the disclosed information is *objectively* of public concern. *See, e.g.*, *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, *or when it is a subject of legitimate news*

*interest*; that is, *a subject of general interest* and of value and concern to the public.")
(emphasis added) (quotations and citations omitted).  Were it otherwise, nearly every
subject of a news story could plausibly allege a claim for public disclosure of private
facts.  Matters regarding the regulatory investigation of financial companies are squarely
and inarguably within the public concern and therefore this claim should be dismissed.

**K.    Plaintiffs' False Light Claim (Claim XII) Fails Because They Do Not Allege FINRA Gave Publicity To Any Matter**

The Hurrys' false light claim fails because, as explained above, the Meagher
articles explicitly state that FINRA did not contribute to them, and thus those articles
cannot support the Hurrys' claims. [*See generally* Doc. ##46-3, 46-4; Appx. A, B.]
Without a publication by FINRA at all, the claim must fail for this reason alone.  *See
Hart*, 190 Ariz. at 280, 947 P.2d at 854 (false light exists only where plaintiff alleges
defendants "knowingly or recklessly published false information or innuendo about the
plaintiff that a reasonable person would find highly offensive.").  Moreover, the Hurrys'
assertion (at 22) that the fact of an investigation can place someone in a false light is
absurd; if every time a regulatory or enforcement agency conducted an investigation it
gave rise to liability for a false light tort claim, the ability to enforce any law would be
severely undermined.  Finally, the articles—which form the only basis for this claim—
speak for themselves, and the Court can examine for itself the minimal extent to which
John Hurry is even mentioned in them. [*See generally* Doc. ##46-3, 46-4; Appx. A, B.]
No other plaintiffs are mentioned in those articles.

**L.    No State Action Supports Plaintiffs' *Bivens* Claim (Claim XIII)**

The Hurrys' sole authority regarding the alleged presence of state action is a
factually distinguishable case in which FINRA and the SEC acknowledged in writing that
they were engaged in a joint, coordinated investigation.  *See In re Frank Quattrone*,
Release No. 53547 (Mar. 24, 2006).  The Hurrys have not alleged, and cannot allege, that
such a joint investigation agreement (written or otherwise) exists here.

The Hurrys do not dispute that every court that has considered the question of
whether FINRA or its predecessors were state actors has reached the conclusion that they
are not.  *See, e.g.*, *Epstein v. SEC*, 416 Fed. App'x 142, 148 (3d Cir. 2010) ("[Appellant]

- 14 -

cannot bring a constitutional due process claim against [FINRA], because '[FINRA] is a private actor, not a state actor.'"); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) ("It has been found, repeatedly, that [FINRA] itself is not a government functionary."); *Desiderio v. NASD*, 191 F.3d 198, 206 (2d Cir. 1999) (FINRA "is a private actor, not a state actor.  It is a private corporation that receives no federal or state funding.  Its creation was not mandated by statute, nor does the government appoint its members or serve on any [FINRA] board or committee.");  *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d Cir. 1979) ("[FINRA] is not a state agency; therefore, First Jersey is unable to state a claim under section 1983."); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001) ("[T]he court is aware of no case . . . in which [FINRA] Defendants were found to be state actors either because of their regulatory responsibilities or because of any alleged collusion with criminal prosecutors.").

Moreover, the Hurrys ignore entirely the law regarding what conduct is required to create state action in the context of a self-regulatory organization such as FINRA.  *See, e.g.*, *D.L. Cromwell*, 279 F.3d at 163 (despite parallel government investigation, no state action when "the Rule 8210 demands issued directly from [FINRA] as a product of its private investigation . . . [and] none of the [Rule 8210] demands was generated by governmental persuasion or collusion."); *Desiderio*, 191 F.3d at 207 ("[A] state is responsible for a private decision only where it exercised coercive power or provided significant encouragement.") (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982)); *SEC v. McGinn*, 2011 U.S. Dist. LEXIS 54416, at *13–14 (N.D.N.Y. 2011) (parallel investigations by FINRA and the SEC do not amount to state action by FINRA).  Even accepting as true the Hurrys' assertion (at 24) that parallel investigations by FINRA and the SEC were ongoing, the Supreme Court has held that such allegations are insufficient as a matter of law to defeat a motion to dismiss.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 548–49 (2007) ("The question in this putative class action is whether a . . . complaint can survive a motion to dismiss when it alleges that [defendants] engaged in certain parallel conduct . . . **absent some factual context suggesting agreement, as distinct from identical, independent action**.  We hold that such a complaint should be dismissed.") (emphasis added).  Accordingly, this claim should be dismissed.

- 15 -

1

**M.**       **Plaintiffs' Conspiracy To Violate Civil Rights Claim (Claim XIV) Fails**

2

The Hurrys suggest (at 25) that the intracorporate conspiracy doctrine does not

3

apply to 42 U.S.C. § 1985(2) claims, and that the Ninth Circuit has not adopted the

4

doctrine.  Although the Ninth Circuit declined to decide the issue in 1993, it has since

5

become clear that the position the Hurrys advance is a receding minority position, and

6

most significantly, one that previously has been rejected by this Court.  *See, e.g.*, *Wolde-*

7

*Giorgis v. Dillard*, No. CV 06-0289-PHX-MHM, 2006 U.S. Dist. LEXIS 71356 (D. Ariz.

8

Sept. 22, 2006) ("The majority of the circuit courts have held that the intracorporate

9

conspiracy doctrine applies to § 1985 actions, although the Ninth Circuit has not yet

10

decided the issue. This Court finds persuasive the rationale of the majority of the circuit

11

courts of appeal.") (citing *Portman v. County of Santa Clara*, 995 F.2d 898, 910 (9th Cir.

1993)).

12

Moreover, the Hurrys ignore that they have alleged no harm to them or any of their

13

businesses based on the purported violation of § 1985(2), and their claim must fail for this

14

reason as well.  *See Portman*, 995 F.2d at 909 ("[T]o make out a claim based on

15

retaliation under the first clause of section 1985(2), a plaintiff must prove four

16

elements: . . . (4) resulting in injury or damages to the plaintiff.").

17

**Conclusion**

18

For the foregoing reasons, all of plaintiffs' claims should be dismissed with

19

prejudice pursuant to Fed. R. Civ. P. 12(b)(1) and (6), and FINRA and Andersen should

20

be awarded their attorneys' fees and costs pursuant to A.R.S. § 12-341.01.

21

RESPECTFULLY SUBMITTED this 10th day of June, 2015.

22

23
  */s/ Gregory A. Davis*
George Brandon
Gregory A. Davis

24
Gregory S. Schneider

25
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700

26
Phoenix, Arizona 85004

27
Attorneys for Defendants Financial Industry
Regulatory Authority, Inc. and Scott M. Andersen

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2015, I electronically filed the foregoing document with the Court using the CM/ECF System for filing and service on plaintiffs as listed below:

Robert A. Mandel
Taylor C. Young
Jennifer M. Perkins
taylor@mandelyoung.com
MANDEL YOUNG PLC
3001 E. Camelback Rd., Suite 140
Phoenix, Arizona 85016
Attorneys for Plaintiffs

*/s/ Sara Ramirez*