George Brandon (No. 017947) george.brandon@squirepb.com
Gregory A. Davis (No. 025976) gregory.davis@squirepb.com
Gregory Schneider (No. 029660) gregory.schneider@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona  85004
Telephone: (602) 528-4000
Facsimile: (602) 253-8129
Attorneys for Defendants Financial Industry Regulatory Authority, Inc.
and Scott Andersen

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife; Investment Services Corporation, an Arizona corporation, et al., | Case No. 14-cv-02490-PHX-ROS |
| Plaintiffs, | **MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, FINRA** |
| v. | **(Assigned to the Hon. Roslyn O. Silver)** |
| Financial Industry Regulatory Authority, Inc., a Delaware corporation, | **Oral Argument Requested** |
| Defendant. | |

## Introduction

The only remaining claims in this lawsuit are for defamation and false light, regarding news articles Bill Meagher published about the Hurrys' involvement in the alleged "pump-and-dump" of the penny-stock Biozoom, Inc. ("Biozoom").  [Second Amended Complaint ("SAC") (Doc. 71) at ¶¶ 327–331, 381–385.]  Without any evidence to support their claims, plaintiffs (collectively, the "Hurrys") allege that Financial Industry Regulatory Authority, Inc. ("FINRA") was Mr. Meagher's source for the articles, and thus that FINRA is liable for the purportedly defamatory information Mr. Meagher published.  [*See* Opposition to Motion to Dismiss (Doc. 76) at 10–11.]

In resolving FINRA's motion to dismiss these claims, the Court observed that "[t]his is . . . a very close call," but nevertheless permitted the Hurrys' claims to proceed to discovery because the Hurrys alleged that (1) "the leaks either did not or could not originate with SCA, Alpine, the Hurrys, or any other entity or individual associated with the Hurrys," and (2) "[t]he SEC categorically denied disseminating such information to the press." [*See* Order Granting in Part and Denying in Part FINRA's Motion to Dismiss (Doc. 81) at 5; *see also* SAC at ¶¶ 336, 338.]

The inference, however, that the Court was required to draw from those allegations—that Mr. Meagher's source was neither an employee of Scottsdale Capital Advisors ("SCA"), a broker-dealer owned by the Hurrys, nor the Securities and Exchange Commission ("SEC")—has been shown through discovery to be false. Indeed, during discovery, Eric Miller, a former senior employee of SCA, admitted to being Mr. Meagher's source. [*See* Separate Statement of Material Facts ("SOF") at ¶ 17.] The SEC also acknowledged in a March 2017 letter that its "investigation relating to whether Mr. Meagher received non-public information from the SEC" was then still "ongoing," and that it could not categorically deny being Mr. Meagher's source. [*Id*. at ¶ 41.]

Discovery has also shown that (1) Mr. Meagher admitted in writing that FINRA was not his source, (2) FINRA's own internal investigation concluded that FINRA was not Mr. Meagher's source, and (3) nearly all the information in Mr. Meagher's articles about SCA's involvement with Biozoom was disclosed in publicly-available court filings months before the publication of the articles at issue. [*See id*. at ¶¶ 19, 23, 38–9.]

The Hurrys' theory of the case has been disproven, and Mr. Meagher's source has been revealed to them. [*See id*. at ¶ 17.] Indeed, the Hurrys have recently sued Mr. Miller directly, apparently as a result of his sworn testimony in this case. [*Id*. at ¶ 44.] Yet the Hurrys nonetheless persist in their now-untenable claims against FINRA. But the evidence adduced during discovery demonstrates that no reasonable juror could conclude that it is more likely than not that FINRA published the allegedly defamatory statements to Mr. Meagher. Because such publication is an essential element of the Hurrys' claims, summary judgment to FINRA should be granted. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)* ("Where the record taken as a whole

- 2 -

could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."); *see Turner v. Devlin*, 174 Ariz. 201, 204 (1993) (defamation requires publication); *see Desert Palm Surgical Group, PLC v. Petta*, 236 Ariz. 568, 579–580, ¶ 29 (App. 2015) (false light requires publication).

**Factual Background**

**I.   Biozoom, Eric Miller, and the SEC complaint.**

Biozoom, a penny-stock company whose shares were traded on the Over-the-Counter Bulletin Board (the "OTCBB"), was incorporated in 2007 as Entertainment Arts, Inc.  [SOF at ¶ 1.]  By April 2013, Entertainment Arts, Inc. had changed its name to Biozoom, Inc. and announced that it was entering the biomedical industry.  [*Id*. at ¶ 2.] "On May 22, 2013, Biozoom and other entities began to tout that Biozoom had 'created the world's first portable, handheld consumer device to instantly and non-invasively measure certain biomarkers.'  This promotional campaign caused a dramatic increase in Biozoom's stock price, which peaked at over $4 per share."  [*Id*. at ¶ 3.]

