George Brandon (No. 017947) george.brandon@squirepb.com
Gregory A. Davis (No. 025976) gregory.davis@squirepb.com
Gregory Schneider (No. 029660) gregory.schneider@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona  85004
Telephone: (602) 528-4000
Facsimile: (602) 253-8129
Attorneys for Defendants Financial Industry Regulatory Authority, Inc. and Scott Andersen

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife; Investment Services Corporation, an Arizona corporation, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Financial Industry Regulatory Authority, Inc., a Delaware corporation,<br><br>Defendant. | Case No. 14-cv-02490-PHX-ROS<br><br>**SEPARATE STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT FINRA**<br><br>**(Assigned to the Hon. Roslyn O. Silver)**<br><br>**Oral Argument Requested** |

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a), defendant Financial Industry Regulatory Authority, Inc. ("FINRA") submits the following separate statement of facts in support of its motion for summary judgment on plaintiffs' (collectively, the "Hurrys") remaining claims.

**Undisputed Facts**

**I.    Biozoom, Eric Miller, and the SEC complaint.**

1.     Biozoom, Inc. ("Biozoom"), a penny-stock company whose shares were traded on the Over-the-Counter Bulletin Board (the "OTCBB"), was incorporated in 2007 as Entertainment Arts, Inc.  [Memorandum and Order (Doc. 68) at 2 in S.D.N.Y. Case No. 1:13-cv-04609 (the "Biozoom Action"), **Ex. 1** hereto.]

2.      By April 2013, Entertainment Arts, Inc. had changed its name to Biozoom, Inc. and announced that it was entering the biomedical industry. [*Id.* at 3.]

3.      "On May 22, 2013, Biozoom and other entities began to tout that Biozoom had 'created the world's first portable, handheld consumer device to instantly and non-invasively measure certain biomarkers.' This promotional campaign caused a dramatic increase in Biozoom's stock price, which peaked at over $4 per share." [*Id.* at 4.]

4.      On June 12, 2013, Eric Miller, then an employee of Scottsdale Capital Advisors ("SCA"), a broker-dealer owned by the Hurrys, secretly contacted SCA's regulator, FINRA, to discuss the abnormal trading in Biozoom by SCA's clients and "further patterns of organized successful attempts to pump and dump and [to] commit fraud by wiring funds out of the country for the benefit of a third party controlling the whole thing." [June 12, 2013 Email from Miller to FINRA, **Ex. 2** hereto.]

5.      Less than two weeks after Mr. Miller exposed SCA's trading practices regarding Biozoom, the Securities and Exchange Commission ("SEC") suspended trading in Biozoom stock for what it described as "a lack of current and accurate information concerning the securities of Biozoom," and because Biozoom and others "may be engaged in an unlawful distribution of securities through the OTCBB." [*See* SEC Release No. 34-69841 (June 25, 2013), **Ex. 3** hereto.]

6.      Shortly thereafter, on July 3, 2013, the SEC filed the Biozoom Action alleging violations of federal securities laws against shareholders of Biozoom, including SCA clients who were referenced in Mr. Miller's email to FINRA. [*See* Complaint (Doc. 1) in the Biozoom Action, **Ex. 4** hereto.]

**II.     The four Meagher articles in dispute.**

7.      Bill Meagher is a financial reporter that writes for an on-line publication, *The Deal Pipeline*. [*See* Hurrys' Second Amended Complaint ("SAC") at ¶ 177.]

8.      Four of his articles, dated September 13, 2013,[1] December 6, 2013, March 20, 2014, and April 16, 2014, are referred to in the SAC, and are alleged by the Hurrys to

---

[1] The Hurrys reference an article by Mr. Meagher dated September 17, 2013 in ¶¶ 177 and 333 of the SAC, but quote directly from Mr. Meagher's September 13, 2013 article.

include statements FINRA purportedly made to Mr. Meagher.  [*See id*. at ¶¶ 177, 192, 208, 216.]

### A.     Article dated September 13, 2013.

9.     Mr. Meagher's September 13, 2013 article is titled "Finra [sic] targets a dozen offshore firms suspecting [sic] of trading in pump-and-dumps."  [September 13, 2013 Article of Bill Meagher at 1, **Ex. 5** hereto.]

10.    In the article, Mr. Meagher contends to have obtained "Fraud Surveillance reports" that were created by FINRA's Office of Fraud Detection and Market Intelligence, and which, according to Mr. Meagher, were "sent to the SEC in 2012 and 2013."  [*See id.* at 1–2.]

