# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

    - against -

MAGDALENA TAVELLA, ANDRES HORACIO
FICICCHIA, GONZALO GARCIA BLAYA,
LUCIA MARIANA HERNANDO, CECILIA DE
LORENZO, ADRIANA ROSA BAGATTIN,
DANIELA PATRICIA GOLDMAN,
MARIANO PABLO FERRARI, MARIANO
GRACIARENA, and FERNANDO LOUREYRO,

        Defendants.
---------------------------------------X

**MEMORANDUM AND ORDER**

13 Civ. 4609 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") moves for entry of default judgment against Magdalena Tavella, Andres Horacio Ficicchia, Gonazalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, and Mariano Pablo Ferrari (collectively "defendants").[1] While we are persuaded that the Commission has established its entitlement to a default judgment, we disagree in part with the Commission's proposed remedies. We write principally to explain this disagreement.

---

[1] The complaint calls these eight parties the "Selling Defendants." Compl. ¶ 1. Two others, Mariana Graciarena and Fernando Loureyro, have settled with the Commission. We ignore Graciarena and Loureyo herein except to emphasize that this opinion contains no findings or conclusions as to them.

## I. BACKGROUND

**A.  The Biozoom Scheme**

The factual allegations of the complaint, which we describe here insofar as they are relevant, revolve around a penny-stock company called Biozoom, whose shares were traded on the Over-the-Counter Bulletin Board.  Compl. ¶¶ 1, 113.

Biozoom was incorporated in Nevada in 2007 as Entertainment Arts, Inc. ("Entertainment Art").  Id. ¶ 27.  Entertainment Art originally represented that it was in the business of designing and marketing leather bags.  Id.  Its stock was divided among three corporate officers and thirty-four outside investors.  Id. ¶¶ 28-30.  In May 2009, Entertainment Art disclosed that the three officers had sold their holdings to a Belize entity called Medford Financial Ltd.  Id. ¶ 31.  Although it was not disclosed, Medford Financial actually purchased all of the stock in Entertainment Art, including the shares held by outside investors.  Id. ¶¶ 32-33.

In October 2012, Medford Financial announced that it had sold 39,600,000 shares of Entertainment Art stock to Le Mond Capital, a British Virgin Islands entity.  Id. ¶¶ 35-36.  In fact, Le Mond Capital purchased all 59,730,000 shares.  Id. ¶ 37.  Le Mond Capital is owned by Sara Deutsch, who is not a party to this action.  Id. ¶ 38.  Deutsch was appointed as "Entertainment Art's new President, Chief Executive Officer,

Principal Executive Officer, Treasurer, Chief Financial Officer, Secretary, . . . and Director." Id. Deutsch also is or was a co-owner, with defendant Tavella, and the manager of a restaurant in Buenos Aires, Argentina. Id. ¶ 39.

Defendants are eight residents of Buenos Aires. Id. ¶¶ 14-21. In January to May 2013, each defendant separately opened an account at one of two United States broker-dealers, and they deposited a combined total of 15,685,000 shares of Entertainment Art stock in those accounts. Id. ¶¶ 46-47, 57, 64, 70, 77, 83, 89, 95, 101. Each defendant represented to the broker-dealers that he or she had acquired the shares in November 2012 through March 2013 in private transactions with individuals who either were among the thirty-four original outside investors or had purchased from those investors. These representations were false, because Medford Financial had acquired all of those shares years earlier. Id. ¶¶ 32, 54-56, 61-63, 67-69, 74-76, 80-82, 86-88, 92-94, 98-100. Defendants also represented that they had paid amounts ranging from $5,445 to $31,050 each, and totaling $84,260, for these shares. Id. ¶¶ 54, 56, 62, 68, 75, 81, 87, 93, 99.

In March and April 2013, Entertainment Art changed its name to Biozoom and announced that, following a transaction involving the acquisition of patents and other intellectual property, it was now in the biomedical industry. Id. ¶¶ 40-41, 45. Sara

Deutsch remained a director, but not an officer, of Biozoom. Id. ¶ 42. On May 22, 2013, Biozoom and other entities began to tout that Biozoom had "'created the world's first portable, handheld consumer device' to instantly and non-invasively measure certain biomarkers." Id. ¶ 106. This promotional campaign caused a dramatic increase in Biozoom's stock price, which peaked at over $4 per share. Id. ¶ 6.

Also beginning in May 2013, defendants began to sell their shares in transactions that were neither registered with the SEC nor exempt from the registration requirement of the Securities Act of 1933 (the "1933 Act"). Id. ¶¶ 107, 111. Between May 16 and June 19, defendants used emails and instant messages to instruct their U.S. broker-dealers to sell 14,078,406 shares for a total of $33,421,062. Id. ¶¶ 107-108.[2] In June, seven defendants sought to wire some or all of these proceeds to foreign bank accounts, successfully moving a total of approximately $15,990,000 abroad. Id. ¶ 109; but see id. ¶ 1 ("almost $17 million"). On June 25, the Commission issued an

---

[2] Paragraph 107 of the complaint alleges that the total proceeds were $33,997,152, but it is followed by a table containing line items for each defendant's "[p]roceeds" totaling $33,421,062. This discrepancy corresponds to the two manners in which the proceeds of four defendants can be calculated, as described in Part II.C.2 below. As we explain there, the lower calculation of these defendants' proceeds is correct for present purposes.

order suspending trading in Biozoom stock.  Id. ¶ 109; see SEC
Release No. 34-69841 (June 25, 2013).


**B.  Procedural History**

On July 3, 2013, the Commission commenced this action, and
we granted the Commission's ex parte application for a temporary
restraining order that included a freeze of defendants' Biozoom
shares and proceeds from the sales of Biozoom shares.  On July
16, defendants having retained McLaughlin & Stern, LLP, a New
York law firm, the parties stipulated to the entry of a
preliminary injunction including a revised version of the asset
freeze.  We so-ordered the preliminary injunction on July 17,
and we ordered defendants to answer or otherwise respond to the
complaint by August 26.

On September 11, 2013, McLaughlin & Stern moved to withdraw
as counsel for reasons described in an ex parte submission.  The
Court granted the motion, which the Commission did not oppose.
On December 17, 2013, we signed a scheduling order directing
defendants to answer or otherwise respond to the complaint by
February 3, 2014.  This order provided that "[f]ailure to answer
or otherwise respond to the complaint by that date may result in
entry of a default judgment against the Defendants."  On
February 3, 2014, Brafman & Associates, another New York law
firm, appeared on behalf of defendants and applied for a further

5

thirty-day extension, which we granted. However, on March 14, 2014, Brafman & Associates applied to withdraw as counsel. We granted this application, which the Commission did not oppose.

On May 15, 2014, the Clerk of Court certified defendants' default pursuant to Fed. R. Civ. P. 55(a), and on June 4, 2014, the SEC filed the instant motion. The Commission served the motion papers on defendants in a manner consistent with the July 16, 2013 stipulation.

In June and July 2014, we engaged in correspondence with Juan Ignacio Prada, an Argentinian lawyer who claimed to represent defendants.[3] Prada requested leave for some defendants to "respond Pro Seo [sic] to the Commission's Complaint, via the expertise of Mr. Juan Ignacio Prada, our Argentinian counsel since [defendants] are unable to retain proper US counsel due to lack of funds." We responded that "[t]here is no mechanism available that would enable a party to be represented in a U.S. action by foreign counsel while simultaneously appearing pro se. Accordingly, this Court cannot grant your request." Prada replied that "[n]otwithstanding there is no mechanism available to be represented by a foreign counsel, the defendants would like to bring before the court all the documents regarding the commercial transactions. If this is available, please let us

---

[3] The Court copied the Commission's counsel on this correspondence.

know and the defendants will send them." We responded that "there is no prohibition on individual defendants appearing pro se -- i.e. representing themselves -- and, in that capacity, making submissions to the Court." Subsequently, the Commission served a copy of its motion papers on Prada.

We have not since heard from defendants or anyone on their behalf.

## II. DISCUSSION

### A. Default Judgment

Rule 55 of the Federal Rules of Civil Procedure permits the entry of a default judgment against a party who "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Here, although two New York law firms appeared for defendants, both firms were permitted to withdraw. Defendants have failed to answer or otherwise response to the complaint, even though the deadline to answer, having been extended multiple times, lapsed over ten months ago. Further, we warned defendants in our December 17, 2013 order that failure to defend "may result in entry of a default judgment," and in July 2014, we informed defendants' Argentinian lawyer that defendants may represent themselves. Defendants' prolonged inaction warrants imposition of a default judgment.

By their default, defendants are deemed to concede the complaint's well-pleaded allegations of liability, but not of the amount of damages. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Thus, we "accept[] as true all of the factual allegations of the complaint, except those relating to damages." Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). However, we must independently establish the damages and other relief to be awarded on the basis of sufficient evidence. Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012) ("Cement Workers"); SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975).

To make the necessary findings upon default, a court may conduct a hearing to, inter alia, "conduct an accounting," "determine the amount of damages," or "investigate any other matter." Fed. R. Civ. P. 55(b)(2)(A), (B), (D). However, it is within a court's discretion to "determine there is sufficient evidence . . . based . . . upon a review of detailed affidavits and documentary evidence." Cement Workers, 699 F.3d at 234.

Here, the SEC has submitted the detailed declaration of Ricky Sachar, Esq., dated June 4, 2013 (the "Sachar Declaration"), including numerous exhibits that, inter alia, fully detail defendants' trading activity. As this submission adequately supports the remedies we will impose, there is no

8

need for an evidentiary hearing.  However, as discussed in Part II.C.3 below, we delay the entry of final judgment to permit the Commission an opportunity to supplement its presentation as to the subject of prejudgment interest.

**B.  Liability**

The facts established by defendants' default support the conclusion that defendants violated Section 5 of the 1933 Act. Section 5 "requires that securities be registered with the SEC before any person may sell or offer to sell such securities." SEC v. Cavanagh, 445 F.3d 105, 111 (2d Cir. 2006) ("Cavanagh II"); see 15 U.S.C. § 77e.  "To state a cause of action under Section 5, one must show (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."  Cavanagh II, 445 F.3d at 111 n.13 (internal quotation marks omitted).  Although some securities sales are exempt from the Section 5 registration requirement, "[o]nce a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." Id. (citing SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953)).  Furthermore, "Section 5 imposes strict liability on offerors and sellers of unregistered securities regardless of any degree of fault, negligence, or

intent on the seller's part." <u>SEC v. Bronson</u>, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014) (internal quotation marks omitted).

In May and June 2013, defendants used international emails and instant messages to sell their Biozoom shares in unregistered transactions. Thus, the SEC has made out a <u>prima facie</u> case that defendants violated Section 5. Defendants have not made any effort to show the applicability of an exemption from the registration requirement, and we are not aware of any applicable exemption. Thus, defendants violated Section 5.

## C. Remedies

The Commission seeks (1) a permanent injunction; (2) disgorgement of the proceeds of the illegal sales; (3) disgorgement of prejudgment interest on those proceeds; and (4) civil penalties in the same amount as the proceeds to be disgorged. We address each remedy in turn.

### 1. Permanent Injunction

Section 20(b) of the 1933 Act expressly authorizes the SEC to seek an order enjoining "acts or practices which constitute or will constitute a violation of the provisions of this [Act]." 15 U.S.C. § 77t(b). The basis for ordering such an injunction must be "a substantial likelihood of future violations of illegal securities conduct." <u>SEC v. Cavanagh</u>, 155 F.3d 129, 135

(2d Cir. 1998) ("Cavanagh I").  To determine whether the SEC has established this substantial likelihood, a court is to consider the following factors:

> the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

Id. (quoting SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 100 (2d Cir. 1978)).  A permanent injunction is "particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence."  SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1477 (2d Cir. 1996) ("First Jersey") (internal quotation marks omitted).

The relevant factors amply support a permanent injunction. Defendants displayed scienter by falsely representing to their American broker-dealers that they had acquired their Entertainment Art stock from individual investors.  That they engaged in parallel conduct strongly supports the inference that they were engaged in coordinated wrongdoing.  Unwary investors are all too vulnerable to market manipulation of the type that

evidently took place here. Thus, we will not hesitate to grant the injunction proposed by the Commission.[4]

### 2. Disgorgement of Illegal Proceeds

The equitable remedy of disgorgement, which "serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct," SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014) ("Contorinis"), is "well-established . . . in securities enforcement actions," Cavanagh II, 445 F.3d at 116. Indeed, "[t]he deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972). "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation'; 'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" First Jersey, 101 F.3d at 1475 (quoting SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995)). However, because the disgorgement "remedy is remedial rather than punitive, the court may not order disgorgement above" "the amount of money

---

[4] The same reasons justify the proposed order permanently barring defendants from participating in an offering of penny stock. See 15 U.S.C. § 77t(g).

acquired through wrongdoing . . . plus interest." <u>Cavanagh II</u>, 445 F.3d at 116 & n.25.

Here, the Commission seeks to disgorge the proceeds of defendants' illegal sales. Disgorgement is appropriate to prevent defendants from profiting from their violations of the securities laws. A reasonable approximation of the amount to be disgorged is the difference between the amounts that each defendant obtained for his or her shares and the amount that that defendant stated that he or she paid for them.

The Commission has provided ample evidence of defendants' proceeds. We have carefully reviewed the Sachar Declaration and its supporting exhibits, which enumerate each of defendants' Biozoom sales. We concur in the Commission's calculation of the amounts to be disgorged by Goldman, Baggatin, Ferrari, and Tavella, which correspond to the complaint's allegations. <u>See</u> Sachar Decl. ¶¶ 27, 29, 30, 32, 33, 35, 36, 38 & Exs. 12-19; Compl. ¶¶ 81, 87, 93, 99, 107.

In contrast, the disgorgement amounts that the Commission proposes for the other defendants exceed those defendants' true net proceeds as reflected in the Commission's exhibits. First, we note a $15 error in the Commission's transcription of the amount Blaya reported paying for his shares. <u>Compare</u> Sachar

13

Decl. ¶ 18, with id. Ex. 6, at 1.[5]   More significantly, as to
Ficicchia, Blaya, De Lorenzo, and Hernando, the SEC staff
appears to have calculated the proceeds by multiplying the
number of shares sold by the selling price.   However, the
exhibits demonstrate that their actual proceeds were lower due
to commissions and fees paid on the trades.   Compare Sachar
Decl. ¶¶ 17, 20, 23, 26, with id. Exs. 5, 7, 9, 11.   The lower
figures, which we have recalculated on the basis of the actual
amounts deposited in those four defendants' brokerage accounts,
as shown in the exhibits, match the complaint's line-item
allegations as to those defendants' "[p]roceeds."   Compl. ¶ 107.
This provides an independent basis for adopting the lower
calculation, since "[a] default judgment must not . . . exceed
in amount[] what is demanded in the pleadings."   Fed. R. Civ. P.
54(c).[6]

Accordingly, we will order that defendants disgorge the
following amounts of principal:   Tavella, $3,107,819; Ficicchia,
$1,948,339; Blaya, $3,008,200; Hernando, $5,042,771; De Lorenzo,
$4,801,536; Baggatin, $6,216,380; Goldman, $3,764,306; and
Ferrari, $5,447,450.

---

[5] The complaint alleges the proper purchase price, which is
$6,765.   Compl. ¶ 62.
[6] Our method for recalculating the proceeds of Ficicchia,
Blaya, De Lorenzo, and Hernando is also consistent with the
method by which the SEC staff appears to have calculated the
proceeds of Goldman, Baggatin, Ferrari, and Tavella, as
reflected in both the complaint and the Sachar Declaration.

### 3. Disgorgement of Prejudgment Interest

It is also within a court's discretion to order disgorgement of prejudgment interest on the principal amount to be disgorged, so as to "to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." Contorinis, 743 F.3d at 308. As a general matter, the Second Circuit has approved the calculation of prejudgment interest at the IRS underpayment rate, which "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its [illegal conduct]." First Jersey, 101 F.3d at 1476.

Last year, in an opinion not cited in the Commission's brief, the Second Circuit limited the availability of disgorgement of prejudgment interest as to funds frozen at the government's behest. SEC v. Razmilovic, 738 F.3d 14, 36-38 (2d Cir. 2013) ("Razmilovic"), cert. denied, 134 S. Ct. 1564 (2014). In Razmilovic, the defendant challenged the district court's award of prejudgment interest at the IRS underpayment rate, see SEC v. Razmilovic, 822 F. Supp. 2d 234, 279 (E.D.N.Y. 2011), on the ground that the government had caused some of his funds in a foreign account to be frozen in anticipation of forfeiture in a

15

pending criminal case. The Circuit found merit in the defendant's argument, explaining as follows:

> [I]t is within the discretion of a court to award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits, see, e.g., First Jersey, 101 F.3d at 1474-77. However, where, as here, the defendant has had some or all of his assets frozen at the behest of the government in connection with the enforcement action, an award of prejudgment interest relating to those funds would be inappropriate with respect to the period covered by the freeze order, for the defendant has already, for that period, been denied the use of those assets. In such a case, after a final order of disgorgement, the funds previously frozen would presumably be turned over to the government in complete or partial satisfaction of the disgorgement order, along with any interest that has accrued on them during the freeze period. In that circumstance, the remedial purpose of prejudgment interest would already have been served with respect to the period of the freeze; to require the defendant to pay prejudgment interest on the entire disgorgement amount including the earlier frozen amount would, for the freeze period, deprive him twice of interest on the portion of the disgorgement award that is satisfied by the frozen assets.

738 F.3d at 36-37 (emphases added).[7]

We interpret Razmilovic to mean that when a defendant's funds have been frozen in connection with an enforcement action, the defendant may not be ordered to disgorge prejudgment

---

[7] The Razmilovic court remanded to permit the government to clarify whether the frozen funds would be applied to the disgorgement order, in which case prejudgment interest would not be allowed, or would remain frozen in connection with the criminal charges pending against the defendant, in which case prejudgment interest on non-frozen funds would be allowed. 738 F.3d at 37-38. But here, there is no question that the frozen funds are those subject to disgorgement.

interest at the IRS underpayment rate. As noted earlier, that rate is intended to "reasonably approximate[] . . . the benefit[] the defendant derived from" the time value of possession of the defendant's ill-gotten gains, First Jersey, 101 F.3d at 1476; but where a defendant's funds are frozen, if the freeze is not violated, the defendant derives no such possessory benefit for the duration of the freeze. Yet Razmilovic also recognizes that frozen funds "turned over to the government in complete or partial satisfaction of the disgorgement order" should be turned over "along with any interest that has accrued on them during the freeze period." 738 F.3d at 36. Otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal.[8]

Here, the Commission seeks prejudgment interest running from July 1, 2013. See Sachar Decl. ¶¶ 39-46 & Exs. 20-27. However, we ordered a worldwide freeze on defendants' relevant

---

[8] Similarly, in the Rules of Practice applicable to its own proceedings, the SEC recognizes that the IRS underpayment rate may be inappropriate for funds secured in anticipation of disgorgement. See 17 C.F.R. § 201.600(b) (Although "[i]nterest on the sum to be disgorged shall be computed at the [IRS] underpayment rate of interest," "[t]he Commission or the hearing officer may, by order, specify a lower rate of prejudgment interest as to any funds which the respondent has placed in an escrow . . . .").

assets in our orders of July 3 and 17, 2013.[9]  While it is possible that our freeze orders have been violated, the SEC does not provide any evidence of such violation.  Nor does the SEC offer any information as to the actual returns, if any, that have accumulated on the frozen assets.  On the current record, in light of Razmilovic, we could merely order disgorgement of any actual returns on the frozen assets, without specifying the amount of such returns.

However, we will defer entering judgment to afford the Commission an opportunity to establish the actual amount of the returns, if any, that have accumulated on the frozen assets.  If the Commission does so, we will be inclined to incorporate those amounts in our final judgment.  Alternatively, if the Commission can show that defendants have violated the asset freeze as to any of the funds subject to that freeze, the Commission may renew its request for disgorgement of prejudgment interest as to those funds at the IRS underpayment rate.

### 4.  Civil Penalties

Section 20(d) of the Securities Act provides that, in an enforcement action brought by the Commission, "the court shall

---

[9] After filing the instant motion, the Commission informed us by letter that authorities in Belize and Cyprus have also ordered defendants' assets within those countries to be frozen. Doc. No. 52, at 2.

have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 77t(d)(1). Section 20(d) "authorizes three tiers of monetary penalties for statutory violations." Razmilovic, 738 F.3d at 38. Each of the three tiers "provides that, for each violation, the amount of penalty 'shall not exceed the greater of' a specified monetary amount or the defendant's 'gross amount of pecuniary gain'; the amounts specified for an individual defendant for the first, second, and third tiers, respectively, are $[7,500], $[80,000], and $[160,000]," id. (quoting 15 U.S.C. § 77t(d) (emphasis in Razmilovic)); see 17 C.F.R. § 201.1005 (adjusting statutory maximum penalties for inflation). The third, most serious tier, requires a showing that "the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C)(I)-(II).

