# EXHIBIT 13

George Brandon (No. 017947) george.brandon@squirepb.com
Gregory A. Davis (No. 025976) gregory.davis@squirepb.com
Gregory Schneider (No. 029660) gregory.schneider@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 528-4000
Facsimile: (602) 253-8129
Attorneys for Defendant Financial Industry Regulatory Authority, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife; Investment Services Corporation, an Arizona corporation, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Financial Industry Regulatory Authority, Inc., a Delaware corporation, <br><br> Defendant. | Case No. 14-cv-02490-PHX-ROS <br><br> **DECLARATION OF CINDY FOSTER-NICHOLAS IN SUPPORT OF FINRA'S MOTION FOR SUMMARY JUDGMENT** |

I, Cindy Foster-Nicholas, declare as follows:

1. I am over the age of 18 years and am in all respects competent to make this declaration. All facts stated herein are based upon my personal knowledge. If called upon to testify, I could and would competently testify to the facts set forth herein.

2. I am the Ombudsman of Financial Industry Regulatory Authority, Inc. ("FINRA"), which is the most senior position in FINRA's Office of the Ombudsman. I have served in that role since January 2009.

3. FINRA's Office of the Ombudsman is an internal, but impartial and independent, group at FINRA designed to promote fair processes and fair administration of member concerns.

4. As FINRA's Ombudsman, I report directly to the Audit Committee of the Board of Governors and function independently from other departments and FINRA

- 1 -

management.

5. On January 10, 2014, I received a letter from D. Michael Cruz, the in-house counsel of FINRA member Scottsdale Capital Advisors ("SCA"), regarding the alleged "leaking" of SCA's confidential information to the financial reporter Bill Meagher of *The Deal Pipeline*. In his letter, Mr. Cruz requested that FINRA's Office of the Ombudsman open an investigation into the source of the alleged "leak."

6. **Exhibit A** hereto is a true and correct copy of Mr. Cruz's January 10, 2014 letter. Mr. Cruz's January 10, 2014 letter was kept and maintained in the regular course of FINRA's business. It is FINRA's practice to keep and maintain in its records investigation requests like Mr. Cruz's January 10, 2014 letter.

7. FINRA's Office of the Ombudsman complied with Mr. Cruz's request, and on January 14, 2014, it began investigating whether FINRA staff leaked information to Mr. Meagher.

8. The investigation performed by FINRA's Office of the Ombudsman was exceedingly thorough, and included at least the following investigative steps:

a. Analyzing Mr. Meagher's articles to determine that significant portions of the articles contained publicly-available information regarding SCA and Biozoom, Inc. ("Biozoom");

b. Determining who had access to the FINRA "fraud surveillance" reports referenced in Mr. Meagher's September 13, 2013 article, and concluding that such reports were provided to the SEC in the normal course of FINRA's business prior to Mr. Meagher's publication;

c. Identifying all FINRA employees that accessed such reports and evaluating their business and/or regulatory need for such access;

d. Interviewing six FINRA employees who accessed the "fraud surveillance" reports referenced in Mr. Meagher's September 13, 2013 article to confirm that reasonable procedures were followed to safeguard the confidentiality of the reports;

e. Reviewing every email FINRA and Mr. Meagher exchanged between January 1, 2012 and December 31, 2013;

- 2 -

      f. Reviewing every email FINRA exchanged with anyone using the domain "thedeal.com" between January 1, 2012 and December 31, 2013;

      g. Reviewing every email FINRA and SCA employee Eric Miller exchanged between January 1, 2012 and December 31, 2013;

      h. Conducting a keyword-driven search for any other emails discussing Mr. Meagher's queries, regulatory staff requests for copies of confidential regulatory information about SCA, and planning of various routine examinations of SCA;

      i. Reviewing FINRA desktop and blackberry telephone records for calls to/from Mr. Meagher and to/from Mr. Miller;

      j. Interviewing the two FINRA media relations employees who had communicated with Mr. Meagher; and

      k. Reviewing the computer hard drive and network drive of former FINRA employee Scott Andersen.

9.    FINRA's Office of the Ombudsman utilizes an electronic database called "Ethics Point" to record all material investigative steps taken by the Office of the Ombudsman with regard to each of its investigations.

10.   **Exhibit B** hereto is a true and correct copy of the Ethics Point report regarding the Office of the Ombudsman's investigation of whether FINRA staff leaked information to Mr. Meagher. The Ethics Point report was kept and maintained in the regular course of FINRA's business. It is FINRA's practice to keep and maintain in its records Ethics Point reports.

11.   The "Case Notes" section of the Ethics Point report (pages 8–17) accurately describes the investigative steps taken by FINRA's Office of the Ombudsman to determine whether FINRA staff leaked information to Mr. Meagher.

12.   After finishing its investigation, FINRA's Office of the Ombudsman concluded that there was no evidence that FINRA staff leaked information to Mr. Meagher. I personally conveyed those conclusions to Mr. Cruz.

