On 7/16/14, CC discussed the case with C. Foster and JA.

**7/3/2014 10:28 AM - Cook, Christopher**
On 7/3/14, CC discussed the case with OGC COC's Betty Brooks and Natalie Norris, and OGC's Terri Reicher. COC staff was not aware of the issue, but during the call Norris found an EP case entered by former COC VP Gary Ford who had been apprised by Colby on 1/10/14 that OMB was conducting the review. Reicher also noted that she had been involved in a litigation filed by an affiliate of the BD in early 2013 complaining that FINRA staff illegally copied hard drive information from the affiliate (which was located at the BD). However, the affiliate never filed a summons and the lawsuit was subsequently dismissed in mid-2013.

**7/2/2014 9:47 AM - Cook, Christopher**
On 7/1/14, CC discussed the case with JA and C. Foster.

On 7/2/14, CC discussed the case further with C. Foster and conducted further research to identify the staff who conducted the work to develop and prepare the ▮▮▮▮▮▮▮▮▮▮ for potential OMB interviews. CC also confirmed with Kovalev that all non-Blackberry corporate mobile telephone records (only 3 exist) had been included in the prior search of corporate mobile telephone records. Kovalev explained that the telephone records for EEs who use Bring Your Own Devices (BYOD) are not provided to FINRA. CC also created a timeline of events regarding the ▮▮▮▮▮▮▮▮▮, tipster contacts, reporter contacts and article publications, and related FINRA events.

**6/20/2014 3:55 PM - Cook, Christopher**
On 6/20/14, CC discussed the case with JA and inventoried the 3,273 emails further.

**6/3/2014 1:33 PM - Cook, Christopher**
On 5/30/14, CC completed a case summary.

**5/29/2014 1:15 PM - Cook, Christopher**
On 5/29/14, CC reviewed the case and drafted a case summary.

**5/9/2014 10:30 AM - Cook, Christopher**
On 5/9/14, with respect to former EE McCallion and current EE Yoon, CC searched the previously obtained FINRA corporate telephone records, Enterprise Search listings of EEs who accessed ▮▮▮▮▮▮▮▮▮▮ and SIRS EE access listings, and found no record that either EE had viewed ▮▮▮▮▮▮▮▮▮ or contacted The Deal reporter Meagher.

**5/7/2014 12:14 PM - Cook, Christopher**
On 5/7/14, CC completed review of the 3,273 emails. No concerns were detected regarding any FINRA EEs leaking confidential information to outside parties, but CC found that:

a) Jennifer McCallion, a former NYC Market Regulation EE who left FINRA on 5/8/13, has/had a personal relationship with Erin Corcoran, who works/worked at The Deal.

b) Dana Yoon, a current NYC Enforcement EE, has/had a personal relationship with Peter Yoon, who appears to be an "education industry banker" who was interviewed and quoted in at least one article for The Deal. See the article at http://thedeal.com/content/tmt/school-supplies-for-the-classroom-of-the-future.php.

**5/7/2014 12:14 PM - Cook, Christopher**
On 5/7/14, CC continued review of the 3,273 emails.

**5/1/2014 10:05 AM - Cook, Christopher**
On 5/1/14, CC and Foster called Rufino and provided a status update on OMB's review. CC also reviewed the 2 STAR matters that have been created as a result of the tipster's leads ▮▮▮▮▮▮▮▮▮▮▮ and found that there are a minimum of 3 FINRA staff who have been in contact with the tipster - OFDMI's Jane Wetterau, Brian Craig, and Paul Lane.

**4/29/2014 9:33 AM - Cook, Christopher**
On 4/29/14, CC reviewed the case, and then discussed the case with Foster.

**4/25/2014 4:21 PM - Cook, Christopher**
On 4/25/14, CC conducted additional research regarding the 4/16/14 The Deal Pipeline article and found that the reference to a FINRA unannounced visit on 3/10/14 appears to refer to a FINRA AML examination team's unannounced visit from 3/24/14 to 3/26/14. According to Jason Foye, manager of Member Regulation-Sales Practice's AML group, he and 3 of his staff (Tom Mellett, David Byrne, and Eli Renshaw) arrived unannounced on 3/24/14 and provided the BD with an initial 8210 request letter (the staff are assigned to the ROOR examination ▮▮▮▮▮▮▮). Over the course of the 3-day visit, the staff provided 2 additional 8210 request letters and obtained documents regarding overseas clients and omnibus accounts. After the call with Foye, Foye emailed to CC copies of the 3 8210 request letters.