On June 12, 2013, Eric Miller, then an employee of SCA, secretly contacted SCA's regulator, FINRA, to discuss the abnormal trading in Biozoom by SCA's clients and "further patterns of organized successful attempts to pump and dump and [to] commit fraud by wiring funds out of the country for the benefit of a third party controlling the whole thing."  [*Id*. at ¶ 4.]  Less than two weeks after Mr. Miller exposed SCA's trading practices regarding Biozoom, the SEC suspended trading in Biozoom stock for what it described as "a lack of current and accurate information concerning the securities of Biozoom," and because Biozoom and others "may be engaged in an unlawful distribution of securities through the OTCBB."  [*Id*. at ¶ 5.]

Shortly thereafter, on July 3, 2013, the SEC filed a lawsuit alleging violations of federal securities laws (the "Biozoom Action") against shareholders of Biozoom, including SCA clients who were referenced in Mr. Miller's email to FINRA.  [*Id*. at ¶ 6.]

**II.   The four Meagher articles in dispute.**

Bill Meagher is a financial reporter that writes for an on-line publication, *The Deal*

*Pipeline*.  [*Id*. at ¶ 7.]  Four of his articles, dated September 13, 2013,[1] December 6, 2013, March 20, 2014, and April 16, 2014, are referred to in the SAC, and are alleged by the Hurrys to include statements FINRA purportedly made to Mr. Meagher.  [*Id*. at ¶ 8.]

### A.    Article dated September 13, 2013.

Mr. Meagher's September 13, 2013 article is titled "Finra [sic] targets a dozen offshore firms suspecting [sic] of trading in pump-and-dumps."  [*Id*. at ¶ 9.]  In the article, Mr. Meagher contends to have obtained "Fraud Surveillance reports" that were created by FINRA's Office of Fraud Detection and Market Intelligence, and which, according to Mr. Meagher, were "sent to the SEC in 2012 and 2013."  [*Id*. at ¶ 10.]

The September 2013 article does not reference Biozoom, and instead describes how "[i]n the past two years, the Financial Industry Regulatory Authority has asked the Securities and Exchange Commission to investigate at least a dozen offshore banks and brokerage houses that have generated at least $37 million in total proceeds from suspicious trading in companies linked to pump-and-dump schemes."  [*Id*. at ¶ 11.]  SCA is referenced only twice in Mr. Meagher's September 2013 article.  [*Id*. at ¶ 12.]  The substance of those references is as follows:

- "FINRA [fraud surveillance reports] said that trading records obtained from U.S.-based brokers Scottsdale Capital Advisors, Vertical Group, and Knight Execution & Clearing Services LLC showed that the offshore traders bought Goff in March and sold the stock by April, as the share price rose from 20 cents to 65 cents."  [*Id*.]

- "Clearwater Securities of Belize made $4 million trading Goff shares, according to Finra [sic] [fraud surveillance reports].  The firm's trading account with Scottsdale Capital was opened in April 2012 by Philip Kueber.  He has been referred to the SEC by Finra [sic] at least eight times for his alleged involvement with pump-and-dump schemes . . . ."  [*Id*.]

Prior to publishing his September 13, 2013 article, Mr. Meagher wrote an email to Nancy Condon, the Vice President for Media and External Communication at FINRA, informing her that he had reviewed "a group of FINRA internal reports that were

---

[1] The Hurrys reference an article by Mr. Meagher dated September 17, 2013 in ¶¶ 177 and 333 of the SAC, but quote directly from Mr. Meagher's September 13, 2013 article.

forwarded to the SEC," and was "doing a story about FINRA advising the SEC of a [sic] suspicious trading by offshore bank and trading houses in regards to pump and dumps." [*Id*. at ¶ 13.]  Ms. Condon denied comment, stating "Bill—I am sorry—but since you will be writing about confidential communications between FINRA and the SEC that we did not provide you—I can't have my people in the story." [*Id*. at ¶ 14.]  Mr. Meagher's September 13, 2013 article ran with the disclaimer that "[o]fficials from . . . Finra [sic], which regulates broker-dealers, declined to comment for this story." [*Id*. at ¶ 15.]

### B.      Article dated December 6, 2013.

Mr. Meagher's December 6, 2013 article is titled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, sources say." [*Id*. at ¶ 16.]  It is the first of three articles Mr. Meagher wrote regarding SCA's involvement with the sale of Biozoom stock.  [*Id*.]