11.    The September 2013 article does not reference Biozoom, and instead describes how "[i]n the past two years, the Financial Industry Regulatory Authority has asked the Securities and Exchange Commission to investigate at least a dozen offshore banks and brokerage houses that have generated at least $37 million in total proceeds from suspicious trading in companies linked to pump-and-dump schemes."  [*See id*. at 1.]

12.    SCA is referenced only twice in Mr. Meagher's September 2013 article. The substance of those references is as follows:

   a.     "FINRA [fraud surveillance reports] said that trading records obtained from U.S.-based brokers Scottsdale Capital Advisors, Vertical Group, and Knight Execution & Clearing Services LLC showed that the offshore traders bought Goff in March and sold the stock by April, as the share price rose from 20 cents to 65 cents."  [*Id.* at 2.]

   b.     "Clearwater Securities of Belize made $4 million trading Goff shares, according to Finra [sic] [fraud surveillance reports].  The firm's trading account with Scottsdale Capital was opened in April 2012 by Philip Kueber.  He has been referred to the SEC by Finra [sic] at least eight times for his alleged involvement with pump-and-dump schemes . . . ."  [*Id*.]

13.    Prior to publishing his September 13, 2013 article, Mr. Meagher wrote an email to Nancy Condon, the Vice President for Media and External Communication at FINRA, informing her that he had reviewed "a group of FINRA internal reports that were

- 3 -

1  forwarded to the SEC," and was "doing a story about FINRA advising the SEC of a [sic] suspicious trading by offshore bank and trading houses in regards to pump and dumps." [*See* Declaration of Nancy Condon ("Condon Dec."), **Ex. 6** hereto, at Ex. A.]

14. Ms. Condon denied comment, stating "Bill—I am sorry—but since you will be writing about confidential communications between FINRA and the SEC that we did not provide you—I can't have my people in the story."  [*See id*.]

15. Mr. Meagher's September 13, 2013 article ran with the disclaimer that "[o]fficials from . . . Finra [sic], which regulates broker-dealers, declined to comment for this story."  [September 13, 2013 Article of Bill Meagher at 1, Ex. 5 hereto.]

    **B.**    <u>Article dated December 6, 2013.</u>

16. Mr. Meagher's December 6, 2013 article is titled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, sources say."  [December 6, 2013 Article of Bill Meagher at 1, **Ex. 7** hereto.]  It is the first of three articles Mr. Meagher wrote regarding SCA's involvement with the sale of Biozoom stock.

17. Mr. Meagher's source for the article was Eric Miller, the SCA employee who also provided information to FINRA regarding SCA's involvement in the alleged pump-and-dump of Biozoom stock, and who participated in a phone call about Biozoom with the SEC, FINRA, and to a lesser extent, the FBI.  [*See* Deposition Transcript of Eric Miller ("Miller Depo."), **Ex. 8** hereto, at 25:24–27:02, 28:5–11, 29:17–33:2, 33:16–34:2, 78:24–79:7, 97:22–98:5, 112:2–17.]  Mr. Miller admitted at his deposition that he told the reporter:

    a.    The SEC and FINRA had opened an investigation into the involvement of SCA and Alpine Securities in the trading of Biozoom [*Id*. at 25:24–27:02, 28:5–11, Ex. 8 hereto];

    b.    The six Biozoom shareholders who held SCA accounts opened them within the same week [*Id*. at 78:24–79:7, Ex. 8 hereto];

    c.    The handwriting on the SCA account applications for the Biozoom shareholders was the same [*Id*. at 29:17–30:04, Ex. 8 hereto];

    d.    The answers to questions on the Biozoom shareholders' due diligence packages were very similar [*Id*. at 29:17–30:04, Ex. 8 hereto];

      e.    The Biozoom shareholders held accounts at the same banks in Cypress, Switzerland, and Panama [*Id*. at 29:17–30:04, Ex. 8 hereto];

      f.    The email addresses of the Biozoom shareholders were opened within a week of each other, and each contain the account holders' last name [*Id*. at 30:5–13, Ex. 8 hereto];