Subject only to the applicable maximum, "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances." 15 U.S.C. § 77t(d)(2)(A). Thus, "[b]eyond setting maximum penalties, the statute[] leave[s] 'the actual amount of the penalty . . . up to the discretion of the

district court." Razmilovic, 738 F.3d at 38 (quoting SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005)).

"In determining whether civil penalties should be imposed, and the[ir] amount," SEC v. Wyly, --- F. Supp. 3d. ---, ---, 2014 WL 4792229, at *4 (S.D.N.Y. 2014) (internal quotation marks omitted), courts in this District have

> look[ed] to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial conduction.

Id. (quoting SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) ("Opulentica")). But although "these factors are helpful in characterizing a particular defendant's actions, . . . each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" Opulentica, 479 F. Supp. 2d at 331 (quoting SEC v. Moran, 944 F. Supp. 286, 297 (S.D.N.Y. 1996)).

Here, "the Commission seeks to impose a penalty against each of the [defendants] equal to his or her gross pecuniary gain from the sale of Biozoom shares, i.e., the disgorgement amount for each [defendant]." Br. at 14. In other words, the Commission seeks civil penalties in the maximum amounts allowed by statute, which range from approximately $2.0 million to $6.2

million per defendant.  The Commission's brief makes no case-specific argument whatsoever in support of the magnitude of these proposed penalties.  Instead, the Commission states only that "[c]ourts have routinely imposed civil penalties equal to the gross amount of a defendant's pecuniary gain," Br. at 14,[10] and that "[a] penalty is appropriate given the massive selling of shares in an unregistered distribution of securities -- an unregistered distribution of which purchasers and sellers of [Biozoom] stock were unaware when they made their investment decisions," Br. at 14-15.  Such cursory presentation is scarcely adequate for a law enforcement agency seeking to invoke the Court's discretion to impose multiple multi-million-dollar fines.

A civil penalty is plainly appropriate to punish defendants' illegal conduct.  Yet the Commission's submission leaves us with many unanswered questions.  Beyond the bare facts pertaining to defendants' deposits and sales of Biozoom stock, practically the only thing we know about defendants is their occupations, which shed little light on the circumstances.[11]

---

[10] Perhaps tellingly, this statement is supported only by out-of-circuit decisions, whose persuasive value is undermined by the lack of any attempt to demonstrate their factual similarity to this case.

[11] In opening their brokerage accounts, defendants reported the following professions:  Ficicchia, "Self-employed music producer"; Blaya, "Music producer-stock investments"; Hernando, "Marketing Manager"; De Lorenzo, "Self-employed marketing

Most importantly, we do not know what defendants' role in the Biozoom scheme was. Did defendants orchestrate that scheme, or was Sara Deutsch or some other master pulling their strings? Did defendants personally participate in the campaign to promote Biozoom to unwary investors? Were defendants the profiteers or mere pawns? Answers to these questions would have illuminated this otherwise obscure portrait.

A third-tier penalty is justified because, as already discussed, defendants' illegal conduct was undertaken with some degree of scienter, and because we infer that it caused substantial collective losses to investors. The amount of money acquired through the Biozoom scheme further justifies a penalty in an amount that Congress and the Commission, in the exercise of its rulemaking authority, have deemed weighty. And we will not reward defendants for their decision to default and thus to deprive the Commission of an opportunity to take discovery into their roles in the scheme. However, we decline to assess the maximum penalties, on top of disgorgement, in the absence of a basis to conclude that such penalties are proportionate to defendants' culpability. Accordingly, we award civil penalties in the amount of $160,000 against each defendant.

---

specialist"; Tavella, "Attorney practicing administrative, political, intellectual property, and patent law"; Bagattin, "Retired Teacher"; Ferrari, "Sales and Marketing"; Goldman, "Delicatessen owner." Compl. ¶ 48. As noted above, Tavella is also part owner, with Sara Deutsch, of a restaurant. Id. ¶ 39.

## CONCLUSION

The Commission's motion for a default judgment (Doc. No. 45) is granted on the foregoing terms.  However, we defer entering judgment to afford the Commission an opportunity to supplement its submission as to the amount of prejudgment interest that should be disgorged.  Such supplemental submission shall be due on January 23, 2015.


Dated:     New York, New York
           January 6, 2015

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

**To:** Craig, Brian[Brian.Craig@finra.org]
**From:**
**Sent:** Thur 6/13/2013 3.46.57 PM
**Importance:** Normal
**Subject:** RE˙ Call
**MAIL_RECEIVED:** Thur 6/13/2013 3.47 08 PM

I can give you any details and structuring you like. Next time you guys drop by, the clearing documentation and the phone records between scarpino, hurry, and james panther would probably be of use to you  Panther is the main ghost in the machine , working with hurry

"Craig, Brian" <Brian.Craig@finra.org> wrote:

Thanks for the information  We will contact you if we need any additional information.

Regards,

Brian Craig

Office of the Whistleblower

**From:**
**Sent:** Wednesday, June 12, 2013 10:46 PM
**To:** Craig, Brian
**Subject:** Re: Call



This latests clearing and trading of BIZM has interesting on several levels. The complicity of Scottsdale Capital, Alpine and  it's clients has quickly proven to be a vastly profitable and quickly trading example of what is possible when a broker deal and its influence over its clearing BD, Alpine, because of common ownership by John Hurry, is enforced.

It all started with the opening of accounts for four Argentine nationals (Adriana Bagatin, Daniela Goldman,Mariano Ferrari, Magdalena Tavella), and AFI a Swiss corporation. Another account Barbieri comes in shortly thereafter with no stock but a wire in for 1MM US which came over

from LEK securites. All of these people come to SCA simulataneoulsy as referrals and finding the firm from advertising, within days of each other. Combined they deposit over 8 million shares of BIZM, well over the 10% limit which would ruin their whole plan to pump this deal and then unload this stock.

Oddly enough, each has a personal email incorporating their last name and example of which would be for Daniela Goldman who has the domain www.danielagoldman.com which, when a whois.com search is done has this for dates:

Updated Date: 08-oct-2012

Creation Date: 17-sep-2012

Expiration Date· 17-sep-2015

When you look at the email addresses of each of the other members, all with similar domains consisting of their last names You will see that each and every one was created on thee same day in 2012.

In overriding push from above (senior management) the accounts are opened with little resistance from anyone even though each has identical writing and alarmingly similar answers for their Foreign Due Dilligence packets. Each one had accounts at the same broker dealers and banks in Panama Cyprus and Switzerland

In clearing documents dated May 20th, each of the account holders signed off that they would not remit money back to the issuer or any other party and would not act in concert, that they did not have the securities purchased for them by a common party. Pretty much all you would need to make sure that you break up ownership and keep below 10% ownership collussion by a group thereby avoiding limitation of sales inherent when you, in normal situations would be considered and affiliate. In this case a single funded group.

The minute the stock they had paid consideration of .003 starts trading the pump starts and they sell into the acitvely trading market consisting of millions of shares which they quickly unload through SCA between 1.65 and 2.65 per share and then BOOM, start wiring the money out the instant it is available.

Now, all these accounts were coded as 'red flag' due to the AML issues in Argentina, and then in an industry defined 'red flag' situation, bringing in cheap illiquid stocks selling then and immediaelty wiring the money to foreign bank accounts, yet no follow up whatsever was done.

CONFIDENTIAL

By policy at Alpine, the first wire request was denied by Alpine, as it is their policy to only wire funds to banks in the country where the person lives of a corporation is based   The first wire for 3 million was rejected by Alpine, only to cause all hell to break lose in the SCA office.  Several phone calls were made something I can go into further at some other time, and Alpine changed it outgoing wire policy firmwide within an hour and appologies made to the client for proposing that her money could not be wired to a bank not disclosed in the foreign due diligence .
 Amazing how a client of less than a week with no history with the firm is able to change the policy of not only SCA but of the clearing firm, Alpine.

Then comes the odd habits of the AFI account, funded with $500 k via wire only to do a few buys and sells 86,000 shares of the BIZM, then leaves 5000 shares in the account and immediatley wire out the balance of the account, a sum just under $500 k.  Yet another 'red flag' that is not followed up on by anyone and when brought up, is ignored.  I have yet to figure out what the role of AFI and Barbieri are with their sudden wires in and out but Im sure in the coming days it will become self evident.

This deal is being follow up by another, currently being cleared but not completed yet, using these same Argentines and a few new ones each day.  This is the same set up as SNPK and GWBU last year.

We even changed our policy for using IM for contact with the clients to enter trades.  Before this crew of Argentines came along, IM was forbidden by our internal guidelines, now all the clients log in with trading and the hour before the trading days starts they start placing and racking their orders with the market makers.  Oddly enough, clients who run restaurants and are retired school teachers can IM into our trading desk and tell our desk what trades they want routed to Vandam, Vfin and have AMAZING ability to trade and type the lingo of someone who has been doing this for years.

Call me up if this sounds like it may be of interest to you further.  If this one is not enough the followups are on their way quickly and may assist you in showing further patterns of organized successful attemts to pump and dump and the commit fraud by wiring funds out of the country for the benefit of a third party controling the whole thing.

On Wed, Jun 12, 2013 at 1:01 PM, Craig, Brian <Brian.Craig@finra.org> wrote.

That would be fine

**From:** ███████████████████████
**Sent:** Wednesday, June 12, 2013 3:41 PM

**To:** Craig, Brian
**Subject:** RE: Call

OK will dial you then. I do want to reiterate I want to remain anonymous. Please reassure me of that.
I can send you an email tonight outlining the insanity going on with the clearing of this stock and the collusion of the investors in detail. Would that be of assistance

███████████████████

"Craig, Brian" <Brian.Craig@finra.org> wrote:

I get in around 9:00 am ET.

**From:** ███████████████████████
**Sent:** Wednesday, June 12, 2013 1:26 PM
**To:** Craig, Brian
**Subject:** RE: Call

This is going to be on the bizm clearing here.

On Jun 12, 2013 9:57 AM, ██████████████████████ wrote:

What time do you get in?

On Jun 12, 2013 9:08 AM, "Craig, Brian" <Brian.Craig@finra.org> wrote:

██████, I am not available at that time. Is there a time that would work for you tomorrow before 2:00 PT?

**From:** ███████████████████████
**Sent:** Wednesday, June 12, 2013 11:37 AM

FINRA_00003981

**To:** Whistle Blower
**Cc:** Wetterau, Jane
**Subject:** Call

Brian are you available for a call say 4: 30 PST today

On Apr 1, 2013 10:40 AM, "Whistle Blower" <WhistlcBlower@finra.org> wrote:

███████████

Please let me know when you will be available to discuss this matter.  Thanks.

Regards,

Brian Craig

Office of the Whistleblower

**From:** ██████████████████████
**Sent:** Tuesday, March 26, 2013 1:11 PM
**To:** Whistle Blower
**Subject:** RE: I have had it with the gifting for orderflow our desk does . THis weekened thay in in vegas all expense paid by Vfin and Vandam. this goes on evey monght. Run trades get big kickbacks. All this does is undermine the streneght of our firm and what I...

██ here I got your call will dial you Thursday with detail

████████████

On Mar 25, 2013 8:45 AM, "Whistle Blower" <WhistlcBlower@finra.org> wrote

███████ - FINRA's investigations and examinations are confidential and non-public.  Accordingly, we generally do not disclose to firms or anyone else the source of information we receive

**From:** <span style="background:black">████████████████</span>
**Sent:** Monday, March 25, 2013 11:35 AM
**To:** Whistle Blower
**Subject:** Re: I have had it with the gifting for orderflow our desk does . THis weekened thay in in vegas all expense paid by Vfin and Vandam. this goes on evey monght. Run trades get big kickbacks. All this does is undermine the streneght of our firm and what I...


Can I remain anonymous

sent from my iPad 6

On Mar 24, 2013 9.30 PM, <span style="background:black">████████████████████████</span> wrote:


--




Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any

part of the contents to any other person. Thank you

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

--



CONFIDENTIAL

# EXHIBIT 3

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 69841 / June 25, 2013

The Securities and Exchange Commission ("Commission") announced the temporary suspension pursuant to Section 12(k) of the Securities Exchange Act of 1934 ("Exchange Act"), of trading in the securities of Biozoom, Inc. ("Biozoom"), of Kassel, Germany at 9:30 a.m. EDT on June 25, 2013, and terminating at 11:59 p.m. EDT on July 9, 2013.

The Commission temporarily suspended trading in the securities of Biozoom due to a lack of current and accurate information concerning the securities of Biozoom because of concern that that certain Biozoom affiliates and shareholders may have unjustifiably relied upon Rule 144 of the Securities Act of 1933 ("Securities Act") and they, Biozoom, and others may be engaged in an unlawful distribution of securities through the OTCBB.  This order was entered pursuant to Section 12(k) of the Exchange Act.

The Commission cautions brokers, dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule.  If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777.  If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to Biozoom's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met.  If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker, dealer or other person has any information which may relate to this matter, they should contact Deborah A. Tarasevich or Ricky Sachar of the Division of Enforcement at (202) 551-4726 and (202) 551-4568, respectively.

# EXHIBIT 4

13 CIV 4609

JUDGE BUCHWALD

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          v.

MAGDALENA TAVELLA,
ANDRES HORACIO FICICCHIA, GONZALO
GARCIA BLAYA, LUCIA MARIANA
HERNANDO, CECILIA DE LORENZO,
ADRIANA ROSA BAGATTIN,
DANIELA PATRICIA GOLDMAN,
MARIANO PABLO FERRARI,
MARIANO GRACIARENA, and
FERNANDO LOUREYRO,

                    Defendants.

Civil Action No.

Jury Trial Demanded



## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") for its Complaint alleges as follows:

1.    The Commission brings this civil law enforcement action against Magdalena Tavella, Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, and Mariano Pablo Ferrari (collectively, the "Selling Defendants") on an emergency basis to prevent millions of dollars of proceeds from unlawful sales of securities being transferred out of the country. Over the past month, the Selling Defendants have sold almost $34 million worth of securities in Biozoom, Inc. ("Biozoom") (f/k/a Entertainment Art, Inc.), a penny stock company traded on the Over-the-Counter Bulletin Board ("OTCBB"), and

millions more shares are sitting in defendants' brokerage accounts and likely to be sold unlawfully to the public. No registration statement was in effect for the Selling Defendants' resale of securities, thus their sales were in violation of Section 5 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e]. Further, almost $17 million of the Selling Defendants' ill-gotten proceeds have been transferred out of the United States. Unless an asset freeze covering the Selling Defendants' Biozoom shares is issued, the unlawful sales of securities and transfer or dissipation of the proceeds from sales of the securities will likely continue.

2.     The Commission also brings this civil law enforcement action against Mariano Graciarena and Fernando Loureyro. These defendants recently deposited over a total of approximately 4.4 million shares of Biozoom stock into their respective brokerage accounts. Like the shares sold by the Selling Defendants, there is no registration statement in effect permitting the lawful resale of the Biozoom shares held by Graciarena and Loureyro. Because Graciarena and Loureyro are likely to engage in the sale of securities in violation of Section 5 of the Securities Act, the Commission seeks to enjoin them from offering for resale their Biozoom shares until such time as a registration statement is filed and in effect.

3.     From March 2013 to June 2013, defendants opened brokerage accounts at broker-dealers and deposited millions of shares of Biozoom, Inc. (f/k/a Entertainment Art, Inc.) that they claimed did not bear a restrictive legend and were free-trading shares. All of the defendants claimed that they had purchased all or some of their shares from some of the original shareholders of Entertainment Art in transactions between November 2012 and March 2013.

2

4.      To bolster their claims, each of the defendants submitted stock purchase agreements dated between November 2012 and March 2013 that purportedly evidenced their purchase of Entertainment Art stock from the former Entertainment Art shareholders. Based on these stock purchase agreements and other documentation, the defendants – between March 2013 and June 2013 – deposited a total of 20,130,000 shares of Biozoom into their brokerage accounts.

5.      The defendants could not, however, have purchased any of their shares from the original Entertainment Art shareholders as they claimed because those shareholders ceased to have any interest in the company on or around May 2009 –more than *three years* earlier than the defendants' claimed purchases.

6.      Almost immediately after defendants deposited shares of Biozoom in their brokerage accounts, Biozoom began issuing a series of press releases and a stock promotional campaign for the company began. Following these press releases and stock promotional campaign, from May 16, 2013 to June 21, 2013, the company's stock price and volume increased dramatically. For example, prior to May 16, 2013, no shares in Biozoom had traded. However, from May 16, 2013 to June 21, 2013, Biozoom's stock price shot past $4 per share, with total volume of more than 87 million shares.

7.      During this same period, eight of the defendants sold millions of Biozoom shares into the rising market — reaping millions of dollars in proceeds as a result. In total, over an approximately one month period from May 16, 2013 – June 17, 2013, eight of the defendants sold a total of over 14 million shares of Biozoom stock into the public markets for proceeds of almost $34 million.

8.      None of these sales were made pursuant to an effective registration statement. By engaging in the foregoing conduct, the eight Selling Defendants violated the registration provisions of the federal securities laws, Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. 15 U.S.C. §§ 77e(a) and 77e(c)].

9.      While the remaining two defendants – Graciarena and Loureyro – have yet to sell any of their Biozoom shares, they are likely to do so unless restrained. They recently deposited millions of shares into their respective brokerage accounts, claiming (as the other defendants) that these shares have no restrictive legend and are available for resale to the public. Therefore, the Commission seeks an order pursuant to Securities Act Section 20(b) [15 U.S.C. 77t(b)] to enjoin them from violations of Sections 5(a) and 5(c) of the Securities Act.

## JURISDICTION AND VENUE

10.     The SEC brings this action pursuant to Section 5 [15 U.S.C. § 77e] and Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)]. Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and 28 U.S.C. § 1331.

12.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v], because certain acts, practices, and courses of business constituting the violations alleged herein have occurred within the Southern District of New York.

4

13.     Defendants will, unless restrained and enjoined, continue to engage in the acts, practices, transactions, and courses of business alleged in this Complaint, or in acts, practices, transactions, and courses of business of similar purport and object.

## THE DEFENDANTS

14.     Defendant Andres Horacio Ficicchia resides in Buenos Aires, Argentina and is an Argentine citizen.

15.     Defendant Gonzalo Garcia Blaya resides in Buenos Aires, Argentina, and is an Argentine citizen.

16.     Defendant Luciana Mariana Hernando resides in Buenos Aires, Argentina, and is an Argentine citizen.

17.     Defendant Cecilia De Lorenzo resides in Buenos Aires, Argentina, and is an Argentine citizen.

18.     Defendant Magdalena Tavella resides in Buenos Aires, Argentina, and is an Argentine citizen.

19.     Defendant Adriana Rosa Bagattin resides in Buenos Aires, Argentina, and is an Argentine citizen.

20.     Defendant Daniela Patricia Goldman resides in Buenos Aires, Argentina, and is an Argentine citizen.

21.     Defendant Mariano Pablo Ferrari resides in Buenos Aires, Argentina, and is an Argentine citizen.

22.     Defendant Mariano Graciarena resides in Buenos Aires, Argentina, and is an Argentine citizen.

23.     Defendant Fernando Loureyro resides in Buenos Aires, Argentina, and is an Argentine citizen.

## OTHER RELEVANT ENTITIES

24.     Biozoom, Inc. (f/k/a Entertainment Arts, Inc.) is a Nevada corporation with its principal place of business in Kassel, Germany. Biozoom purports to be in the business of researching, developing, and licensing technologies relating to the mobile remote collection of biomedical data as well as bilateral diagnostic communication. Biozoom's common stock is registered with the Commission pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78l] and is quoted on the Over-the-Counter Bulletin Board ("OTCBB") under the trading symbol "BIZM."

25.     Legend Securities ("Legend") is a registered broker-dealer located in New York, New York.

26.     Scottsdale Capital Advisors ("Scottsdale") is a registered broker-dealer located in Phoenix, Arizona.

## FACTUAL BACKGROUND

### A.     The Creation of Entertainment Art and Initial Sale of Company

27.     On June 15, 2007, Entertainment Art was incorporated under the laws of the state of Nevada. In public filings, Entertainment Art represented that it was a developmental stage company formed to design, produce, and sell a line of leather bags, with offices located in West Hempstead, New York. Entertainment Art was controlled by the three members of company management.

28.     From November 2007 through March 2008, Entertainment Art offered and sold a total of 610,000 shares to 34 different investors in private placement transactions.

6

A share certificate reflecting Entertainment Art share ownership was issued to each investor.

29.     On July 18, 2008, Entertainment Art filed a Form S-1 registration statement with the Commission to register the resale transactions for the 34 shareholders who acquired Entertainment Art stock in these private placements ("the Form S-1 Shareholders"). In particular, of the total 1,810,000 shares outstanding at the time of the Form S-1, Entertainment Art's S-1 covered 610,000, or approximately one-third, of the company's then outstanding shares.