13.   **Exhibit C** hereto is a true and correct copy of the Final Case Summary issued by FINRA's Office of the Ombudsman regarding its investigation of whether FINRA staff leaked information to Mr. Meagher. The Final Case Summary was kept

and maintained in the regular course of FINRA's business. It is FINRA's practice to keep and maintain in its records final case summaries regarding investigations performed by its Office of the Ombudsman.

14. The Final Case Summary accurately summarizes investigative steps taken by FINRA's Office of the Ombudsman to determine whether FINRA staff leaked information to Mr. Meagher. It also accurately describes the conclusions reached by FINRA's Office of the Ombudsman regarding that investigation.

I declare under penalty of perjury that the following is true and correct.

Executed this __6__ day of July, 2017.

_Cindy Foster-Nicholas_
Cindy Foster-Nicholas

# EXHIBIT A



## SCOTTSDALE CAPITAL ADVISORS
Member FINRA & SIPC


Ex. No. 14  ( 13p.
Witness: Cruz
Date: 2.17.17
mgreporting.com
L. Marin-Garcia #50541

January 9, 2013

VIA FEDEX DELIVERY:

FINRA Office of the Ombudsman
9509 Key West Avenue
Rockville, MD 20850

Robert Colby
FINRA Chief Legal Officer
1735 K Street
Washington, DC 20006


RECEIVED
JAN 10 2014
FINRA
Ombudsman Office

RE: Information Leak to The Deal Pipeline

Ladies and Gentlemen:

    I am President and Chief Counsel of Scottsdale Capital Advisors ("SCA"), a registered broker-dealer and member firm of FINRA. I am writing to express my concern about a potential media leak of certain non-public, confidential information concerning SCA, its employees and customers as it pertains to one or more ongoing inquiries by FINRA. Attached please find two articles from The Deal Pipeline and a set of questions received from a reporter just prior to the release of the second article. As explained below, the facts contained in the articles and the nature of the questions strongly suggest FINRA is the source of the information leak. When SCA through counsel approached FINRA, FINRA's head of enforcement, Brad Bennett, suggested that the information came from SCA itself and was dismissive of our concerns, and SCA was informed that the "No one on staff can have anything more to say about it" regarding the leaks. We find this response unacceptable and respectfully request confirmation that the FINRA is appropriately safeguarding confidential information obtained during its investigations. This potential breach of the integrity and confidentiality of FINRA's investigative process represents a serious matter worthy of more attention. SCA and its customers have been embarrassed and harmed by these reports. We hope this complaint initiates a full investigation by either SEC or FINRA.

    It is very unlikely that anyone at SCA released the confidential and customer sensitive information to The Deal Pipeline. The reporter called several senior people at SCA, who referred the calls to me without discussing the matter with the reporter, and we have been unable to identify anyone who provided information to the reporter. The articles and questions make reference to facts that were known by FINRA staff conducting the OTRs and only a few senior officers of SCA and SCA's outside counsel. The articles and questions make reference to facts that cover a full spectrum of details concerning SCA's business, internal practices, customers, customer transactions, securities deposits,

7170 E McDonald Road Suite 6, Scottsdale, AZ 85253
Office: 480.603.4900 • Toll Free: 866.404.9051 • Fax: 480.603.4901

wire activities and trading activity. Only counsel and I had knowledge of the full spectrum of facts covered in the articles and questions, other than FINRA.

The article titled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says" appeared shortly after our counsel received questions from the reporter and forwarded them via email to FINRA Enforcement Staff on December 3, 2013. The article references as sources "persons who have spoken with investigators" and according to the reporter these sources raise issues very similar to those the FINRA Staff has conveyed to us in the course of its investigation. For example, the reporter cites the source as identifying issues such as commission rates, use of instant messages, the names of people who have provided testimony, internal SCA policy, and wire activity. The article further states that a source "familiar with the investigative documents said the handwriting on the account applications for the Biozoom shareholders was the same, the answers to questions on their foreign due diligence packages were very similar and they held accounts at the same banks in Cyprus, Switzerland and Panama." The source appears to be someone who reviewed or had access to the exhibits presented during the OTRs.

Further, the article in its title and first sentence, for example, refers to an FBI investigation but we are currently not aware of any such investigation into SCA, so that information did not come from SCA. The article further states that FINRA is working with the SEC, which, if true, the Staff has never said to SCA. The article also states it did not receive comments from people approached at SCA. However, the possibility that FINRA may have an unauthorized leak is supported by an earlier article, titled "Finra targets offshore firms in pump-and-dumps" by the same author, which claims that the author obtained internal FINRA documents from FINRA's Office of Fraud Detection and Market Intelligence ("OFDI"). SCA is also mentioned in that article, and Staff from OFDI have been present for almost every testimony in the Staff's inquiry.