**4/24/2014 2:22 PM - Cook, Christopher**
On 4/24/14, CC received and commenced review of the emails from the requested search. CC received 3,273 emails (345MB total size); many of the emails, however, did not involve emails to/from either the tipster or the The Deal publication.

**4/22/2014 11:46 AM - Cook, Christopher**
On 4/22/14, CC spoke with Dougherty who confirmed that none of his staff were involved in any 3/10/14 onsite visit, but that he had seen the 4/16/14 article and believes this refers to a 3/24/14-3/26/14 unannounced onsite visit by an AML investigation team from other FINRA offices; Dougherty is unsure of which examination comprised this visit. CC then reviewed STAR and found that the 2014 ROOR routine examination [redacted] team visited the BD from 3/24/14-3/26/14.

**4/21/2014 1:35 PM - Cook, Christopher**
On 4/17/14, the visitor sent another email to Foster and Colby with an article from The Deal Pipeline dated 4/16/14 in which the same author Meagher re-hashed his earlier articles and discussed a 3/10/14 onsite surprise visit by FINRA staff to the BD wherein the staff obtained documents regarding certain omnibus accounts of the BD.

On 4/21/14, Foster forwarded the email to CC. CC reviewed the 4/16/14 article and found that the vast majority of it re-iterated information provided in the author's prior articles and discussed publicly available information; but the 3/10/14 FINRA staff visit is new information. CC then reviewed STAR and found [redacted]

CC reviewed the time tracking information in each matter, but none captured any onsite review of the BD on/around 3/10/14. CC then emailed Dougherty seeking information.

**4/7/2014 12:36 PM - Cook, Christopher**
On/around 4/2/14, Foster notified CC that she was informed that the email search criteria is too large, and thus needs to be further targeted.

On 4/7/14, CC discussed the case with Foster and then revised the email search request to solely emails to/from the The Deal author, any other emails to/from The Deal email domain, and emails to/from the OFDMI tipster.

**4/3/2014 1:00 PM - Cook, Christopher**
On 4/2/14, Funkhouser provided CC a list of FINRA staff with access to SIRS as of February 2014.

On 4/3/14, CC arranged with Funkhouser for OFDMI Insider Trading Associate Director Leslie Dawkins to provide CC a demo of the SIRS system. CC found that staff maintains Word and PDF versions of [redacted] on their groups' shared file directory (e.g., one file for staff in ITS and PIPES which jointly report to SVP Sam Draddy). [redacted] In STAR, supporting documents generally are uploaded, but not [redacted] - Dawkins does not know why [redacted] is not alos uploaded; and in the STAR record, the date of [redacted] is captured and staff enters a comment that summarizes the [redacted] Dawkins does not know whether copies of [redacted] are ever shared with other FINRA departments; she noted that any such requests likely are handled by Draddy.

**3/25/2014 2:51 PM - Cook, Christopher**
On 3/25/14, Dougherty informed CC that no correspondence can be located that provided the BD with advance notice of the 2014 examination, but the interactive system that BDs now use would have been used. Also, Dougherty provided CC a copy of an Outlook Meeting request that was used to schedule a conference call between the staff and BD staff on 2/20/14.

**3/24/2014 9:38 AM - Cook, Christopher**
On 3/24/14, CC revised and submitted a revised email search request. CC also reviewed 20140389717 in STAR, EET, and Enterprise Desktop's Exam Workspace, but could find no documents and no indication as to whether/when the examination has been announced to the BD. CC spoke with Denver District Office AD Gerry Dougherty, who responded that the examination was announced to the BD on/around February 13, 2014, and the staff has been having ongoing dialogues with the BD's management in preparation of the onsite fieldwork.

CC also asked Funkhouser follow-up questions regarding the following (and see Funkhouser's responses below):
(a) seeking whether tipster [redacted] is the subject of a pending formal disciplinary action: Funkhouser responded that he has no such knowledge.
(b) the duration that [redacted] are maintained in SIRS: Funkhouser responded that FINRA does not know, as this is an SEC system.

(c) who, if any, non-OFDMI staff have access to SIRS: Funkhouser will provide a current list of FINRA staff with access to the system (he is away on vacation this week, so will provide it next week).

**3/21/2014 2:53 PM - Cook, Christopher**
On 3/21/14, CC reviewed an email sent by the Counsel on this day to OMB and Colby that raised continuing concerns of a leak and includes a 3/20/14 article published by reporter Meagher in The Deal Pipeline. As pointed out in the Counsel's email, the 3/20/14 article contains new purportedly confidential information regarding a FINRA examination that is scheduled to commence in March 2014 and that FINRA and the SEC have required the BD to provide all EEs' personal notes regarding Biozoom and ordered the BD to not destroy any Biozoom records. Colby responded that OMB is currently reviewing the concerns, and noted that FINRA policies prohibit staff from disclosing its audit schedule and regulatory requests.