Mr. Meagher's source for the article was Eric Miller, the SCA employee who also provided information to FINRA regarding SCA's involvement in the alleged pump-and-dump of Biozoom stock, and who participated in a phone call about Biozoom with the SEC, FINRA, and to a lesser extent, the FBI.  [*Id*. at ¶ 17.]  Mr. Miller admitted at his deposition that he told the reporter:

- The SEC and FINRA had opened an investigation into the involvement of SCA and Alpine Securities in the trading of Biozoom [*Id*.];

- The six Biozoom shareholders who held SCA accounts opened them within the same week [*Id*.];

- The handwriting on the SCA account applications for the Biozoom shareholders was the same [*Id*.];

- The answers to questions on the Biozoom shareholders' due diligence packages were very similar [*Id*.];

- The Biozoom shareholders held accounts at the same banks in Cypress, Switzerland, and Panama [*Id*.];

- The email addresses of the Biozoom shareholders were opened within a week of each other, and each contain the account holders' last name [*Id*.];

- "These shareholders were brought in for this.  It's as simple as that.  They are retired teachers, a deli owner, but they come in with millions of shares of stock.  They only trade Biozoom and they are directing trades using traders' lingo, telling them which market makers to use for the trades?  Come on.  They were straw men for whoever is behind this whole thing," which quote Mr. Meagher attributed to "a person with knowledge of the investigations" [*Id*.];

- Biozoom shareholders enjoyed special perks not available to other SCA clients, like paying 2% per transaction despite that typical SCA clients paid 4–4.5% per transaction, and like being permitted to make trades using instant messaging despite that typical SCA clients were prohibited from making trades in that manner [*Id*.];

- Contrary to SCA policy, Biozoom shareholders, who all lived in Argentina, were allowed to send funds to Cypress, Switzerland, Panama, and Belize. [*Id*.];

- SCA disregarded red flags that were raised regarding Biozoom trades [*Id*.];

- FINRA had several on-the-record conversations with SCA staff regarding the trading of Biozoom shares, the process by which the SCA accounts were opened, and how assets were moved offshore [*Id*.]; and

- SCA staff members who had talked with FINRA regarding Biozoom trades include Timothy Scarpino, Tim DiBlasi, Liz Arndt, Henry Diekman, Jay Noiman, Michael Cruz, Adam Fiandaca, and Ted Ashton.  [*Id*.]

In addition to using Eric Miller as a confidential source, Mr. Meagher notes that the information in his December 6, 2013 article originated from the July 3, 2013 SEC complaint in the Biozoom Action and the July 9, 2013, declaration of SEC Assistant Director, Ricky Sachar, filed in support of that SEC complaint.  [*Id*. at ¶ 18.]  In fact, much of what Mr. Meagher published in his December 6, 2013 article was information contained in documents previously filed by the SEC in the Biozoom Action that had been in the public domain since July 2013, including:

- The names, email address, alleged occupation, and nationality of the SCA Biozoom shareholders [*Id*. at ¶ 19];

- That the SCA Biozoom shareholders created their email address domain names in the same month using the same regional internet registry [*Id*.];

- The dates each of the SCA Biozoom shareholders opened an account at SCA, each shareholder's account number at SCA, and the content of a security deposit checklist each shareholder provided to SCA [*Id.*];

- That each of the SCA Biozoom shareholders submitted nearly identical attorney opinion letters regarding the applicability of various safe-harbors or statutory exemptions, and that each of those opinion letters were subsequently withdrawn [*Id.*];

- That between May 15, 2013 and June 21, 2013 the daily trading volume in Biozoom shares increased from 0 shares per day to 11,657,600 shares per day [*Id.*];

- That during the same period Biozoom's stock price rose from $1.10 per share to over $4 per share [*Id.*];

- Specific information regarding the SCA Biozoom shareholders' sale of their stock at a time when Biozoom's stock price and trading volume rose dramatically, including the number of shares sold, the date of the various transactions, and the millions of dollars in proceeds each SCA Biozoom shareholder obtained as a result of their sales [*Id.*];

- That each of the SCA Biozoom shareholders placed their sell orders using e-mail or instant messaging [*Id.*];

- That none of the SCA Biozoom shareholders traded in any security other than Biozoom; [*Id.*] and

- The name and location of the financial institutions to which the SCA Biozoom shareholders attempted to wire the proceeds of their stock sales.  [*Id.*]

Prior to publishing his December 6, 2013 article, Mr. Meagher sought a comment from FINRA.  [*Id.* at ¶ 20.]  Michelle Ong, a Director in the Media and External Communication department of FINRA, denied comment, stating "we have not provided this information to you and have nothing for you on it."  [*Id.* at ¶ 21.]  In response to Ms. Ong's email, Mr. Meagher acknowledged that his source did not come from FINRA.  [*Id.* at ¶ 22.]  Indeed, Mr. Meagher explained that "you are certainly correct in that I did not learn about a probe that tied to trading in Biozoom from Finra [sic].  Rather, I have spoken with someone who has knowledge of the investigation."  [*Id.* at ¶ 23.]