      g.    "These shareholders were brought in for this. It's as simple as that. They are retired teachers, a deli owner, but they come in with millions of shares of stock. They only trade Biozoom and they are directing trades using traders' lingo, telling them which market makers to use for the trades? Come on. They were straw men for whoever is behind this whole thing," which quote Mr. Meagher attributed to "a person with knowledge of the investigations" [*Id*. at 30:14–31:3, Ex. 8 hereto; December 6, 2013 Article of Bill Meagher at 4, Ex. 7 hereto];

      h.    Biozoom shareholders enjoyed special perks not available to other SCA clients, like paying 2% per transaction despite that typical SCA clients paid 4–4.5% per transaction, and like being permitted to make trades using instant messaging despite that typical SCA clients were prohibited from making trades in that manner [Miller Depo. at 31:4–32:1, 97:22–98:5, 136:23–137:8, Ex. 8 hereto];

      i.    Contrary to SCA policy, Biozoom shareholders, who all lived in Argentina, were allowed to send funds to Cypress, Switzerland, Panama, and Belize [*Id*. at 32:2–17, Ex. 8 hereto];

      j.    SCA disregarded red flags that were raised regarding Biozoom trades [*Id*. at 32:18–33:2, Ex. 8 hereto];

      k.    FINRA had several on-the-record conversations with SCA staff regarding the trading of Biozoom shares, the process by which the SCA accounts were opened, and how assets were moved offshore [*Id*. at 112:2–17, Ex. 8 hereto]; and

      i.    SCA staff members who had talked with FINRA regarding Biozoom trades include Timothy Scarpino, Tim DiBlasi, Liz Arndt, Henry Diekman, Jay Noiman, Michael Cruz, Adam Fiandaca, and Ted Ashton. [*Id*. at 33:16–34:2, Ex. 8 hereto.]

- 5 -

18. In addition to using Eric Miller as a confidential source, Mr. Meagher notes that the information in his December 6, 2013 article originated from the July 3, 2013 SEC complaint in the Biozoom Action and the July 9, 2013, declaration of SEC Assistant Director, Ricky Sachar, filed in support of that SEC complaint. [*See* December 6, 2013 Article of Bill Meagher at 3, 4 ("The SEC complaint alleges that . . . ."), ("According to a declaration filed with the court by Ricky Sachar, an assistant director of enforcement for the SEC . . . ."), Ex. 7 hereto.]

19. In fact, much of what Mr. Meagher published in his December 6, 2013 article was information contained in documents previously filed by the SEC in the Biozoom Action that had been in the public domain since July 2013, including:

 a. The names, email address, alleged occupation, and nationality of the SCA Biozoom shareholders [*See* Declaration of Ricky Sachar ("Sachar Dec.") (Doc. 8-1) in the Biozoom Action at ¶ 22, **Ex. 9** hereto];

 b. That the SCA Biozoom shareholders created their email address domain names in the same month using the same regional internet registry [*See id.* at ¶ 23, Ex. 9 hereto];

 c. The dates each of the SCA Biozoom shareholders opened an account at SCA, each shareholder's account number at SCA, and the content of a security deposit checklist each shareholder provided to SCA [*See id.* at ¶¶ 54–88, Ex. 9 hereto];

 d. That each of the SCA Biozoom shareholders submitted nearly identical attorney opinion letters regarding the applicability of various safe-harbors or statutory exemptions, and that each of those opinion letters were subsequently withdrawn [*See id.* at ¶ 79 fn. 4, Ex. 9 hereto];

 e. That between May 15, 2013 and June 21, 2013 the daily trading volume in Biozoom shares increased from 0 shares per day to 11,657,600 shares per day [*See id.* at ¶ 93, Ex. 9 hereto];

 f. That during the same period Biozoom's stock price rose from $1.10 per share to over $4 per share [*See id.* at ¶ 92, Ex. 9 hereto];

      g.    Specific information regarding the SCA Biozoom shareholders' sale of their stock at a time when Biozoom's stock price and trading volume rose dramatically, including the number of shares sold, the date of the various transactions, and the millions of dollars in proceeds each SCA Biozoom shareholder obtained as a result of their sales [*See id*. at ¶ 94, Ex. 9 hereto];

      h.    That each of the SCA Biozoom shareholders placed their sell orders using e-mail or instant messaging [*See id*. at ¶ 96, Ex. 9 hereto];

      i.    That none of the SCA Biozoom shareholders traded in any security other than Biozoom [*See id*. at ¶ 121, Ex. 9 hereto]; and

      j.    The name and location of the financial institutions to which the SCA Biozoom shareholders attempted to wire the proceeds of their stock sales. [*See id*. at ¶ 97, Ex. 9 hereto.]