30.     The remaining 1,200,000 shares of Entertainment Art stock were held by the three company officers in three identical 400,000 share blocks.

31.     On May 1, 2009, Entertainment Art announced, in a public filing with the Commission, that the three Entertainment Art officers sold their total 1,200,000 shares of Entertainment Art to Medford Financial Ltd. ("Medford Financial"), a Belizean entity, for a purchase price of $120,000.

32.     Contrary to this disclosure, however, Medford Financial purchased more than 1,200,000 shares of Entertainment Art. In fact, Medford Financial also purchased all of the 610,000 shares that had been purchased by the Form S-1 shareholders. Thus, in this transaction, Medford Financial purchased *all* of the outstanding shares, including the shares then held by the Form S-1 Shareholders.

33.     Each of the Form S-1 shareholders received their initial investment back, with an additional, small return on their investment. Thus, by on or around May 2009, each of the Form S-1 shareholders had no remaining shares or other interest in Entertainment Art.

34. According to company filings, on June 30, 2009, Entertainment Art's board of directors approved the implementation of a 33:1 forward split for Entertainment Art stock without correspondingly increasing the authorized shares of common stock for Entertainment Art. On July 21, 2009, the forward split became effective, and as a result of the forward split, the company had 59,730,000 shares of common stock outstanding – which was **all** owned by Medford Financial.

**B.      Another Sale of Entertainment Art and Acquisition of Biozoom Technology**

35. On October 25, 2012, Entertainment Art reported, in a public filing with the Commission, that on October 19 Medford Financial sold 39,600,000 common shares of Entertainment Art in a private transaction with Le Mond Capital for a purchase price of $430,000, which equates to approximately $0.01 per share.

36. Le Mond Capital purports to be a foreign entity based in the British Virgin Islands. As a result of the sale, Entertainment Art disclosed that Le Mond Capital controlled over 66.3% of the Company's issued and outstanding common stock.

37. However, on information and belief, Le Mond Capital purchased the *entire* company from Medford Financial – and all of 59,730,000 outstanding shares.

38. The owner of Le Mond Capital, Sara Deutsch, became Entertainment Art's new President, Chief Executive Officer, Principal Executive Officer, Treasurer, Chief Financial Officer, Secretary, Treasurer, and Director. On information and belief, Deutsch is a resident of Buenos Aires, Argentina.

39. From September 2011 to at least October 2012, Deutsch worked as a manager of Magdalena's Party. According to the business' website, Magdalena's Party is

8

a restaurant located in Buenos Aires, Argentina. According to another website describing Magdalena's Party, it is co-owned by Deutsch, defendant Magdalena Tavella, and others.

40.     On March 12, 2013, Entertainment Art filed a Form 8-K with the Commission in which it announced a dramatic change in its business operations from a company that developed fashionable leather bags to a company that was involved in the biomedical industry. In particular, Entertainment Art announced a transaction pursuant to which its newly formed subsidiary, Biozoom Technologies, Inc., acquired certain patents, licenses, and related assets from each of three separate companies: Opsolution Spectroscopic Systems, Opsolution NanoPhotonics, and Opsolution GmBH, (the "Opsolution acquisition") in exchange for cash of $50,000 and 39 million shares of Entertainment Art common stock.

41.     Entertainment Art described that, through Biozoom, it was now in the business of "researching, developing, and licensing technologies relating to the mobile remote collection of biomedical data as well as bilateral diagnostic communication."

42.     Entertainment Art further disclosed that – as of immediately after closing of the Opsolution acquisition and filing of the Form 8-K – Deutsch would step down as CEO and Chief Financial Officer of Entertainment Art, but would stay on as a Director only.

43.     As a result of the transaction, the 59,730,000 outstanding shares of Entertainment Art were allocated in the following manner. First, Le Mond Capital returned 39,000,000 shares to the company, and then those 39,000,000 shares were allocated – as shares bearing a restrictive legend – to four entities that were associated with the Opsolution entities.

44.     Thus, after these allocations, 20,730,000 shares of Entertainment Art remained.  Le Mond Capital retained 600,000 of these shares bearing a restrictive legend. The remaining 20,130,000 shares – which represented the total shares purchased by the Form S-1 Shareholders (and subsequently sold in the Medford Financial transaction on or around May 2009) – were unallocated.

45.     On April 1, 2013, Entertainment Art changed its name to Biozoom, under the trading symbol "BIZM" on the OTC Bulletin Board.

## C.     Defendants Deposit Biozoom Shares In Their Newly Opened Brokerage Accounts

46.     From January 2013 to May 2013, brokerage accounts were opened at Legend, a registered broker-dealer based in New York, in the name of four of the defendants:  Ficicchia, Blaya, Hernando, and De Lorenzo.

47.     In May 2013, brokerage accounts were opened at Scottsdale, a registered broker-dealer based in Phoenix, Arizona, in the name of another four defendants: Tavella, Bagattin, Goldman, and Ferrari.

48.     According to the account opening documentation – and as reflected in the table below – with one exception, none of the defendants worked in fields related to securities.

| Defendant | Profession |
|-----------|------------|
| Ficicchia | Self-employed music producer |
| Blaya | Music producer-stock investments |
| Hernando | Marketing Manager |
| De Lorenzo | Self-employed marketing specialist |

| Defendant | Profession |
|-----------|------------|
| Tavella | Attorney practicing administrative, political, intellectual property, and patent law |
| Bagattin | Retired Teacher |
| Ferrari | Sales and Marketing |
| Goldman | Delicatessen owner |

   1. Accounts at Legend

**Andres Horacio Ficicchia**

  49. Defendant Ficicchia opened his account at Legend on or about January 24, 2013 and funded the account with $26,000 cash.

  50. On November 30, 2012, Entertainment Art's transfer agent issued an Entertainment Art certificate for 165,000 shares to Ficicchia.

  51. On March 13, 2013, Entertainment Art's transfer agent issued an Entertainment Art certificate for 1,237,500 shares to Ficicchia.

  52. The certificate for 1,237,500 shares was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – the company approved the issuance of that certificate to Ficicchia.

  53. In order to deposit the certificate for 1,237,500 shares and the certificate of 165,000 shares of Entertainment Art into his brokerage account at Legend, defendant Ficicchia completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

54.    The documentation reflected that Ficicchia acquired the 1,237,500 shares pursuant to two private sales that were completed on February 19, 2013: (1) a purchase of 412,500 shares from Investor A and (2) a purchase of 825,000 shares from Investor B. The documentation also reflected that Ficicchia paid a total of approximately $6,300 for these shares, which equals approximately $.005 per share. For the following reasons, the documentation submitted by Ficicchia was false.

55.    Investor A was one of the Form S-1 shareholders who had sold his shares of Entertainment Art on or around May 2009 – almost four years before Ficicchia's claimed purchase of shares from Investor A. Investor B was purportedly a shareholder that acquired its shares from some of the Form S-1 shareholders in 2011 – approximately two years after the Form S-1 shareholders actually sold their shares.

56.    The documentation further reflected that Defendant Ficicchia acquired the 165,000 shares pursuant to a private sale that was completed on November 30, 2012 with Investor C – shares that he acquired for $24,750, which equals $0.15 per share. Investor C was also one of the Form S-1 Shareholders who had sold his shares of Entertainment Art on or around May 2009 – over three years before Ficicchia's claimed purchase of shares from Investor C.

57.    On March 5, 2013, Ficicchia deposited 165,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend; and then on March 27, 2013, Ficicchia deposited an additional 1,237,500 shares (again not bearing a restrictive legend) – for a total of 1,402,500 shares.

58.    On April 1, 2013, due to the name change of Entertainment Art to Biozoom, these shares became Biozoom shares. Thus, defendant Ficicchia held

12

1,402,500 shares of Biozoom that were purportedly available to be sold on the public markets.

**Gonzalo Garcia Blaya**

59.     On or about March 26, 2013, defendant Blaya opened an account at Legend and funded this account with $26,000 cash.

60.     On March 22, 2013 – just four days prior to opening this account – Entertainment Art's transfer agent issued a certificate for 1,485,000 Entertainment Art shares to Blaya.

61.     In order to deposit his certificate for 1,485,000 shares of Entertainment Art into his brokerage account at Legend, defendant Blaya completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.  For the following reasons, the documentation submitted by Blaya was false.

62.     The documentation reflected that Blaya acquired the 1,485,000 shares in four separate private sales that were completed on March 4, 2013: (1) a purchase of 165,000 shares from Investor D; (2) a purchase of 495,000 shares from Investor E; (3) a purchase of 165,000 shares from Investor F; and (4) a purchase of 660,000 shares from Investor G.  The documentation also reflected that Blaya paid a total of approximately $6,765 for these shares, which equals approximately $.005 per share.

63.     Each of Investors D, E, F, and G were Form S-1 Shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before Blaya's claimed purchase of shares from these investors.

64.     On April 16, 2013, Blaya deposited 1,485,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend. As a result of the business name change on April 1, 2013, these shares became Biozoom shares. Thus, defendant Blaya held 1,485,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Luciana Mariana Hernando**

65.     On or about March 7, 2013, defendant Hernando opened an account at Legend and funded the account with $50,000 cash.

66.     On March 22, 2013, Entertainment Art's transfer agent issued a certificate for 1,815,000 Entertainment Art shares to Hernando.

67.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account at Legend, defendant Hernando completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation. For the following reasons, the documentation submitted by Hernando was false.

68.     The documentation reflected that Hernando acquired the 1,815,000 shares pursuant to two separate private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor H; and (2) a purchase of 165,000 shares from Investor I. The documentation also reflected that Hernando paid a total of approximately $5,445 for these shares, which equals approximately $.003 per share.

69.     Both Investors H and I were Form S-1 shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before Hernando's claimed purchase of shares from these investors.

70.     On May 14, 2013, defendant Hernando deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend Securities.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.  Thus, defendant Hernando held 1,815,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Cecilia De Lorenzo**

71.     On or about February 4, 2013, defendant De Lorenzo opened an account at Legend and funded the account with $50,000 cash.

72.     On March 13, 2013, Entertainment Art's transfer agent issued a certificate for 2,062,500 shares to De Lorenzo.

73.     The certificate was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – the company approved the issuance of the above certificate to De Lorenzo.

74.     In order to deposit her 2,062,500 shares of Entertainment Art into her brokerage account at Legend, De Lorenzo completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.  For the following reasons, the documentation submitted by De Lorenzo was false.

75.     The documentation reflected that De Lorenzo acquired the 2,062,500 shares pursuant to two separate private sales that were completed on February 19, 2013 – the same day as the purported purchases of Entertainment Art stock by Ficicchia: (1) a purchase of 1,650,000 shares from Investor J; and (2) a purchase of 412,500 shares from

Investor K. The documentation also reflected that Defendant De Lorenzo paid a total of approximately $8,300 for these shares, which equals approximately $.004 per share.

76.     Both Investors J and K, however, were Form S-1 shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before defendant De Lorenzo's claimed purchase of shares from these investors.

77.     On March 22, 2013, defendant De Lorenzo deposited 2,062,500 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend. As a result of the business name change on April 1, 2013, these shares became Biozoom shares. Thus, defendant De Lorenzo held 2,062,500 shares of Biozoom that purportedly could be sold on the public markets.

        2.  Accounts at Scottsdale

**Magdalena Tavella**

78.     On March 22, 2013, Entertainment Art's stock transfer agent issued a certificate for 1,815,000 shares of Entertainment Art to Tavella.

79.     On or about May 16, 2013, defendant Tavella opened an account at Scottsdale.

80.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Tavella, completed a securities deposit checklist. For the following reasons, the documentation submitted by Tavella was false.

81.     The documentation reflected that Tavella acquired the 1,815,000 shares pursuant to three separate private sales that were completed on March 5, 2013 – the same day as the purported purchases of Entertainment Art by defendant Hernando: (1) a

purchase of 165,000 shares from Investor L; (2) a purchase of 165,000 shares from Investor M; and (3) a purchase of 1,485,000 shares from Investor N. The documentation reflected that Tavella paid a total of approximately $9,075 for these shares, which equals approximately $.006 per share.

82.     Investors L and M were two of the Form S-1 shareholders who had sold their shares of Entertainment Art on or around May 2009 – almost four years before Tavella's claimed purchase of shares from them.     Investor N was purportedly a shareholder that acquired its shares from some of the Form S-1 shareholders in March 2011 – almost two years after the Form S-1 shareholders sold their shares.

83.     On May 22, 2013, defendant Tavella deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares. Thus, defendant Tavella held 1,815,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Adriana Rosa Bagattin**

84.     On March 13, 2013, Entertainment Art's transfer agent issued a certificate for 2,310,000 Entertainment Art shares to defendant Bagattin.

85.     On or about May 10, 2013, defendant Bagattin opened an account at Scottsdale.

86.     In order to deposit her 2,310,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Bagattin, completed a securities deposit checklist.     For the following reasons, the documentation submitted by Bagattin was false.

87.     The documentation reflected that Bagattin acquired the 2,310,000 shares pursuant to three private sales that were completed on February 26, 2013: (1) a purchase of 1,650,000 shares from Investor O; (2) a purchase of 330,000 shares from Investor P; and (3) a purchase of 330,000 shares from Investor Q. The documentation reflected that Defendant Bagattin paid approximately $6,930 for these shares, which equals approximately $.003 per share.

88.     Each of Investors O, P, and Q, however, were Form S-1 Shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before defendant Bagattin's claimed purchase of shares from these persons.

89.     On May 22, 2013, Bagattin deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares. Thus, defendant Bagattin held 2,310,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Daniela Patricia Goldman**

90.     On March 22, 2013, Entertainment Art's transfer agent issued a certificate for 2,485,000 Entertainment Art shares to Goldman.

91.     On or about May 13, 2013, defendant Goldman opened an account at Scottsdale.

92.     In order to deposit her 2,485,000 shares of Entertainment Art into her brokerage account, Scottsdale, using documentation and information provided by Goldman, completed a securities deposit checklist. For the following reasons, the documentation submitted by Goldman was false.

18

93.     The documentation reflected that Goldman acquired the 2,485,000 shares pursuant to two private sales that were completed on March 4, 2013: (1) a purchase of 1,485,000 shares from Investor R; and (2) a purchase of 1,000,000 shares from Investor S. The documentation also reflected that Goldman paid approximately $7,455 for these shares, which equals approximately $.003 per share.

94.     Investor R purportedly obtained its shares from some of the Form S-1 Shareholders in March 2011 – almost two years after the Form S-1 shareholders sold their shares. Investor S was one of the Form S-1 shareholders and sold his shares on or around May 2009 – almost four years before defendant Goldman's claimed purchase of shares from him.

95.     On May 22, 2013, Goldman deposited 2,485,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares. Thus, defendant Goldman held 2,485,000 shares of Biozoom that were purportedly available for sale on the public markets.

**Mariano Pablo Ferrari**

96.     On March 22, 2013, Entertainment Art's transfer agent issued a certificate for 2,310,000 Entertainment Art shares to Ferrari.

97.     On or about May 20, 2013, Ferrari opened an account at Scottsdale.

98.     In order to deposit his 2,310,000 shares of Entertainment Art into his brokerage account, Scottsdale, using documentation and information provided by Ferrari, completed a securities deposit checklist. For the following reasons, the documentation provided by Ferrari was false.

99.     The documentation reflected that Ferrari acquired the 2,310,000 shares pursuant to two private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor T; and (2) a purchase of 660,000 shares from Investor U. The documentation also reflected that Goldman paid approximately $9,240 for these shares, or approximately $.004 per share.

100.    Investor T was one of the Form S-1 shareholders and sold his shares on or around May 2009 – almost four years before defendant Ferrari's claimed purchase of shares from him. Investor U purportedly obtained its shares from some of the Form S-1 shareholders in September 2009.

101.    On May 22, 2013, Ferrari deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale.    As a result of the business name change on April 1, 2013, these shares became Biozoom shares. Thus, defendant Ferrari held 2,310,000 shares of Biozoom that were purportedly available for sale on the public markets.

**Two Other Accounts in Names of Defendants Graciarena and Loureyro**

102.    On March 22, 2013, Manhattan Transfer issued a certificate for 2,145,000 Entertainment Art shares to Graciarena and 2,300,000 Entertainment Art shares to Loureyro.    Graciarena and Loureyro submitted documentation reflecting that they had obtained their shares in the same manner as the other eight defendants – i.e. – by purportedly purchasing shares from the Form S-1 shareholders.

103.    On or about June 14, 2013, Fernando Loureyro and Mariano Graciarena opened separate accounts at Scottsdale.   Like the other eight defendants, both stated in brokerage firm documents that they resided in Buenos Aires, Argentina.

20

104.    On June 18, 2013, these shares were deposited in the brokerage accounts of these two individuals. To date, none of these shares have been sold.

105.    In sum, from November 2012 to June 2013, the ten defendant accounts received a total of 20,130,000 shares of Entertainment Art. These shares represented all of the shares that were unallocated after the Opsolution acquisition. Moreover, these shares represented *100%* percent of the total shares without a restrictive legend outstanding in Biozoom at the time, and more than *33%* percent of the total outstanding shares of Biozoom.

### D.    Defendants Sell Millions of Biozoom Shares

106.    Beginning on May 22, 2013 – and after nearly all of the defendants had deposited their Biozoom shares not bearing a restrictive legend in their accounts – Biozoom began issuing a series of press releases in which it claimed it "created the world's first portable, handheld consumer device" to instantly and non-invasively measure certain biomarkers. These claims were also made by other entities, including Global Financial, Inc., Stock Preacher.com, among others.

107.    Following these positive claims concerning Biozoom's prospects, the accounts in the name of eight of the selling defendants sold substantial amounts of their Biozoom stock that did not bear a restrictive legend for massive proceeds. In particular, and as reflected in the chart below, eight of the defendants sold 14,078,406 shares of BIZM stock for proceeds of $33,997,152.

| Defendant | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|---|---|---|---|---|
| Blaya | 1,312,053 | 5/16/13 – 6/13/13 | $3,014,965 | 172,947 |
| De Lorenzo | 1,328,000 | 6/17/13 – 6/18/13 | $4,809,836 | 734,500 |
| Hernando | 1,815,000 | 6/6/13 – 6/17/13 | $5,048,217 | 0 |

21

| Defendant | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|-----------|-------------|------------|----------|------------------|
| Ficicchia | 1,402,500 | 5/20/13 – 6/5/13 | $1,979,389 | 272,620[1] |
| Tavella | 1,592,444 | 6/7/13 – 6/11/13 | $3,116,894 | 382,956[2] |
| Bagattin | 2,176,726 | 6/10/13 – 6/18/13 | $6,223,310 | 133,724 |
| Ferrari | 1,994,038 | 6/7/13 – 6/19/13 | $5,456,690 | 315,962 |
| Goldman | 2,457,645 | 5/28/13 – 6/6/13 | $3,771,761 | 27,355 |

108.    All of the eight selling defendants placed their orders to sell Biozoom stock in the same manner – via e-mail and instant message to either Legend or Scottsdale.

109.    Upon selling shares in Biozoom, several of the defendants instructed their brokerage firms to wire the proceeds of their sales to foreign bank accounts in various countries:

- **Ficicchia**: On June 7, 2013, defendant Ficicchia instructed Legend, to wire $1 million to Alpine Securities, Inc., a registered clearing broker-dealer. Alpine provides clearing services for Scottsdale, and as described earlier, Ficicchia opened an account at Scottsdale on or around June 10, 2013 and funded it with this $1 million. On June 25, 2013 – the same day as the Commission's order suspending trading in Biozoom – Ficicchia instructed Scottsdale to wire $325,000 to a bank account in Cyprus. This wire was not executed. Ficicchia's brokerage account at Legend currently has a cash balance of slightly over $1 million, and Ficicchia's brokerage account at Scottsdale currently has a cash balance of approximately $328,000.

---

[1]    On or around June 10, 2013, Ficicchia opened an account at Scottsdale and funded this account with $1 million from his account at Legend. Ficicchia's "Shares Remaining" column reflects Biozoom purchases that he has made in his account at Scottsdale.

[2]    Tavella's "Shares Remaining" column includes 160,400 Biozoom shares that she purchased in the open market on June 19, 2013.

- **Blaya:** On June 14, 2013, Blaya instructed Legend to wire "all settled funds except $30,000" to an account held in Geneva, Switzerland. This wire was not executed. This account currently has a cash balance of approximately $3.5 million.

- **Hernando:** On June 13, 2013, Hernando instructed his broker-dealer, Legend, to wire "all available settled cash" in her account, which at the time, was approximately $600,000, to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus. This wire was executed. On June 17, 2013, Hernando instructed his broker-dealer, Legend, to wire $2 million, again to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus. This wire was not executed by Legend. This account has a cash balance of approximately $4.5 million.