We feel the Staff's response to our concerns was inappropriate in light of the gravity of the underlying issue, which is protecting confidential information of member firms and their customers. FINRA members are required by federal law, rules and regulations to maintain policies and procedures that address the protection of customer information and records. However, FINRA has no corresponding responsibility to maintain the confidentiality of the information obtained through its investigative processes. I quote the disclaimer language in a recent FINRA 8210 request regarding confidentiality:

> We [*referring to FINRA*] will not (1) entertain requests for confidential treatment of any information or documents you provide in response to this request; (2) give you notice of any subpoena or access request we receive that encompasses any such information or documents; or (3) undertake to return documents when this investigation is completed.

The SEC is required to maintain the confidentiality of the documents they receive yet FINRA, a non-government private entity does not see the need to maintain the same level of confidential treatment of customer information as the firms and the SEC. The information in the articles has damaged SCA's reputation and prospective business relationships. Though we don't expect this policy to be changed anytime soon, we do expect assurances that the information we provide FINRA during the course of its investigations does not get directly fed to a third party source, which seems to be the case right now.

You may address any questions or requests for additional information to either me directly or to our counsel Gerald Russello, Sidley Austin, at 202-839-5716. Thank you for your attention to this matter.

Sincerely,

*[signature]*

D. Michael Cruz

Enclosures

CONFIDENTIAL

FINRA_00000289

Mike Cruz

**From:** Russello, Gerald <grussello@Sidley.com>
**Sent:** Tuesday, December 03, 2013 3:34 PM
**To:** Andersen, Scott M
**Cc:** Christina L. Stanland (christina.stanland@finra.org)
**Subject:** FW: Questions regarding SCA Alpine

Scott,

We received the below questions from a reporter asking for comment. As you will see, the questions are extremely detailed and indicate a knowledge of the Staff's investigation and the questions the Staff has posed to SCA and its employees. SCA is extremely concerned that confidential information has been leaked that may be damaging to the firm or its employees. Please advise as to whether the Staff is aware of this information being provided to the reporter. We plan to advise the Ombudsman and if necessary others within FINRA, of this matter, as it raises questions as to the integrity of the Staff's investigative process and ability to maintain confidentiality.

Gerald

Gerald J. Russello
Partner
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5716
grussello@sidley.com


**From:** Bill Meagher [mailto:bmeagher@thedeal.com]
**Sent:** Tuesday, December 03, 2013 5:12 PM
**To:** Russello, Gerald
**Subject:** Questions regarding SCA Alpine

Hi Gerald,

Here are the questions. I am on a deadline for tomorrow morning. Should SCA/Alpine have any response to my questions, I will treat them as direct quotes offered via email so there are no misunderstandings. Should there be a response that requires a follow up, I will direct it to you. Should the company/John Hurry offer a quote, pls include attribution. Thank you for your timely response.

1. Does either SCA or Alpine have any response to Finra, SEC and FBI looking into their conduct in connection to trading in Biozoom?
2. Have SCA/Alpine staff spoken to Finra officials?
3. Have SCA/Alpine staff spoken to SEC officials?
4. Have SCA/Alpine staff spoken to FBI officials?
5. Have records regarding Biozoom shareholder accounts, trades and wire transfers been preserved unaltered?
6. Was SCA, Alpine or any of its staff/ownership involved in Biozoom beyond the servicing of the accounts? The SEC is looking at that angle.

1

7. Does SCA, Alpine or any staff/ownership have any knowledge of how the Biozoom trading was done beyond public record? There are allegations that the Argentine nationals who are Biozoom shareholders are "straw players". Does anyone associated with either SCA or Alpine know anything connected to these allegations?
8. Why were internal policies at SCA/Alpine changed for Biozoom shareholders? Specifically, why were they allowed to trade via instant messenger and email, why did they receive transactional discounts and why were wire transfers allowed to non-domiciled countries?
9. How is James Panther associated with SCA/Alpine? What was his role in bringing Biozoom shareholders to SCA?
10. Why did Scarpino and Ted Ashton leave SCA?
11. When will the purchase of Wilson Davis by John Hurry close?
12. What are the terms of the sale?
13. What is the status of the new broker-dealer firm in the Caymans headed up by Hurry?

Best,

Bill

**BILL MEAGHER** | Associate Editor
*The DealFlow Report* | 707-992-0725 x36 | bmeagher@thedeal.com
www.thedeal.com

Click *here* to view me on Linkedin | Follow us on Twitter! @TheDealNewsroom



* Need help? Contact Client Services at customerservice@thedeal.com
* Read about developing events in *First Take*
* Sign up for newsletters here

---

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.
*******************************************************************************
**********

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

*******************************************************************************
**********

CONFIDENTIAL

FINRA_00000291

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline



[RETURN TO ARTICLE]

PIPEs

Share    Reprint    Save to My Articles

# FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says

By Bill Meagher   Updated 09:05 PM, Dec-06-2013 ET

The FBI, the Securities and Exchange Commission and the Financial Industry Regulatory Authority have opened investigations into the involvement of Scottsdale Capital Advisors and Alpine Securities in the trading of Biozoom Inc., according to a person familiar with those investigations.

Investors in Biozoom lost some $300 million after the SEC halted trading in the stock in June. The commission cited "a lack of current and accurate information" about the stock and suspicions that the company and some shareholders may have illegally sold unregistered shares to the public.