CC then checked STAR and found that the Denver District Office's 2014 routine examination of the BD (20140389717) is scheduled to commence fieldwork on 3/31/14.

**3/18/2014 4:12 PM - Cook, Christopher**
On 3/18/14, Kovalev informed CC that the 2nd blackberry call record search (calls to/from the tipster) found no results.

**3/17/2014 1:08 PM - Cook, Christopher**
On 3/17/14, Foster approved the email search criteria, so CC emailed the request to IA's Sat Jagerdeo. Also at Foster's request, CC provided Colby a status update on the case.

**3/13/2014 10:24 PM - Cook, Christopher**
On 3/13/14, CC provided C. Foster a status update on the case. CC also completed preparation of the criteria for an email search (persons, time period, and key words).

**2/28/2014 12:35 PM - Cook, Christopher**
On 2/28/14, CC reviewed the Enterprise Search results, and tentatively found that all persons who were able to access the ▮▮▮▮ were OFDMI staff, with the exception of 1 EE who works in Market Regulation and accessed ▮▮▮▮. Only a few OFDMI staff accessed more than ▮▮▮▮
--Flood: 5
--Heffern: 5
--Lane: 6
--Neuner: 4
--Sazegar: 6

For a few EEs who accessed ▮▮▮▮ the user names could not be clearly tied to any specific EEs, so CC asked Karper to identify the EEs. Karper referred the request to Identity and Access Management's Joseph 'Sep' Fraunhoffer.

Kovalev also informed CC that Karper maintains the desktop telephone reports, so CC forwarded that request to Karper (Kovalev is reviewing the blackberry reports). Karper provided the report, which shows 10 calls to/from the tipster: 9 of the 10 involved either Brian Craig or Paul Lane in OFDMI; the 1 remaining call from x6804 originated in an OFDMI conference room.

CC also reviewed STAR and prepared a list of all Member Regulation and Enforcement staff who were assigned to examinations of BDs who are the subject of this case (▮▮▮▮ Scottsdale Capital #118786) or were indicated by Funkhouser to have requested one or more of ▮▮▮▮
▮▮▮▮

**2/27/2014 12:52 PM - Cook, Christopher**
On 2/27/14, CC conducted further research and commenced preparing a list of persons whose email addresses will be subjected to a search.

CC also asked Kovalev to search calls to/from the AP tipster (▮▮▮▮) who has been working with OFDMI.

CC also coordinated the Enterprise search and received the results of the search. For reference, the following technology staff were involved: Duane Knauf, Doug Cohen, Ivy Ho, and Sergey Ivanchenko.

Knauf also informed CC that ▮▮▮▮ are maintained on a shared file drive in OFDMI, which is the source for the indexing into Enterprise Search.

**2/26/2014 10:09 AM - Cook, Christopher**
On 2/26/14, CC queried Enterprise Solutions' Duane Knauf on the capabilities of Enterprise Search's ability to identify EEs who have sought/obtained hits on specific items. Knauf responded that Enterprise Search's technology team can identify which persons, based on search results, attempted to open specific documents. CC discussed the confidential nature of his inquiry (without explaining why it is confidential), and then emailed Knauf the list of ▮▮▮▮. Knauf will inform his manager and his lead 'search' technician to keep disclosure at a minimum, and will provide CC with his results.

**2/25/2014 1:11 PM - Cook, Christopher**
On 2/25/14, CC reviewed and updated the case.

**2/25/2014 10:38 AM - Cook, Christopher**
On 2/12/14, Funkhouser provided a list of EEs who had requested and obtained copies of ▮▮▮▮▮ as follows:

a. ▮▮▮▮▮ – Odessa Izuhara (Principal Regulatory Coordinator, Member Regulation Los Angeles) for ▮▮▮▮▮
b. ▮▮▮▮▮ – Julie Wang (Principal Regulatory Coordinator, Member Regulation New York) for ▮▮▮▮▮
c. ▮▮▮▮▮ – Odessa Izuhara (Principal Regulatory Coordinator, Member Regulation Los Angeles) for ▮▮▮▮▮
d. ▮▮▮▮▮ - Melissa Keller (Principal Regulatory Coordinator, Member Regulation New York) for ▮▮▮▮▮
e. ▮▮▮▮▮ – no requests received
f. ▮▮▮▮▮ – Philip Ciantro (Principal Regulatory Coordinator, Member Regulation New York) for ▮▮▮▮▮

**2/12/2014 2:35 PM - Cook, Christopher**
On 2/11/14, Kovalev informed CC that all remaining blackberry records were searched with no results for the specified telephone number.