To that end, Mr. Meagher's December 6, 2013 article explained that "Finra [sic] . . . officials declined to comment for this story."  [*Id*. at ¶ 24.]

### C.      Article dated March 20, 2014.

On March 20, 2014, Mr. Meagher published an article titled "SEC requests default judgment in $34M Biozoom pump-and-dump case."  [*Id*. at ¶ 25.]  In the article, Mr. Meagher provides an update regarding the procedural posture of the Biozoom Action. [*Id*. at ¶ 26.]  The March 20, 2014 article contains little new information about SCA, and instead repeats much of the information first published in the December 16, 2013 article, which information Mr. Meagher obtained from SCA employee, Eric Miller.  [*Id*. at ¶ 27.]

Mr. Meagher stated in his March 20, 2014 article that "[r]epresentatives from . . . Finra [sic] . . . declined to comment."  [*Id*. at ¶ 28.]

### D.      Article dated April 16, 2014.

Mr. Meagher published an article on April 16, 2014, titled "Finra [sic] focusing on money-laundering violations."  [*Id*. at ¶ 29.]  The principal focus of Mr. Meagher's April 16, 2014 article is FINRA's alleged increased enforcement of its existing anti-money laundering rules.  [*Id*. at ¶ 30.]  In the April 16, 2014 article, Mr. Meagher repeats, for the second time, information Eric Miller gave him regarding SCA's involvement in the alleged pump-and-dump of Biozoom stock.  [*Id*. at ¶ 31.]

The only new information Mr. Meagher published about SCA in his April 16, 2014 article related to an unannounced FINRA examination of SCA that occurred on March 10, 2014.  [*Id*. at ¶ 32.]  Eric Miller admitted during his deposition that he was Mr. Meagher's source for this new information.  [*Id*. at ¶ 33.]

Like all the other articles at issue in this matter, Mr. Meagher's April 16, 2014 articles provides that "Finra [sic] . . . did not make anyone available to comment for this story."  [*Id*. at ¶ 34.]

### III.    FINRA's internal investigation of alleged leaks.

Presumably unaware that their own employee was Mr. Meagher's source, the Hurrys pointed the finger at FINRA when Mr. Meagher published news articles containing information linking SCA to irregular Biozoom transactions.  [*Id*. at ¶ 35.] Shortly after Mr. Meagher published his first article about SCA's involvement with

- 8 -

Biozoom, SCA's in-house counsel wrote a letter to FINRA's Office of the Ombudsman, an internal but impartial and independent group at FINRA, requesting that FINRA open an investigation into the source of the alleged "leak." [*Id*. at ¶ 36.] FINRA promptly complied with that request, and on January 14, 2014, FINRA's Office of the Ombudsman began investigating whether Mr. Meagher's source was FINRA. [*Id*. at ¶ 37.]

The investigation performed by FINRA's Office of the Ombudsman was exceedingly thorough and included at least the following investigative steps:

- Analyzing Mr. Meagher's articles to determine that significant portions of the articles contained publicly-available information regarding SCA and Biozoom [*Id*. at ¶ 38];

- Determining who had access to the FINRA "fraud surveillance" reports referenced in Mr. Meagher's September 13, 2013 article, and concluding that such reports were provided to the SEC in the normal course of FINRA's business prior to Mr. Meagher's publication [*Id*.];

- Identifying all FINRA employees that accessed such reports and evaluating their business and/or regulatory need for such access [*Id*.];

- Interviewing six FINRA employees who accessed the "fraud surveillance" reports referenced in Mr. Meagher's September 13, 2013 article to confirm that reasonable procedures were followed to safeguard the confidentiality of the reports [*Id*.];

- Reviewing every email FINRA and Mr. Meagher exchanged between January 1, 2012 and December 31, 2013 [*Id*.];

- Reviewing every email FINRA exchanged with anyone using the domain "thedeal.com" between January 1, 2012 and December 31, 2013 [*Id*.];

- Reviewing every email FINRA and Mr. Miller exchanged between January 1, 2012 and December 31, 2013 [*Id*.];

- Conducting a keyword-driven search for any other emails discussing Mr. Meagher's queries, regulatory staff requests for copies of confidential regulatory information about SCA, and planning of various routine examinations of SCA [*Id*.];

- Reviewing FINRA desktop and blackberry telephone records for calls to/from Mr. Meagher and to/from Mr. Miller [*Id*.];

- Interviewing the two FINRA media relations employees who had communicated with Mr. Meagher [*Id*.]; and

- Reviewing the computer hard drive and network drive of former FINRA employee Scott Andersen.  [*Id*.]