20.    Prior to publishing his December 6, 2013 article, Mr. Meagher sought a comment from FINRA. [*See* Declaration of Michelle Ong ("Ong Dec."), **Ex. 10** hereto, at Ex. A.]

21.    Michelle Ong, a Director in the Media and External Communication department of FINRA, denied comment, stating "we have not provided this information to you and have nothing for you on it." [*See id*.]

22.    In response to Ms. Ong's email, Mr. Meagher acknowledged that his source did not come from FINRA. [*See id*.]

23.    Indeed, Mr. Meagher explained that "you are certainly correct in that I did not learn about a probe that tied to trading in Biozoom from Finra [sic]. Rather, I have spoken with someone who has knowledge of the investigation." [*Id*.]

24.    To that end, Mr. Meagher's December 6, 2013 article explained that "Finra [sic] . . . officials declined to comment for this story." [December 6, 2013 Article of Bill Meagher at 2, Ex. 7 hereto.]

    **C.**    <u>**Article dated March 20, 2014.**</u>

25.    On March 20, 2014, Mr. Meagher published an article titled "SEC requests default judgment in $34M Biozoom pump-and-dump case." [March 20, 2014 Article of Bill Meagher, **Ex. 11** hereto.]

26. In the article, Mr. Meagher provides an update regarding the procedural posture of the Biozoom Action.  [*See id*.]

27. The March 20, 2014 article contains little new information about SCA, and instead repeats much of the information first published in the December 16, 2013 article, which information Mr. Meagher obtained from SCA employee, Eric Miller.  [*Compare* March 20, 2014 Article of Bill Meagher at 2, Ex. 11 hereto, *to* December 6, 2013 Article of Bill Meagher at 4, Ex. 7 hereto; *See* Miller Depo. at 35:21–37:3, Ex. 8 hereto.]

28. Mr. Meagher stated in his March 20, 2014 article that "[r]epresentatives from . . . Finra [sic] . . . declined to comment." [March 20, 2014 Article of Bill Meagher at 3, Ex. 11 hereto.]

   D.   **Article dated April 16, 2014.**

29. Mr. Meagher published an article on April 16, 2014, titled "Finra [sic] focusing on money-laundering violations." [April 16, 2014 Article of Bill Meagher, **Ex. 12** hereto.]

30. The principal focus of Mr. Meagher's April 16, 2014 article is FINRA's alleged increased enforcement of its existing anti-money laundering rules.  [*See, e.g.*, *id*. at 3]

31. In the April 16, 2014 article, Mr. Meagher repeats, for the second time, information Eric Miller gave him regarding SCA's involvement in the alleged pump-and-dump of Biozoom stock.  [*See* April 16, 2014 Article of Biller Meagher at 4–5, Ex. 12 hereto; *see also* Miller Depo. at 40:1–13, Ex. 8 hereto.]

32. The only new information Mr. Meagher published about SCA in his April 16, 2014 article related to an unannounced FINRA examination of SCA that occurred on March 10, 2014.  [*Compare* April 16, 2014 Article of Bill Meagher, Ex. 12 hereto, *to* December 6, 2013 Article of Bill Meagher, Ex. 7 hereto.]

33. Eric Miller admitted during his deposition that he was Mr. Meagher's source for this new information.  [*See* Miller Depo. at 38:7–39:25; 122:15–22, Ex. 8 hereto.]

34. Like all the other articles at issue in this matter, Mr. Meagher's April 16, 2014 articles provides that "Finra [sic] . . . did not make anyone available to comment for this story." [April 16, 2014 Article of Bill Meagher at 3, Ex. 12 hereto.]

- 8 -

### III. FINRA's internal investigation of alleged leaks.

35. Presumably unaware that their own employee was Mr. Meagher's source, the Hurrys pointed the finger at FINRA when Mr. Meagher published news articles containing information linking SCA to irregular Biozoom transactions. [*See, e.g.*, Declaration of Cindy Foster-Nicholas ("Foster Dec."), **Ex. 13** hereto, at Ex. A.]

36. Shortly after Mr. Meagher published his first article about SCA's involvement with Biozoom, SCA's in-house counsel wrote a letter to FINRA's Office of the Ombudsman, an internal but impartial and independent group at FINRA, requesting that FINRA open an investigation into the source of the alleged "leak." [*See id.*]

37. FINRA promptly complied with that request, and on January 14, 2014, FINRA's Office of the Ombudsman began investigating whether Mr. Meagher's source was FINRA. [*See id.* at ¶ 7.]