- **De Lorenzo:** De Lorenzo has not yet attempted to wire any money out of her account. De Lorenzo has a bank account in Dar Es Salaam. The account has a cash balance of approximately $4.8 million.

- **Tavella:** On June 25, 2013 – the day of the Commission's order suspending trading in the securities of Biozoom – Tavella attempted to wire approximately $2,450,000 out of her account at Scottsdale to a bank account in St. Vincent and the Grenadines. This wire has not been executed. The current cash balance in Tavella's brokerage account is approximately $2.47 million.

- **Bagattin:** On June 20, 2013, Bagattin instructed Scottsdale to wire approximately $4.33 million to a bank account in Cyprus. This wire was executed. On June 24, 2013, Bagattin instructed Scottsdale to send an additional

23

approximately $1.89 million to the same bank account.  This wire was also executed.  The current cash balance in Bagattin's brokerage account is $3,000.

- **Goldman:**   On June 11, 2013, Goldman instructed Scottsdale to wire approximately $3.77 million to an account held at a bank in Geneva, Switzerland – a bank where Blaya also holds an account.  This wire was executed.  The cash balance in Goldman's account is $0.

- **Ferrari:** On June 19, 2013, Ferrari instructed Scottsdale to wire $500,000 to an account held at a bank in Panama.  This wire was executed.  On June 24, 2013, Ferrari instructed Scottsdale to wire an additional $4.9 million, this time to a bank in Belize.  This wire was also executed.  The cash balance in Ferrari's account is $0.

### F.  No Registration Statement Was In Effect At the Time Defendants Sold Biozoom Shares

110.    Section 5 of the Securities Act makes it unlawful for any person, directly or indirectly, to offer or sell securities, using the U.S. mails or interstate commerce, unless such offer or sale is registered with the Commission.

111.    No registration statement was in effect for the shares sold by the Selling Defendants.

112.    No registration statement is in effect for the Biozoom shares held by defendants Graciarena and Loureyro.

### G.  Biozoom Is A Penny Stock As Defined By The Securities Exchange Act of 1934 ("Exchange Act")

113.    Biozoom's stock is a "penny stock" as defined by the Exchange Act.  At times relevant to this Complaint, the stock's shares traded at less than $5.00 per share.  During the same time period, Biozoom's stock did not meet any of the exceptions to

24

penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act.

114.   For example, the company's stock: (1) did not trade on a national securities exchange; (2) was not an "NMS stock," as defined in 17 C.F.R. § 242.242.600(b)(47); (3) did not have net tangible assets (i.e., total assets less intangible assets and liabilities) in excess of $5,000,000; and (4) did not have average revenue of at least $6,000,000 for the last three years. (*See* Exchange Act, Rule 3a51-1(g).)

## COUNT I

## VIOLATION OF SECTION 5 OF THE SECURITIES ACT, 15 U.S.C. §77e

### (Defendants Tavella, Ficicchia, Blava, Hernando, De Lorenzo, Bagattin, Ferrari, Goldman)

115.   Paragraphs 1 through 114 are hereby re-alleged and incorporated by reference.

116.   Defendants, by engaging in the conduct described above, directly or indirectly, and without a registration statement in effect as to such securities:

> (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise; or
>
> (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale.

117.   Defendants, by engaging in the conduct described above, also directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or

medium of any prospectus or otherwise securities, without a registration statement having been filed as to those securities.

118.    By engaging in the foregoing conduct, Defendants directly or indirectly, violated, and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

## INJUNCTION PURSUANT TO SECTION 20(b) OF THE SECURITIES ACT

### (Defendants Graciarena and Loureyro)

119.    Paragraphs 1 through 114 are re-alleged and incorporated by reference herein.

120.    Securities Act Section 20(b) provides that "whenever it shall appear to the Commission that any person is engaged in or is about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title, the Commission may in its discretion, bring an action in district court to enjoin such acts or practices . . ."

121.    Defendants Graciarena and Loureyro have deposited shares of Biozoom in their respective brokerage accounts.  Those shares do not bear a restrictive legend.  However, no registration statement is in effect for the offer of sale of those shares.

122.    Unless restrained and enjoined, Graciarena and Loureyro are likely to offer or sell their Biozoom shares to the public in violation of Section 5 of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari committed the violations charged and alleged herein.

### II.

Enter an order temporarily restraining and enjoining defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, Ferrari, Graciarena, and Loureyro, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### III.

Enter an order freezing the brokerage accounts and any assets of defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari derived from the sale of Biozoom stock; and, freezing the brokerage accounts of defendants Graciarena and Loureyro holding Biozoom shares.

### IV.

Enter an order requiring defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari to return to the United States any proceeds from the sale of Biozoom stock that have been transferred abroad and those proceeds which are

returned be frozen in a domestic bank during the pendency of this action to preserve such assets for the satisfaction of disgorgement.

**V.**

Enter an Order of Permanent Injunction restraining and enjoining defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, Ferrari, Graciarena, and Loureyro, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**VI.**

Enter an Order requiring defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari to disgorge the ill-gotten gains received as a result of the violations alleged herein, including prejudgment interest.

**VII.**

Issue an Order imposing upon defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)].

**VIII.**

Issue an order permanently and unconditionally barring, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], the Selling Defendants from participating in an

28

offering of penny stock as defined by Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other relief as this Court deems appropriate.

Dated: July 3, 2013

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: _Richard E. Simpson_

Richard E. Simpson (KS5859)
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4420
SimpsonR@sec.gov

*Of counsel:*

David J. Gottesman
Patrick M. Bryan

Antonia Chion
Ricky Sachar
Deborah J. Tarasevich
Scott M. Lowry
Jennie B. Krasner
U.S. Securities and Exchange Commission
100 F Street, NE

Washington, DC 20549

# EXHIBIT 5

## _Finra targets a dozen offshore firms suspecting of trading in pump-and-dumps_

The Deal Pipeline

September 13, 2013 Friday

Copyright 2013 The Deal, L.L.C. All Rights Reserved


Ex. No. __9__ ( __5__ p.
Witness: __Cruz__
Date: __2.17.17__
mgreporting.com
L Marin-Garcia #50541

**Length:** 1683 words

**Byline:** by Bill Meagher

## Body

In the past two years, the Financial Industry Regulatory Authority has asked the Securities and Exchange Commission to investigate at least a dozen offshore banks and brokerage houses that have generated at least $37 million in total proceeds from suspicious trading in companies linked to pump-and-dump schemes, according to internal documents obtained by The Deal.

The allegations were made in a series of reports that Finra sent to the SEC in 2012 and 2013. Officials from the SEC and from Finra, which regulates broker-dealers, declined to comment for this story.

The entities named by Finra include **Caledonian Global Financial Services Inc.** and Caledonian Bank, located in the Cayman Islands; **Legacy Global Markets SA** and **Clearwater Securities Inc.** of Belize; **Argus Stockbrokers Ltd.** of Cyprus; **CBH Compagnie Bancaire Helvetique SA, Rigi Capital AG** and **Bank Gutenberg AG** of Switzerland; **Verdmont Capital SA** and **Financial Pacific Inc.** of Panama; **Sharma Investments Inc.** of Samoa; **Sherman Capital LLC** of the Philippines and **Boutique Services Ltd.** in Hong Kong.

So far, it does not appear that the SEC has brought any enforcement actions against the offshore firms.

None of the offshore banks and trading houses named by Finra in its "Fraud Surveillance" reports responded to The Deal's requests for interviews.

The reports allege that the firms traded in shares of **Goff Corp., Marine Drive Mobile Corp., Toron Inc., Bioflamex Corp.** and **U.S. Highland Inc.** All of the companies were the subjects of paid stock promotions. All of their stocks climbed as a result of the promotions and then dropped after insiders sold shares. All the companies were also named in Finra reports to the SEC as probable targets of pump-and-dump campaigns.

The companies did not respond to requests for comment from The Deal.

Finra targets a dozen offshore firms suspecting of trading in pump-and-dumps

Pump-and-dumps typically occur in microcap companies that are the subjects of paid promotions. Stock promotion is often done through e-mail and direct-mail advertising targeting retail investors. The promotional materials often make colorful or exaggerated claims about the future course of the company or its products. The promotion is also sometimes paired with a flurry of press releases from the company itself, announcing positive developments in its business. Retail investors may buy shares based on the promotional claims, while insiders wait for the shares to rise, and then sell off their positions into the promotion.

Paid promotions are not necessarily illegal. To be legal, however, the promotion must contain true information and a legal a disclaimer disclosing that the promotion was paid for, who is paying for it and who is being paid.

The Finra reports, which originated in the agency's Office of Fraud Detection and Market Intelligence in Rockville Md., detailed the trades made by the offshore firms, the backgrounds of the companies involved, their finances and, in some cases, include interviews with company management. The dispatches also point out where press releases from the companies coincided with the promotions, detailed the promotions, named promoters and described the claims they made about the companies. Each report ends with a conclusion that the combination of promotions, timely trades and sometimes other issues suggest that a pump-and-dump has occurred.

The Finra reports allege that Caledonian Global's, Caledonian Bank's, Legacy's, Argus', CBH's, Bank Gutenberg's, Verdmont's and Clearwater's trading in Goff Corp. generated total proceeds of $24.6 million.

Goff purports to be a mining concern headquartered in Medellin, Colombia. Earlier this year, someone paid $3 million for websites including PennyStockPillager.com and AwesomePennyStocks.com to promote Goff shares.

"When the price of gold EXPLODES--shares of GOFF could soar--transforming early investors into Millionaires!" one promotion from PennyStockPillager stated.

Finra said that trading records obtained from U.S.-based brokers **Scottsdale Capital Advisors Vertical Group** and **Knight Execution & Clearing** Services LLC showed that the offshore traders bought Goff in March and sold the stock by April, as the share price rose from 20 cents to 65 cents. Goff, which trades over the counter under the symbol GOFF, was trading at 0.78 cents as of Sept. 12.

Clearwater Securities of Belize made $4 million trading Goff shares, according to Finra. The firm's trading account with Scottsdale Capital was opened in April 2012 by Philip Kueber. He has been referred to the SEC by Finra at least eight times for his alleged involvement with pump-and-dump schemes, including one involving the shares of purported mining company **Pepper Rock Resources Corp.** in May 2011. Kueber was Pepper Rock's CEO in 2010. He was also an officer with privately held **Oxalis Energy Group Inc.**, which participated in a joint venture with Pepper

Finra targets a dozen offshore firms suspecting of trading in pump-and-dumps

Rock that year, according to Finra. The agency alleges that Pepper Rock was a vehicle for a pump-and-dump fueled by Internet promotions and company-issued press releases.

Legacy Global also traded in the Pepper Rock pump-and-dump, according to Finra. Kueber was a signatory on account documents associated with Legacy.

He could not be reached for comment by The Deal.

In the case of Bioflamex, a Danish-based company that claims to manufacture fire extinguishers, it issued its first-ever press release on March 5, 2012. The next day a $552,500 stock promotion began. Bioflamex shares jumped from $6 to $20.92 that day.

By March 9, they had fallen to $3.96.

Bioflamex then issued a press release claiming to have "initiated an internal review and investigation of the unusually high volume of trading in its common shares on the OTC Bulletin Board, and the resulting precipitous drop in the market price of its stock." CEO Kristian Schiorring went on to blame a "slander campaign" against the company on stock trading message boards and a very high volume of short selling and panic selling for the share slide.

Finra said Bioflamex never responded to its request for more information.

As of Sept. 12, 2013, the stock, which trades under the symbol BFLX, was quoted at .05 cents.

In the case of Marine Drive Mobile, Finra detailed a May 2012 stock promotion that was paid for by **Newmarket Traders Ltd.** According to the report, John Person's Bottom Line Newsletter claimed that a $10,000 investment in Marine Drive Mobile could turn into $261,700 "in nearly the blink of an eye" and that the company might be acquired by **Facebook Inc.** at $26.17 a share. San Francisco-based Marine Drive Mobile offers technology that consumer companies can use to manage daily-deal and loyalty programs. A legal disclaimer in Person's newsletter said he had not verified any of the information in his publication and that he had been paid $5,000 to promote Marine Drive Mobile.

The Finra report noted that Person and his newsletter had been referenced several times before by the regulator to the SEC "for his suspect promotion of issuers that were potentially the subject of a 'pump-and-dump' scheme." Finra said it previously referred Person to the SEC in March 2012 for the promotion of **FrogAds Inc.**

The promotion of Marine Drive drove its shares from 67 cents on May 1 to $1.06 on May 24, according to Finra.

As of Sept. 12, 2013, Marine Drive stock had not traded for the past two days and was last quoted at 1 cent. The shares trade over the counter under the symbol MDMCD.

Finra officials interviewed Marine Drive CEO Colin MacDonald about the promotion in May 2012. He told them that he had "no clue on this crap," that he did not know anything about any

promotions paid for by people unaffiliated with the company and he had not hired anyone to do investor relations.

He had, however, hired Kevin Finn to market the company, according to Finra. Finn was Person's agent. Finn told Finra that Person was paid $10,000 for his promotion of Marine Drive Mobile. Finn also said that he had been referred to the company by a Vancouver, British Columbia-based client.

Finn said he did not review Person's newsletter and that he did not judge material in the newsletters for "truthfulness." Finn also told Finra that if someone involved in the Marine Drive Mobile promotion was doing something wrong, the regulator should "bring the bastards to justice."

A June 2012 promotion of the company by the James Rapholz Economic Advice newsletter called Marine Drive Mobile the "Game Changer of the Decade" and claimed that the company could become a takeover target for "Google, Amazon, Living Social or Groupon itself could suddenly enter a bidding war to get their hands on this breakthrough technology."

Rapholz advised investors to buy the stock at below $2 with a short-term target price of $3.50 to $4 and a two-year target of $27.

A legal disclaimer in Rapholz's newsletter shows that he was paid $7,500 by Newmarket. Finra noted that Rapholz was banned from the securities industry for a decade in 1991 because of his alleged securities law violations in his sales of shares in a Palm Beach, Fla.-based equity fund. Rapholz was also the subject of a cease-and-desist order from the South Carolina Securities Commissioner over the promotion of Cobra Oil & Gas Co., now known as **Viper Resources Inc.**, in 2010. Finn was referenced in the same order.

Person did not return a call from The Deal seeking comment. Finn declined to comment. MacDonald could not be reached for comment. Phone numbers listed for Rapholz's Economic Advice newsletter were either disconnected or had been reassigned to another business.

A disclaimer in Rapholz's newsletter had said that Newmarket managed a production budget of $460,000 to promote Marine Drive Mobile.

In the case of Toron, a Montreal-based mining company, Rigi Capital engaged in trades that appeared to match with Financial Pacific and Boutique, according to Finra. Rigi sold the same number of shares on the same days and at the same time that the other traders bought the same number of share with limit prices. In its report to the SEC, Finra said that Rigi made $62,195 from its trades, and Bank Gutenberg realized $22,135. Sharma Investments made $40,489.

DEAL SIZE

Undisclosed

**Load-Date:** September 27, 2013

Finra targets a dozen offshore firms suspecting of trading in pump-and-dumps

**End of Document**

# EXHIBIT 6

1  George Brandon (No. 017947) george.brandon@squirepb.com
2  Gregory A. Davis (No. 025976) gregory.davis@squirepb.com
   Gregory Schneider (No. 029660) gregory.schneider@squirepb.com
3  SQUIRE PATTON BOGGS (US) LLP
   One East Washington Street, Suite 2700
4  Phoenix, Arizona 85004
5  Telephone: (602) 528-4000
   Facsimile: (602) 253-8129
6  Attorneys for Defendant Financial Industry Regulatory Authority, Inc.

7

8                    IN THE UNITED STATES DISTRICT COURT

9                        FOR THE DISTRICT OF ARIZONA

10  John J. Hurry and Justine Hurry, as husband        Case No. 14-cv-02490-PHX-ROS
11  and wife; Investment Services Corporation,
    an Arizona corporation, et al.,
12
13              Plaintiffs,                             DECLARATION OF NANCY
                                                        CONDON IN SUPPORT OF
14          v.                                          FINRA'S MOTION FOR SUMMARY
                                                        JUDGMENT
15  Financial Industry Regulatory Authority,
    Inc., a Delaware corporation,
16
17              Defendant.

18          I, Nancy Condon, declare as follows:

19          1.      I am over the age of 18 years and am in all respects competent to make

20  this declaration. All facts stated herein are based upon my personal knowledge. If

21  called upon to testify, I could and would competently testify to the facts set forth herein.

22          2.      I am the Vice President for Media and External Communication at

23  Financial Industry Regulatory Authority, Inc. ("FINRA"). I have worked in that

24  department of FINRA and its predecessor, the National Association of Securities

25  Dealers, since 1997.

26          3.      **Exhibit A** hereto is a true and correct copy of emails the reporter Bill

27  Meagher and I exchanged on September 9, 2013. The September 9, 2013 email

28  exchange was kept and maintained in the regular course of FINRA's business. It is

                                          - 1 -

1  FINRA's practice to keep and maintain email communications between its Media and
2  External Communication department and reporters.
3       I declare under penalty of perjury that the following is true and correct.
4
5
6  Executed this _____ day of July, 2017.
7
8                                    _____
9                                    Nancy Condon
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 2 -

# EXHIBIT A

| | |
|---|---|
| **From:** | Condon, Nancy |
| **To:** | Bill Meagher |
| **Sent:** | 09-Sep-13 2:21:06 PM |
| **Subject:** | RE: Request for comment on story |

Bill – I am sorry – but since you will be writing about confidential communications between FINRA and the SEC that we did not provide you – I can't have my people in the story.  We need to be able to say that we had no part in the story and if we speak to you then we will not be able to do that.
Nancy

**From:** Bill Meagher [mailto:bmeagher@thedeal.com]
**Sent:** Monday, September 09, 2013 1:26 PM
**To:** Condon, Nancy
**Subject:** Request for comment on story

Hi Nancy,

I'm doing a story about FINRA advising the SEC of a suspicious trading by offshore banks and trading houses in regards to pump and dumps. After reviewing a group of FINRA internal reports that were forwarded to the SEC, it seems that trades made by the following list of banks raised flags:

Caledonian Global Financial Services
Caledonian Bank Limited
Legacy Global Markets S.A.
Argus Stockbrokers
CBH Compagnie Bancaire Helvetique SA
Bank Gutenberg AG
Verdmont Capital S.A.
Sharma Investments Inc
Financial Pacific
Boutique Services (Paul Turner)
Rigi Capital
Clearwater Securities

The reports give a pretty fair picture of the issues on the trades, and I know that normally FINRA prefers to go the no comment route. But since I'm not asking for confirmation of the agency's actions, I thought we might be able to set up an interview where I could get a better sense of how FINRA puts the reports together, put the issue of offshore banks, microcap trading and pump and dumps into perspective, and also get a better sense of how FINRA views this issue.

I have a deadline of COB Wed for the story. I look forward to hearing from you.


Best,

Bill

**BILL MEAGHER** | Associate Editor
*The DealFlow Report* | 707-992-0725 x36 | bmeagher@thedeal.com
www.thedeal.com

*Click **here** to view me on LinkedIn* | *Follow us on Twitter!* @TheDealNewsroom

FINRA_00000362



*Need help? Contact Client Services at customerservice@thedeal.com*
*Read about developing events in First Take*
*Sign up for newsletters here*

CONFIDENTIAL

# EXHIBIT 7

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline



[RETURN TO ARTICLE]

## PIPEs

Share     Reprint    Save to My Articles

Ex. No. 10 (5 p.
Witness: Cruz
Date: 2.12.17
mgreporting.com
L. Marin-Garcia #50541

# FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says

By Bill Meagher   Updated 09:05 PM, Dec-06-2013 ET

The FBI, the Securities and Exchange Commission and the Financial Industry Regulatory Authority have opened investigations into the involvement of Scottsdale Capital Advisors and Alpine Securities in the trading of Biozoom Inc., according to a person familiar with those investigations.

Investors in Biozoom lost some $300 million after the SEC halted trading in the stock in June. The commission cited "a lack of current and accurate information" about the stock and suspicions that the company and some shareholders may have illegally sold unregistered shares to the public.

Before it allowed trading in Biozoom to resume in July, the SEC obtained an emergency order from the U.S. District Court in Manhattan, freezing almost $16 million in cash in U.S. brokerage accounts.

Another $17 million in trading revenues connected to sales of Biozoom shares was wired overseas before the court order, the SEC claimed in its court filing. Another $8 million in wire transfers requested by Biozoom shareholders were halted by the broker-dealers before they could go overseas.

The SEC also ordered the broker-dealers involved in the transactions, Arizona-based Scottsdale Capital, Salt Lake City-based Alpine and Legend Securities Inc. of New York, to preserve all of their records connected to the Biozoom transactions.

The regulator charged eight Argentine citizens with illegal sales of unregistered shares of Biozoom. The complaint also named two other Argentines who owned shares of Biozoom but did not sell them prior to the asset freeze.