Before it allowed trading in Biozoom to resume in July, the SEC obtained an emergency order from the U.S. District Court in Manhattan, freezing almost $16 million in cash in U.S. brokerage accounts.

Another $17 million in trading revenues connected to sales of Biozoom shares was wired overseas before the court order, the SEC claimed in its court filing. Another $8 million in wire transfers requested by Biozoom shareholders were halted by the broker-dealers before they could go overseas.

The SEC also ordered the broker-dealers involved in the transactions, Arizona-based Scottsdale Capital, Salt Lake City-based Alpine and Legend Securities Inc. of New York, to preserve all of their records connected to the Biozoom transactions.

The regulator charged eight Argentine citizens with illegal sales of unregistered shares of Biozoom. The complaint also named two other Argentines who owned shares of Biozoom but did not sell them prior to the asset freeze.

Biozoom, which lists Kassel, Germany, as its headquarters, purports to manufacture a "biofeedback device" that consumers can use to monitor and analyze data related to their health. The company went public in February through a reverse merger with registered shell company Entertainment Art Inc. and raised $1.15 million in a private placement to an investor whose identity was not disclosed.

The stock was the subject of an unusual promotion four months later. Recommendations for Biozoom stock appeared in at least 13 e-mail newsletters, according to Hotstocked.com, a website that tracks stock promotions. Legal disclaimers that accompanied the promotions claimed that no compensation had been paid

CONFIDENTIAL                                                                                                          FINRA_00000292

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

for the stock-friendly hype. Legal disclaimers in penny stock newsletters often identify the companies that pay for stock promotions and sometimes provide details of the compensation, as is required under securities law Some stock promotion budgets run as high as $3 million.

One of the promotions claimed that Biozoom's "hand held device for the non-invasive transdermal analysis of antioxidants and other biomarkers in the human body... replaces expensive, time consuming and invasive blood tests."

"Future applications, future roll-out markets and applications are even more impressive," another newsletter stated. "Relevant biomarkers can and will be identified and analyzed for things such as cholesterol, alcohol, various illegal drugs, smoke, poisons, and blood pressure - to name a few. The unit is being further developed to measure blood sugar levels, tapping into a staggering $220 billion a year diabetes market in the U.S. and 350 million people with diabetes around the world."

Biozoom stock was also promoted in an unusual advertising campaign that made use of mainstream media outlets, including the New York Times and USA Today. In June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

A full-page black and white ad in USA Today could have cost $125,000, according to information that the newspaper distributes to advertisers. A similar New York Times ad would run $80,000 to $100,000, according to a newspaper spokesperson.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

Biozoom started trading with a thin volume of about 10,000 shares a day. The $1.10 share price implied a market value of $108.6 million for the company.

But when the promotion began to pick up speed, the shares rose to $1.50 on their way to an intraday high of $4.50 and a market cap of $421.5 million. Trading volume jumped as high as 11.7 million shares.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, giving Biozoom a market capitalization of just $9.56 million. Investors lost more than $300 million.

Finra and SEC officials declined to comment for this story. An FBI spokesman would neither confirm nor deny the existence of a criminal probe tied to Biozoom trading.

But a source who has spoken to investigators said the investigations are ongoing. The probes by Finra and the SEC began in May, prior to the trading halt.

The brokerage firm Scottsdale Capital is owned by Scottsdale Capital Advisors Holdings LLC and the Hurry Family Irrevocable Trust. Alpine is owned by SCA Clearing LLC. Both Scottsdale and Alpine are controlled by John Hurry, who is a director of both companies. Hurry's wife Justine is a director with Scottsdale and a minority owner.

The home pages of both Scottsdale Capital's and Alpine's websites feature the same motto, "At the top of the Small Cap Market," along with a photo of a mountain peak. For Scottsdale, it is a desert mountain. For Alpine, it's a snow capped peak.

CONFIDENTIAL

FINRA_00000293

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

The SEC complaint alleges that six of the shareholders named in the action, Magdalena Tavella, Adriana Bagattin, Daniela Goldman, Mariano Graciarena, Fernando Loureyro and Mariano Ferrari, opened accounts at Scottsdale between May 10 and June 14. The other shareholders named by the SEC — Andres Ficicchia, Gonzalo Blaya, Lucia Hernando and Cecilia De Lorenzo — opened trading accounts at Legend Securities from January through March, according to the SEC. Ficicchia also had an account at Scottsdale.

In all, the Biozoom shareholders deposited 20.1 million shares in the trading accounts which represented 100% of the share float that did not carry a trading restriction. Those shares represented about 33% of the total shares in the company.

None of the Biozoom shareholders, contacted by e-mail, responded to a request for comment from The Deal.

Legend Securities is owned by Stocktrade Network Inc., Chris Cacace, Salvatore Caruso, **Anthony** Fusco and Mark Sulavka, according to Finra records.