On 2/12/14, CC discussed the case with JA. CC also reviewed emails JA had received from Funkhouser that pertain to ▮▮▮▮▮ and the claimed media leak. CC also contacted Enterprise Solutions' Chris Verhoeven seeking information regarding EEs who received search hits on and/or accessed certain ▮▮▮▮▮ from Enterprise Search.

**2/12/2014 9:15 AM - Abraham, Jasmine**
2/11/2014

Meeting with OFDMI
Attendees: Cam Funkhouser (CF); Cindy Foster; Jasmine Abraham
Date: Tues. Feb. 11, 2014, 1:00-2:00 p.m.

▮▮▮▮▮

b. Currently, the contact person at the SEC for SIRS is Bob Nesbitt who was with FINRA previously.
c. SEC controls entitlements and at the request of FINRA will add or remove users. In addition to OFDMI, the SIRS system may also be used by Market Regulation and Enforcement. It is unclear whether Member Regulation has access to SIRS.
d. Each FINRA unit is restricted to seeing its own ▮▮▮▮▮ For example, when a search was conducted by Chad Snyder, Fraud Surveillance, he was able to see ▮▮▮▮▮ Fraud Surveillance made to the SEC in the outbox functionality.

2. Location of ▮▮▮▮▮
a. Each unit within OFDMI is responsible for keeping their ▮▮▮▮▮ in their directory. All staff in the unit has access to all the content of the directory.
b. While OFDMI staff in another unit cannot access a document for other units via the directory, they are able to access documents in other unit's directories by doing an Enterprise search and opening up the documents this way.
c. A non-OFDMI employee doing an enterprise search may come across a search result indicating ▮▮▮▮▮ was made but is not able to open ▮▮▮▮▮
d. No hard copies of ▮▮▮▮▮ are maintained anywhere.
e. Doug Cohen might be able to answer if a digital footprint is left when employees access Enterprise documents.

3. Requesting ▮▮▮▮▮
a. Requests for ▮▮▮▮▮ from FINRA staff will go to "DL-Search-OFDMI Mgmt" which sends the request out to Ann Marie Flood, Tony Cavallaro, Cam Funkhouser etc… as an email.
b. Staff person requesting ▮▮▮▮▮ needs to identify reason for why they need ▮▮▮▮▮. Sometimes, additional information is requested by OFDMI to determine the need for the individual to have ▮▮▮▮▮

5. Bill Meagher
a. CF did not exchange any emails with Bill Meagher but indicated that he exchanged emails with Nancy Condon regarding Meagher.

Reviewed documents, emails provided.

2/6/2014
Reviewed telecommunications report.


(180 minutes)

**2/7/2014 11:44 AM - Cook, Christopher**
On 2/7/14, CC reviewed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. CC found nothing in ▮▮▮▮▮ that provided additional non-public information that had been captured in the 12/6/13 The Deal article (i.e., nothing additional from the information contained in 20130372768).

CC also reviewed STAR and found no additional non-public information that had been captured in the 12/6/13 The Deal article, but CC found that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The STAR comments for the above investigation also indicate that the SEC requested access to the file in September 2013.

CC also was referred by Kovalev regarding certain telephone record entries (those with unclear IDs of any EE) to Network Engineering analyst John Karper. CC discussed the confidential nature of the request with Karper, who then reviewed the entries and informed CC that no EEs could be tied to those entries. Based upon the above and CC and JA's discussion on 2/6/14 regarding the known EEs, there appears to be no person who had contact with The Deal that was potentially inconsistent with their job activities.

Kovalev also informed CC that there were no calls to/from Verizon blackberries and The Deal's telephone number during 2013; Kovalev added that he does not have access to 2012 Verizon blackberry records.

CC also reviewed EET and reviewed the most recently posted planning notes from cycle examinations of each of the two BDs, but did not find any information relevant to this case.

**2/6/2014 9:32 AM - Cook, Christopher**
On 2/5/14, CC discussed the case with JA and CF, and then reviewed a draft email by JA seeking additional information from OFDMI.

On 2/6/14, CC discussed the case further with JA, and initiated with Telecommunications' Alex Kovalev an office telephone and blackberry search of calls to and from The Deal reporter Meagher's telephone (707-992-0725) for 2012-2013.