After finishing its investigation regarding Mr. Meagher's source, FINRA's Office of the Ombudsman concluded that "there was no indication that staff had inappropriate communications with either [Mr. Miller] or [Mr. Meagher], or other persons at The Deal publishing company. . . . [and that it] has found no evidence that FINRA staff leaked information to [Mr. Meagher]." [*Id*. at ¶ 39.]  FINRA conveyed the results of its investigation to SCA, but the Hurrys nevertheless filed this lawsuit.  [*Id*. at ¶ 40.]

<u>Argument</u>

**I.    <u>Legal standard.</u>**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is only genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is only material if it "might affect the outcome of the suit." *Id.*

FINRA does not bear the burden of proof at trial, and it may therefore "carry its initial burden of production by . . . show[ing] that the [Hurrys do] not have enough evidence of an essential element of [their] claim . . . to carry [their] ultimate burden of persuasion at trial." *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  Rather, the burden shifts to the nonmoving party to "introduce some significant probative evidence tending to support the complaint." *Summers v. A. Teichert & Son*, 127 F.3d 1150, 1152 (9th Cir. 1997) (quotation omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citation omitted).

**II.**   <u>**No reasonable juror could conclude that FINRA was Mr. Meagher's source**</u>.

Publication from FINRA to Mr. Meagher is an essential element of the Hurrys'
remaining claims.  *See* *Turner*, 174 Ariz. at 204; *Desert Palm*, 236 Ariz. at 580, ¶ 29.
Proving such publication requires, under the doctrine of *respondeat superior*, that the
Hurrys present evidence (1) identifying the FINRA representative who purportedly
conveyed the defamatory information to Mr. Meagher, and (2) demonstrating that the
defamatory information was conveyed to Mr. Meagher in the course and scope of that
FINRA representative's employment. *See, e.g.*, *Phx. Newspapers v. Church*, 24 Ariz.
App. 287, 301 (1975) ("[W]ellsettled [sic] principles of agency law [only make] the
employer liable for defamatory statements made by an employee acting within the scope
of his employment."); Restatement (Second) of Agency, § 247 (2010).  The Hurrys can
present no evidence on either of these points, and for that reason alone summary
judgment should be granted to FINRA.

FINRA's motion for summary judgment should also be granted because the only
reasonable conclusion that can be drawn from the evidence is that FINRA was not Mr.
Meagher's source.  The "facts" the Hurrys have referenced in the parties' Joint Status
Report are merely a combination of false, irrelevant, inconsequential, or inadmissible
statements that could not allow a reasonable juror to conclude by a preponderance of the
evidence that FINRA published defamatory statements about the Hurrys to Mr. Meagher.
*See* *Liberty Lobby*, 477 U.S. at 252.  A jury trial is not warranted, and judgment should be
entered in favor of FINRA dismissing the Hurrys' claims.

**A.**   <u>**Substantial evidence demonstrates FINRA was not Mr. Meagher's source.**</u>

Evidence obtained during discovery overwhelmingly demonstrates that the source
for Mr. Meagher's alleged defamatory statements was not FINRA, and instead that Mr.
Meagher's sources were Mr. Miller and publicly-filed documents in the Biozoom Action.

Eric Miller has admitted that he was Mr. Meagher's source.  [*See* SOF at ¶ 17.]
Indeed, it was Mr. Miller that blew the whistle to FINRA regarding SCA's "attempts to
pump and dump and [to] commit fraud by wiring funds out of the country." [*See id.* at ¶
4.]  It was Mr. Miller who called Mr. Meagher and shared with him dozens of

confidential facts regarding irregularities in SCA's trading of Biozoom stock.  [*See id.* at ¶ 17.]  And it was Mr. Miller who told Mr. Meagher that "[t]hese shareholders were brought in for this.  It's as simple as that.  . . .  They were straw men for whoever is behind this whole thing."  [*Id.*]  The Hurrys attempt to explain away Mr. Miller's admissions by theorizing that he and FINRA could have each shared the same information with Mr. Meagher.  But there is, of course, no evidence to support this assertion.  Furthermore, the Hurrys cannot show, as they must to survive summary judgment, that their alleged damages were caused by FINRA's supposed publication to Mr. Meagher, and not by Mr. Miller's publications, which Mr. Meagher directly quotes in his articles.  *See Morris v. Warner*, 160 Ariz. 55, 62 (App. 1988); [*see also* SOF at ¶ 17.]