38. The investigation performed by FINRA's Office of the Ombudsman was exceedingly thorough, and included at least the following investigative steps:

   a. Analyzing Mr. Meagher's articles to determine that significant portions of the articles contained publicly-available information regarding SCA and Biozoom [*Id.* at ¶ 8];

   b. Determining who had access to the FINRA "fraud surveillance" reports referenced in Mr. Meagher's September 13, 2013 article, and concluding that such reports were provided to the SEC in the normal course of FINRA's business prior to Mr. Meagher's publication [*Id.*];

   c. Identifying all FINRA employees that accessed such reports and evaluating their business and/or regulatory need for such access [*Id.*];

   d. Interviewing six FINRA employees who accessed the "fraud surveillance" reports referenced in Mr. Meagher's September 13, 2013 article to confirm that reasonable procedures were followed to safeguard the confidentiality of the reports [*Id.*];

   e. Reviewing every email FINRA and Mr. Meagher exchanged between January 1, 2012 and December 31, 2013 [*Id.*];

- 9 -

  f. Reviewing every email FINRA exchanged with anyone using the domain "thedeal.com" between January 1, 2012 and December 31, 2013 [*Id.*];

  g. Reviewing every email FINRA and Mr. Miller exchanged between January 1, 2012 and December 31, 2013 [*Id.*];

  h. Conducting a keyword-driven search for any other emails discussing Mr. Meagher's queries, regulatory staff requests for copies of confidential regulatory information about SCA, and planning of various routine examinations of SCA [*Id.*];

  i. Reviewing FINRA desktop and blackberry telephone records for calls to/from Mr. Meagher and to/from Mr. Miller [*Id.*];

  j. Interviewing the two FINRA media relations employees who had communicated with Mr. Meagher [*Id.*]; and

  k. Reviewing the computer hard drive and network drive of former FINRA employee Scott Andersen.  [*Id.*]

39. After finishing its investigation, FINRA's Office of the Ombudsman concluded that "there was no indication that staff had inappropriate communications with either [Mr. Miller] or [Mr. Meagher], or other persons at The Deal publishing company. . . . [and that it] has found no evidence that FINRA staff leaked information to [Mr. Meagher]." [*See id.* at Ex. C.]

40. FINRA conveyed the results of its investigation to SCA, but the Hurrys nevertheless filed this lawsuit.  [*See id.* at ¶ 12.]

41. The SEC acknowledged in a March 28, 2017 letter to the Hurrys' counsel that its own "investigation relating to whether Mr. Meagher received non-public information from the SEC" was then still "ongoing," and that it thus could not categorically deny being Mr. Meagher's source.  [*See* March 28, 2017 Letter from the SEC to Hurrys' counsel at 1, **Ex. 14**, hereto.]

42. All FINRA witnesses deposed in this matter who were asked about their communications with the SEC testified that they either did not speak with the SEC or were not provided reports from the SEC regarding its internal leak investigation.  [*See* Deposition Transcript of Nancy Condon ("Condon Depo."), **Ex. 15** hereto, at 112:08–18;

- 10 -

*see* Deposition Transcript of Christopher Cook ("Cook Depo."), **Ex. 16** hereto, at 51:15–52:01; *see* Deposition Transcript of Cindy Foster-Nicholas ("Foster Depo."), **Ex. 17** hereto, at 61:18–21.]

### IV. <u>The Hurrys lack evidence supporting their claims</u>.

43. Each of the five representatives of plaintiffs that were deposed in this matter conceded having no personal knowledge of any alleged publication between FINRA and Mr. Meagher. [*See* Deposition Transcript of John Hurry ("John Hurry Depo."), **Ex. 18** hereto, at 111:9–20, 145:11–146:7, 152:10–14, 159:2–6; Deposition Transcript of Justine Hurry ("Justine Hurry Depo."), **Ex. 19** hereto, at 24:2–13, 26:22–27:7, 30:20–31:9, 31:16–32:5, 33:2–6, 36:23–38:7, 44:14–45:3, 49:16–50:3, 51:9–20, 52:15–53:1, 59:24–60:23; Deposition Transcript of Henry Diekmann ("Diekmann Depo"), **Ex. 20** hereto, at 35:14–36:4, 39:17–25, 48:1–8, 49:22–50:7, 51:16–23, 54:25–55:7, 57:7–14, 58:19–59:4, 62:1–20, 66:16–67:1, 70:22–71:5, 72:14–23; Deposition Transcript Darrel Michael Cruz ("Cruz Depo."), **Ex. 21** hereto, at 28:14–19; Deposition Transcript of Gerald Russello ("Russello Depo."), **Ex. 22** hereto, at 17:3–19:11.]