Biozoom, which lists Kassel, Germany, as its headquarters, purports to manufacture a "biofeedback device" that consumers can use to monitor and analyze data related to their health. The company went public in February through a reverse merger with registered shell company Entertainment Art Inc. and raised $1.15 million in a private placement to an investor whose identity was not disclosed.

The stock was the subject of an unusual promotion four months later. Recommendations for Biozoom stock appeared in at least 13 e-mail newsletters, according to Hotstocked.com, a website that tracks stock promotions. Legal disclaimers that accompanied the promotions claimed that no compensation had been paid

CONFIDENTIAL

FINRA_00000292

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

for the stock-friendly hype. Legal disclaimers in penny stock newsletters often identify the companies that pay for stock promotions and sometimes provide details of the compensation, as is required under securities law. Some stock promotion budgets run as high as $3 million.

One of the promotions claimed that Biozoom's "hand held device for the non-invasive transdermal analysis of antioxidants and other biomarkers in the human body... replaces expensive, time consuming and invasive blood tests."

"Future applications, future roll-out markets and applications are even more impressive," another newsletter stated. "Relevant biomarkers can and will be identified and analyzed for things such as cholesterol, alcohol various illegal drugs, smoke, poisons, and blood pressure - to name a few. The unit is being further developed to measure blood sugar levels, tapping into a staggering $220 billion a year diabetes market in the U.S. and 350 million people with diabetes around the world."

Biozoom stock was also promoted in an unusual advertising campaign that made use of mainstream media outlets, including the New York Times and USA Today. In June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

A full-page black and white ad in USA Today could have cost $125,000, according to information that the newspaper distributes to advertisers. A similar New York Times ad would run $80,000 to $100,000, according to a newspaper spokesperson.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

Biozoom started trading with a thin volume of about 10,000 shares a day. The $1.10 share price implied a market value of $108.6 million for the company.

But when the promotion began to pick up speed, the shares rose to $1.50 on their way to an intraday high of $4.50 and a market cap of $421.5 million. Trading volume jumped as high as 11.7 million shares.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, giving Biozoom a market capitalization of just $9.56 million. Investors lost more than $300 million.

Finra and SEC officials declined to comment for this story. An FBI spokesman would neither confirm nor deny the existence of a criminal probe tied to Biozoom trading.

But a source who has spoken to investigators said the investigations are ongoing. The probes by Finra and the SEC began in May, prior to the trading halt.

The brokerage firm Scottsdale Capital is owned by Scottsdale Capital Advisors Holdings LLC and the Hurry Family Irrevocable Trust. Alpine is owned by SCA Clearing LLC. Both Scottsdale and Alpine are controlled by John Hurry, who is a director of both companies. Hurry's wife Justine is a director with Scottsdale and a minority owner.

The home pages of both Scottsdale Capital's and Alpine's websites feature the same motto, "At the top of the Small Cap Market," along with a photo of a mountain peak. For Scottsdale, it is a desert mountain. For Alpine, it's a snow capped peak.

CONFIDENTIAL

FINRA_00000293

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

The SEC complaint alleges that six of the shareholders named in the action, Magdalena Tavella, Adriana Bagattin, Daniela Goldman, Mariano Graciarena, Fernando Loureyro and Mariano Ferrari, opened accounts at Scottsdale between May 10 and June 14. The other shareholders named by the SEC — Andres Ficicchia, Gonzalo Blaya, Lucia Hernando and Cecilia De Lorenzo — opened trading accounts at Legend Securities from January through March, according to the SEC. Ficicchia also had an account at Scottsdale.

In all, the Biozoom shareholders deposited 20 1 million shares in the trading accounts which represented 100% of the share float that did not carry a trading restriction. Those shares represented about 33% of the total shares in the company.

None of the Biozoom shareholders, contacted by e-mail, responded to a request for comment from The Deal.

Legend Securities is owned by Stocktrade Network Inc., Chris Cacace, Salvatore Caruso, Anthony Fusco and Mark Sulavka, according to Finra records.

The SEC claims that when the Argentine shareholders opened their trading accounts at Scottsdale and Legend, they provided documents and sales receipts purporting to show that they had bought their shares between Feb 19 and March 15 from the original shareholders of shell company Entertainment Art. But the SEC states in its complaint that all of the Entertainment Art shareholders sold their shares to Medford Financial Ltd. In 2009. Medford in turn was purchased by Le Mond Capital, a British Virgin Islands-based firm, for $430,000 last year. Le Mond was controlled by Sara Deutsch, who became CEO of Entertainment Art.

When the reverse merger took place in February, Deutsch paid $50,000 and 39 million shares to complete the transaction with four German entities for intellectual property that became the basis for Biozoom. The deal left her with 20 1 million shares. Deutsch became a director and assistant secretary for Biozoom, and in doing so, became what the SEC considers to be a control person.

The commission alleges that the shares Deutsch controlled were the shares that were actually distributed to the Argentine shareholders and that the stock sale agreements they used to help open the trading accounts at Scottsdale and Legend were fakes. Since Deutsch was a control person, any shares she distributed would be restricted and not free trading.

Deutsch ran a restaurant in Buenos Aires along with Magdalena Tavella called Magdalena's Party, according to the SEC complaint. Tavella was one of the Biozoom shareholders who traded through Scottsdale.

Miller Place, N Y -based securities attorney Randall Goulding supplied a legal opinion for all of the Biozoom shareholders, based in part on the stock sale documents portraying the transactions with original Entertainment Art shareholders, the SEC claimed in a court filing requesting the asset freeze. His opinion letter stated that the share certificates could be deposited without restrictions based on an exemption from registration provided by Rule 144 of the Securities Act. He said that the sellers were not affiliates of the company and had held the shares for more than four years and that the account holders were not individually or collectively the beneficial owner of more than 10% of the common shares of the company

On June 19, Goulding e-mailed the general counsel for Legend saying, "I hereby withdraw all of my opinions issued for the securities of Biozoom, formerly Entertainment Art. Be advised that none of these opinions should be relied upon," according to the SEC

San Antonio-based securities lawyer David Wise, who had supplied a similar legal opinion letter to Scottsdale for Tavella and Goldman on May 20, withdrew his letter June 26. Wise sent an e-mail to Scottsdale that in part read, "It has been brought to our attention that the SEC recently suspended trading in Biozoom. It has also been brought to our attention that Tavella and Goldman may have provided inaccurate or misleading information and documentation to Scottsdale and to this firm "

A number of factors make it appear that the Biozoom shareholders were connected in an organized effort.

CONFIDENTIAL

FINRA_00000294

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

A person who has spoken with investigators said that the six shareholders who held Scottsdale accounts opened them within the same week. The SEC complaint states that all of the shareholders live in Buenos Aires.

A person familiar with the investigative documents said the handwriting on the account applications for the Biozoom shareholders was the same, the answers to questions on their foreign due diligence packages were very similar and they held accounts at the same banks in Cyprus, Switzerland and Panama.

Moreover the e-mail addresses they furnished for their trading accounts were opened within a week of each other, according to Whosis.com, a website that furnishes information or domain registrations. The addresses are also similar all containing the account holders' last names

The shareholders with accounts at Legend were also from Buenos Aires.

According to a declaration filed with the court by Ricky Sachar, an assistant director of enforcement for the SEC, all of the shareholder's e-mail accounts were opened with the same regional Internet registry. All of the Biozoom trades were made from May 16 to June 17 and no other stocks were deposited or traded through the accounts at either Scottsdale or Legend. Also, all of the Biozoom trades were ordered using either e-mail or instant messaging accounts.

"These shareholders were brought in for this. It's as simple as that," said a person with knowledge of the investigations. "They are retired teachers, a deli owner, but they come in with millions of shares of stock. They only trade Biozoom and they are directing trades using traders' lingo, telling them which market makers to use for the trades? Come on. They were straw men for whoever is behind this whole thing."

That same person said the Biozoom shareholders who opened accounts with Scottsdale enjoyed perks that were not available to other Scottsdale clients.

Typical clients pay 4% per transaction, or 4.5% if their transactions are cleared through Alpine. Longtime clients who do a heavy volume of business may occasionally receive a discount of one percentage point. But Biozoom clients paid just 2%, the person said.

They were also allowed to place orders using instant messaging, which is generally forbidden under Scottsdale's internal policies. A person with knowledge of Scottsdale's operations said the policy was changed for the Biozoom shareholders by the broker-dealer's management after Biozoom shareholders complained.

A standing Scottsdale policy only allows clients to wire funds from their accounts to banks in the U.S or to institutions in the country where they live. But the person said that Biozoom shareholders were allowed to send funds to Cyprus, Switzerland, Panama and Belize, despite the fact that all of them live in Argentina and all of them had signed documents agreeing to abide by Scottsdale's wire policy

The same person said that several red flags were raised regarding the Biozoom trades at Scottsdale: They were large trades in a microcap stock with relatively little liquidity. Also, foreign nationals were wiring large sums out of the U.S., raising potential concerns about money laundering. Still, no follow-up occurred at the broker-dealer, the person said.

Finra, who has worked with the SEC on the probe, has had several "on-the-record" conversations with Scottsdale staff regarding the trading of Biozoom shares, the process by which the accounts were opened for the Argentine nationals and how assets were moved offshore, according to a person who has spoken with investigators. "OTRs" as they are known in the brokerage industry, are sessions in which Finra staff ask specific questions of registered representatives who must answer them or face disciplinary actions.

A source who has spoken to investigators said Scottsdale staff members who have talked with Finra regarding Biozoom trades are Timothy Scarpino, Tim Diblasi, Liz Arndt, Henry Diekmann, Jay Noiman, Michael Cruz, Adam Flandaca and Ted Ashton

CONFIDENTIAL

FINRA_00000295

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

Finra also talked with John Hurry, that same source said.

Scarpino, who processed the Argentine accounts connected to the Biozoom trades, resigned from his position at Scottsdale  He declined comment for this story  Ashton, who was a compliance analyst, also is no longer with the firm. Efforts to reach him failed.

Arndt is the office manager and oversees trading. Noiman and Diekmann are in compliance, and Diblasi is chief operating officer. Cruz is chief counsel, and Flandaca handles wiring of funds.

Diekmann denied he participated in the OTRs with Finra in a very brief phone interview.

None of the other Scottsdale staff questioned by Finra returned phone calls from The Deal seeking comment regarding the OTR's about Biozoom.

Gerald Russello, a partner at the law firm of Sidley Austin LLP in New York, said that Scottsdale and Alpine would have no comment regarding Biozoom trading or the investigations by Finra, the SEC and the FBI. Russello is a securities lawyer and former SEC enforcement branch chief.

Richard Kirby, a partner with K&L Gates LLP in Washington who represents Legend Securities, said he does not know if the SEC is concerned with how Legend conducted itself with regards to the Biozoom trades, but he said that Legend had not filed any notice with Finra regarding an SEC investigation.

Kirby also said that Legend alerted the SEC to its concerns regarding Biozoom and that the broker-dealer had acted on its own to freeze accounts tied to the Argentine nationals prior to the SEC action July 7.

While Legend did complete a June 13 $600,000 wire transfer for Luciana Hernando to Hellenic Bank Public Co. in Lemesos, Cyprus, it refused Hernando's request to move $2 million to the same bank on June 17  Legend also refused a wire request from Blaya June 14 to transfer almost $3.5 million to a bank in Geneva, according to the SEC complaint.

Meanwhile, John Hurry, who controls both Scottsdale and Alpine, is in negotiations to buy Salt Lake City-based broker-dealer Wilson-Davis & Co., according to a person with knowledge of the deal.

Representatives of Wilson-Davis did not return phone calls from The Deal seeking comment  Scottsdale representatives declined to comment.

Share    Reprint   Save to My Articles

Privacy  |  Terms and Conditions  |  My Account  |  Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

CONFIDENTIAL

FINRA_00000296

# EXHIBIT 8

| Case | FINRA |
|---|---|
| Issue Code | MSJ EXHIBIT |

| MILLER, ERIC 2/28/17 VOL 1 | | |
|---|---|---|
| 1 | 025:24 - 027:02 | 025:24   Q.    And Exhibit 10 is another Deal Pipeline<br>25 article dated, I believe --<br>026:01   A.    December 6.<br>02   Q.    -- December 6, 2013.  Correct.<br>03       Have you seen this article before?<br>04   A.    Yes.<br>05   Q.    And you discussed with Mr. Meagher some of<br>06 the information contained in this article, did you<br>07 not, sir?<br>08   A.    Correct.<br>09   Q.    So at least one of your conversations with<br>10 Mr. Meagher was prior to December 6, 2013?<br>11   A.    Yes.<br>12   Q.    Okay.  Now, if you take a look at the first<br>13 paragraph of the article it says, "The FBI, the<br>14 Securities and Exchange Commission, and the Financial<br>15 Industry Regulatory Authority have opened<br>16 investigations into the involvement of Scottsdale<br>17 Capital Advisors and Alpine Securities in the trading<br>18 of Biozoom, Inc., according to a person familiar with<br>19 those investigations."<br>20       Do you see that?<br>21   A.    Yes, I see that.<br>22   Q.    Are you the person that told Mr. Meagher<br>23 that?<br>24   A.    I was never aware of the FBI.  I was aware<br>25 of the Securities Exchange Commission and FINRA.<br>027:01   Q.    And you told Mr. Meagher that?<br>02   A.    Yeah.  Yes. |
| 2 | 028:05 - 028:11 | 028:05   Q.    But did you, at some point prior to<br>06 December 6 of 2013, say to Mr. Meagher in words or in<br>07 substance, "The investigations are ongoing" -- "There<br>08 are investigations ongoing"?<br>09   A.    Yeah.  Yeah.<br>10   Q.    You did?<br>11   A.    Yes.  Yes. |

| 3 | 029:17 - 033:02 | 029:17 | Q.   Okay.  The next paragraph says, "A person |
|---|---|---|---|
| | | 18 | familiar with the investigative documents said the |
| | | 19 | handwriting on the account applications for the |
| | | 20 | Biozoom shareholders was the same.  The answers to |
| | | 21 | questions on their foreign due diligence packages |
| | | 22 | were very similar, and they held accounts at the same |
| | | 23 | banks in Cypress, Switzerland, and Panama." |
| | | 24 | Did you discuss that those -- facts -- |
| | | 25 | A.   Yes. |
| | | 030:01 | Q.   -- with Mr. Meagher? |
| | | 02 | A.   Yes. |
| | | 03 | Q.   You told him those facts? |
| | | 04 | A.   Correct. |
| | | 05 | Q.   And the next paragraph says, "Moreover, the |
| | | 06 | e-mail addresses they furnished for their trading |
| | | 07 | accounts were opened within a week of each other, |
| | | 08 | according to Whois.com.  The addresses are all so |
| | | 09 | similar, all containing the account holders' last |
| | | 10 | name." |
| | | 11 | Did you discuss that with Mr. Meagher or |
| | | 12 | point that out to him? |
| | | 13 | A.   Yes. |
| | | 14 | Q.   Okay.  Now I'm going to skip down to the |
| | | 15 | paragraph that quotes someone.  It says, "These |
| | | 16 | shareholders," two paragraphs down, it's quoted in |
| | | 17 | the article, "'These shareholders were brought in for |
| | | 18 | this.  It's as simple as that,' said a person with |
| | | 19 | knowledge of the investigations.  'They are retired |
| | | 20 | teachers, a deli owner, but they come in with |
| | | 21 | millions of shares of stock.  They only trade Biozoom |
| | | 22 | and they are directing trades using traders' lingo |
| | | 23 | telling them which market makers to use for the |
| | | 24 | trades?  Come on, they were strawmen for whoever is |
| | | 25 | behind this whole thing.'" |
| | | 031:01 | A.   Uh-huh. |
| | | 02 | Q.   Sir, is that Mr. Meagher quoting you? |
| | | 03 | A.   Yes. |
| | | 04 | Q.   Okay.  And the next paragraph says, "That |
| | | 05 | same person," presumably you, "said the Biozoom |
| | | 06 | shareholders who opened accounts with Scottsdale |
| | | 07 | enjoyed perks that were not available to other |
| | | 08 | Scottsdale clients.  Typical clients pay 4 percent |
| | | 09 | per transaction or 4.5 percent if their transactions |

10  are cleared through Alpine.  Long-time clients who do

11  a heavy volume of business may occasionally receive a

12  discount of 1 percentage point.  Biozoom clients paid

13  just 2 percent, the person said."

14       Is he stating -- is Mr. Meagher stating

15  correctly there what you told him?

16    A.   Yes.

17    Q.   It goes on, "They were also allowed to

18  place orders using instant messaging, which is

19  generally forbidden under Scottsdale's internal

20  policies.  A person with knowledge of Scottsdale's

21  operations said the policy was changed for the

22  Biozoom shareholders by the broker-dealers'

23  management after Biozoom shareholders complained."

24       Are you that person, sir, mentioned in that

25  paragraph, who talked about instant messaging and --

032:01    A.   Oh, yes.  Yes.

02    Q.   Okay.  The next paragraph says, "A standing

03  Scottsdale policy only allows clients to wire funds

04  from their accounts to bank" -- "banks in the U.S. or

05  to institutions in the country where they live, but

06  the person said that Biozoom shareholders were

07  allowed to send funds to Cypress, Switzerland,

08  Panama, and Belize, despite the fact that all of them

09  live in Argentina and all of them had signed

10  documents agreeing to abide by Scottsdale's wire

11  policy."

12    A.   Correct.

13    Q.   Did I read that correctly?

14    A.   Correct.

15    Q.   And you're the person mentioned there who

16  told Mr. Meagher that?

17    A.   Correct.

18    Q.   Okay.  The next paragraph reads, "The same

19  person said that several red flags were raised

20  regarding the Biozoom trades at Scottsdale.  'They

21  were large trades in a microcap stock with relatively

22  little liquidity.  Also, foreign nationals were

23  wiring large sums out of the U.S., raising potential

24  concerns about money laundering.  Still, no follow-up

25  occurred at the broker-dealer,' the person said."