The SEC claims that when the Argentine shareholders opened their trading accounts at Scottsdale and Legend, they provided documents and sales receipts purporting to show that they had bought their shares between Feb. 19 and March 15 from the original shareholders of shell company Entertainment Art. But the SEC states in its complaint that all of the Entertainment Art shareholders sold their shares to Medford Financial Ltd. in 2009. Medford in turn was purchased by Le Mond Capital, a British Virgin Islands-based firm, for $430,000 last year. Le Mond was controlled by Sara Deutsch, who became CEO of Entertainment Art.

When the reverse merger took place in February, Deutsch paid $50,000 and 39 million shares to complete the transaction with four German entities for intellectual property that became the basis for Biozoom. The deal left her with 20.1 million shares. Deutsch became a director and assistant secretary for Biozoom, and in doing so, became what the SEC considers to be a control person.

The commission alleges that the shares Deutsch controlled were the shares that were actually distributed to the Argentine shareholders and that the stock sale agreements they used to help open the trading accounts at Scottsdale and Legend were fakes. Since Deutsch was a control person, any shares she distributed would be restricted and not free trading.

Deutsch ran a restaurant in Buenos Aires along with Magdalena Tavella called Magdalena's Party, according to the SEC complaint. Tavella was one of the Biozoom shareholders who traded through Scottsdale.

Miller Place, N.Y.-based securities attorney Randall Goulding supplied a legal opinion for all of the Biozoom shareholders, based in part on the stock sale documents portraying the transactions with original Entertainment Art shareholders, the SEC claimed in a court filing requesting the asset freeze. His opinion letter stated that the share certificates could be deposited without restrictions based on an exemption from registration provided by Rule 144 of the Securities Act. He said that the sellers were not affiliates of the company and had held the shares for more than four years and that the account holders were not individually or collectively the beneficial owner of more than 10% of the common shares of the company.

On June 19, Goulding e-mailed the general counsel for Legend saying, "I hereby withdraw all of my opinions issued for the securities of Biozoom, formerly Entertainment Art. Be advised that none of these opinions should be relied upon," according to the SEC.

**San Antonio**-based securities lawyer David Wise, who had supplied a similar legal opinion letter to Scottsdale for Tavella and Goldman on May 20, withdrew his letter June 26. Wise sent an e-mail to Scottsdale that in part read, "It has been brought to our attention that the SEC recently suspended trading in Biozoom. It has also been brought to our attention that Tavella and Goldman may have provided inaccurate or misleading information and documentation to Scottsdale and to this firm."

A number of factors make it appear that the Biozoom shareholders were connected in an organized effort

CONFIDENTIAL

FINRA_00000294

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

A person who has spoken with investigators said that the six shareholders who held Scottsdale accounts opened them within the same week. The SEC complaint states that all of the shareholders live in Buenos Aires.

A person familiar with the investigative documents said the handwriting on the account applications for the Biozoom shareholders was the same, the answers to questions on their foreign due diligence packages were very similar and they held accounts at the same banks in Cyprus, Switzerland and Panama.

Moreover, the e-mail addresses they furnished for their trading accounts were opened within a week of each other, according to Whosis.com, a website that furnishes information on domain registrations. The addresses are also similar, all containing the account holders' last names.

The shareholders with accounts at Legend were also from Buenos Aires.

According to a declaration filed with the court by Ricky Sachar, an assistant director of enforcement for the SEC, all of the shareholder's e-mail accounts were opened with the same regional Internet registry. All of the Biozoom trades were made from May 16 to June 17 and no other stocks were deposited or traded through the accounts at either Scottsdale or Legend. Also, all of the Biozoom trades were ordered using either e-mail or instant messaging accounts.

"These shareholders were brought in for this. It's as simple as that," said a person with knowledge of the investigations. "They are retired teachers, a deli owner, but they come in with millions of shares of stock. They only trade Biozoom and they are directing trades using traders' lingo, telling them which market makers to use for the trades? Come on. They were straw men for whoever is behind this whole thing."

That same person said the Biozoom shareholders who opened accounts with Scottsdale enjoyed perks that were not available to other Scottsdale clients.

Typical clients pay 4% per transaction, or 4.5% if their transactions are cleared through Alpine. Longtime clients who do a heavy volume of business may occasionally receive a discount of one percentage point. But Biozoom clients paid just 2%, the person said.

They were also allowed to place orders using instant messaging, which is generally forbidden under Scottsdale's internal policies. A person with knowledge of Scottsdale's operations said the policy was changed for the Biozoom shareholders by the broker-dealer's management after Biozoom shareholders complained.

A standing Scottsdale policy only allows clients to wire funds from their accounts to banks in the U.S. or to institutions in the country where they live. But the person said that Biozoom shareholders were allowed to send funds to Cyprus, Switzerland, Panama and Belize, despite the fact that all of them live in **Argentina** and all of them had signed documents agreeing to abide by Scottsdale's wire policy.

The same person said that several red flags were raised regarding the Biozoom trades at Scottsdale: They were large trades in a microcap stock with relatively little liquidity. Also, foreign nationals were wiring large sums out of the U.S., raising potential concerns about money laundering. Still, no follow-up occurred at the broker-dealer, the person said.