Kovalev later provide office telephone results. CC and JA reviewed the records.

**2/5/2014 4:28 PM - Abraham, Jasmine**
Met with CF and CC to discuss OFDMI's review of the matter.
After discovering the leak, OFDMI had discussed the possible leak with Media Relations, and indicated that the SEC was also looking into the matter. No phone records or email records were reviewed. To obtain ▮▮▮▮▮▮▮ from OFDMI, a written request must be presented with a justification for the request.

JA emailed Cam Funkhouser to follow up on CF's conversation and to request additional information to facilitate OMB's review of the matter:

1. May we have a list of FINRA staff who requested the following ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as well as the date and reason for their request:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2. Additionally, we'd also like to request any emails sent by you or sent to you related to The Deal Pipeline's Dec. 6, 2013 article and The Deal Flow Report's Sept. 17, 2013 article containing non-public information that Chris Cook shared with you last week.

3. Finally, we would like to better understand how the SIRS system works. (1) Will you please provide a list of FINRA staff who had access to the SIRS system in 2012 and 2013? (2) Is the SIRS system used to simply facilitate ▮▮▮ or does it also house ▮▮▮▮▮▮▮▮▮? If so, how long is ▮▮▮▮▮▮▮ housed on the system?

(See attachments for complete email).

(90 minutes)

**2/4/2014 2:20 PM - Cook, Christopher**
On 2/4/14, CC discussed the case with C. Foster and JA.

**2/4/2014 10:50 AM - Abraham, Jasmine**
Completed review of ▮▮▮▮▮ on 2/3 and 2/4.

1. The Sept. 17, 2013 article directly references ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

2. Completed chart comparing statements in the article attributed to FINRA with information contained in ▮▮▮▮▮. The non-public statements directly attributed to FINRA could easily be identified in ▮▮▮▮▮ that FINRA made due to the similarily of information. Specifically, the language contained in ▮▮▮▮▮ was used in the article although quotes were not used.

3. Researched FINRA's policy on media contacts
FINRA's Employee Handbook's section XV. Additional Policies and Guidelines has a section on communications with the media.

"B. Communication with the Media

Occasionally, employees may receive inquiries from the media such as newspapers, television stations, magazines or other news outlets. If the media contacts you, you should refer the individual making the inquiry to our Media Relations department. No other employees are authorized to give statements to any representative of the media. Violation of this policy will lead to disciplinary action, up to and including termination.

No opinion submissions, blog postings, voice mail broadcast messages, or any other public representations about FINRA may be made or issued without the approval of Corporate Communications. In addition, when making public statements that do not relate to FINRA (for example, personal postings on social networking sites, list serves, newsgroups, or blogs, or opinions sent to a news organization), employees may not use FINRA accounts or identify themselves as FINRA employees because the statements could be interpreted as official FINRA positions."

4. Met with CF and CC to discuss next steps for review of matter.

Case note updated:
Update:
CF consulted Media Relations to determine if any The Deal Pipeline and The Deal Flow Report had consulted FINRA for a statement. Media Relations indicated they received several phone calls from Bill Meagher, phone # 707-992-0725. Media Relations responded by indicating that FINRA does not comment on open and on going investigations.

(300 Minutes)

**2/4/2014 10:44 AM - Abraham, Jasmine**
1/27 - 1/31, 2014

Continued reviewing STAR matters under ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ likely directly referenced in the article. On 1/28 JA and CC met with CF to discuss case work to date and next steps for moving forward. Commenced reviewing ▮▮▮▮▮ documents from OFDMI pertinent to the Sept. 17, 2013 article.

(525 Minutes)

**1/31/2014 12:45 PM - Cook, Christopher**
On 1/31/14, OFDMI EVP Cam Funkhouser called CC and offered to send ▮▮▮▮▮▮▮▮▮ to CC. Funkhouser noted that he is familiar with issues regarding ▮▮▮▮▮ because of a leak to a reporter at The Deal Pipeline along with a related potential leak on a later article that could be tied to a FINRA tipster. CC acknowledged that OMB's review is related to the two articles. Funkhouser explained that the system that transmits ▮▮▮▮▮▮▮▮▮▮▮▮ is an SEC intake platform staff uses to transmit ▮▮▮▮, and is called SIRS (SRO Investigation Referral System). Funkhouser added that the system is accessible on FINRA's end solely by OFDMI staff due to the confidential nature of ▮▮▮▮▮▮▮ - often, they contain

insider trading information. For this reason, although any staff can see the existence of ▮▮▮▮ in Enterprise Search, non-OFDMI staff cannot access them; they must contact OFDMI to request a copy. He also noted that the SEC, and an FBI officer who is embedded in the SEC offices, have access to ▮▮▮▮.