Lest there be any doubt about FINRA's alleged involvement, Mr. Meagher confirmed in contemporaneous correspondence with FINRA that FINRA was not his source.  [*See* SOF at ¶ 23 ("you are certainly correct in that I did not learn about a probe that tied to trading in Biozoom from Finra [sic].  Rather, I have spoken with someone who has knowledge of the investigation.").]  Mr. Meagher also stated in each of the articles that FINRA declined to comment.  [*See id.* at ¶¶ 15, 24, 28, 34.]

Additionally, at the time Mr. Meagher published the articles detailed information regarding SCA's involvement with the alleged Biozoom pump-and-dump had been publicly available for months in documents filed in the Biozoom Action.  [*See id.* at ¶ 19.]  The evidence demonstrates that Mr. Meagher used those filings to obtain information he did not obtain from Mr. Miller.  For example, in his December 6, 2013 article, Mr. Meagher quotes directly from an email that attorney David Wise sent SCA withdrawing his legal opinion regarding the legality of the Biozoom trades, which quote first appeared in the declaration of Ricky Sachar in the Biozoom Action on July 9, 2013.  [*See id.*]  Mr. Meagher even expressly acknowledged in his December 6, 2013 article that some of the information he published had originated from documents filed in the Biozoom Action.  [*Id.* at ¶ 18.]

The results of FINRA's internal investigation further support the conclusion that FINRA was not Mr. Meagher's source.  FINRA's Office of the Ombudsman conducted a comprehensive internal investigation that included, among other things, reviewing

thousands of emails and phone records, formally interviewing eight FINRA employees, analyzing employee computer hard drives and network drives, and evaluating the circumstances surrounding the access of confidential FINRA documents that were sent to the SEC.  [*See id.* at ¶ 38.]  The Office of the Ombudsman concluded at the end of that investigation that it "found no evidence that FINRA staff leaked information to the reporter."  [*See id.* at ¶ 39.]

### B.   The Hurrys proffer no evidence that FINRA published defamatory information about SCA to Mr. Meagher.

The Hurrys can present no direct evidence that FINRA published defamatory information about SCA to Mr. Meagher.  No emails; no letters; no phone calls; no in-person communications; indeed, nothing.  Each of the five representatives of plaintiffs that were deposed in this matter similarly conceded having no personal knowledge of any alleged publication between FINRA and Mr. Meagher.  [*Id.* at ¶ 43.]  Rather, the Hurrys have argued throughout this case that circumstantial evidence points to FINRA as the source of alleged defamatory statements in Mr. Meagher's articles.  But what the Hurrys call circumstantial evidence are really just self-serving and unreasonable inferences drawn from innocuous facts, which facts, as discussed below, cannot show by a preponderance of the evidence that FINRA was Mr. Meagher's source.

### 1.   Information in Mr. Meagher's September 13, 2013 article.

The Hurrys assert that Mr. Meagher received information that "had to have come from FINRA . . . ."  [Joint Status Report (Doc. 168) at 2.]  There is no evidence to support that argument.  The evidence shows that Mr. Meagher's September 13, 2013 article described information contained in reports drafted by FINRA's Office of Fraud Detection and Market Intelligence (the "Fraud Surveillance reports"), which reports the SEC also possessed.  [*See* SOF at ¶ 10.]  There is no evidence supporting the Hurrys' assumption that FINRA, and not the SEC, disclosed the content of the Fraud Surveillance reports to Mr. Meagher.  In fact, the evidence is to the contrary.  Whereas the SEC is still in the process of investigating "whether Mr. Meagher received non-public information from the SEC," FINRA has completed its own internal investigation and "found no evidence that FINRA staff leaked information to the reporter."  [*See id.* at ¶¶ 39, 41.]

The Hurrys' contention that the SEC nevertheless "told FINRA that it believed the leaks came from FINRA" is baseless. [*See* Joint Status Report (Doc. 168) at 2.] No disclosed SEC document or witness accuses FINRA of leaking information. And all FINRA witnesses deposed in this matter who were asked about their communications with the SEC testified that they either did not speak with the SEC or were not provided reports from the SEC regarding its internal leak investigation. [*See* SOF at ¶ 42.]