44. After deposing Mr. Miller in this case and learning that he was Mr. Meagher's source, the Hurrys sued Mr. Miller directly in Maricopa County Superior Court Case No. CV2017-005018. [*See* Complaint at ¶ 25 in the Miller Defamation Action, **Ex. 23**, hereto (alleging that "[i]n a further effort to harm SCA, in or about September 2013, Miller contacted a reporter at the Deal Pipeline . . . . Miller divulged to The Deal Pipeline confidential information about SCA's business practices and its client that was confidential, including without limitation the names of SCA clients, SCA's business methods for accepting orders from clients, and SCA's fee structures, and *Miller further made many false and defamatory statements to The Deal Pipeline of and concerning SCA*.") (emphasis added).]

45. The Hurrys have also sued Mr. Meagher for defamation, and in that suit did not allege that Mr. Meagher's September 13, 2013 article contained any defamatory information. [*See* Complaint (Doc. 1-1) at ¶¶ 9–12 in D.N.H. Case No. 1:16-cv-00545-JL (the "Meagher Defamation Action"), **Ex. 24**, hereto (alleging only that "[t]he statements in the December 6, March 20, and April 16 Articles are false and defamatory.").]

46. Michelle Ong, a Director in the Media and External Communication department of FINRA, testified at her deposition that she does not believe that leaks occur at FINRA. [*See* Deposition Transcript of Michelle Ong ("Ong Depo."), **Ex. 25** hereto, at 25:11–16 (**Q:** Okay. Is it your belief that leaks occur all the time at FINRA? **A:** No. **Q:** Is it your belief that leaks ever occur at FINRA. **A:** No.").]

47. Ms. Ong also testified that any reference to "leaks" during her discussion with personnel from FINRA's Office of the Ombudsman related only to leaks in the media, and not to purported leaks at FINRA. [*See id.* at 45:13–19, 24:06–10 (**Q:** And isn't it true that you told the ombudsman that leaks happen all the time because you were aware of instances in which non-public information had been leaked to The Deal Pipeline? **A:** No."), ("**Q:** What is your best recollection or belief as to the context of those words ['leaks occur all the time']? **A:** Sitting here now, I would almost—I'm positive I meant leaks occur all the time in the media.").]

48. Ms. Ong stated in an email that Mr. Meagher "definitely has his source(s)," which of course he did in the person of Eric Miller. [*See generally* Miller Depo., Ex. 8 hereto.]

49. Ms. Ong did not state in her email that those sources were within FINRA, and when questioned about it at her deposition, she expressly denied believing Mr. Meagher had sources within FINRA. [*See* Ong Depo. at 45:4–11, Ex. 25 hereto ("**Q:** Isn't it true that when you said that Mr. Meagher definitely had his sources, you believed that Mr. Meagher in fact had at least one person within FINRA who was communicating non-public information to him? **A:** No.").]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 12 -

RESPECTFULLY SUBMITTED this 7th day of July, 2017.

                                      */s/ Gregory A. Davis*
                                      George Brandon
                                      Gregory A. Davis
                                      Gregory Schneider
                                      SQUIRE PATTON BOGGS (US) LLP
                                      One East Washington Street, Suite 2700
                                      Phoenix, Arizona 85004
                                      Attorneys for Defendants Financial Industry
                                      Regulatory Authority, Inc. and Scott M. Andersen

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2017, I electronically filed the foregoing document with the Court using the CM/ECF System for filing and service on plaintiffs as listed below:

| | |
|---|---|
| Joseph G. Adams | Charles J. Harder |
| Carlie Tovrea | Jordan Susman |
| Snell & Wilmer L.L.P. | Harder Mirell & Abrams LLP |
| One Arizona Center | 132 S. Rodeo Drive, Fourth Floor |
| 400 East Van Buren, Suite 1900 | Beverly Hills, California 90212 |
| Phoenix, Arizona 85004-2022 | |

*Attorneys for Plaintiffs*

*/s/ Sara Ramirez*