033:01       And that person was you.  Correct?

| | | | |
|---|---|---|---|
| | | 02 | A.    Correct. |
| 4 | 033:16 - 034:02 | 033:16 | Q.    The next paragraph says, "A source who has |
| | | 17 | spoken to investigators says Scottsdale staff members |
| | | 18 | who have talked with FINRA regarding Biozoom trades |
| | | 19 | are Timothy Scarpino, Tim DiBlasi, Liz Arndt, Henry |
| | | 20 | Dickerman [sic], Jay Noiman, Michael Cruz, Adam" |
| | | 21 | Flandaca -- "Fiandaca" -- |
| | | 22 | A.    Correct. |
| | | 23 | Q.    "And Ted Ashton." |
| | | 24 | A.    Yes. |
| | | 25 | Q.    Are you the source of Mr. Meagher being |
| | | 034:01 | able to say that? |
| | | 02 | A.    Correct. |
| 5 | 035:21 - 037:03 | 035:21 | If you'll turn to the second page, fifth |
| | | 22 | paragraph down, it reads, "The account documents |
| | | 23 | furnished by the Biozoom shareholders led to |
| | | 24 | speculation that the members of the group were not |
| | | 25 | the real investors, but instead, were simply |
| | | 036:01 | nominees.  None of the Argentines listed 'investor' |
| | | 02 | as their profession and none of them deposited or |
| | | 03 | traded in any other stocks, according to a person |
| | | 04 | familiar with the investigation." |
| | | 05 | Was that you who told Mr. Miller that, |
| | | 06 | sir -- Mr. Meagher that? |
| | | 07 | A.    No, I understood.  I would assume so, based |
| | | 08 | on previous testimony. |
| | | 09 | Q.    Okay.  The next sentence says, "The |
| | | 10 | Argentine group is said to have included retired |
| | | 11 | teachers and the owner of a delicatessen." |
| | | 12 | Is he just repeating something you -- |
| | | 13 | A.    Repeating. |
| | | 14 | Q.    Yes, but that's something you did tell him |
| | | 15 | originally? |
| | | 16 | A.    Correct.  And it was answered before. |
| | | 17 | Q.    Right.  It was in the prior article? |
| | | 18 | A.    Correct. |
| | | 19 | Q.    Okay.  And in -- the next two paragraphs |
| | | 20 | talks about the perks and different treatment of the |
| | | 21 | Biozoom shareholders by SCA, and that's the same |
| | | 22 | material -- |
| | | 23 | A.    Repeated. |
| | | 24 | Q.    That's the same material repeated that you |

| | | | |
|---|---|---|---|
| | | 25 | said you gave to Mr. Meagher for the prior article? |
| | 037:01 | | A.     Uh-huh. |
| | | 02 | Q.     Yes? |
| | | 03 | A.     Correct. |
| 6 | 038:07 - 040:13 | 038:07 | Q.     That is an April 16th, 2014, article in The |
| | | 08 | Deal Pipeline.  I'll ask you to just take a look |
| | | 09 | briefly -- |
| | | 10 | A.     Uh-huh. |
| | | 11 | Q.     -- and tell me whether you've seen this |
| | | 12 | article before. |
| | | 13 | A.     Correct. |
| | | 14 | Q.     You have seen it before? |
| | | 15 | A.     Correct. |
| | | 16 | Q.     And you discussed with Mr. Meagher some of |
| | | 17 | the information contained in this article, did you |
| | | 18 | not? |
| | | 19 | A.     Correct. |
| | | 20 | Q.     And do you attribute this to a second |
| | | 21 | conversation with Mr. Meagher in your recollection? |
| | | 22 | A.     I would assume so. |
| | | 23 | Q.     Okay.  The first paragraph reads, "On March |
| | | 24 | 10, the staff at Scottsdale Capital Advisors was |
| | | 25 | startled when their receptionist called out into the |
| | 039:01 | | office 'FINRA is here!'" |
| | | 02 | Did you tell Mr. Meagher that? |
| | | 03 | A.     Correct. |
| | | 04 | Q.     The next paragraph reads, "While |
| | | 05 | representatives from the Financial Industry |
| | | 06 | Regulatory Authority were expected at the end of the |
| | | 07 | month for a scheduled two-week exam, this visit had |
| | | 08 | nothing to do with that appointment.  Rather, the |
| | | 09 | investigators asked for files related to overseas |
| | | 10 | clients and omnibus accounts, which are owned in the |
| | | 11 | names of other brokerage firms, according to a person |
| | | 12 | familiar with the raid." |
| | | 13 | Was that person you? |
| | | 14 | A.     Yes. |
| | | 15 | Q.     And it goes on, "That person said that a |
| | | 16 | group of FINRA investigators hauled away copies of |
| | | 17 | documents regarding omnibus accounts at Scottsdale |
| | | 18 | that included those owned in the name of Belize-based |
| | | 19 | Titan International Securities, Inc., and Cayman |

|   |   |   |
|---|---|---|
| | | 20    Island-based Caledonian Global Financial Services, |
| | | 21    Inc., and a Cayman account linked to Scottsdale owner |
| | | 22    John Hurry." |
| | | 23         I take it you also told Mr. Meagher that -- |
| | | 24    those facts? |
| | | 25    A.    Correct. |
| | | 040:01    Q.    I'll just ask you to turn over to page 4 of |
| | | 02    the article, which is Exhibit 13.  Okay.  And you'll |
| | | 03    see down in the last paragraph "Attributes of the |
| | | 04    Argentine investors discussed again," and that is a |
| | | 05    repetition of facts you earlier gave Mr. Meagher; is |
| | | 06    that correct? |
| | | 07    A.    Correct. |
| | | 08    Q.    And the same is true about the perks the |
| | | 09    Biozoom shareholders were given -- |
| | | 10    A.    Correct. |
| | | 11    Q.    -- at the top of page 5 in the first two |
| | | 12    paragraphs? |
| | | 13    A.    Correct. |
| 7 | 078:24 - 079:07 | 078:24    Q.    So flipping the page, it says, "A person |
| | | 25    who has spoken with investigators said that the six |
| | | 079:01    shareholders who held Scottsdale accounts opened them |
| | | 02    within the same week." |
| | | 03         Do you see that? |
| | | 04    A.    Yes. |
| | | 05    Q.    And to the best of your knowledge, you're |
| | | 06    the source for that sentence.  Correct? |
| | | 07    A.    Yes. |
| 8 | 097:22 - 098:05 | 097:22    Q.    Okay.  We'll get to that.  It says -- going |
| | | 23    down a couple paragraphs, it says, "Typical clients |
| | | 24    pay 4 percent per transaction or 4.5 percent if the |
| | | 25    transactions are cleared through Alpine." |
| | | 098:01         Do you see that? |
| | | 02    A.    Yes, I do. |
| | | 03    Q.    And it's your belief that you were the |
| | | 04    source of that -- |
| | | 05    A.    Yes. |
| 9 | 112:02 - 112:17 | 112:02    Q.    Reading the next paragraph, it says, |
| | | 03    "FINRA, who has worked with the SEC on the probe, has |
| | | 04    had several 'on-the-record' conversations with |
| | | 05    Scottsdale staff regarding the trading of Biozoom |
| | | 06    shares, the process by which the accounts were opened |

|    |                   |        |                                                      |
|----|-------------------|--------|------------------------------------------------------|
|    |                   | 07     | for the Argentine nationals and how assets were moved |
|    |                   | 08     | offshore, according to a person who has spoken with  |
|    |                   | 09     | investigators."                                      |
|    |                   | 10     |     Do you see that?              |
|    |                   | 11     |   A.   Yes, I do.            |
|    |                   | 12     |   Q.   Do you believe you're the source of that |
|    |                   | 13     | statement?                                           |
|    |                   | 14     |   A.   Perhaps.             |
|    |                   | 15     |   Q.   Why do you say "perhaps"? |
|    |                   | 16     |   A.   I would say -- all right.  I'll go on the |
|    |                   | 17     | record and say yes.                                  |
| 10 | 122:15 - 122:22   | 122:15 |   Q.   Okay.  And you -- you say you were the |
|    |                   | 16     | source of the information in the first paragraph     |
|    |                   | 17     | where the receptionist called out, "FINRA is here!"  |
|    |                   | 18     | Correct?                                             |
|    |                   | 19     |   A.   Yes.                 |
|    |                   | 20     |   Q.   Did the receptionist really call out, |
|    |                   | 21     | "FINRA is here!"?                                    |
|    |                   | 22     |   A.   Yes.                 |
| 11 | 136:23 - 137:08   | 136:23 |   Q.   Last page, top paragraph, "Scottsdale |
|    |                   | 24     | Advisors is said to have given the Biozoom           |
|    |                   | 25     | shareholders perks that were not available to other  |
|    |                   | 137:01 | clients.  They submitted trade orders by e-mail or   |
|    |                   | 02     | instant messaging, which the firm did not allow for  |
|    |                   | 03     | most clients."                                       |
|    |                   | 04     |     Do you see that?              |
|    |                   | 05     |   A.   Yes.                 |
|    |                   | 06     |   Q.   Do you believe you're the source of that |
|    |                   | 07     | information?                                         |
|    |                   | 08     |   A.   Yes.                 |

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

        v.

MAGDALENA TAVELLA,
ANDRES HORACIO FICICCHIA, GONZALO
GARCIA BLAYA, LUCIA MARIANA
HERNANDO, CECILIA DE LORENZO,
ADRIANA ROSA BAGATTIN,
DANIELA PATRICIA GOLDMAN,
MARIANO PABLO FERRARI,
MARIANO GRACIARENA, and
FERNANDO LOUREYRO,

        Defendants.

**DECLARATION OF RICKY
SACHAR**

---

    I, Ricky Sachar, pursuant to 28 U.S.C. §1746, declare as follows:

    1.    I am over 18 years of age and an Assistant Director in the Division of Enforcement of the United States Securities and Exchange Commission ("Commission"). I have been employed by the Commission for nine years. My duties include supervising and conducting investigations into potential violations of the federal securities laws. In June 2013, the Division of Enforcement commenced a formal investigation involving trading in the shares of Biozoom Inc. (f/k/a Entertainment Art, Inc.), whose stock is traded on the OTC Bulletin Board.

1

**A. Biozoom, Inc. f/k/a Entertainment Art, Inc. Background**

2.     Biozoom, Inc. ("Biozoom") is a Nevada corporation.  Biozoom's common stock is registered with the Commission pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78l] and is quoted on the OTCBB under the trading symbol "BIZM."  Until April 1, 2013, Biozoom was known as Entertainment Art, Inc. ("Entertainment Art").

3.     Entertainment Art represented itself as a developmental stage company formed to design, produce, and sell a line of leather bags, with offices located in West Hempstead, New York.  According to filings made by Entertainment Art with the Commission, beginning in late 2007, Entertainment Art sold some of its stock in private placements.  On July 18, 2008, Entertainment Art filed a Form S-1 registration statement with the Commission to register the resale transactions for the 34 shareholders who acquired Entertainment Art stock in these private placements.  In particular, of the total 1,810,000 shares outstanding at the time of the Form S-1, Entertainment Art's S-1 covered 610,000, or approximately one-third, of the company's then outstanding shares.

4.     The remaining 1,200,000 shares of Entertainment Art stock were held by the three officers of Entertainment Art (Joseph Koegel, Ian Beiss, and David Lubin) in three identical 400,000 share blocks.

5.     On May 1, 2009, Entertainment Art made a public filing that the three Entertainment Art officers sold their total 1,200,000 shares of Entertainment Art to Medford Financial Ltd. ("Medford Financial"), a Belizean entity, for a purchase price of $120,000.

6.     The Commission's staff, however, has uncovered evidence that Medford Financial purchased more than 1,200,000 shares of Entertainment Art.  In particular, Medford

Financial also purchased all of the 610,000 shares that were sold to the 34 shareholders identified in the company's July 18, 2008 Form S-1. (*See* Declaration of David Lubin, filed contemporaneously herewith.)

7.     All of the share certificates for the 34 shareholders were collected by David Lubin, who was then Entertainment Art's legal counsel and one of its officers. Each of the 34 share certificates contained the requisite signature guarantees and other information to allow for them to be sold or transferred to Medford Financial.[1]

8.     On June 30, 2009, Entertainment Art's board of directors approved the implementation of a 33:1 forward split for Entertainment Art stock without correspondingly increasing the authorized shares of common stock for Entertainment Art. On July 21, 2009, the forward split went effective, and as a result of the forward split, the company had 59,730,000 shares of common stock outstanding.

**B.   Sale of Entertainment Art and Acquisition of Biozoom Technology**

9.     On October 25, 2012, Entertainment Art announced that Medford Financial sold 39,600,000 common shares of Entertainment Art in a private transaction to Le Mond Capital for a purchase price of $430,000, or approximately $0.01 per share. Entertainment Art disclosed that, as a result of the sale, Le Mond Capital controlled over 66.3% of the Company's issued and outstanding common stock. In the stock purchase agreement reflecting this transaction, Sarah Deutsch ("Deutsch") signed on behalf of Le Mond Capital as "Purchaser."

---

[1]     Based on information obtained from Manhattan Transfer Registrar Co. ("Manhattan Transfer"), Entertainment Art's transfer agent based in Miller Park, New York, however, the stock certificates of the 34 shareholders were not presented to Manhattan Transfer with instructions that all of those certificates had been purchased by Medford Financial.

10.     Upon information and belief, however, Medford Financial owned all of the outstanding shares of Entertainment Art at this time (59,730,000 shares), and sold all of the outstanding shares to Le Mond Capital.[2]

11.     The stock certificates originally issued to the Entertainment Art private placement investors were provided to counsel for Sarah Deutsch and Le Mond Capital.

12.     As a result of this transaction, Entertainment Art announced Deutsch as the company's new President, Chief Executive Officer, Principal Executive Officer, Treasurer, Chief Financial Officer, Secretary, Treasurer, and Director.

13.     Entertainment Art public filings with the Commission indicate that from September 2011 to at least October 2012, Deutsch worked as manager of Magdalena's Party which, according to the website http://www.magdalenasparty.com, is a restaurant located in Buenos Aires, Argentina, where, upon information and belief, Deutsch resides.   Further, according to the website http://www.whatsupbuenosaires.com/goingout/Magdalena's_Party, Magdalena's Party is co-owned by Deutsch, Magdalena ("Magui") Tavella, and others.

14.     On March 12, 2013, Entertainment Art filed a Form 8-K with the Commission in which it announced a dramatic change in its business operations from a company that developed fashionable leather bags to a company that was involved in the biomedical industry.   In particular, Entertainment Art announced a transaction pursuant to which its newly formed subsidiary, Biozoom Technologies, Inc., acquired certain patents, licenses, and related assets from each of three separate companies: Opsolution Spectroscopic Systems, Opsolution NanoPhotonics, and Opsolution GmBH, (the "Opsolution acquisition") in exchange for cash of $50,000 and 39 million shares of Entertainment Art common stock.

---

[2]     As set forth herein, this assertion is based on the circumstantial evidence the Commission's staff has developed that we have concerning the connection between Deutsch and the brokerage accounts opened by the defendants.

15.     Entertainment Art described that, through Biozoom, it was now in the business of "researching, developing, and licensing technologies relating to the mobile remote collection of biomedical data as well as bilateral diagnostic communication."

16.     Entertainment Art further disclosed in the March 12, 2013 Form 8-K that, as a result of the Opsolution acquisition, it ceased being considered a "shell" company.

17.     Counsel for Biozoom has informed Commission staff that in connection with the Opsolution acquisition, Le Mond Capital returned 39,000,000 shares of Entertainment Art stock to the company and retained 600,000 shares of Entertainment Art bearing a restrictive legend. The 39,000,000 shares were subsequently allocated, and those shares were issued – as shares bearing a restrictive legend – to four entities associated with the Opsolution entities.

18.     Thus, after the Opsolution acquisition, the company's outstanding total stock was in two categories:  39,600,000 shares of shares bearing a restrictive legend and the 20,130,000 shares that were listed in the July 2008 Form S-1 for the 34 shareholders who acquired their Entertainment Art shares in private placements starting in 2007 – shares that were sold and relinquished to Medford Financial in May 2009.

19.     In the March 12, 2013 Form 8-K, Entertainment Art stated that – as of immediately after closing of the Opsolution acquisition – Deutsch stepped down as CEO and Chief Financial Officer of Entertainment Art, but stayed on as a Director only.

20.     On April 1, 2013, Entertainment Art changed its name to Biozoom, under the trading symbol "BIZM" on the OTC Bulletin Board.

**C. Accounts In the Names of Argentine Nationals Receive Biozoom Stock**

21.     From January 2013 to May 2013, brokerage accounts were opened at Legend Securities, Inc. ("Legend") a registered broker-dealer based in New York, New York, in the

name of four Argentine nationals:  Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Luciana Mariana Hernando, and Cecilia De Lorenzo.

22.      From May 2013 to June 2013, brokerage accounts were opened at Scottsdale Capital Advisors, Inc. ("Scottsdale") a registered broker-dealer based in Phoenix, Arizona, in the name of six Argentine nationals:  Magdalena Tavella, Adriana Rosa Bagattin, Daniela Patricia Goldman, Mariano Pablo Ferrari, Mariano Graciarena, and Fernando Loureyro.

23.      According to the brokerage firms' account opening and due diligence documentation, all of the accountholders reside in Buenos Aires, Argentina.  Moreover, all of the accountholders had email addresses with domain names that had a very distinctive and similar format that incorporated their actual names into the web address.  For example, Lucia Mariana Hernando indicated that her email address was lucia@marianahernando.com.    Similarly, Gonzalo Garcia Blaya indicated that his email address was gonzalo@garciablaya.com.     A search of the domain names for each of the accountholders indicates that all of these domain names were created in September 2012 and were registered with the same regional internet registry.

24.      According to the brokerage firms' documentation, none of the Argentine accountholders, with one exception, worked in fields unrelated to securities.  In particular, the account documents for Ficicchia indicated that he was a self-employed "music producer"; the account documents for Blaya indicated that he was a "music producer-stock investments"; the account documents for Hernando indicated that she was a "Marketing Manager"; the account documents for De Lorenzo indicated that she was a self-employed marketing specialist; and the account documents for Tavella indicated that she was an attorney practicing "administrative, political, intellectual property, and patent law."

6

25.     The account documents for Bagattin indicated that she was a "retired teacher"; the account documents for Ferrari indicated he worked in "sales and marketing"; the account documents for Loureyro indicated that he was an attorney practicing in the areas of tax, corporations, and business; the account documents for Graciarena indicated that he was an attorney practicing in the area of tax; and the account documents for Goldman indicated that she was an owner of a deli.

Andres Horacio Ficicchia

26.     Based on account opening documentation, Ficicchia opened his account at Legend on or about January 24, 2013 (account number ending in -FICICC) and funded the account with $26,000 cash.

27.     On November 30, 2012, Manhattan Transfer issued an Entertainment Art certificate for 165,000 shares to Ficicchia.

28.     On March 13, 2013, Manhattan Transfer issued an Entertainment Art certificate for 1,237,500 shares to Ficicchia.

29.     The certificate for 1,237,500 shares was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – that the company approved the issuance of that certificate to Ficicchia.

30.     In order to deposit the certificate for 1,237,500 shares and the certificate of 165,000 shares of Entertainment Art into his brokerage account at Legend, Ficicchia completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

31.     The documentation reflected that Ficicchia acquired the 1,237,500 shares pursuant to two private sales that were completed on February 19, 2013: (1) a purchase of

412,500 shares from Investor A and (2) a purchase of 825,000 shares from Investor B.[3]  The documentation also reflected that he paid a total of approximately $6,300 for these shares, which equals approximately $.005 per share.

32.     The documentation further reflected that Ficicchia acquired the 165,000 shares pursuant to a private sale that was completed on November 30, 2012 with Investor C – shares that he acquired for $24,750, which equals approximately $0.15 per share.

33.     In connection with the questionnaire, Ficicchia provided three separate stock purchase agreements that were purportedly signed by him and Investors A, B, and C, respectively.

34.     On March 5, 2013, Ficicchia deposited 165,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend; and then on March 27, 2013, Ficicchia deposited an additional 1,237,500 shares of Entertainment Art (again not bearing a restrictive legend) – for a total of 1,402,500 shares.  On April 1, 2013, due to the name change of Entertainment Art to Biozoom, these shares became Biozoom shares.

Gonzalo Garcia Blaya

35.     On or about March 26, 2013, Blaya opened an account at Legend (account number ending -KBLAYA) and funded the account with $26,000 cash.

36.     On March 22, 2013 –four days prior to opening this account – Manhattan Transfer issued a certificate for 1,485,000 Entertainment Art shares to Blaya.

37.     In order to deposit his certificate for 1,485,000 shares of Entertainment Art into his brokerage account at Legend, Blaya completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

---

[3]       Based on records obtained from Manhattan Transfer, Investor B is an entity based in Panama City, Panama.

38.     The documentation reflected that Blaya acquired the 1,485,000 shares in four separate private sales that were completed on March 4, 2013: (1) a purchase of 165,000 shares from Investor D; (2) a purchase of 495,000 shares from Investor E; (3) a purchase of 165,000 shares from Investor F; and (4) a purchase of 660,000 shares from Investor G.   The documentation reflected that he paid a total of approximately $6,765 for these shares, which equals approximately $.005 per share.

39.     In connection with the questionnaire, Blaya provided four stock purchase agreements that were purportedly signed by him and each of Investors D, E, F, and G, respectively.

40.     On April 16, 2013, Blaya deposited 1,485,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend.   As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Luciana Mariana Hernando

41.     On or about March 7, 2013, Hernando opened an account at Legend (account number ending in –RNANDO) and funded the account with $50,000 cash.

42.     On March 22, 2013, Manhattan Transfer issued a certificate for 1,815,000 Entertainment Art shares to Hernando.

43.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account at Legend, Hernando completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

44.     The documentation reflected that Hernando acquired the 1,815,000 shares pursuant to two separate private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor H; and (2) a purchase of 165,000 shares from Investor I.   The

documentation also reflected that Hernando paid a total of approximately $5,445 for these shares, which equals approximately $.003 per share.

45.　　In connection with the questionnaire, Hernando provided two separate stock purchase agreements that were purportedly signed by her and each of the above persons, respectively.

46.　　On May 14, 2013, Hernando deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend. As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

<u>Cecilia De Lorenzo</u>

47.　　On or about February 4, 2013, De Lorenzo opened an account at Legend (account ending in –ORENZO) and funded the account with $50,000 cash.

48.　　On March 13, 2013, Manhattan Transfer issued a certificate for 2,062,500 shares to De Lorenzo.

49.　　The certificate was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – that the company approved the issuance of the above certificate to De Lorenzo.

50.　　In order to deposit her 2,062,500 shares of Entertainment Art into her brokerage account at Legend, De Lorenzo completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and also provided additional documentation.

51.　　The documentation reflected that De Lorenzo acquired the 2,062,500 shares pursuant to two separate private sales that were completed on February 19, 2013 – the same day as the purported purchases of Entertainment Art stock by Ficicchia: (1) a purchase of 1,650,000 shares from Investor J; and (2) a purchase of 412,500 shares from Investor K.　　The

documentation also reflected that De Lorenzo paid a total of approximately $8,300 for these shares, which equals approximately $.004 per share.

52.     In connection with the questionnaire, De Lorenzo provided two separate stock purchase agreements for each of the transactions, signed by her and each of the above persons, respectively.

53.     On March 22, 2013, De Lorenzo deposited 2,062,500 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

<u>Magdalena Tavella</u>

54.     On or about May 16, 2013, Tavella opened an account at Scottsdale (account number ending in 13831).

55.     On March 22, 2013, Manhattan Transfer issued a certificate for 1,815,000 shares of Entertainment Art to Tavella.

56.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Tavella, completed a securities deposit checklist.