Finra, who has worked with the SEC on the probe, has had several "on-the-record" conversations with Scottsdale staff regarding the trading of Biozoom shares, the process by which the accounts were opened for the Argentine nationals and how assets were moved offshore, according to a person who has spoken with investigators. "OTRs", as they are known in the brokerage industry, are sessions in which Finra staff ask specific questions of registered representatives who must answer them or face disciplinary actions.

A source who has spoken to investigators said Scottsdale staff members who have talked with Finra regarding Biozoom trades are Timothy Scarpino, Tim Diblasi, Liz Arndt, Henry Diekmann, Jay Noiman, Michael Cruz, Adam Fiandaca and Ted Ashton.

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

Finra also talked with John Hurry, that same source said.

Scarpino, who processed the Argentine accounts connected to the Biozoom trades, resigned from his position at Scottsdale. He declined comment for this story. Ashton, who was a compliance analyst, also is no longer with the firm. Efforts to reach him failed.

Arndt is the office manager and oversees trading. Noiman and Diekmann are in compliance, and Diblasi is chief operating officer. Cruz is chief counsel, and Fiandaca handles wiring of funds.

Diekmann denied he participated in the OTRs with Finra in a very brief phone interview.

None of the other Scottsdale staff questioned by Finra returned phone calls from The Deal seeking comment regarding the OTR's about Biozoom.

Gerald Russello, a partner at the law firm of Sidley Austin LLP in New York, said that Scottsdale and Alpine would have no comment regarding Biozoom trading or the investigations by Finra, the SEC and the FBI. Russello is a securities lawyer and former SEC enforcement branch chief.

Richard Kirby, a partner with K&L Gates LLP in Washington who represents Legend Securities, said he does not know if the SEC is concerned with how Legend conducted itself with regards to the Biozoom trades, but he said that Legend had not filed any notice with Finra regarding an SEC investigation.

Kirby also said that Legend alerted the SEC to its concerns regarding Biozoom and that the broker-dealer had acted on its own to freeze accounts tied to the Argentine nationals prior to the SEC action July 7.

While Legend did complete a June 13 $600,000 wire transfer for Luciana Hernando to Hellenic Bank Public Co. in Lemesos, Cyprus, it refused Hernando's request to move $2 million to the same bank on June 17. Legend also refused a wire request from Blaya June 14 to transfer almost $3.5 million to a bank in Geneva, according to the SEC complaint.

Meanwhile, John Hurry, who controls both Scottsdale and Alpine, is in negotiations to buy Salt Lake City-based broker-dealer Wilson-Davis & Co., according to a person with knowledge of the deal.

Representatives of Wilson-Davis did not return phone calls from The Deal seeking comment. Scottsdale representatives declined to comment.

Share    Reprint    Save to My Articles

Privacy | Terms and Conditions | My Account | Contact Us

©Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

http://pipeline.thedeal.com/31/10007918514/14093955.t?d=6&amp;cmpid=em:RG120913&amp;user...

CONFIDENTIAL

FINRA_00000296



# The DealFlow Report

TUESDAY
SEPTEMBER 17, 2013
VOLUME 11, NO. 34

**IN THIS EDITION**



**LAW FIRM ANSLOW & JACLIN SHUTTING DOWN**

The law firm of Anslow & Jaclin LLP, a major player in the microcap and reverse merger markets, is calling it quits. The Manalapan, N.J.-based firm is dissolving in what partners Richard Anslow and Gregg Jaclin termed an amicable split. This is at least the second time since late 2011 that they have approached an exit. In October of that year, a planned merger with Sichenzia Ross Friedman Ference LLP was scuttled for what the firms called "professional differences" after months of negotiations. Anslow, along with two other attorneys and a paralegal, are headed for Ellenoff Grossman & Schole LLP, he said. Jaclin and four other attorneys will join Szaferman Lakind.

page 9

## Finra targets offshore firms in pump-and-dumps

*Regulator suspects a dozen firms for suspicious trading*

**BY BILL MEAGHER**

In the past two years, the Financial Industry Regulatory Authority has asked the Securities and Exchange Commission to investigate at least a dozen offshore banks and brokerage houses that have generated at least $37 million in total proceeds from suspicious trading in companies linked to pump-and-dump schemes, according to internal documents obtained by The Deal.

The allegations were made in a series of reports that Finra sent to the SEC in 2012 and 2013. Officials from the SEC and from Finra, which regulates broker-dealers, declined to comment for this story.

The entities named by Finra include **Caledonian Global Financial Services Inc.** and **Caledonian Bank**, located in the Cayman Islands; **Legacy Global Markets SA** and **Clearwater Securities Inc.** of Belize; **Argus Stockbrokers Ltd.** of Cyprus; **CBH Compagnie Bancaire Helvetique SA**, **Rigi Capital AG** and **Bank Gutenberg AG** of Switzerland; **Verdmont Capital SA** and **Financial Pacific Inc.** of Panama; **Sharma Investments Inc.** of Samoa; **Sherman Capital LLC** of the Philippines and **Boutique Services Ltd.** in Hong Kong.