Funkhouser also noted that he had checked the SIRS system to determine whether any inappropriate persons had accessed any of ▮▮▮▮ noted in the articles, but no such access was detected. He offered that the article does include direct quotes from ▮▮▮▮. Funkhouser is certain that none of his senior staff leaked ▮▮▮▮ and added that the SEC also is looking into the leak and they had acknowledged that the leak could have come from their staff. Funkhouser expressed that he is upset that the leak occurred because it endangered his group's enforcement case against the BDs.

CC also asked Funkhouser whether the reports indicating FBI investigations are accurate; he responded that he cannot comment on that matter.

Funkhouser then sent CC copies of ▮▮▮▮ CC had requested the previous day, and Funkhouser will check into and provide copies of ▮▮▮▮ that were referred to in the 9/17/13 The Deal Pipeline article. Funkhouser subsequently provided ▮▮▮▮ that he believes were referred to in the article.

CC and JA also discussed the case.

**1/30/2014 9:30 AM - Cook, Christopher**
On 1/30/14, CC and JA discussed the case. Later, CC discussed the case with JA and C. Foster. JA and CC then identified ▮▮▮▮ memos to be obtained; CC called and emailed the request to Fraud Surveillance's Maureen Seiss. The requested ▮▮▮▮ are from the following STAR matters:

▮▮▮▮

**1/29/2014 11:41 AM - Cook, Christopher**
On 1/29/14, CC completed a chart tracking CC's research of the 12/6/13 news article.

**1/28/2014 2:12 PM - Cook, Christopher**
On 1/28/14, CC discussed the case with C. Foster and JA. CC later discussed the case further with JA. CC also conducted research regarding FINRA's Central Access Group and commenced developing a chart tracking CC's research of the 12/6/13 news article.

**1/24/2014 11:20 AM - Abraham, Jasmine**
1/24/14 Completed review of Sept. 17, 2013 The Deal Flow Report article. Completed chart of statements attributed to FINRA, and decided which statements contained information that were non-public and/or public. Conducted general Google searches on parties and entities named in the article as well as searches for FINRA News Releases on any of the stocks/parties/entities. Reviewed BrokerCheck disclosure report for firm as well as actions released via the FINRA Disciplinary Actions online system to determine if there were publicized disciplinary actions regarding matters mentioned in the article. Commenced review of STAR matters to determine/location FINRA ▮▮▮▮ that was cited to in the article. (200 minutes).

1/17/14, 1/21/14, 1/23/14 Continued reviewing firm correspondence and Sept. 17, 2013 The Deal Flow Report article. Commenced developing a chart of statements in the article directly attributed to FINRA. Of approximately 20 statements attributed to a FINRA report in the article, only two statements mentioned Scottsdale Capital Advisors. ▮▮▮▮

▮▮▮▮

1/15/14 Completed initial review of correspondence. Conducted general research on topics mentioned in the article. Met with CC and TM to discuss matter. JA to conduct in depth review of Tuesday, Sept. 17, 2013 article "FINRA targets offshore firms in pump-and-dumps – Regulators suspects a dozen firms for suspicious trading" by Bill Meagher published on Tuesday, Sept. 17, 2013 in The Deal Flow Report (subscription required for online access to archives). (180 minutes)

1/14/14 Matter assigned to JA & CC by CF. Commenced initial review of correspondence dated Jan. 9, 2013 from D. Michael Cruz, CEO & Chief Counsel, Scottsdale Capital Advisors and two related attachments. Reviewed two related cases: OMB cases ▮▮▮▮ Cursory review of STAR matters for firm (90 minutes)

**1/24/2014 10:41 AM - Cook, Christopher**
On 1/24/14, CC and JA discussed the case and their initial findings.

**1/22/2014 4:27 PM - Cook, Christopher**
On 1/22/14, CC completed review of the 12/9/13 article. CC reviewed BrokerCheck and found no disclosure of Wells Notices or any other pending disciplinary events. CC reviewed STAR and found ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ one of which - ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The investigation resulted from a tip by a Scottsdale AP on 6/12/13, and reflected continuing information being provided by the AP through late 2013, as well as discussions between OFDMI staff and the AP. The AP provided to staff nearly all the same information that the 12/9/13 article alluded to as being learned from "a person familiar with these investigations".