Moreover, the source of Mr. Meagher's knowledge regarding the content of the Fraud Surveillance reports is irrelevant for two reasons. First, the Hurrys do not even allege that Mr. Meagher's September 13, 2013 article or the Fraud Surveillance reports contain defamatory statements about SCA. That is made plain by the fact that the Hurrys do not reference the September 2013 article in their recently-filed defamation lawsuit against Mr. Meagher. [*See id.* at ¶ 45.] Second, it is unreasonable to infer that FINRA conveyed defamatory statements to Mr. Meagher regarding SCA's involvement with Biozoom merely because Mr. Meagher obtained truthful information from Fraud Surveillance reports regarding Goff, a different company altogether. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Asso.*, 809 F.2d 626, 631 (9th Cir. 1987) ("[T]here must be some limit on the extent of the inferences that may be drawn in the nonmoving party's favor from whatever 'specific facts' it sets forth; if not, Rule 56(e)'s requirement of 'specific facts' would be entirely gutted.").

### 2.    Mr. Miller's Denials.

Contrary to the Hurrys' argument, the mere fact that Mr. Miller did not admit to being the source for every statement in Mr. Meagher's articles does not allow the Hurrys to survive summary judgment. Mr. Miller's denial that he was Mr. Meagher's source regarding certain statements is not evidence that Mr. Meagher's source was FINRA. Such an inference is unreasonable and contrary to the evidence. For example, although Mr. Miller denied telling Mr. Meagher that attorney David Wise withdrew legal opinions he provided to SCA, such information was contained in publicly-available filings in the Biozoom Action for five months prior to Mr. Meagher's publication. [*See* SOF at ¶ 19.]

There is no evidence that any of the alleged defamatory statements Mr. Meagher published was known to FINRA alone, much less provided to him by FINRA.

### 3.    FINRA emails and interview notes.

Next, the Hurrys erroneously allege that "a FINRA public relations employee told the ombudsman that leaks happen all the time at FINRA, a statement that was consistent with statements made by FINRA employees in e-mails in the wake of the leaks to Mr. Meagher." [*See* Joint Status Report (Doc. 168) at 3.]  That assertion is false.  Nobody will testify that the FINRA employee in question, Michelle Ong, told anyone that leaks happen all the time at FINRA.  When she was deposed in this matter, Ms. Ong testified that she does not believe that leaks occur at FINRA.  [*See* SOF at ¶ 46 ("**Q:**  Okay.  Is it your belief that leaks occur all the time at FINRA?  **A:**  No.  **Q:**  Is it your belief that leaks ever occur at FINRA.  **A:**  No.").]  Ms. Ong also testified that any reference to "leaks" during her discussion with personnel from FINRA's Office of the Ombudsman related only to leaks in the media, and not to purported leaks at FINRA.  [*Id*. at ¶ 47.]

Similarly, there are no FINRA documents stating the leaks are common at FINRA.  Ms. Ong stated in an email that Mr. Meagher "definitely has his source(s)," which of course he did in the person of Eric Miller.  [*Id*. at ¶ 48.]  Ms. Ong did not state in her email that those sources were within FINRA, and when questioned about it at her deposition, she expressly denied believing Mr. Meagher had sources within FINRA.  [*Id*. at ¶ 49 ("**Q:**  Isn't it true that when you said that Mr. Meagher definitely had his sources, you believed that Mr. Meagher in fact had at least one person within FINRA who was communicating non-public information to him?  **A:**  No.").]

### 4.    FINRA's alleged motive.

Lastly, the Hurrys argue that summary judgment is not appropriate because FINRA purportedly (1) "had a motive to defame plaintiff" (2) "had a motive to try plaintiffs in the press" and (3) "had spent substantial sums of money . . . looking for evidence of [the Hurrys'] wrongdoing . . . ."  [*See* Joint Status Report (Doc. 168) at 4.]  There is not a shred of evidence to support these assertions.