57.     The documentation reflected that Tavella acquired the 1,815,000 shares pursuant to three separate private sales that were completed on March 5, 2013 – the same day as the purported purchases of Entertainment Art by Hernando: (1) a purchase of 165,000 shares from Investor L; (2) a purchase of 165,000 shares from Investor M; and (3) a purchase of 1,485,000 shares from Investor N.  The documentation reflected that Tavella paid a total of approximately $9,075 for these shares, which equals approximately $.006 per share.

58.     In connection with the checklist, Tavella provided three separate stock purchase agreements that were purportedly signed by her and each of the above persons, respectively.

59.     In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Tavella had acquired her shares from Investors L, M, and N. In a letter dated May 20, 2013 to Scottsdale, Tavella made various representations concerning her deposit of 1,815,000 shares of Entertainment Art into her account. For example, Tavella represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

60.     On May 22, 2013, Tavella deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Adriana Rosa Bagattin

61.     On or about May 10, 2013, Bagattin opened an account at Scottsdale (account number ending in 15345).

62.     On March 13, 2013, Manhattan Transfer issued a certificate for 2,310,000 Entertainment Art shares to Bagattin.

63.     In order to deposit her 2,310,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Bagattin, completed a securities deposit checklist.

64.     The documentation reflected that Bagattin acquired the 2,310,000 shares pursuant to three private sales that were completed on February 26, 2013: (1) a purchase of 1,650,000 shares from Investor O; (2) a purchase of 330,000 shares from Investor P; and (3) a purchase of 330,000 shares from Investor Q. The documentation further reflected that Bagattin paid approximately $6,930 for these shares, which equals approximately $.003 per share.

12

65.     In connection with the checklist, Bagattin provided three separate stock purchase agreements that were purportedly signed by her and Investors O, P, and Q, respectively.

66.     In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Bagattin had acquired her shares from Investors O, P, and Q.  In a letter dated May 20, 2013 to Scottsdale, Bagattin made various representations concerning her deposit of 2,310,000 shares of Entertainment Art into her account.  For example, Bagattin represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

67.     On May 22, 2013, Bagattin deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Daniela Patricia Goldman

68.     On or about May 13, 2013, Goldman opened an account at Scottsdale (account number ending in 43536).

69.     On March 22, 2013, Manhattan Transfer issued a certificate for 2,485,000 Entertainment Art shares to Goldman.

70.     In order to deposit her 2,485,000 shares of Entertainment Art into her brokerage account, Scottsdale, using documentation and information provided by Goldman, completed a securities deposit checklist.

71.     The documentation reflected that Goldman acquired the 2,485,000 shares pursuant to two private sales that were completed on March 4, 2013:  (1) a purchase of 1,485,000 shares from Investor R; and (2) a purchase of 1,000,000 shares from Investor S.   The

documentation further reflected that Goldman paid approximately $7,455 for these shares, which equals approximately $.003 per share.

72.     In connection with the checklist, Goldman provided two separate stock purchase agreements that were purportedly signed by her and Investor R and Investor S, respectively.

73.     In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Goldman had acquired her shares from Investors R and S. In a letter dated May 20, 2013 to Scottsdale, Goldman made various representations concerning her deposit of 2,485,000 shares of Entertainment Art into her account. For example, Goldman represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

74.     On May 22, 2013, Goldman deposited 2,485,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Mariano Pablo Ferrari

75.     On or about May 20, 2013, Ferrari opened an account at Scottsdale (account number ending in 55327).

76.     On March 22, 2013, Manhattan Transfer issued a certificate for 2,310,000 Entertainment Art shares to Ferrari.

77.     In order to deposit his 2,310,000 shares of Entertainment Art into his brokerage account, Scottsdale, using documentation and information provided by Ferrari, completed a securities deposit checklist.

78.     The documentation reflected that Ferrari acquired the 2,310,000 shares pursuant to two private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor T; and (2) a purchase of 660,000 shares from Investor U. The documentation

14

further reflected that Ferrari paid approximately $9,240 for these shares, which equals approximately $.004 per share.

79.     In connection with the checklist, Ferrari provided two separate stock purchase agreements that were purportedly signed by him and Investor T and U, respectively.[4]

80.     In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Ferrari had acquired his shares from Investors T and U.  In a letter dated May 20, 2013 to Scottsdale, Ferrari made various representations concerning his deposit of 2,310,000 shares of Entertainment Art into her account.  For example, Ferrari represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

81.     On May 22, 2013, Ferrari deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Two Other Accounts in Names of Argentine Nationals

82.     On or about June 14, 2013, Fernando Loureyro opened an account at Scottsdale (account number ending in 77518).  On or about June 14, 2013, Mariano Graciarena opened an account at Scottsdale (account number ending in 38720).  Like the other eight accountholders, both stated in brokerage firm documents that they resided in Buenos Aires, Argentina.

83.     On March 22, 2013, Manhattan Transfer issued a certificate for 2,145,000 Entertainment Art shares to Graciarena and a certificate for 2,300,000 Entertainment Art shares to Loureyro.

---

[4]     As part of their documentation to deposit their Entertainment Art shares, each account holder submitted nearly identical attorney opinion letters stating that the shares deposited into their brokerage accounts qualified for various safe-harbors or statutory exemptions such that their shares could be issued without a restrictive legend. Accountholders Tavella, Ficicchia, Blaya, Hernando, De Lorenzo, Goldman, Ferrari, Bagattin, Graciarena, and Loureyro submitted letters from Randall S. Goulding, Esq. and accountholders Tavella and Goldman submitted letters from David Wise, Esq.  Both Mr. Goulding and Mr. Wise have withdrawn their opinion letters for all accountholders.

84.    Graciarena presented documentation to Scottsdale reflecting that he acquired his 2,145,000 shares in four separate private sales on March 4, 2013: (1) a purchase of 165,000 shares from Investor V; (2) a purchase of 165,000 shares from Investor W; (3) a purchase of 165,000 shares from Investor X; and (4) a purchase of 1,650,000 shares from Investor Y.  The documentation further reflected that Graciarena obtained his shares for approximately $6,435, which equals approximately $.003 per share.  Graciarena also presented four separate stock purchase agreements that were purportedly signed by him and Investors V, W, X, and Y, respectively, persons identified whose shares were registered for resale transactions in the July 2008 Form S-1.

85.    On June 18, 2013, Graciarena deposited 2,145,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

86.    Like Graciarena and the other accountholders at Scottsdale, Loureyro presented documentation to Scottsdale reflecting that he acquired his 2,300,000 shares in a private sale on March 4, 2013 with Investor S.  The documentation further reflected that Loureyro obtained his shares for approximately $9,200, which equals approximately $.004 per share.  Loureyro also presented a stock purchase agreement that was purportedly signed by him and Investor S, an individual whose shares were registered for resale transactions in the July 2008 Form S-1.

87.    On June 18, 2013, Loureyro deposited 2,300,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

88.    Thus, from November 2012 to June 2013, ten accounts in the name of Argentine nationals received a total of 20,130,000 shares of Entertainment Art.  These shares represented

100% percent of the total shares without a restrictive legend outstanding in Biozoom at the time, and approximately 33% percent of the total outstanding shares of Biozoom.

**D. Biozoom Promotional Campaign and Dramatic Increase in Stock Price and Volume**

89.     Beginning on May 22, 2013 – and after almost all of the account holders named above had deposited their Biozoom shares (without bearing a restrictive legend) into their accounts – Biozoom began issuing a series of press releases in which it claimed it "created the world's first portable, handheld consumer device" to instantly and non-invasively measure certain biomarkers.  According to the press releases, "[w]ith a simple click of a button, the Biozoom scanner reflects a beam of light off the skin" and "instantly and non-invasively measures certain biomarkers," such as antioxidant levels, vitamin absorption, stress responses, oxygen consumption and other factors to help improve wellness and physical performance, and then sends the results "instantly" to a smart phone or online account.

90.     These claims were also made by other entities, including Global Investors Research, LLP, Stock Preacher.com, among others.  For example, on May 16, 2013, The Stock Report published a 24-page research report touting investment in Biozoom stock.  The Stock Report claimed that Biozoom was "a leader in developing, patenting, and licensing premiere technology in the space" and that GNC, Nutilite, CVS, Walgreens, P&G and Walmart were "some of the companies that the firm may target for the launch of the device."  The Stock Report concluded that Biozoom stock, which at the time was trading at $1.10 per share, would yield a 12-month price target of $10.30 a share.

91.     Global Financial Insight, an affiliate of The Stock Report, issued a separate research report on Biozoom.  The report claimed that the Biozoom scanner was "the only handheld diagnostic device of its kind worldwide that tests for your health WITHOUT blood

tests or piercing the skin." On June 23, 2013, Global Financial Insight placed a full-page advertisement which ran in the Business Section of the Sunday New York Times. This advertisement was an abbreviated version of Global Financial's earlier research report.

92.     Following the press releases and the above-described reports, Biozoom's stock and volume rose dramatically. In particular, on May 16, 2013, Biozoom's stock price was $1.10 per share – but in just one month's time, Biozoom's stock price rose to over $4 per share and currently trades at approximately $3 per share.

93.     Prior to May 16, 2013, there were no Biozoom shares traded. However, between May 16 and June 21, 2013, a total of 87,936,300 Biozoom shares traded. The daily trading volume in Biozoom shares increased from 10,000 shares on May 16, 2013, to a high of 11,657,600 shares on June 11, 2013.

**E. Large Biozoom Sales By Accounts in The Names of Eight Argentine Nationals**

94.     As Biozoom's stock price and volume rose dramatically, the accounts in the name of eight of the Argentine Nationals sold substantial amounts of their Biozoom stock that did not bear a restrictive legend for large profits. In particular, and as reflected in the chart below, the accounts sold 14,078,406 shares of BIZM stock for proceeds of almost $34 million ($33,957,152).

| Argentine National | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|---|---|---|---|---|
| Blaya | 1,312,053 | 5/16/13 – 6/13/13 | $3,070,251 | 172,947 |
| De Lorenzo | 1,328,000 | 6/17/13 – 6/18/13 | $5,020,550 | 734,500 |
| Hernando | 1,815,000 | 6/6/13 – 6/17/13 | $5,269,030 | 0 |
| Ficcichia | 1,402,500 | 5/20/13 – 6/5/13 | $2,068,666 | 272,620[5] |
| Tavella | 1,592,444 | 6/7/13 – 6/11/13 | $3,116,894 | 382,956[6] |

---

[5]     On or around June 10, 2013, Ficicchia opened an account at Scottsdale and funded this account with $1 million from his account at Legend. Ficicchia's "Shares Remaining" column reflects Biozoom purchases that he has made in his account at Scottsdale.

| Argentine National | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|---|---|---|---|---|
| Bagattin | 2,176,726 | 6/10/13 – 6/18/13 | $6,223,310 | 133,724 |
| Ferrari | 1,994,038 | 6/7/13 – 6/19/13 | $5,456,690 | 315,962 |
| Goldman | 2,457,645 | 5/28/13 – 6/6/13 | $3,771,761 | 27,355 |
| Total | 14,078,406 | 5/16/13 – 6/19/13 | $33,997,152 | 1,384,488 |

95.     There was no registration statement in effect for the Biozoom stock sale transactions by the Argentine accountholders. Further, there is no registration statement in effect concerning any sale transactions for Biozoom securities.

96.     All of the accounts in the names of the selling Argentine Nationals placed their orders to sell Biozoom stock in the same manner – via e-mail and instant message to Legend and Scottsdale. These accounts have not traded in any securities other than BIZM.

97.     Upon selling shares in Biozoom, several of the accountholders instructed their registered broker-dealer (Legend and Scottsdale) to wire the proceeds of their sales to foreign bank accounts in various countries:

- **Ficicchia**: On June 7, 2013, defendant Ficicchia instructed Legend, to wire $1 million to Alpine Securities, Inc., a registered clearing broker-dealer. Alpine provides clearing services for Scottsdale, and as described earlier, Ficicchia opened an account at Scottsdale on or around June 10, 2013 and funded it with this $1 million. On June 25, 2013 – the same day as the Commission's order suspending trading in Biozoom – Ficicchia instructed Scottsdale to wire $325,000 to a bank account in Cyprus. This wire was not executed. Ficicchia's brokerage account at Legend currently has a cash balance of slightly over $1 million, and Ficicchia's brokerage account at Scottsdale currently has a cash balance of approximately $328,000.

---

[6]     Tavella's "Shares Remaining" column includes 160,400 Biozoom shares that she purchased in the open market on June 19, 2013.

- **Blaya**: On June 14, 2013, Blaya instructed his broker-dealer, Legend, to wire "all settled funds except $30,000" to an account held at CBH Compagnie Bancaire Helvetique SA in Geneva, Switzerland. This wire was not executed. This account currently has a cash balance of approximately $3 million.

- **Hernando**: On June 13, 2013, Hernando instructed her broker-dealer, Legend, to wire "all available settled cash" in her account, which at the time, was approximately $600,000, to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus. This wire was executed. On June 17, 2013, Hernando instructed her broker-dealer, Legend, to wire $2 million, again to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus. This wire was not executed by Legend. This account has a cash balance of approximately $4.5 million.

- **De Lorenzo**: De Lorenzo has not yet attempted to wire any money out of her account. De Lorenzo has a bank account at FBME Bank, Ltd. in Dar es Salaam. The account has a cash balance of approximately $4.8 million.

- **Tavella**: On June 25, 2013 – the day of the Commission's order suspending trading in the securities of Biozoom – Tavella attempted to wire approximately $2,450,000 out of her account at Scottsdale to a bank account at Loyal Bank in St. Vincent and the Grenandines. This wire has not been executed by Scottsdale. The current cash balance in Tavella's brokerage account is approximately $2.47 million.

- **Bagattin**: On June 20, 2013, Bagattin instructed Scottsdale to wire approximately $4.33 million to an account held at FBME Bank Limited in Cyprus. This wire was executed. On June 24, 2013, Bagattin instructed Scottsdale to send an additional approximately

$1.89 million to the same bank account. This wire was also executed. The current cash balance in Bagattin's brokerage account is $3,000.

- **Goldman:** On June 11, 2013, Goldman instructed Scottsdale to wire approximately $3.77 million to an account held at CBH Compagnie Bancaire Helvetique SA in Geneva, Switzerland – a bank where Blaya also holds an account. This wire was executed. The cash balance in Goldman's account is $0.

- **Ferrari:** On June 19, 2013, Ferrari instructed Scottsdale to wire $500,000 to an account held at HSBC Bank in Panama. This wire was executed. On June 24, 2013, Ferrari instructed Scottsdale to send an additional $4.9 million, this time to Choice Bank Limited in Belize. This wire was also executed. The cash balance in Ferrari's account is $0.

98.  Thus, $16,989,390.92 in proceeds from the sale of Biozoom stock has been wired outside of the United States. $15,751,501 in cash from the Biozoom stock sale proceeds remain in the Argentine account-holders' brokerage accounts along with 1,384,488 shares of Biozoom stock. However, defendants have already instructed their brokers to wire $7,712,671.37 of these proceeds to foreign bank accounts.

99.  On June 25, 2013, as a result of its preliminary investigation into suspicious trading activity in Biozoom stock, the Commission issued a ten business day trading suspension in Biozoom stock.

## F. Evidence That Accounts Used False Stock Purchase Agreements

100.  Accountholders for each of the ten accounts submitted documentation reflecting that they had acquired their shares from persons who had purchased Entertainment Art stock in the private placements beginning in late 2007 – whose shares were subsequently registered for resale pursuant to Entertainment Art's July 18, 2008 Form S-1. The accountholders provided

stock purchase agreements that they had purportedly signed with each of the identified sellers of Entertainment Art stock.

101.    The Commission has uncovered evidence demonstrating that the accountholders did not obtain their Entertainment Art shares in the above-described manner, and that they did so through false stock purchase agreements.

Andres Horacio Ficicchia

102.    Ficicchia represented that he acquired his 1,237,500 shares from two private transactions with Investor A and Investor B.  Ficicchia represented that he obtained 412,500 shares from Investor A and 825,000 shares from Investor B – both on February 19, 2013. Ficicchia also represented that he acquired an additional 165,000 shares from a private transaction with Investor C.  Ficicchia provided stock purchase agreements purportedly signed by him and the sellers.

103.    Investor A's wife has informed the Staff that both she and her husband had previously invested in Entertainment Art years ago, and had not thought of that investment in a "long time."  This is not consistent with Ficicchia's claim that he purchased Entertainment Art shares from Investor A in February 2013 – just four months ago.

Gonzalo Garcia Blaya

104.    Gonzalo Garcia Blaya represented that he acquired his 1,485,000 shares in four private transactions:  165,000 shares purchased from Investor D; 495,000 shares purchased from Investor E; 165,000 shares purchased from Investor F; and 660,000 shares purchased from Investor G.

105.    Investor F has informed the Staff that, sometime in 2007 or 2008, she provided approximately $1,000 to a family friend for an investment that she believed was in Entertainment

Art – the family friend's company.  Investor F informed us that, about one year after providing this $1,000, she received her money back with a slight return.

106.    Investor F said that she never sold any Entertainment Art shares to Gonzalo Garcia Blaya, and had never heard of that person before.  In addition, Investor F said that she never signed any stock purchase agreement with Gonzalo Garcia Blaya.

107.    Investor F – along with her brother – confirmed that Investor E – a person from whom Blaya claimed to have purchased 495,000 shares of Entertainment Art – was their mother. Both Investor F and Investor F's brother informed the Staff that Investor E died in 2010 – approximately three years before Blaya's claimed purchase of Entertainment Art stock from her.

108.    Blaya also represented that he purchased 660,000 shares from Investor G. Investor G informed us that – he and his wife – had invested a small amount of money in 2008 with a friend associated with Entertainment Art; and had sold their shares of Entertainment Art years ago.  Investor G said that he never sold 660,000 shares of Entertainment Art shares to Gonzalo Garcia Blaya.  Investor G further said that he never signed any stock purchase agreement to sell Entertainment Art shares to Gonzalo Garcia Blaya.

Luciana Mariana Hernando

109.    Luciana Mariana Hernando represented that she acquired her 1,815,000 shares in two private transactions:   1,650,000 shares purchased from Investor I and 165,000 shares purchased from Investor J.  Hernando provided stock purchase agreements purportedly signed by her and the sellers.

110.    Investor I informed us that, sometime in 2007, he recalled giving $5,000 a friend, who was then Entertainment Art's CEO, for an investment in a company.  Investor I vaguely recalled that this company was Entertainment Art.  Investor I informed the Staff that, soon after

his investment, his friend gave him his full $5,000 back with a very small return. Investor I said he had never met or heard of Luciana Mariana Hernando and never sold his Entertainment Art shares to Luciana Mariana Hernando.

Cecilia De Lorenzo

111.    Cecilia De Lorenzo represented that she acquired her 2,062,500 shares in two private transactions:  1,650,000 shares purchased from Investor J and 412,500 shares purchased from Investor K. De Lorenzo provided stock purchase agreements purportedly signed by her and the sellers.

112.    Investor J informed the Staff that, in approximately 2008, he loaned approximately $5,000 to his friend, who needed the money to start a business. Investor J said that, in exchange for providing the $5,000 loan, he received shares, and believes that the shares were in a company called Entertainment Art. Investor J said that the loan he made to his friend was paid back in approximately 2009.

113.    Investor J said that he did not sign a stock purchase agreement to sell his shares to Cecelia De Lorenzo—the individual who claimed to have purchased her shares from Investor J.

114.    Investor K has informed the Staff that both she and her husband had previously invested in Entertainment Art years ago, and had not thought of that investment in a "long time." This is not consistent with De Lorenzo's claim that she purchased Entertainment Art shares from Investor K on February 19, 2013 – approximately four months ago.

Magdalena Tavella

115.    Magdalena Tavella represented that she acquired her 1,815,000 shares in three private transactions on March 5, 2013:  165,000 shares purchased from Investor L, 165,000 shares purchased from Investor M, and 1,485,000 purchased from Investor N.

116. Investor L informed the Staff that, many years ago, he made an investment with a friend in a company that he believed was Entertainment Art. He said that he believed he made a small investment, and soon after his investment, received his money back from his friend.

117. Investor L informed us, contrary to the stock purchase agreement with Tavella, he never had heard of her and that he never signed a stock purchase agreement with Tavella to sell her any shares of Entertainment Art.

118. Moreover, as noted above, all ten accountholders submitted documentation reflecting that they purchased their shares from the 34 shareholders whose shares were registered for resale transactions in the July 2008 Form S-1 (or from persons who had acquired their shares from one of those 34 shareholders). According to Entertainment Art's legal counsel at the time, however, the shares of all of those 34 shareholders were sold to Medford Financial in connection with Medford Financial's purchase of the company in May 2009 – almost <u>four years</u> before the claimed sale of these shares to the Argentine nationals.