So far, it does not appear that the SEC has brought any enforcement actions against the offshore firms.

None of the offshore banks and trading houses named by Finra in its "Fraud Surveillance" reports responded to The Deal's requests for interviews.

The reports allege that the firms traded in shares of **Goff Corp.**, **Marine Drive Mobile Corp.**, **Toron Inc.**, **Bioflamex Corp.** and **U.S. Highland Inc.** All of the companies were the subjects of paid stock promotions. All of their stocks climbed as a result of the promotions and then dropped after insiders sold shares. All the companies were also named in Finra reports to the SEC as probable targets of pump-and-dump campaigns.

The companies did not respond to requests for comment from The Deal.

Pump-and-dumps typically occur in microcap companies that are the subjects of paid promotions.

FINRA continued on page 4 >

## EDAP seeking partner, investors to fund company

**BY DAN LONKEVICH**

EDAP TMS SA, a French developer of a shock wave treatment to break up kidney stones and ultrasound devices to treat prostate cancer, is looking for a partner and investors to fund a new company to begin clinical trials of its HIFU technology to treat liver metastases and pancreatic cancer.

EDAP CEO Marc Oczachowski said in a Tuesday, Sept. 10, interview that EDAP is setting up a separate company because the HIFU product for prostate cancer and the HIFU products for liver metastases and pancreatic cancer require separate managements to be developed properly.

"We can't work on the two projects at the same time," he said.

Vaulx-en-Velin, France-based EDAP is "actively looking for a partner and investors" and will try to raise "close to $10 million," Oczachowski said. "We might want to attract venture capital investors. It's more early-stage."

Shares of EDAP, which trade on the Nasdaq under the symbol EDAP, fell 7 cents to $2.57 on Sept. 10, giving the company a market value of $51.2 million. Over the past year, the stock has risen 50.9%.

EDAP's HIFU device for liver metastases and pancreatic cancer are currently being studied in phase II

EDAP continued on page 6 >

CLOSE  PRINT  BACK  < INDEX >  COVER  SEARCH  VIEW

CONFIDENTIAL

FINRA_00000297

## MARKET UPDATE

< FINRA from page 1

Stock promotion is often done through e-mail and direct-mail advertising targeting retail investors. The promotional materials often make colorful or exaggerated claims about the future course of the company or its products. The promotion is also sometimes paired with a flurry of press releases from the company itself, announcing positive developments in its business. Retail investors may buy shares based on the promotional claims, while insiders wait for the shares to rise, and then sell off their positions into the promotion.

Paid promotions are not necessarily illegal. To be legal, however, the promotion must contain true information and a legal a disclaimer disclosing that the promotion was paid for, who is paying for it and who is being paid.

The Finra reports, which originated in the agency's Office of Fraud Detection and Market Intelligence in Rockville Md., detailed the trades made by the offshore firms, the backgrounds of the companies involved, their finances and, in some cases, include interviews with company management. The dispatches also point out where press releases from the companies coincided with the promotions, detailed the promotions, named promoters and described the claims they made about the companies. Each report ends with a conclusion that the combination of promotions, timely trades and sometimes other issues suggest that a pump-and-dump has occurred.

The Finra reports allege that Caledonian Global's, Caledonian Bank's, Legacy's, Argus', CBH's, Bank Gutenberg's, Verdmont's and Clearwater's trading in Goff Corp. generated total proceeds of $24.6 million.

Goff purports to be a mining concern headquartered in Medellin, Colombia. Earlier this year, someone paid $3 million for websites including PennyStockPillager.com——and AwesomePennyStocks.com to promote Goff shares.

"When the price of gold EXPLODES-- shares of GOFF could soar--transforming early investors into Millionaires!" one promotion from PennyStockPillager stated.

Finra said that trading records obtained from U.S.-based brokers **Scottsdale Capital Advisors, Vertical Group** and **Knight Execution & Clearing Services LLC** showed that the offshore traders bought Goff in March and sold the stock by April, as the share price rose from 20 cents to 65 cents. Goff, which trades over the counter under the symbol GOFF, was trading at 0.78 cents as of Sept. 12.

Clearwater Securities of Belize made $4 million trading Goff shares, according to Finra. The firm's trading account with Scottsdale Capital was opened in April 2012 by Philip Kueber. He has been referred to the SEC by Finra at least eight times for his alleged involvement

CON... >>



Lehman assignments ending... Bankruptcy filings on the decline... New players entering the market... How will The Deal Pipeline's Quarterly Bankruptcy League Tables shake out?

**Q2 2013 BANKRUPTCY LEAGUE TABLES**

AVAILABLE NOW.