**1/17/2014 2:25 PM - Cook, Christopher**
On 1/17/14, CC commenced reviewing the 12/9/13 article provided in the Counsel's correspondence. CC conducted an internet search seeking publicly available information that was cited in the article. One article found on the web discusses the Biozoom pump-and-dump in some detail, and was written on/around 6/13/13: http://promotionstocksecrets.com/biozoom-inc-bizm-this-pump-dump-seems-all-too-familiar/.

**1/15/2014 8:18 AM - Cook, Christopher**
On 1/14/14, CC and JA were jointly assigned to this case by C. Foster. CC then opened the case and reviewed the Counsel's letter, and reviewed CRD information regarding the Counsel, the CEO and the 2 affiliated BDs (the other BD is Alpine Securities Corporation #14952 - both BDs are commonly owned by John Hurry).

Note that the Counsel's letter was dated 1/9/13, but likely it was meant to be 1/9/14 because the letter was sent via fedex to FINRA on 1/9/14.

On 1/15/14, CC conducted internet research and found a July 2013 SEC action against Biozoom (the security discussed in the Counsel's attached news article) at http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171624934. The related SEC Complaint discusses both BDs as being involved in the trading of the security. An earlier SEC release on 6/25/13 announced a suspension of trading in the stock; see http://www.sec.gov/news/digest/2013/dig062513.htm.

CC also found that the 12/6/13 article attached to the Counsel's letter was reprinted at http://www.thestreet.com/story/12145216/1/the-deal-fbi-securities-officials-investigate-biozoom-trading-source-says.html (the originating publication www.thedeal.com is accessible solely via paid subscription). CC was unable to track down any online copy of the 9/17/13 article.

## Related Cases

**Cases marked as related to this case**

| Case # | Tier | Assignee(s) |
|---|---|---|
| OMB-2011-949 | Ombuds | Abraham, Jasmine |
| OMB-2013-2288 | Ombuds | McCormack, Thomas |

**Cases in which this case has been marked as related**
None

# EXHIBIT C

FINRA Office of the Ombudsman
Scottsdale Capital Case: Case Summary – October 2015

In January 2014, D. Michael Cruz, President and Chief Counsel for BD Scottsdale Capital Advisors Corp. ("Scottsdale") sent a letter to Office of the General Counsel's Bob Colby and the Office of the Ombudsman ("OMB") with a concern that FINRA staff may have been the source for two articles published by The Deal Pipeline which disclosed confidential FINRA investigative information. The articles were written by the same reporter – Bill Meagher. Mr. Cruz was seeking assurances that FINRA reasonably safeguards information it obtains from Broker/Dealers ("BD" or "BDs") and does not inappropriately provide the information to third parties.

The first of the two articles initially provided by Scottsdale was published on September 17, 2013 and discussed several entities, including Scottsdale, which are suspected by regulators of involvement in pump-and-dump trading. The article noted that the author's source of information originated from a half-dozen referral reports sent by FINRA to the U.S. Securities & Exchange Commission ("SEC"). OMB reviewed ▇▇▇▇▇▇▇▇▇▇ and an email in which the reporter claimed that he had reviewed the reports, and concluded that the reporter had obtained copies of ▇▇▇ confidential FINRA reports.

In the second article that was published on December 6, 2013, the reporter claimed that Scottsdale and its affiliate BD Alpine Securities are under investigation by the Federal Bureau of Investigation, the SEC, and FINRA for suspicious trading in Biozoom. The author asserted that his source of information was "a person familiar with those investigations". OMB reviewed STAR records and learned that nearly all the information in this article had originally been provided to FINRA by a tipster who is a current employee at Scottsdale, and had been secretly providing information to the Office of Fraud Detection and Market Intelligence and SEC staff between June 2013 and December 2013.

In March 2014, the president/counsel sent to FINRA a March 20, 2014 article that contained new purportedly confidential information regarding a FINRA examination that was scheduled to commence later that month. The article also asserted that FINRA and the SEC have required the BD to provide all its employees' personal notes regarding Biozoom and ordered the BD not to destroy any Biozoom records. OMB reviewed FINRA's System for Tracking Activity for Regulatory Policy & Operations ("STAR") and the Exam Element Toolbox ("EET") and interviewed District Office management, and learned that the routine examination had been announced to the BD on or before February 20, 2014.

Subsequently, Scottsdale's president/counsel forwarded to FINRA a fourth article that was published on April 16, 2014, in which reporter Meagher provided a summation of his earlier articles, but also discussed a purported March 10, 2014 onsite surprise visit by FINRA staff to Scottsdale wherein the staff obtained documents regarding certain omnibus accounts of the BD. OMB reviewed STAR records and interviewed staff, and learned that FINRA staff did make an unannounced visit – on March 24, 2014 – seeking certain BD records. Thus, aside from the erroneous date of the visit, OMB found that the article's information was accurate.