Furthermore, the Hurrys' argument that allegations of motive are sufficient to defeat summary judgment in a defamation case has been rejected by a court considering the issue in a nearly identical circumstance.  In *DiFolco v. MSNBC Cable L.L.C.*, the plaintiff alleged that defendants were responsible for conveying defamatory information

to the authors of three web publications, who each subsequently published such information on the internet. *DiFolco v. MSNBC Cable L.L.C.* 831 F. Supp. 2d 634, 637–40 (S.D.N.Y. 2011).  Like FINRA here, the defendants in *DiFolco* denied "that they made or had any connection with the alleged defamatory statements." *Id*. at 644.  And like the Hurrys here, the plaintiff in *DiFolco* "assert[ed] that although there is no direct evidence linking Defendants to the statements, there is sufficient circumstantial evidence to create a material issue of fact." *Id*. at 645.  The Court in *DiFolco* rejected plaintiff's argument and granted the defendants' no-evidence motion for summary judgment. *See id.* at 645–46.  In doing so, the court in *DiFolco* explained that

> [T]he record is devoid of any evidence that any Defendant ever had any contact with any of the above websites or their administrators . . . Plaintiff attempts to salvage her defamation claims by asserting that one of the Defendants must be the source of the alleged defamatory statements because Defendants allegedly had the motive to harm her and the opportunity to do so because they were part of an alleged limited group of people who knew of Plaintiff's situation with [her employer]. But Plaintiff has cited no authority—and this Court has found none—in which bare allegations of motive and opportunity alone are sufficient to survive summary judgment where there is otherwise no record evidence tending to show that a defendant was the source of an alleged defamatory statement. Indeed . . . what Plaintiff refers to as 'circumstantial evidence' is nothing more than a reiteration of her unproven theory—based solely on her 'beliefs,' 'imagination,' and 'common sense'—that Defendants must be responsible for making the alleged defamatory statements. ***Theories and beliefs, however, are not enough to survive summary judgment. Evidence is required.***

*Id.* (emphasis added).

The Hurrys simply cannot present any "significantly probative" evidence demonstrating that it is more likely than not that FINRA, and not someone else, was Mr. Meagher's source. *Liberty Lobby*, 477 U.S. at 249–50 (citation omitted).  That summary judgment to FINRA is warranted becomes even more apparent "[w]here the record [is] taken as a whole," as is required. *See Matsushita*, 475 U.S. at 587.  Mr. Miller has admitted to being Mr. Meagher's source. [*See* SOF at ¶ 17.]  Mr. Meagher has declared in emails and his articles that FINRA was not his source. [*See id.* at ¶¶ 15, 23, 24, 28, 34.]  FINRA performed an internal investigation confirming it was not Mr. Meagher's source. [*See id.* at ¶¶ 37–9.]  And the alleged defamatory information contained in Mr.

Meagher's articles was publicly available in the Biozoom Action for months prior to his publication.  [*See id*. at ¶ 19.]  The overwhelming weight of the evidence is that FINRA was not Mr. Meagher's source.  Nothing the Hurrys present allows a reasonable juror to conclude that it is possible that FINRA is Mr. Meagher's source, let alone that it is more likely than not that FINRA is Mr. Meagher's source, which is the threshold required to survive summary judgment.  *Liberty Lobby*, 477 U.S. at 252 ("The judge's inquiry [on summary judgment], therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.").

Despite the fact that the Hurrys cannot present significantly probative evidence to support their assertion that FINRA published defamatory information about the Hurrys to Mr. Meagher, the Hurrys nevertheless contend that a trial is required so that a jury can evaluate the credibility of FINRA's denials.  That argument, however, runs contrary to the entire purpose of summary judgment, and if true would prevent summary judgment from being granted in any case.  Unsurprisingly, the Hurrys last-gasp argument has been squarely rejected by the Ninth Circuit Court of Appeals.  *See Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) (A party opposing summary judgment "may not simply rest on the hope of discrediting movant's evidence at trial.  Neither a desire to cross-examine affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment, unless other evidence about an affiant's credibility raises a genuine issue of material fact.").

## Conclusion

For the foregoing reasons, FINRA respectfully requests that the Court grant it summary judgment on both of the Hurrys' remaining claims.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

RESPECTFULLY SUBMITTED this 7th day of July, 2017.

_/s/ Gregory A. Davis_
George Brandon
Gregory A. Davis
Gregory Schneider
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
Attorneys for Defendants Financial Industry
Regulatory Authority, Inc. and Scott M.
Andersen

1

<u>**CERTIFICATE OF SERVICE**</u>

2

      I hereby certify that on July 7, 2017, I electronically filed the foregoing document

3

with the Court using the CM/ECF System for filing and service on plaintiffs as listed

4

below:

5

6         Joseph G. Adams                  Charles J. Harder

         Carlie Tovrea                      Jordan Susman

7         Snell & Wilmer L.L.P.            Harder Mirell & Abrams LLP

         One Arizona Center              132 S. Rodeo Drive, Fourth Floor

8         400 East Van Buren, Suite 1900     Beverly Hills, California 90212

         Phoenix, Arizona 85004-2022

9

                            *Attorneys for Plaintiffs*

10

11

*/s/ Sara Ramirez*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28