**G. Withdrawal of Legal Opinions Provided to Argentine Nationals**

119. In order to deposit their Entertainment Art share certificates in their brokerage accounts, each accountholder submitted legal opinions issued by Randall Goulding in which he opined that the share certificates for each of the accountholders could be received without bearing a restrictive legend based on an exemption from registration provided by Securities Act Rule 144.

120. Goulding opined that the six-month holding period of Rule 144(d) was met because the accountholders were not affiliates of the company and they acquired the shares from persons who held the shares more than four years. Goulding further opined that the accountholders were not, "individually or collectively" the beneficial owner of more than 10% of

the common shares of the Company and the share issuance was "not in connection with the distribution of any securities on . . .and the Holder is not an underwriter with respect to the Shares."

121.     These accounts, however, have many similarities:  they were each opened in the name of an Argentine national who purports to reside in Buenos Aires, Argentina; each represented that they had purchased their shares between February 19, 2013 and March 5, 2013 from persons who had acquired their shares from years ago (all of them claimed to have acquired shares from one or more of the original Form S-1 shareholders); each used email addresses that where the domain name was their last name and were created in September 2012 and opened with the same regional internet registry; each traded their Biozoom securities between May 16, 2013 and June 17, 2013 and traded no other securities; and, to the extent they traded, each accountholder placed their trades through instant messaging or email.

122.     Moreover, and as described above, the Commission's staff has uncovered evidence that each of the accountholders did not purchase their shares in the manner reflected in the documentation they provided.[7]

123.     On June 19, 2013, Goulding emailed the General Counsel of Legend and wrote "[a]s discussed, I hereby withdraw all of my opinions issued for the securities of Biozoom, Inc., formerly Entertainment Art, Inc., a Listed OTCBB company, symbols BIZM.  Be advised that none of these opinions should be relied upon.  I will also notify the issuer as well as other broker-dealers that I am aware of who may be relying upon these opinions." (See Exhibit A hereto).

124.     On May 20, 2013, attorney David Wise provided a similar legal opinion letter to Scottsdale for the accounts of Tavella and Goldman.  On June 26, 2013, Wise sent an email to

---

[7]     David Lubin, a former director and legal counsel for Entertainment Art, swore that all shareholders relinquished and sold their shares in Entertainment Art to Medford Financial in May 2009.  See David Lubin Declaration filed simultaneously herewith.

representatives of Scottsdale and Manhattan Transfer in which he wrote: "On May 20, 2013, this firm issued legal opinions for [Magdalena Tavella and Daniela Goldman]. It has been brought to our attention that the SEC recently suspended trading in the shares of Biozoom, Inc. It has also been brought to our attention that [Magdalena Tavella and Daniela Goldman] may have provided inaccurate or misleading information and documentation to Scottsdale Capital Advisors and to this firm in connection with the requests for this firm's legal opinions. Therefore, we hereby withdraw our legal opinions on the subject persons and their proposed sales of Biozoom, Inc. securities." (See Exhibit B hereto).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 2, 2013
Washington, DC

Ricky Sachar
Assistant Director, Division of Enforcement
U.S. Securities and Exchange Commission

27

# EXHIBIT 10

1  George Brandon (No. 017947) george.brandon@squirepb.com
2  Gregory A. Davis (No. 025976) gregory.davis@squirepb.com
   Gregory Schneider (No. 029660) gregory.schneider@squirepb.com
3  SQUIRE PATTON BOGGS (US) LLP
   One East Washington Street, Suite 2700
4  Phoenix, Arizona 85004
5  Telephone: (602) 528-4000
   Facsimile: (602) 253-8129
6  Attorneys for Defendant Financial Industry Regulatory Authority, Inc.

7

8              IN THE UNITED STATES DISTRICT COURT

9                  FOR THE DISTRICT OF ARIZONA

10  John J. Hurry and Justine Hurry, as husband        Case No. 14-cv-02490-PHX-ROS
11  and wife; Investment Services Corporation,
    an Arizona corporation, et al.,
12
                                                        **DECLARATION OF MICHELLE**
13                  Plaintiffs,                         **ONG IN SUPPORT OF FINRA'S**
                                                        **MOTION FOR SUMMARY**
14          v.                                          **JUDGMENT**

15  Financial Industry Regulatory Authority,
    Inc., a Delaware corporation,
16
                    Defendant.
17

18          I, Michelle Ong, declare as follows:

19          1.      I am over the age of 18 years and am in all respects competent to make

20  this declaration.  All facts stated herein are based upon my personal knowledge.  If

21  called upon to testify, I could and would competently testify to the facts set forth herein.

22          2.      I am a Director in the Media and External Communication department of

23  Financial Industry Regulatory Authority, Inc. ("FINRA").  I have served in that role

24  since 2011.

25          3.      **Exhibit A** hereto is a true and correct copy of emails the reporter Bill

26  Meagher and I exchanged on November 19, 2013.  The November 19, 2013 email

27  exchange was kept and maintained in the regular course of FINRA's business.  It is

    FINRA's practice to keep and maintain email communications between its Media and
28
    External Communication department and reporters.

                                      - 1 -

I declare under penalty of perjury that the following is true and correct.


Executed this _6th_ day of July, 2017.


Michelle Ong

- 2 -

# EXHIBIT A

| | |
|---|---|
| **From:** | Bill Meagher |
| **To:** | Ong, Michelle |
| **Sent:** | 19-Nov-13 1:58:20 PM |
| **Subject:** | RE: Message from FINRA |

Michelle,

I appreciate you getting back to me and I will write that you declined to comment. BTW, this story has nothing to do with the internal Finra reports that I had previously asked Nancy about.

I hope you understand that when I write a story which involves Finra, I am obligated to ask for a comment and more information. I do this not only as a way of attempting to make the story as accurate as possible, but also to be fair in giving Finra the chance to comment on a story prior to its publication.

In this instance, you are certainly correct in that  I did not learn about a probe that tied to trading in Biozoom from Finra. Rather, I have spoken with someone who has knowledge of the investigation.

Whether I learn of something from a Finra statement or from an outside source, I am obligated to reach out to your agency. I apologize if you or Nancy find this to be distasteful. It is a professional obligation and one that I will need to fulfill going forward.

Best,

Bill Meagher
Associate Editor
The Deal
707-992-0725 x36

**From:** Ong, Michelle [mailto:Michelle.Ong@finra.org]
**Sent:** Tuesday, November 19, 2013 10:48 AM
**To:** Bill Meagher
**Cc:** Condon, Nancy
**Subject:** Message from FINRA

Bill – I received your voicemail. As Nancy and others here have told you, we have not provided this information to you and have nothing for you on it.

---

Michelle J. Ong
Director, Media Relations
FINRA I 1735 K Street, NW I Washington, DC 20006
202.728.8464  I  c) 202.697.3318
michelle.ong@finra.org  I  www.finra.org

---

FINRA_00000380

# EXHIBIT 11



[RETURN TO ARTICLE]

## Law



Ex. No. 12 (3 p.
Witness: Cruz
Date: 2.17.17
mgreporting.com
L. Marin-Garcia #50541

Share    Reprint    Save to My Articles

# SEC requests default judgment in $34M Biozoom pump-and-dump case

By Bill Meagher   Updated 03:40 PM, Mar-20-2014 ET

The Securities and Exchange Commission plans to request a default judgment against the 10 Argentine residents who have been named as defendants in the $34 million Biozoom Inc. pump-and-dump case after two law firms representing the Argentines asked to withdraw from the case.

The SEC filed a letter Tuesday, March 18, with Judge Naomi Buchwald in the U.S. District Court in Manhattan, stating that it planned to request the judgment because the defendants had failed to respond to the lawsuit by court ordered deadlines.

Four days earlier, attorney Marc Agnifilo had informed the court that his firm, New York-based Brafman & Associates PC, would withdraw as counsel to the Argentines.

Brafman is the second firm that has represented the group charged with selling 20.3 million shares of Biozoom without proper registration. In September, McLaughlin & Stern LLP also withdrew.

Brafman is a high-profile criminal defense firm that has counted crime boss Salvatore "Sammy the Bull" Gravano, rapper Sean Combs and former International Monetary Fund chief Dominique Strauss-Kahn among its clients.

Agnifilo declined to comment on the firm's withdrawal from the Biozoom case. In his letter to the court, he said that Brafman had been told by the Argentines that it would be retained, but that a retainer agreement was never signed.

Those named as defendants are Magdalena Tavella, Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, Mariano Pablo Ferrari, Mariano Graciarena and Fernando Loureyro.

None of them responded to e-mails requesting comment.

A person familiar with the case said that Buenos Aires-based lawyer Juan Ignacio Prada has been seeking representation for the group. Prada did not respond to a request for comment.

Patrick Bryan, assistant chief litigation counsel for the SEC, said the commission will file paperwork to pursue the default judgment in the next month. He declined to comment further

The SEC filed the lawsuit last July, claiming that the Argentines had opened brokerage accounts at Arizona-based Scottsdale Capital Advisors and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the stock was purchased from shareholders in Entertainment Arts Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

In its complaint, the SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation.

The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

The promotion was unusual in the form it took. It included advertising in mainstream media outlets, including the New York Times and USA Today in June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

CONFIDENTIAL                                                                                      FINRA_00011343

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

The FBI and the Financial Industry Regulatory Authority have been investigating the involvement of Scottsdale and Alpine Securities, its Salt Lake City-based clearing firm, in connection with the Biozoom stock sales since May, according to a person with knowledge of the probe.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under an unusual request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

Finra has scheduled an audit of Scottsdale at the end March, according to a person familiar with the investigation.

Representatives of the SEC, Finra, Scottsdale and Alpine declined to comment. An FBI spokesman said the agency will neither confirm nor deny the existence of an investigation.

Share    Reprint   Save to My Articles

Privacy  |  Terms and Conditions  |  My Account  |  Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

# EXHIBIT 12



[RETURN TO ARTICLE]

## Law



Ex. No. __13__ (5 p.
Witness: **Cruz**
Date: __2.17.17__
mgreporting.com
L. Marin-Garcia #50541

Share    Reprint    Save to My Articles

# Finra focusing on money-laundering violations

By **Bill Meagher**   Updated 07:00 PM, Apr-16-2014 ET

On March 10, the staff at Scottsdale Capital Advisors was startled when their receptionist called out into the office, "Finra is here!"

While representatives from the Financial Industry Regulatory Authority were expected at the end of the month for a scheduled two-week exam, this visit had nothing to do with that appointment. Rather, the investigators asked for files relating to overseas clients and omnibus accounts, which are owned in the names of other brokerage firms, according to a person familiar with the raid.

That person said that a group of Finra investigators hauled away copies of documents regarding omnibus accounts at Scottsdale that included those owned in the names of Belize-based Titan International Securities Inc. and Cayman Islands-based Caledonian Global Financial Services Inc., and a Cayman account linked to Scottsdale owner John Hurry.

Gerald Russello, a partner with the law firm of **Sidley Austin LLP** who represents Scottsdale, declined to comment. Representatives of Titan International did not return a phone call seeking comment.

Caledonian Global CEO Kobi Dorenbush said his firm had not been contacted by any U.S. regulators.

The action at Scottsdale's Arizona offices came a month after brokerage firm **Brown Brothers Harriman & Co.** was fined a record $8 million by Finra in a settlement over alleged violations of anti-money laundering regulations. Finra also levied a $25,000 fine and a one-month suspension from the securities industry against Harold Crawford, the New York-based firm's former anti-money-laundering compliance officer.

Finra said that, from January 2009 to June 2013, Brown Brothers executed trades or delivered securities in transactions involving at least 6 billion penny stock shares, with many of those transactions made through omnibus accounts on behalf of clients that the firm could not identify. Some of the $845 million in proceeds were allegedly wired to Switzerland, Guernsey and Jersey, countries with strong bank secrecy laws. Those locations and transactions should have raised red flags with Brown Brothers and prompted the firm to file suspicious activity reports under federal anti-money-laundering regulations, according to Finra.

Brown Brothers agreed to the settlement without admitting or denying Finra's findings. The firm also issued a statement saying it had changed its procedures for handling low-priced securities and for surveillance of

FINRA_00000305

activity in low-priced securities to "mitigate a possible recurrence of this matter." Brown Brothers also said that the activity covered by the settlement represented a small part of its investor services business and did not involve its investment management or private banking business.

Some violations of anti-money-laundering regulations have been closely linked with stock manipulation and pump-and-dumps of microcap stocks, both of which have been identified as priority areas for enforcement action by Finra and the Securities and Exchange Commission.

Finra's action against Brown Brothers has gotten the attention of broker-dealers, anti-money laundering consultants and lawyers for two reasons. The fine, the largest ever handed down for an anti-money-laundering violation by Finra, has served notice that the regulator is serious about firms cleaning up their anti-money-laundering programs. And the fact that Crawford was fined for the company's alleged failure to create an effective anti-money-laundering program is seen by some as unfair.

"Finra has served notice that there is personal responsibility for a company failing to implement an adequate program," said Kevin Petrasic, a partner in the Washington office of law firm Paul Hastings LLP, whose practice includes anti-money-laundering litigation.

"It is a no-win situation and a bit draconian," he said. "AML compliance officers are in a barbell on this. They want to put a program in place, and Finra expects that program to work, but sometimes the senior management doesn't want to pay for the resources, so they choose not to implement the program, and the AML officers are in the middle between management and the regulators. Who wants that job?"

In Crawford's case, he went to Brown Brothers' management and proposed changes that would affect the anti-money-laundering program, according to documents that Finra staff filed in their administrative action. In November 2011, Crawford and other Brown Brothers compliance staff are said to have recommended that the firm stop executing trades for penny stocks below a certain threshold value. They are also said to have recommended that the firm require omnibus account clients that wished to offer brokerage services to their own customers to set up a disclosed subaccounts.

Brown Brothers did not change how it handled penny stocks until last June, according to Finra.

Omnibus accounts are often held in the name of foreign financial intermediaries who, in turn, are handling stocks for clients that might not be known to the U.S. broker-dealer. Finra has told broker-dealers that it is important to know who are the actual investors behind the omnibus accounts.

Anti-money laundering regulations are designed to keep money made in illegal activities from being made to look as if it is the product of legitimate endeavors. With Finra, they center on Rule 3310. It requires each brokerage firm to implement a compliance plan that is approved by a member of senior management in writing. The plan must be designed to detect and assure the reporting of suspicious transactions. The plan must also comply with the Bank Secrecy Act and include an annual independent compliance test. Firms are also required to identify to Finra an individual or group responsible for the day-to-day operation of the anti-money-laundering program.

Each year in January, Finra issues its Regulatory and Examination Priorities Letter which details issues where the regulator plans to devote resources. In 2012, the letter named microcap stock fraud as an enforcement priority.

"As a part of their anti-money laundering responsibilities, member firms are obligated to monitor suspicious activity and to file Suspicious Activity Reports where warranted," the 2012 letter stated.

Last year, efforts against money laundering received their own paragraph in the letter.

"Finra examiners continue to focus on AML compliance, particularly at firms with higher-risk business models due to their clients, products and service mix or location in which they operate."

FINRA_00000306

This year, Finra doubled the space in its letter devoted to efforts against money laundering. The regulator said it planned to focus on institutional business, as well as a trend of broker-dealers not pursing the identities of some shareholders in transactions disposing of large volumes of low-priced stocks.

"I think what is going on is obvious," said a former Finra official who now consults on anti-money-laundering issues. "Finra feels like these regulations have been on the books for what, 11, 12 years? The firms have had a chance to put AML programs in place, hire good people, and still there are problems. So Finra jumps the fines to get their attention. They are saying, 'We are serious and unless you take care of this, it is going to cost you some real money.'"

Paul Tyrrell, of counsel in the Boston office of law firm Sidley Austin LLP, said that some in the brokerage industry have been rattled by Finra's targeting of individuals for enforcement of anti-money-laundering rules.

"Where is the line being drawn?" he said. "I don't know and nobody else does either. What we are seeing in the [anti-money-laundering] exams is that Finra is being more robust, running it down to the end. They are asking what you did, and when you did it, and people are worried that Finra is now looking at AML officers, branch managers and even individual representatives."

For example, in March 2013, the regulator accused James Pilla, a registered representatives of Ameriprise Financial Services Inc., of failing to report red flags raised by penny stock trades in 28 of his client accounts and failing to meet face-to-face with 59 of his clients to verify their identities before opening their accounts. His actions allegedly violated Ameriprise's anti-money-laundering procedures. Finra suspended him for three months and fined him $15,000.

Finra filed 36 anti-money-laundering actions last year, down from 45 in 2012 and 38 in 2011. The regulator did not make anyone available to comment for this story.

Among its actions was a $1.4 million fine against **Oppenheimer Holdings Inc.** last August for alleged violations that included a failure to conduct due diligence on foreign financial intermediaries. Finra claims that from August 2008 through September 2010, Oppenheimer sold 1 billion unregistered penny stock shares on behalf of 13 clients, without performing due diligence on the status of the shares. The firm also allegedly failed to probe suspicious trading by a Bahamas-based broker-dealer. Oppenheimer agreed to pay the fine without admitting or denying Finra's allegations.

In December, Finra fined COR Clearing LLC of Omaha, Neb., $1 million over allegations that, for three years beginning in 2009, the firm failed to establish and implement anti-money-laundering policies and for a time in 2012, its anti-money-laundering program had almost collapsed. COR accepted the penalty without admitting or denying the allegations.

Both COR and Oppenheimer were required to hire independent consultants to monitor and evaluate their anti-money-laundering programs.

World Trade Financial Corp., a San Diego-based brokerage firm, was the subject of a $250,000 fine after Finra alleged it violated anti-money-laundering regulations by not setting up and enforcing supervisory procedures. From March 2009 to August 2011, World Trade bought and sold 27.5 billion shares of a dozen different penny stocks on behalf of one client. Those shares were unregistered and not eligible for an exemption from registration requirements, according to Finra. The transactions generated $61 million in proceeds for the client. The business generated by those transactions was the lion's share of World Trade's business.

The firm accepted the fine without admitting or denying the allegations.

The link between anti-money-laundering regulations involving omnibus accounts and penny stock trading is a growing topic of conversation in the brokerage industry.

FINRA_00000307

"It is what everybody is talking about, and the recent Brown Brothers bust has really made it obvious that's what Finra is worried about as well," said one brokerage firm executive.

The connection was brought into sharp focus by the SEC's recent lawsuit and emergency asset freeze order against John Babikian, a Canadian national who the commission claims is behind the now defunct stock promoter Awesome Penny Stocks.

At the SEC's request, the federal court in Manhattan froze assets belonging to Babikian including two homes in Los Angeles, farm and vineyard land in Oregon and a fractional interest in a corporate jet.

In its lawsuit filed last month, the SEC alleged that Babikian sold 1.3 million shares of coal mining company America West Resources Inc. on Feb. 23, 2012, in 90 minutes, after first promoting the stock to 700,000 subscribers to Awesome Penny Stocks' e-mail newsletters. He allegedly made $1.9 million, selling the shares through an omnibus account with Swiss bank Frankfurter Bankgesellschaft (Schweiz) AG maintained by Brown Brothers.

In a set of Finra internal records from 2012 and 2013 obtained by The Deal, the regulator said it has initiated probes of suspicious trading activity involving offshore entities tied to pump and dumps in Toron Inc., U.S. Highland Inc., Bioflamex Corp., Goff Corp. and Marine Drive Mobile Corp. Those reports were furnished to the SEC.

The offshore brokerage firms cited by Finra in those reports include Caledonian Global, Caledonian Bank Ltd , Caledonian Securities Ltd., Clearwater Securities Inc., Legacy Global Markets SA, Argus Stockbrokers Ltd., CBH Compagnie Bancaire Helvetique SA, Bank Gutenberg AG, Sherman Capital, Rigi Capital and Verdmont Capital SA.

The regulator obtained trading records regarding the omnibus accounts from Scottsdale Capital, Brown Brothers, Vertical Group, Knight Execution and Clearing Services LLC, OC Securities Inc. and Ascendiant Capital Markets LLC, according to the Finra records.

Scottsdale is already the subject of investigations by Finra, the SEC and the FBI pertaining to an unusual $34 million pump and dump involving a German company known as Biozoom Inc., according to a person familiar with the situation. Scottsdale's clearing agency and related entity, Salt Lake City-based Alpine Securities is also a part of those probes.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under a request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

The SEC filed a lawsuit last July, claiming that a group of 10 Argentine nationals had opened brokerage accounts at Scottsdale and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the Biozoom stock was purchased from shareholders in Entertainment Art Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

The SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation. The Argentine group is said to have included retired teachers and the owner of a delicatessen.

FINRA_00000308

Case 2:14-cv-02490-ROS   Document 173-1   Filed 07/07/17   Page 134 of 134

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing anti-money-laundering policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

Share    Reprint   Save to My Articles

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

FINRA_00000309