CLICK HERE TO SEE THE LATEST WINNERS

Deal Pipeline

CLOSE   PRINT   BACK   < INDEX >   COVER   SEARCH   VIEW

CONFIDENTIAL

FINRA_00000298



< PREVIOUS

with pump-and-dump schemes, including one involving the shares of purported mining company **Pepper Rock Resources Corp.** in May 2011. Kueber was Pepper Rock's CEO in 2010. He was also an officer with privately held **Oxalis Energy Group Inc.**, which participated in a joint venture with Pepper Rock that year, according to Finra. The agency alleges that Pepper Rock was a vehicle for a pump-and-dump fueled by Internet promotions and company-issued press releases.

Legacy Global also traded in the Pepper Rock pump-and-dump, according to Finra. Kueber was a signatory on account documents associated with Legacy.

He could not be reached for comment by The Deal.

In the case of Bioflamex, a Danish-based company that claims to manufacture fire extinguishers, it issued its first-ever press release on March 5, 2012. The next day a $552,500 stock promotion began. Bioflamex shares jumped from $6 to $20.92 that day.

By March 9, they had fallen to $3.96.

Bioflamex then issued a press release claiming to have "initiated an internal review and investigation of the unusually high volume of trading in its common shares on the OTC Bulletin Board, and the resulting precipitous drop in the market price of its stock." CEO Kristian Schiorring went on to blame a "slander campaign" against the company on stock trading message boards and a very high volume of short selling and panic selling for the share slide.

Finra said Bioflamex never responded to its request for more information.

As of Sept. 12, 2013, the stock, which trades under the symbol BFLX, was quoted at .05 cents.

In the case of Marine Drive Mobile, Finra detailed a May 2012 stock promotion that was paid for by **Newmarket Traders Ltd.** According to the report, John Person's Bottom Line Newsletter claimed that a $10,000 investment in Marine Drive Mobile could turn into $261,700 "in nearly the blink of an eye" and that the company might be acquired by **Facebook Inc.** at $26.17 a share. San Francisco-based Marine Drive Mobile offers technology that consumer companies can use to manage daily-deal and loyalty programs. A legal disclaimer in Person's newsletter said he had not verified any of the information in his publication and that he had been paid $5,000 to promote Marine Drive Mobile.

The Finra report noted that Person and his newsletter had been referenced several times before by the regulator to the SEC "for his suspect promotion of issuers that were potentially the subject of a 'pump-and-dump' scheme." Finra said it previously referred Person to the SEC in March 2012 for the promotion of **FrogAds Inc.**

The promotion of Marine Drive drove its



shares from 67 cents on May 1 to $1.06 on May 24, according to Finra.

As of Sept. 12, 2013, Marine Drive stock had not traded for the past two days and was last quoted at 1 cent. The shares trade over the counter under the symbol MDMCD.

Finra officials interviewed Marine Drive CEO Colin MacDonald about the promotion in May 2012. He told them that he had "no clue on this crap," that he did not know anything about any promotions paid for by people unaffiliated with the company and he had not hired anyone to do investor relations.

He had, however, hired Kevin Finn to market the company, according to Finra. Finn was Person's agent. Finn told Finra that Person was paid $10,000 for his promotion of Marine Drive Mobile. Finn also said that he had been referred to the company by a Vancouver, British Columbia-based client.

Finn said he did not review Person's newsletter and that he did not judge material in the newsletters for "truthfulness." Finn also told Finra that if someone involved in the Marine Drive Mobile promotion was doing something wrong, the regulator should "bring the bastards to justice."

A June 2012 promotion of the company by the James Rapholz Economic Advice newsletter called Marine Drive Mobile the "Game Changer of the Decade" and claimed that the company could become a takeover target for "Google, Amazon, Living Social or Groupon itself could suddenly enter a bidding war to get their hands on this breakthrough technology."

Rapholz advised investors to buy the stock at below $2 with a short-term target price of $3.50 to $4 and a two-year target of $27.

A legal disclaimer in Rapholz's newsletter shows that he was paid $7,500 by Newmarket. Finra noted that Rapholz was banned from the securities industry for a decade in 1991 because of his alleged securities law violations in his sales of shares in a Palm Beach, Fla.-based equity fund. Rapholz was also the subject of a cease-and-desist order from the South Carolina Securities Commissioner over the promotion of Cobra Oil & Gas Co., now known as **Viper Resources Inc.**, in 2010. Finn was referenced in the same order.

Person did not return a call from The Deal seeking comment. Finn declined to comment. MacDonald could not be reached for comment. Phone numbers listed for Rapholz's Economic Advice newsletter were either disconnected or had been reassigned to another business.

A disclaimer in Rapholz's newsletter had said that Newmarket managed a production budget of $460,000 to promote Marine Drive Mobile.

In the case of Toron, a Montreal-based mining company, Rigi Capital engaged in trades that appeared to match with Financial Pacific and Boutique, according to Finra. Rigi sold the same number of shares on the same days and at the same time that the other traders bought the same number of share with limit prices. In its report to the SEC, Finra said that Rigi made $62,195 from its trades, and Bank Gutenberg realized $22,135, Sharma Investments made $40,489. ∎

CLOSE   PRINT   BACK   < INDEX >   COVER   SEARCH   VIEW

CONFIDENTIAL