Notwithstanding that the information contained in the latter three articles could have been provided by the tipster or other personnel at the BD, the FINRA ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ that were the source of the first article should not have been known by the tipster. Therefore, OMB conducted a review to determine whether there was any evidence that one or more FINRA

F000002

**CONFIDENTIAL TREATMENT REQUESTED BY FINRA**

FINRA Office of the Ombudsman
Scottsdale Capital Case:  Case Summary – October 2015

employees were the source of the information provided to the reporter for any of the four published articles.  OMB conducted the following steps to investigate the matter:

- Obtained emails provided by FINRA senior managers that included emails to/from the reporter, internal emails discussing the reporter's queries, and regulatory staff requests for copies of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ during initial planning of various routine examinations.
- Conducted a keyword-driven search that resulted in a review of more than 3,000 FINRA emails seeking to determine whether any inappropriate communications had occurred between staff and the tipster or any persons associated with The Deal publishing company.
- Reviewed FINRA desktop and blackberry telephone records for calls to/from the reporter and to/from the tipster.
- Conducted an internet search to determine which information in the articles was publicly available.
- Interviewed key FINRA managers.
- Reviewed STAR, SRO Investigation Referral System ("SIRS", SEC's internet-based system that allows regulators to electronically transmit regulatory referrals to the SEC), Enterprise Search, Enterprise Desktop, and EET.
- Identified staff who would have had access to one or more, or all of ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇  More than 100 FINRA staff had access to ▇▇▇▇▇▇▇▇ and more than 60 employees across three departments had access to ▇▇▇▇▇▇ OMB subsequently interviewed 6 key employees from among the 60 who had access to ▇▇▇ ▇▇▇▇ along with 2 employees from Media Relations who had been contacted by the reporter.
- Verified that reasonable procedures are followed to safeguard the confidentiality of FINRA's SEC referral reports.

OMB's review found no evidence that unauthorized persons accessed the confidential ▇▇▇ reports, and there was no indication that staff had inappropriate communications with either the tipster or the reporter, or other persons at The Deal publishing company.  Accordingly, OMB has found no evidence that FINRA staff leaked information to the reporter.

After discussions with staff from the SEC's Office of Inspector General and FINRA's Office of General Counsel, OMB subsequently decided to expand its review.  During the course of doing so, OMB learned of two additional news articles published by the reporter that alluded to ▇▇▇ ▇▇▇▇▇▇▇▇▇▇ so OMB obtained FINRA emails to external email addresses that contained key words pertaining to ▇▇▇▇▇▇▇▇▇▇▇▇▇ cited across the six known news articles.  These additional email searches resulted in OMB reviewing an additional 7,000 emails.  With respect to one email, OMB found that an employee had sent an email pertaining to FINRA's investigation of the subject BD to their personal email address.  As a result, OMB obtained and reviewed all emails the employee had sent to their personal email address, and OMB interviewed the employee.  OMB found no concerns with respect to the employee being the source of the leak, but OMB did report the matter to FINRA's Information Privacy Protection Policy staff in compliance with corporate policy.

In addition to the additional email searches, OMB conducted further reviews of STAR, additional telephone records, and one employee's computer records.  OMB also searched FINRA's corporate servers and other electronic files available on FINRA's intranet, and obtained

F000003

**CONFIDENTIAL TREATMENT REQUESTED BY FINRA**

FINRA Office of the Ombudsman
Scottsdale Capital Case:  Case Summary – October 2015

information from OFDMI identifying staff who had requested copies of ▆▆▆▆▆▆, to determine which staff had access to ▆▆▆▆▆▆.

OMB also further reviewed the six news articles and determined that, although ▆▆▆▆▆▆ were cited, the reporter appeared to have had access to a minimum of ▆▆▆▆▆▆. For the remaining ▆▆▆▆▆▆, the reporter could have seen references to them in the other ▆▆▆▆▆▆. OMB then further reviewed STAR and OFDMI records, and identified 110 employees who had access to one or more of ▆▆▆▆▆▆. OMB found that non-OFDMI employees had access to no more than ▆▆▆▆▆▆. Therefore, it appears that no non-OFDMI staff could have been the source of the media leak.

Accordingly, OMB's additional review found no evidence that FINRA staff leaked information to the reporter.

F000004

**CONFIDENTIAL TREATMENT REQUESTED BY FINRA**

CONFIDENTIAL                                                                                                                   FINRA_00003342