# EXHIBIT 18

| Case | FINRA |
|---|---|
| Issue Code | MSJ EXHIBIT |

| HURRY, JOHN 2/27/17 VOL 1 | | | |
|---|---|---|---|
| 1 | 111:09 - 111:20 | 111:09 | Q     But my question is a little bit different.  I'm |
| | | 10 | not asking what you believe.  I'm asking, do you -- have you |
| | | 11 | seen a document in which FINRA is conveying to Mr. Meagher |
| | | 12 | any of the information that appears in Exhibit 9? |
| | | 13 | A    I have not seen a document that was specifically |
| | | 14 | labeled from this person at FINRA to Mr. Meagher, no, I have |
| | | 15 | not seen that document. |
| | | 16 | Q    Okay.  And did you ever witness anyone from FINRA |
| | | 17 | conveying any -- to Mr. Meagher any of the information that |
| | | 18 | appears in the article that is Exhibit 9? |
| | | 19 | A    Other than what's in this article, I have not seen |
| | | 20 | any individual, no. |
| 2 | 145:11 - 146:07 | 145:11 | Q    As to Exhibit 10, the December 6, 2013, article by |
| | | 12 | Mr. Meagher, do you have any personal knowledge of anyone at |
| | | 13 | FINRA communicating to Mr. Meagher in any way any of the |
| | | 14 | information that appears in this article? |
| | | 15 | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 16 | THE WITNESS:  No, other than what we talked about |
| | | 17 | with the prior article. |
| | | 18 | BY MR. SCHNEIDER |
| | | 19 | Q    Which is that, other than what appears in the |
| | | 20 | itself, the -- |
| | | 21 | A    Yeah.  The -- what appears in the article on the |
| | | 22 | documents that have been provided could only have come from, |
| | | 23 | in its entirety, somebody who was at FINRA, and I think |
| | | 24 | specifically in -- sitting in all the OTRs. |
| | | 25 | Q    But as you sit here today, you are not aware of |
| | | 146:01 | any specific communication from anyone at FINRA in which |
| | | 02 | they conveyed any information that appears in the article in |
| | | 03 | Exhibit 10 to Mr. Meagher; correct? |
| | | 04 | A    I am not aware of anybody specifically at FINRA. |
| | | 05 | But, again, the information could have only come |
| | | 06 | from somebody at FINRA that was involved in this and the |
| | | 07 | OTRs that they took. |
| 3 | 152:10 - 152:14 | 152:10 | Q    And as to Exhibit 12, do you have any personal |
| | | 11 | knowledge of anyone at FINRA conveying any of the |

| | | | |
|---|---|---|---|
| | | 12 | information that appears in Exhibit 12 to the reporter, Bill |
| | | 13 | Meagher? |
| | | 14 | A    Other than what I testified already, no. |
| 4 | 159:02 - 159:06 | 159:02 | Q    Okay.  And as to this article by Mr. Meagher in |
| | | 03 | Exhibit 13, do you have any personal knowledge of anyone at |
| | | 04 | FINRA communicating to Mr. Meagher any of the statements |
| | | 05 | that appear in this article? |
| | | 06 | A    Other than what I testified, no. |

# EXHIBIT 19

| Case | FINRA |
|------|-------|
| Issue Code | MSJ EXHIBIT |

| HURRY, JUSTINE 2/21/17 VOL 1 | | |
|---|---|---|
| 1 | 024:02 - 024:13 | 024:02  Q    But you have not specifically seen any document in<br>03  which someone from FINRA is conveying this information to<br>04  the reporter, Bill Meagher; is that correct?<br>05    A    Correct.<br>06    Q    And you also haven't seen any document in which<br>07  someone from the SEC has -- was conveying this information<br>08  to the reporter, Bill Meagher; is that correct?<br>09    A    Correct.<br>10    Q    And you didn't witness anyone from FINRA conveying<br>11  the information in Exhibit 9 to the reporter, Bill Meagher;<br>12  correct?<br>13    A    Correct. |
| 2 | 026:22 - 027:07 | 026:22  Q    Okay.  And have you seen any documents in which<br>23  someone from FINRA conveyed the statement we were just<br>24  talking about in Exhibit 10 to the reporter, Bill Meagher?<br>25    A    No, I have not.<br>027:01    MR. SUSMAN:  Objection.  Vague and ambiguous.<br>02  BY MR. SCHNEIDER<br>03    Q    And did you witness anyone from FINRA conveying<br>04  the information we were just discussing in Exhibit 10 to the<br>05  reporter, Bill Meagher?<br>06    MR. SUSMAN:  Objection.  Vague and ambiguous.<br>07    THE WITNESS: No, I did not. |
| 3 | 030:20 - 031:09 | 030:20  Q    Have you seen any documents in which someone at<br>21  FINRA is conveying any information about accounts that these<br>22  individuals listed in Exhibit 10 that we were just<br>23  discussing, conveyed information about accounts that those<br>24  individuals held at Scottsdale Capital to the reporter, Bill<br>25  Meagher?<br>031:01    MR. SUSMAN:  Objection.  Vague and ambiguous.<br>02    THE WITNESS:  No.<br>03  BY MR. SCHNEIDER<br>04    Q    And did you ever witness anyone from FINRA<br>05  conveying information about any of these individuals holding<br>06  accounts at Scottsdale Capital to the reporter, Bill<br>07  Meagher? |

| | | | |
|---|---|---|---|
| | | 08 | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 09 | THE WITNESS:  No. |
| 4 | 031:16 - 032:05 | 031:16 | Q    Okay.  And in 2013 or since, do you have any |
| | | 17 | knowledge of anyone at FINRA conveying any information to |
| | | 18 | the reporter, Bill Meagher, about any accounts at Scottsdale |
| | | 19 | Capital Advisors? |
| | | 20 | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 21 | THE WITNESS:  No, I do not. |
| | | 22 | BY MR. SCHNEIDER |
| | | 23 | Q    So you haven't seen any documents in which FINRA |
| | | 24 | is conveying information about Scottsdale Capital Advisors' |
| | | 25 | accounts to the reporter, Bill Meagher; correct? |
| | | 032:01 | A    Correct. |
| | | 02 | Q    And you have not witnessed anyone at FINRA |
| | | 03 | conveying information about accounts at Scottsdale Capital |
| | | 04 | Advisors to the reporter, Bill Meagher? |
| | | 05 | A    Correct. |
| 5 | 033:02 - 033:06 | 033:02 | Q    Okay.  Do you know if anyone at FINRA conveyed a |
| | | 03 | copy of any email from David Wise to the reporter, Bill |
| | | 04 | Meagher? |
| | | 05 | MR. SUSMAN:  Objection.  Calls for speculation. |
| | | 06 | THE WITNESS:  No, I do not. |
| 6 | 036:23 - 038:07 | 036:23 | Q    Do you have any knowledge of anyone at FINRA |
| | | 24 | conveying information about Scottsdale -- the transaction |
| | | 25 | fees that Scottsdale Capital Advisors charged to its clients |
| | | 037:01 | to the reporter, Bill Meagher? |
| | | 02 | A    No, I do not. |
| | | 03 | Q    And you never witnessed anyone from FINRA |
| | | 04 | conveying that information to the reporter, Bill Meagher; |
| | | 05 | correct? |
| | | 06 | A    Correct. |
| | | 07 | Q    And do you have any knowledge about anyone at |
| | | 08 | FINRA conveying information about any of Scottsdale Capital |
| | | 09 | Advisors' policies to the reporter, Bill Meagher? |
| | | 10 | A    No. |
| | | 11 | Q    And you never witnessed anyone at FINRA conveying |
| | | 12 | that information to the reporter, Bill Meagher? |
| | | 13 | A    Correct. |
| | | 14 | Q    Do you have any knowledge of anyone at FINRA |
| | | 15 | conveying information to the reporter, Bill Meagher, about |
| | | 16 | how clients of Scottsdale Capital Advisors placed orders |
| | | 17 | with that firm? |

| | | | |
|---|---|---|---|
| | | 18 | A    No, I do not. |
| | | 19 | Q    And you never witnessed anyone from FINRA |
| | | 20 | conveying that information to Bill Meagher; correct? |
| | | 21 | A    Correct. |
| | | 22 | Q    Do you have any information or any knowledge that |
| | | 23 | anyone at FINRA conveyed to the reporter, Bill Meagher, any |
| | | 24 | information about the history of wire transfers to or from |
| | | 25 | any accounts at Scottsdale Capital Advisors? |
| | | 038:01 | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 02 | THE WITNESS:  No, I do not. |
| | | 03 | BY MR. SCHNEIDER |
| | | 04 | Q    And you never witnessed anyone at FINRA conveying |
| | | 05 | that information to the reporter, Bill Meagher; correct? |
| | | 06 | MR. SUSMAN:  Same objections. |
| | | 07 | THE WITNESS:  Correct. |
| 7 | 044:14 - 045:03 | 044:14 | Q    Are you aware of anyone at FINRA conveying |
| | | 15 | information to the reporter, Bill Meagher, about any of the |
| | | 16 | on-the-record examinations that occurred at Scottsdale |
| | | 17 | Capital? |
| | | 18 | MR. SUSMAN:  Objection.  Vague and ambiguous, |
| | | 19 | lacks foundation. |
| | | 20 | THE WITNESS:  No, I'm not -- was not. |
| | | 21 | BY MR. SCHNEIDER |
| | | 22 | Q    And you didn't witness anyone at FINRA conveying |
| | | 23 | any information to the reporter, Bill Meagher, about |
| | | 24 | on-the-record examinations that occurred at Scottsdale |
| | | 25 | Capital? |
| | | 045:01 | MR. SUSMAN:  Objection.  Vague and ambiguous, |
| | | 02 | lacks foundation. |
| | | 03 | THE WITNESS:  No, I was not. |
| 8 | 049:16 - 050:03 | 049:16 | Q    Okay.  Do you have any information about anyone at |
| | | 17 | FINRA conveying to the reporter, Bill Meagher, any |
| | | 18 | information about a visit by FINRA to Scottsdale Capital |
| | | 19 | Advisors in March of 2014? |
| | | 20 | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 21 | THE WITNESS:  No, I do not. |
| | | 22 | BY MR. SCHNEIDER |
| | | 23 | Q    And you didn't witness anyone from FINRA conveying |
| | | 24 | any information about a visit by FINRA to Scottsdale Capital |
| | | 25 | Advisors in March of 2014 to the reporter, Bill Meagher; |
| | | 050:01 | correct? |
| | | 02 | MR. SUSMAN:  Objection.  Vague and ambiguous. |

| | | | | |
|---|---|---|---|---|
| | | 03 | | THE WITNESS:  Correct. |
| 9 | 051:09 - 051:20 | 051:09 | Q | Do you have any knowledge of anyone at FINRA |
| | | 10 | | conveying to the reporter, Bill Meagher, any information |
| | | 11 | | about the statements made in this article that is |
| | | 12 | | Exhibit 13? |
| | | 13 | A | No. |
| | | 14 | | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 15 | BY MR. SCHNEIDER |
| | | 16 | Q | And you never witnessed anyone at FINRA conveying |
| | | 17 | | information to the reporter, Bill Meagher, about any of the |
| | | 18 | | subjects of this article; correct? |
| | | 19 | | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 20 | | THE WITNESS:  Correct. |
| 10 | 052:15 - 053:01 | 052:15 | | And like the other articles, you don't have any |
| | | 16 | | information about anyone at FINRA conveying to the reporter, |
| | | 17 | | Bill Meagher, any of the statements that appear in this |
| | | 18 | | article; correct? |
| | | 19 | | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 20 | | THE WITNESS:  Correct. |
| | | 21 | BY MR. SCHNEIDER |
| | | 22 | Q | And you never witnessed anyone at FINRA conveying |
| | | 23 | | to the reporter, Bill Meagher, any of the statements that |
| | | 24 | | are made in this article that is Exhibit 12; correct? |
| | | 25 | | MR. SUSMAN:  Objection.  Vague and ambiguous. |
| | | 053:01 | | THE WITNESS:  Correct. |
| 11 | 059:24 - 060:23 | 059:24 | Q | So -- but you don't have any direct knowledge that |
| | | 25 | | anyone from FINRA gave Mr. Meagher any of the information |
| | | 060:01 | | contained in these articles that we talked about today; |
| | | 02 | | correct? |
| | | 03 | | MR. SUSMAN:  Objection.  Vague and ambiguous, |
| | | 04 | | compound. |
| | | 05 | | THE WITNESS:  Correct. |
| | | 06 | BY MR. SCHNEIDER |
| | | 07 | Q | And you never witnessed anyone from FINRA giving |
| | | 08 | | Mr. Meagher any of the information that appears in the |
| | | 09 | | articles we discussed today; correct? |
| | | 10 | A | Correct. |
| | | 11 | | MR. SUSMAN:  Objection.  Vague and ambiguous, |
| | | 12 | | compound. |
| | | 13 | | THE WITNESS:  Correct. |
| | | 14 | BY MR. SCHNEIDER |
| | | 15 | Q | So would it be fair to say that your belief that |

16  FINRA is the source is based on the information that appears

17  in the articles and the information you know that

18  individuals at Scottsdale Capital Advisors had access to?

19          MR. SUSMAN:  Objection.  Vague and ambiguous,

20  lacks foundation --

21              THE WITNESS:  Yes.

22              MR. SUSMAN:  -- compound.

23              THE WITNESS:  Yes.

# EXHIBIT 20

| Case | FINRA |
|------|-------|
| Issue Code | MSJ EXHIBIT |

| DIEKMANN, HENRY 2/21/17 VOL 1 | | |
|---|---|---|
| 1 | 035:14 - 036:04 | 035:14        **Have you ever seen a document in which FINRA or** |
| | | 15    **someone from FINRA is conveying information about the** |
| | | 16    **inquiries it made in the year 2013 into SCA to the reporter,** |
| | | 17    **Bill Meagher?** |
| | | 18       A    No. |
| | | 19        MR. SUSMAN:  Objection.  Lacks foundation, vague |
| | | 20    and ambiguous. |
| | | 21   BY MR. SCHNEIDER |
| | | 22       **Q**    **And your answer was no?** |
| | | 23       A    My answer is no. |
| | | 24       **Q**    **And you never saw anyone from FINRA conveying** |
| | | 25    **information about FINRA's inquiries into SCA to the** |
| | | 036:01   **reporter, Bill Meagher; correct?** |
| | | 02        MR. SUSMAN:  Objection.  Lacks foundation, vague |
| | | 03    and ambiguous. |
| | | 04        THE WITNESS:  No, I have not. |
| 2 | 039:17 - 039:25 | 039:17      **Q**    **As you sit here today, have you seen any document** |
| | | 18    **in which someone from FINRA is conveying information about** |
| | | 19    **accounts at Scottsdale Capital Advisors to the reporter,** |
| | | 20    **Bill Meagher?** |
| | | 21       A    No. |
| | | 22       **Q**    **Have you ever witnessed anyone from FINRA** |
| | | 23    **conveying information about the accounts of anyone at** |
| | | 24    **Scottsdale Capital Advisors to the reporter, Bill Meagher?** |
| | | 25       A    No. |
| 3 | 048:01 - 048:08 | 048:01      **Q**    **As you sit here today, are you aware of any** |
| | | 02    **document that shows anyone from FINRA conveying information** |
| | | 03    **to the reporter, Bill Meagher, about how clients at SCA** |
| | | 04    **ordered trades through the firm?** |
| | | 05       A    No. |
| | | 06       **Q**    **And did you ever witness anyone at FINRA conveying** |
| | | 07    **that information to the reporter, Bill Meagher?** |
| | | 08       A    No. |
| 4 | 049:22 - 050:07 | 049:22      **Q**    **Okay.  Are you aware of anyone at FINRA conveying** |
| | | 23    **information about what transaction fees were charged to** |
| | | 24    **clients of SCA who were trading Biozoom shares to the** |

| | | | |
|---|---|---|---|
| | | 25 | reporter, Bill Meagher? |
| | | 050:01 | A    No. |
| | | 02 | Q    And you never witnessed anyone at FINRA conveying |
| | | 03 | that information to the reporter, Bill Meagher; correct? |
| | | 04 | A    No. |
| | | 05 | Q    That's incorrect or -- |
| | | 06 | A    I was thinking the same thing. |
| | | 07 | No, I did not witness that. |
| 5 | 051:16 - 051:23 | 051:16 | Q    And are you aware of any document that shows that |
| | | 17 | someone at FINRA conveyed information to the reporter, Bill |
| | | 18 | Meagher, about how clients of SCA who were trading Biozoom |
| | | 19 | shares were permitted to place their trade orders? |
| | | 20 | A    No. |
| | | 21 | Q    And you never witnessed anyone at FINRA conveying |
| | | 22 | that information to the reporter, Bill Meagher? |
| | | 23 | A    No. |
| 6 | 054:25 - 055:07 | 054:25 | Q    Are you aware of any document that shows someone |
| | | 055:01 | from FINRA conveying information about SCA's written |
| | | 02 | policies regarding wire transfers to the reporter, Bill |
| | | 03 | Meagher? |
| | | 04 | A    No. |
| | | 05 | Q    And did you ever witness anyone from FINRA |
| | | 06 | conveying that information to the reporter, Bill Meagher? |
| | | 07 | A    No. |
| 7 | 057:07 - 057:14 | 057:07 | Q    Okay.  Are you aware of anyone at FINRA conveying |
| | | 08 | to the reporter, Bill Meagher, any information about red |
| | | 09 | flags that were noted in the trading of Biozoom shares at |
| | | 10 | Scottsdale Capital? |
| | | 11 | A    No. |
| | | 12 | Q    And did you ever witness anyone at FINRA conveying |
| | | 13 | that information to the reporter, Bill Meagher? |
| | | 14 | A    No. |
| 8 | 058:19 - 059:04 | 058:19 | Q    Okay.  Are you aware of any document in which |
| | | 20 | FINRA conveys to the reporter, Bill Meagher, the substance |
| | | 21 | of any of the on-the-record examinations that were conducted |
| | | 22 | at SCA regarding Biozoom? |
| | | 23 | A    No. |
| | | 24 | Q    And did you ever witness the reporter, Bill |
| | | 25 | Meagher, convey any of that information to -- sorry.  Let me |
| | | 059:01 | rephrase that. |
| | | 02 | Did you ever witness anyone at FINRA conveying |
| | | 03 | that information to the reporter, Bill Meagher? |

| | | | |
|---|---|---|---|
| | | 04 | A    No. |
| 9 | 062:01 - 062:20 | 062:01 | So this is just a global question.  We've gone |
| | | 02 | through this article pretty closely, but is there anything |
| | | 03 | in this article that you're aware of FINRA, in any form, |
| | | 04 | conveying any of these statements that appear here in |
| | | 05 | Exhibit 10 to the reporter, Bill Meagher? |
| | | 06 | MR. SUSMAN:  Objection.  Vague and ambiguous, |
| | | 07 | compound. |
| | | 08 | THE WITNESS:  Are you asking whether the reporter |
| | | 09 | cites FINRA as a source? |
| | | 10 | BY MR. SCHNEIDER |
| | | 11 | Q    No.  I'm asking whether you have seen anything |
| | | 12 | directly, firsthand, in which FINRA conveyed any of the |
| | | 13 | information that appears in Exhibit 10 to the reporter, Bill |
| | | 14 | Meagher? |
| | | 15 | A    I understand. |
| | | 16 | No. |
| | | 17 | Q    And you never witnessed anyone from FINRA |
| | | 18 | conveying any of the information that appears in Exhibit 10 |
| | | 19 | to the reporter, Bill Meagher; correct? |
| | | 20 | A    That's correct. |
| 10 | 066:16 - 067:01 | 066:16 | Q    Okay.  While you were interacting with FINRA staff |
| | | 17 | potentially over multiple days during that unannounced visit |
| | | 18 | in March, did anyone on the FINRA staff say to you or |
| | | 19 | suggest to you in any way that they were going to convey any |
| | | 20 | of the information that they were gleaning from that visit |
| | | 21 | to the reporter, Bill Meagher? |
| | | 22 | A    No. |
| | | 23 | Q    And while they were there during that visit, you |
| | | 24 | didn't observe any of them conveying that information -- any |
| | | 25 | information about that visit to the reporter, Bill Meagher? |
| | | 067:01 | A    No. |
| 11 | 070:22 - 071:05 | 070:22 | Q    After FINRA left from its unannounced on-site |
| | | 23 | exam, did you subsequently see any document in which FINRA |
| | | 24 | was conveying information about that on-site exam to the |
| | | 25 | reporter, Bill Meagher? |
| | | 071:01 | A    No. |
| | | 02 | Q    And you never witnessed anyone at FINRA conveying |
| | | 03 | any information about that on-site exam in March of 2014 to |
| | | 04 | the reporter, Bill Meagher? |
| | | 05 | A    No, I did not. |
| 12 | 072:14 - 072:23 | 072:14 | So I'm going to ask you the same big-picture |

| | | 15 | question about this article that I asked you about the last |
| | | 16 | one, which is, are you aware of any document in which anyone |
| | | 17 | at FINRA conveyed to the reporter, Bill Meagher, any of the |
| | | 18 | statements that appear in this article, Exhibit 13? |
| | | 19 | A    No. |
| | | 20 | Q    And you never witnessed anyone at FINRA conveying |
| | | 21 | to the reporter, Bill Meagher, any of the statements that |
| | | 22 | appear in this article that is Exhibit 13? |
| | | 23 | A    That's correct. |

# EXHIBIT 21

| Case | FINRA |
|---|---|
| Issue Code | MSJ EXHIBIT |

| CRUZ, DARREL 2/17/17 VOL 1 | | |
|---|---|---|
| 1 | 028:14 - 028:19 | 028:14     Q     And so the basis for your opinion is -- comes from<br>15   the content of the articles.   Is that fair?<br>16     A     Yes.<br>17     Q     Okay.   No one at FINRA told you that they were the<br>18   source for Mr. Meagher; right?<br>19     A     Correct. |

# EXHIBIT 22

| Case | FINRA |
|------|-------|
| Issue Code | MSJ EXHIBIT |

| RUSSELLO, GERALD 2/17/17 VOL 1 | | | |
|---|---|---|---|
| 1 | 017:03 - 019:11 | 017:03 | Q.    But other than the questions |
| | | 04 | that you received from Mr. Meagher, did |
| | | 05 | you have any other factual -- any other |
| | | 06 | facts that suggested to you that FINRA had |
| | | 07 | communicated with the reporter Bill |
| | | 08 | Meagher about Mr. Hurry or any of his |
| | | 09 | businesses? |
| | | 10 |         MR. UNGER:  I am going to object |
| | | 11 |     on privilege.  I am going to allow the |
| | | 12 |     witness to answer but just advise him |
| | | 13 |     not to disclose any conversations that |
| | | 14 |     he may have had that were privileged |
| | | 15 |     with his client in terms of responding |
| | | 16 |     to this question. |
| | | 17 |     A.    Well, with that admonition, my |
| | | 18 | answer is no. |
| | | 19 |     Q.    Did you ever talk to anyone at |
| | | 20 | FINRA who said that they had communicated |
| | | 21 | with the reporter Bill Meagher? |
| | | 22 |     A.    No, I did not. |
| | | 23 |     Q.    And did you ever witness anyone, |
| | | 24 | employee of FINRA or former employee from |
| | | 25 | FINRA communicate with Bill Meagher in any |
| | | 018:01 |             G. RUSSELLO |
| | | 02 | way? |
| | | 03 |     A.    No, I did not. |
| | | 04 |     Q.    And so other than the questions |
| | | 05 | that you received from Bill Meagher |
| | | 06 | himself, do you have any reason to believe |
| | | 07 | that FINRA made the allegedly defamatory |
| | | 08 | remarks in Mr. Meagher's articles to |
| | | 09 | Mr. Meagher? |
| | | 10 |         MR. UNGER:  Again, I believe |
| | | 11 |     that question calls for attorney |
| | | 12 |     impression, privileged information. |
| | | 13 |     If you want to ask him what facts he |
| | | 14 |     knew or is aware of I don't have a |

|   |   |   |
|---|---|---|
|   |   | 15   problem with that, but you seem to be |
|   |   | 16   asking "reasons to believe" which gets |
|   |   | 17   into attorney impressions. |
|   |   | 18      Q.    I am asking if there is a |
|   |   | 19   factual basis that would support |
|   |   | 20   Mr. Russello.  I am not looking for work |
|   |   | 21   product, I am not looking for your |
|   |   | 22   theories.   I am looking -- do you know of |
|   |   | 23   any facts that FINRA made the defamatory |
|   |   | 24   remarks that are alleged to be defamatory |
|   |   | 25   in the articles published by Mr. Meagher? |
|   |   | 019:01              G. RUSSELLO |
|   |   | 02      A.    At this time, I don't recall |
|   |   | 03   what those remarks in the articles were, |
|   |   | 04   so I am afraid I am not understanding how |
|   |   | 05   to answer the question. |
|   |   | 06      Q.    Okay.  So let's take out the |
|   |   | 07   "defamatory" part of it.  Do you know of |
|   |   | 08   any communication that anyone at FINRA |
|   |   | 09   made to the reporter Bill Meagher about |
|   |   | 10   Mr. Hurry or any of his businesses? |
|   |   | 11      A.    I am not aware of any, no. |
| 2 | 034:22 - 035:18 | 034:22   Q.    So then let me just ask you, did |
|   |   | 23   you have a conversation with |
|   |   | 24   Ms. Tarasevich and Ms. Krasner at the SEC |
|   |   | 25   about Mr. Hurry and his businesses in |
|   |   | 035:01              G. RUSSELLO |
|   |   | 02   February of 2014? |
|   |   | 03      A.    I don't recall speaking to the |
|   |   | 04   SEC about this subject. |
|   |   | 05      Q.    In addition to Ms. Krasner and |
|   |   | 06   Ms. Tarasevich alleged here, you didn't |
|   |   | 07   talk to anyone at the SEC about Mr. Hurry |
|   |   | 08   or his businesses; isn't that correct? |
|   |   | 09      A.    With respect to the articles and |
|   |   | 10   any potential leaks? |
|   |   | 11      Q.    Yes. |
|   |   | 12      A.    Then to that question, the |
|   |   | 13   answer is no. |
|   |   | 14      Q.    So the SEC never said to you, |
|   |   | 15   "We're not the source of any leaks to the |
|   |   | 16   reporter Bill Meagher about Mr. Hurry or |

| | | **17**  **his businesses."  Correct?** |
|---|---|---|
| | | **18**      A.    Not that I can recall today; no. |

# EXHIBIT 23

MICHAEL K. JEANES
Clerk of the Superior Court
By Anna Valenzuela, Deputy
Date 04/04/2017 Time 16:44:48
Description                    Amount
--------- CASE# CV2017-005018 ---------
CIVIL NEW COMPLAINT              319.00
----------------------------------------
TOTAL AMOUNT                     319.00
            Receipt# 25848361

Joseph G. Adams (#018210)
Carlie Tovrea (#029709)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: jgadams@swlaw.com
        ctovrea@swlaw.com

Charles J. Harder (*pro hac vice* to be filed)
Dilan A. Esper (*pro hac vice* to be filed)
Jordan Susman (*pro hac vice* to be filed)
HARDER MIRELL & ABRAMS L.L.P.
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90067
Telephone: (424) 203-1600
E-mail: CHarder@hmafirm.com
        DEsper@hmafirm.com
        JSusman@hmafirm.com

Attorneys for Plaintiff
Scottsdale Capital Advisors

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

SCOTTSDALE CAPITAL ADVISORS
CORP., an Arizona corporation,

Plaintiff,

v.

ERIC MILLER and DEBRA FREIDNASH,
husband and wife,

Defendants.

Case No.  CV 2017-005018

**COMPLAINT**

1    Plaintiff Scottsdale Capital Advisors Corp., for its Complaint against Eric Miller

2 and Debra Freidnash, alleges as follows:

3                              **INTRODUCTION**

4    1.    Plaintiff Scottsdale Capital Advisors Corp. ("SCA") is a well-regarded and

5 very successful securities broker dealer.

6    2.    Defendant Eric Miller ("Miller") is a former employee of SCA.

7    3.    This action arises from Miller's two-pronged scheme to destroy SCA and

8 abscond with its clients using SCA's confidential information.

9    4.    While still an employee of SCA, Miller divulged confidential information

10 about SCA, and made false and defamatory statements of and concerning SCA, to the

11 Financial Industry Regulatory Authority ("FINRA") and the financial press.

12    5.    Simultaneously, and in flagrant violation of numerous securities, banking,

13 and privacy laws, Miller used private information about SCA's clients to try to obtain a

14 job with a securities brokerage firm in Belize.

15    6.    By this action, SCA seeks to hold Miller liable for his misconduct that has

16 caused lasting and permanent harm to SCA.

17                              **THE PARTIES**

18    7.    Plaintiff Scottsdale Capital Advisors Corp. is, and at all pertinent times was,

19 a corporation organized under the laws of the State of Arizona, with its principal place of

20 business in Maricopa County, Arizona.

21    8.    Defendant Eric Miller is an individual who resides in Maricopa County,

22 Arizona.

23    9.    Defendant Debra Freidnash is also an individual who resides in Maricopa

24 County, Arizona.

25    10.    On information and belief, Eric Miller and Debra Freidnash are a married

26 couple. On information and belief, Eric Miller's individual conduct that gives rise to this

1    action was undertaken on behalf of, and for the benefit of, the marital community.

2    ### JURISDICTION AND VENUE

3        11.    This Court has jurisdiction of this matter under Ariz. Const. Art. VI, § 14

4    and A.R.S. § 12-123.

5        12.    Venue in Maricopa County is proper under A.R.S. § 12-401.

6    ### FACTS COMMON TO ALL CAUSES OF ACTION

7    #### Background Information About SCA

8        13.    SCA was founded in 2002 as a full service broker-dealer focused on serving

9    the microcap securities market, often referred to as the over-the-counter market.  In that

10   time, SCA has grown to be one of the largest and most dominant firms in the clearing

11   microcap securities market in the United States.

12       14.    In the course of their employment, employees at SCA are exposed to, and

13   entrusted with, information that is commercially valuable to SCA and not generally

14   known or readily ascertainable in the broker-dealer securities industry or the public at

15   large.  In addition, SCA employees are privy to information regarding SCA's business

16   practices and clients that is confidential even though it may not rise to the level of trade

17   secret information, as well as private financial information obtained from SCA's

18   customers.

19       15.    As a consequence, SCA requires its employees to enter into written

20   agreements to protect SCA's trade secrets and the various forms of confidential

21   information that SCA employes come in contact with.  SCA also has, in compliance with

22   SEC regulations, promulgated an extensive financial privacy policy to protect its

23   customers' private information, and requires its employees to comply with this policy.

24   #### Miller Agrees Not To Disclose Confidential Information

25       16.    Defendant Eric Miller was employed at SCA as a stock broker between

26   approximately February 2012 and September 2014, and again between approximately

October 2015 and March 2016.

17.     Attached hereto as Exhibit 1 and incorporated by this reference is a true and correct copy of an Employee Nondisclosure & Computer Use Agreement ("NDA") between Miller and SCA that Miller executed on or about January 27, 2012.

18.     Attached hereto as Exhibit 2 and incorporated by this reference is a true and correct copy of a second NDA between Miller and SCA that Miller executed on or about October 5, 2015.  The first and second NDA (collectively, the "NDAs") contain identical verbiage.

19.     As acknowledged in the NDAs, Miller was exposed to SCA's "Confidential Information" in the performance of his job duties at SCA.

20.     The NDAs define Confidential Information as "information or material that is commercially valuable to Company [i.e., SCA] and not generally known or readily ascertainable in the industry," including without limitation "information concerning Company's business" and "information submitted by Company's customers."

21.     Per the NDAs, Miller agreed not to disclose Confidential Information to anyone outside of the SCA without SCA's prior written consent.  The NDAs further provide that "Employee's [i.e., Miller's] obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends."

**Miller Attempts to Destroy SCA By Sharing Confidential Information With And Making Defamatory Statements To FINRA And the Press**

22.     In or about mid-2013, while working at SCA, Miller contacted FINRA, a self-regulatory organization that acts under authority of the U.S. Securities and Exchange Commission to regulate broker-dealer firms registered under section 15 of the Exchange Act, ostensibly to report suspicious activities at SCA.  In fact, Miller contacted FINRA for the express purpose of destroying SCA.

23.     Over the course of several months, Miller spoke with employees at FINRA about SCA and on numerous occasions emailed information about SCA, including information about SCA's business practices and its clients, that was either confidential or false. Among other things, Miller divulged to FINRA the names of SCA clients, SCA's business methods for accepting orders from clients, and SCA's pricing schedules for charging clients.

24.     Miller encouraged FINRA to harass and intimidate SCA, and advised them on ways to do it, such as suggesting that FINRA review the text messages of SCA's employees and telling FINRA that it should promptly press forward with regulatory proceedings against SCA.  In addition, Miller encouraged FINRA to block a pending acquisition of another broker dealer named Wilson Davis by SCA's president John Hurry.

25.     In a further effort to harm SCA, in or about September 2013, Miller contacted a reporter at The Deal Pipeline, a financial news and information service whose readership includes a range of financial institutions and other key audiences in the financial services market.  Miller divulged to The Deal Pipeline confidential information about SCA's business practices and its clients that was confidential, including without limitation the names of SCA clients, SCA's  business methods for accepting orders from clients, and SCA's fee structures, and Miller further made many false and defamatory statements to The Deal Pipeline of and concerning SCA.

**Miller Divulges Confidential Information to Try to Leverage a Job in Belize**

26.     In or about December 2013, after wrongfully divulging confidential and false information about SCA to FINRA and The Deal Pipeline, Miller contacted Unicorn International Securities LLC ("Unicorn") in Belize in an attempt to set up a lucrative position for himself as a broker-dealer.

27.     Between January and November 2014, Miller sent dozens of emails to Unicorn's compliance officer, many of which contained confidential information about

1    SCA's clients, including names, social security numbers, account numbers, and stocks
2    owned.

3        28.    Although Miller did not obtain a position at Unicorn, it was not for his lack
4    of trying. Rather, in September 2014, Unicorn was indicted in the Eastern District of New
5    York for conspiracy to commit securities fraud, tax fraud, and money laundering.

6                                  **COUNT ONE**
7              **(Breach of Written Contract: Nondisclosure Agreement)**

8        29.    Plaintiff incorporates by reference all of the preceding paragraphs as though
9    fully restated herein.

10       30.    The NDAs, to which Miller agreed to be bound, constitute valid and
11   enforceable contracts between SCA and Miller.

12       31.    Notwithstanding Miller's obligations under the NDAs, as described herein
13   he knowingly and systematically disclosed Confidential Information to third parties.

14       32.    As a direct and proximate result of Miller's breaches of the NDAs, SCA has
15   suffered and will continue to suffer irreparable harm and economic damages.

16       33.    Moreover, it was foreseeable that SCA would suffer damages if Miller
17   disclosed SCA's Confidential Information to third parties.

18       34.    SCA is entitled to recover its reasonable attorneys' fees and costs pursuant
19   to the NDAs, to which Miller agreed to be bound, and A.R.S. §§ 12-341 and 12-
20   341.01(A).

21                                  **COUNT TWO**
22           **(Breach of Implied Covenant of Good Faith and Fair Dealing:**
23                          **Nondisclosure Agreement)**

24       35.    Plaintiff incorporates by reference all of the preceding paragraphs as though
25   fully restated herein.

26       36.    Implicit in all contracts is the covenant of good faith and fair dealing that

1    imposes on each party a duty of good faith and fair dealing.

2         37.   Miller prevented SCA from receiving the benefits and entitlements that SCA

3    reasonably expected to flow from the NDAs to which Miller agreed to be bound, thereby

4    breaching the implied covenant of good faith and fair dealing existing in those contracts.

5         38.   As a direct and proximate result of Miller's breaches of the implied

6    covenant of good faith and fair dealing, SCA has suffered and will continue to suffer

7    irreparable harm and economic damages.

8         39.   This count arises out of contract.  Accordingly, Company is entitled to its

9    costs and reasonable attorneys' fees under A.R.S. §§ 12-341 and 12-341.01(A).

10                                **COUNT THREE**

11          **(Breach of Written Contract: Registered Representative Agreement)**

12        40.   Plaintiff incorporates by reference all of the preceding paragraphs as though

13   fully restated herein.

14        41.   Attached hereto as Exhibit 3 and incorporated by this reference is a true and

15   correct copy of a Registered Representative Agreement ("RRA") between Miller and SCA

16   that Miller executed in or about January 2012.

17        42.   The RRA defines Confidential Information as certain information disclosed

18   to Miller as a consequence of his association with SCA and not generally known

19   outside of SCA, including financial data and client information.

20        43.   Per the RRA, Miller agreed not to disclose Confidential Information without

21   SCA's prior written consent.

22        44.   The RRA, to which Miller agreed to be bound, constitutes a valid and

23   enforceable contract between SCA and Miller.

24        45.   Notwithstanding Miller's obligations under the RRA, as described herein he

25   knowingly and systematically disclosed Confidential Information to third parties.

26        46.   As a direct and proximate result of Miller's breaches of the RRA, SCA has

1    suffered and will continue to suffer irreparable harm and economic damages.

2        47.    Moreover, it was foreseeable that SCA would suffer damages if Miller

3    disclosed SCA's Confidential Information to third parties.

4        48.    SCA is entitled to recover its reasonable attorneys' fees and costs pursuant

5    to the RRA, to which Miller agreed to be bound, and A.R.S. §§ 12-341 and 12-341.01(A).

6                                **COUNT FOUR**

7                **(Breach of Implied Covenant of Good Faith and Fair Dealing:**

8                        **Registered Representative Agreement)**

9        49.    Plaintiff incorporates by reference all of the preceding paragraphs as though

10   fully restated herein.

11       50.    Implicit in all contracts is the covenant of good faith and fair dealing that

12   imposes on each party a duty of good faith and fair dealing.

13       51.    Miller prevented SCA from receiving the benefits and entitlements that SCA

14   reasonably expected to flow from the RRA to which Miller agreed to be bound, thereby

15   breaching the implied covenant of good faith and fair dealing existing in those contracts.

16       52.    As a direct and proximate result of Miller's breaches of the implied

17   covenant of good faith and fair dealing, SCA has suffered and will continue to suffer

18   irreparable harm and economic damages.

19       53.    This count arises out of contract. Accordingly, Company is entitled to its

20   costs and reasonable attorneys' fees under A.R.S. §§ 12-341 and 12-341.01(A).

21                                **COUNT FIVE**

22                    **(Violation of Arizona Trade Secret Act)**

23       54.    Plaintiff incorporates by reference all of the preceding paragraphs as though

24   fully restated herein.

25       55.    During the course of his relationship with SCA, Miller had access to SCA's

26   confidential business information.

56.     At all relevant times, SCA undertook reasonable steps to safeguard its confidential business information.

57.     SCA's confidential business information constitutes "trade secrets" as the term is defined in A.R.S. § 44-401 because it is information:

•       from which SCA derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

•       that is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

58.     Pursuant to the contracts entered into by Miller, and under A.R.S. § 44-401 *et seq.*, Miller owed SCA a duty to protect those trade secrets to which he had access.

59.     Miller violated those duties by knowingly misappropriating and wrongfully using SCA's trade secrets for his own benefit, including *inter alia*:

•       information concerning SCA's internal policies and pricing strategies;

•       information concerning SCA's client lists;

•       information received from SCA's customers;

•       legal opinions from SCA's attorneys;

60.     As a direct and proximate result of Miller's unauthorized misappropriation and use of SCA's trade secrets, SCA has suffered and will continue to suffer irreparable harm and economic damages.

61.     SCA is entitled to an injunction for actual and threatened misappropriation pursuant to A.R.S. § 44-402.

62.     SCA is entitled to compensation for all actual damages and unjust enrichment pursuant to A.R.S. § 44-403(A).

63.     SCA is entitled to its reasonable attorneys' fees pursuant to A.R.S. § 44-404(3).

64.     SCA is entitled to exemplary damages pursuant to A.R.S. § 44-403(B) because Miller's misappropriation and wrongful use of SCA's trade secrets was willful and malicious.

### COUNT SIX

**(Common Law Misappropriation of Confidential Information)**

65.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully restated herein.

66.     In addition to its rights in its trade secrets, SCA has rights in other confidential information.

67.     Miller improperly divulged confidential information about SCA and its clients to third parties.  The confidential information that Miller divulged does not rise to the level of trade secret information.

68.     Miller's actions described herein violated SCA's common law rights and constitute misappropriation of confidential information.

69.     Miller committed these acts of misappropriation of confidential information willfully, maliciously, and in conscious disregard of SCA's rights, with the intent to injure SCA.

70.     As a direct and proximate result of Miller's actions, SCA has suffered irreparable harm and economic damage.

WHEREFORE, Plaintiff requests that judgment be entered against the Defendants, and each of them, as follows:

A.     For compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial, but which exceeds $50,000.00;

B.     For pre- and post-judgment interest on the foregoing sum at the highest lawful rate from entry of judgment until paid in full;

C.     For Plaintiff's costs, including attorneys' fees, incurred herein pursuant to

1  A.R.S. § 12-341;

2      D.     For all other relief the Court deems appropriate.

3

4      RESPECTFULLY SUBMITTED this 4th day of April, 2017.

5                                    SNELL & WILMER L.L.P.

6

7                              By
                                   Joseph G. Adams
8                                  Carlie Tovrea
                                   One Arizona Center
9                                  400 E. Van Buren, Suite 1900
                                   Phoenix, Arizona 85004-2202
10                                 Attorneys for Plaintiff

11

12  4829-9582-7782

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-11-

# EXHIBIT 1

# SCOTTSDALE CAPITAL ADVISORS
**Member FINRA & SIPC**

### EMPLOYEE NONDISCLOSURE & COMPUTER USE AGREEMENT

This agreement (the "Agreement") is entered into by Scottsdale Capital Advisors Corp. ("Company") and _____ ("Employee").

In consideration of the commencement of Employee's employment with Company and the compensation that will be paid, Employee and Company agree as follows:

**1.   Company's Trade Secrets**

In the performance of Employee's job duties with Company, Employee will be exposed to Company's Confidential Information. "Confidential Information" means information or material that is commercially valuable to Company and not generally known or readily ascertainable in the industry. This includes, but is not limited to:

(a)  technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b)  information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c)  information concerning Company's employees, including salaries, strengths, weaknesses and skills;

(d)  information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

(e)  any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

**2.   Nondisclosure of Trade Secrets**

Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company.

However, Employee shall have no obligation to treat as confidential any information which:

(a)  was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company;

(b)  is or becomes public knowledge through a source other than Employee and through no fault of Employee; or

(c)  is or becomes lawfully available to Employee from a source other than Company.

**3.   Confidential Information of Others**

Employee will not disclose to Company, use in Company's business, or cause Company to use, any trade secret of others.

**4.   Return of Materials**

When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and

(sca05-2009)

1/27/2012

other materials containing any Confidential Information. Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.

**5.   Confidentiality Obligation Survives Employment**

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains a trade secret.

**6.   Computer Access and Use**

As part of Employee's duties, Employee will have access to Company's Electronic Communication Systems (ECS), which includes without limitation, its computers, network systems, Internet connection, Intranet, electronic mail, voicemail, facsimiles, telephones and other information systems used for the transmission of electronic communications.  As a condition of employment, Employee agrees to the following restrictions on the access and use of Company's ESS:

(a) Any access and use of ESS is strictly limited for purposes relating to Employee's duties and responsibilities as an employee, official business within Company and other activities approved in writing (including e-mail approval) by Company.

(b) All information or messages that are created, sent, received or stored using Company's ESS remain the property of Company. Company has the absolute right to monitor and log all aspects of its ESS.  Employee understands and agrees that electronic communications are neither private nor secure.

(c) Employee is the sole person authorized to use the computer account(s) issued to him/her by Company, and Employee will not share his/her password(s) with anyone.  If Employee suspects that someone else knows his/her password(s), Employee will notify his/her supervisor immediately.

(d) Employee will only access those computing resources that he/she has authorization from Company to use and will only use such resource in carrying out his/her job duties.

(e) Employee is responsible for all computing activities that occur under his/her personal computer account(s).  If Employee suspects or knows that activities by any individual or entity are in violation of this agreement, Employee agrees to immediately report it to his/her supervisor.

(f) Prohibited actions using Company's ECS include, but are not limited to the following: (1) entering data under another person's computer account or permitting another to enter data under his/her account; (2) helping an unauthorized person gain access to a Company computer or information asset; (3) accessing personal Internet email accounts (e.g., Hotmail, Yahoo, AOL, etc.); (4) sending or displaying materials that are sexually explicit, threatening, discriminatory, harassing, illegal or otherwise inappropriate; (5) using the system for illegal or criminal activities, commercial ventures, private profit, religious or political causes, any form of solicitation (except those approved by Company); (6)sending or receiving documents in violation of copyright laws; (7) transmitting confidential patient, business or risk management information to any non-Company email address; (8) attaching unauthorized devices to Company's computer network; and (9) attempting to gain access to an unauthorized area of any computing system or disabling it in any way.

**7.   General Provisions**

(a) Relationships: Nothing contained in this Agreement shall be deemed to make Employee a partner or joint venturer of Company for any purpose.

(b) Severability: If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of Company and Employee.

(c) Integration: This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and

1/27/2012

understandings. This Agreement may not be amended except in a writing signed by both Company and Employee.

(d) Waiver: The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

(e) Injunctive Relief: Any misappropriation of any of the Confidential Information in violation of this Agreement may cause Company irreparable harm, the amount of which may be difficult to ascertain, and therefore Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate. This right is to be in addition to the remedies otherwise available to Company.

(f) Indemnity: Employee agrees to indemnify Company against any and all losses, damages, claims or expenses incurred or suffered by Company as a result of Employee's breach of this Agreement.

(g) Attorney Fees and Expenses: In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

(h) Governing Law. This Agreement shall be governed in accordance with the laws of the State of Arizona.

(i) Jurisdiction. Employee consents to the exclusive jurisdiction and venue of the federal and state courts located in Maricopa County, Arizona in any action arising out of or relating to this Agreement. Employee waives any other venue to which Employee might be entitled by domicile or otherwise.

(j) Successors & Assigns. This Agreement shall bind each party's heirs, successors and assigns. Company may assign this Agreement to any party at any time. Employee shall not assign any of his or her rights or obligations under this Agreement without Company's prior written consent. Any assignment or transfer in violation of this section shall be void.

**8. Signatures**

Employee has carefully read all of this Agreement and agrees that all of the restrictions set forth are fair and reasonably required to protect Company's interests. Employee has received a copy of this Agreement as signed by Employee.

Employee:

_____ (Signature)

_Eric Muller_ (Typed or Printed Name)

Date: _1/27/2012_

1/27/2012

EXHIBIT 2

# SCOTTSDALE CAPITAL ADVISORS
**Member FINRA & SIPC**

### EMPLOYEE NONDISCLOSURE & COMPUTER USE AGREEMENT

This agreement (the "Agreement") is entered into by Scottsdale Capital Advisors Corp. ("Company") and ____E R i c  m i l o_____ ("Employee").

In consideration of the commencement of Employee's employment with Company and the compensation that will be paid, Employee and Company agree as follows:

**1.   Company's Trade Secrets**

In the performance of Employee's job duties with Company, Employee will be exposed to Company's Confidential Information. "Confidential Information" means information or material that is commercially valuable to Company and not generally known or readily ascertainable in the industry. This includes, but is not limited to:

(a)  technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b)  information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c)  information concerning Company's employees, including salaries, strengths, weaknesses and skills;

(d)  information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

(e)  any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

**2.   Nondisclosure of Trade Secrets**

Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company.

However, Employee shall have no obligation to treat as confidential any information which:

(a)  was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company;

(b)  is or becomes public knowledge through a source other than Employee and through no fault of Employee; or

(c)  is or becomes lawfully available to Employee from a source other than Company.

**3.   Confidential Information of Others**

Employee will not disclose to Company, use in Company's business, or cause Company to use, any trade secret of others.

**4.   Return of Materials**

When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and

(sca: 05-2009)

other materials containing any Confidential Information. Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.

### 5.   Confidentiality Obligation *Survives Employment*

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains a trade secret.

### 6.   Computer Access and Use

As part of Employee's duties, Employee will have access to Company's Electronic Communication Systems (ECS), which includes without limitation, its computers, network systems, Internet connection, Intranet, electronic mail, voicemail, facsimiles, telephones and other information systems used for the transmission of electronic communications. As a condition of employment, Employee agrees to the following restrictions on the access and use of Company's ESS:

(a) Any access and use of ESS is strictly limited for purposes relating to Employee's duties and responsibilities as an employee, official business within Company and other activities approved in writing (including e-mail approval) by Company.

(b) All information or messages that are created, sent, received or stored using Company's ESS remain the property of Company. Company has the absolute right to monitor and log all aspects of its ESS. Employee understands and agrees that electronic communications are neither private nor secure.

(c) Employee is the sole person authorized to use the computer account(s) issued to him/her by Company, and Employee will not share his/her password(s) with anyone. If Employee suspects that someone else knows his/her password(s), Employee will notify his/her supervisor immediately.

(d) Employee will only access those computing resources that he/she has authorization from Company to use and will only use such resource in carrying out his/her job duties.

(e) Employee is responsible for all computing activities that occur under his/her personal computer account(s). If Employee suspects or knows that activities by any individual or entity are in violation of this agreement, Employee agrees to immediately report it to his/her supervisor.

(f) Prohibited actions using Company's ECS include, but are not limited to the following: (1) entering data under another person's computer account or permitting another to enter data under his/her account; (2) helping an unauthorized person gain access to a Company computer or information asset; (3) accessing personal Internet email accounts (e.g., Hotmail, Yahoo, AOL, etc.); (4) sending or displaying materials that are sexually explicit, threatening, discriminatory, harassing, illegal or otherwise inappropriate; (5) using the system for illegal or criminal activities, commercial ventures, private profit, religious or political causes, any form of solicitation (except those approved by Company); (6) sending or receiving documents in violation of copyright laws; (7) transmitting confidential patient, business or risk management information to any non-Company email address; (8) attaching unauthorized devices to Company's computer network; and (9) attempting to gain access to an unauthorized area of any computing system or disabling it in any way.

### 7.   General Provisions

(a) Relationships: Nothing contained in this Agreement shall be deemed to make Employee a partner or joint venturer of Company for any purpose.

(b) Severability: If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of Company and Employee.

(c) Integration: This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and

understandings. This Agreement may not be amended except in a writing signed by both Company and Employee.

(d) Waiver: The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

(e) Injunctive Relief: Any misappropriation of any of the Confidential Information in violation of this Agreement may cause Company irreparable harm, the amount of which may be difficult to ascertain, and therefore Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate. This right is to be in addition to the remedies otherwise available to Company.

(f) Indemnity: Employee agrees to indemnify Company against any and all losses, damages, claims or expenses incurred or suffered by Company as a result of Employee's breach of this Agreement.

(g) Attorney Fees and Expenses: In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

(h) Governing Law. This Agreement shall be governed in accordance with the laws of the State of Arizona.

(i) Jurisdiction. Employee consents to the exclusive jurisdiction and venue of the federal and state courts located in Maricopa County, Arizona in any action arising out of or relating to this Agreement. Employee waives any other venue to which Employee might be entitled by domicile or otherwise.

(j) Successors & Assigns. This Agreement shall bind each party's heirs, successors and assigns. Company may assign this Agreement to any party at any time. Employee shall not assign any of his or her rights or obligations under this Agreement without Company's prior written consent. Any assignment or transfer in violation of this section shall be void.

**8. Signatures**

Employee has carefully read all of this Agreement and agrees that all of the restrictions set forth are fair and reasonably required to protect Company's interests. Employee has received a copy of this Agreement as signed by Employee.

Employee:

_____ (Signature)

Eric miller (Typed or Printed Name)

Date: 5+ 10 5/15

Page 3 of 3

# EXHIBIT 3

# SCOTTSDALE CAPITAL ADVISORS
Member FINRA & SIPC

7170 E. McDonald Road, Suite 6, Scottsdale, AZ 85253

### REGISTERED REPRESENTATIVE AGREEMENT
(Independent Contractor)

This Registered Representative Agreement for Independent Contractors ("Agreement") is made and entered into on _____ by and between Scottsdale Capital Advisors Corp (the "Company" or "SCA") and _Eric Miller_ (the "Representative").

## RECITALS

Company is a registered securities broker dealer that offers securities and other investment products and services (the "Products") to retail and institutional clients. Representative is a qualified, experienced and duly licensed registered representative.

NOW THEREFORE, for good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Company hereby appoints Representative as its registered representative to solicit, offer and sell Products for which the Company may act as broker, dealer, or underwriter, and Representative, hereby accepts said appointment subject to the following terms and considerations:

1. Duties. Representative agrees to become registered with Company through the Financial Industry Regulatory Authority ("FINRA") and in each State jurisdiction where Representative offers and sells securities and use his/her best efforts to offer and sell Products on behalf of Company. Representative shall at all times comply with and conform to all applicable laws, rules, regulations, and reporting requirements regarding the sale of securities, including, but not limited to, those relating to the following: FINRA, the New York Stock Exchange, Inc., the Securities and Exchange Commission, all applicable national and regional stock exchanges, the state or states where Representative is registered, and all procedures of any clearing broker with which Company may become associated at any time during the term of this Agreement (the "Regulations"). Representative agrees to strictly adhere to all policies and procedures established by Company for the conduct of its registered representatives and licensed insurance agents as may be amended from time to time, including, without limitation, Scottsdale Capital Advisors' Firm Rules & Procedures (the "Firm Procedures"). Representative shall maintain all individual insurance and securities licenses required for the sale of Products and only open accounts or solicit business in States where both Company and Representative are registered.

2. Relationship.

a) Nothing herein shall be construed to create the relation of employer and employee between the Company and Representative. Representative shall be free to exercise his own judgment as to those persons from whom he will solicit applications and orders, the method of solicitation and the time and place of solicitation; provided, however, that in such activities Representative shall conform to applicable Firm Procedures and the Regulations then in effect. Representative will not be eligible to participate in any benefits made available by the Company to employees and the Company will not withhold any deductions for Social Security, income taxes, unemployment, or other taxes. Representative shall be responsible for all of his self-employment taxes and all other related governmental obligations, including all local fees and taxes incidental to doing business as a Registered Representative and/or insurance agent, as applicable.

Confidential

3. <u>Expenses</u>. Representative, as an independent contractor, shall promptly pay all expenses relating to the performance of his duties hereunder, including but not limited to, financial planning charges, office rentals, transportation costs, costs of office equipment and facilities, advertising expenses, long distance telephone toll and other communication charges, cost of stationary and business cards, license registration fees, errors and omission liability coverage premium, bonding fees and any national or regional securities exchange fees where applicable, subject to any prior written agreement between Representative, Company and any third party.

4. <u>Employees</u>. Representative agrees that any person or persons, whom Representative shall employ to assist Representative in the performance of his duties, hereunder shall be the employee of Representative and shall not be an employee or agent of Company. Representative agrees that he will comply with all Federal and applicable state laws relating to the employment of labor and including but not limited to, compliance with provisions of the Internal Revenue Code relating to payroll taxes and compliance with applicable state laws relating to workman's compensation. Representative shall take such steps as are necessary and appropriate to ensure that none of such persons misconceive his or her relationship with Company.

5. <u>No Binding Authority</u>. Representative shall have no authority to bind the Company by any statement, promise, representation, agreement or contract of any kind, or to waive any of Company's right or to obligate the Company in any way unless specifically authorized to do so by Company in writing. This Agreement is one for the services of Representative who shall not be entitled to assign or delegate to any other person the authority and obligations assumed or any rights, claims, or interests granted or arising hereunder.

6. <u>Commissions; Refunds; Advances; and Liens</u>.

   a) The Company shall pay Representative commissions in accordance with the Representative's Offer letter and the related "Payout Schedule." Representative understands and agrees that the compensation paid under the Payout Schedule represents an advance against commissions payable. The receipt of commissions is subject to the following conditions precedent (the "Conditions"): (i) the offer and sale of the related investment transaction is made in accordance and compliance with the Regulations and Firm Procedures; (ii) all events or actions establishing the right of the Company to receive payment of commissions with respect to the subject transaction have occurred; (iii) the Company receives payment from the customer and product provider, such as the issuer, the clearing broker, the mutual fund issuer, or the insurance carrier (each a "Product Provider"), as applicable, for the related transaction[1]; and (iv) the Product Provider does not reject, cancel, reverse or chargeback against Company for any reason the commission within one year of receipt by Company. Company shall have the right to recover against future commissions payable, any commission advance to which an unsatisfied Condition relates, any overpayments, payments made in error, unpaid company advances or loans, the value of any unreturned Company property, or any losses and expenses attributable to the Company exercising its refund rights as set forth in sub-subsection (b) below, to the extent permitted by law. The Company may from time to time in its sole discretion and without notice, increase or decrease rates and amounts of commissions and

---

[1] If such payment is not delivered in US Dollars such shall not be considered payment until such is converted into US Dollars. The net Dollar amount shall then constitute the gross payment less any adjustment applicable.

Confidential

make any other changes in the Payout Schedule due to material changes in the costs and/or risks associated with the business mix conducted by Representative or Company; provided however, no such change shall be made retroactive.

b) Company reserves the right, in its sole discretion, to refund any purchaser all or any part of payments made by him, and Representative agrees to reimburse the Company promptly for its expenses in connection therewith. Representative also agrees to repay promptly to Company all commissions received by him with respect to any such refunded payments, and the Company is hereby authorized to deduct from any commissions due or that may become due to Representative hereunder the amount owed for any such repayment of commissions and expenses.

c) Any and all monies which may be advanced by Company or Representative over and above the commissions actually due and payable by Company to Representative hereunder at the time of such advances shall constitute personal loans from Company to Representative and shall be due and payable 10 days from the date of demand bearing interest at a rate of 12% from the date of demand until paid in full. After termination of this Agreement, for any reason whatsoever, any such loan then outstanding shall automatically and immediately become due and payable, and if not then bearing interest pursuant to the provisions of the preceding sentence shall bear interest at the maximum legal rate from the date of termination until date of repayment. If any such loan is not paid in full or if no agreement has been reached between Representative and Company within thirty (30) days after termination, Representative shall pay, as liquidated damages, in addition to the interest, an amount equal to the maximum rate of interest calculated retroactively from the date such loan first become outstanding until it is paid in full. Representative agrees to pay all costs of collection of any indebtedness created hereunder including all reasonable attorney fees and court costs.

d) The Company shall have a lien on all securities or investments owned by Representative which are in Company's possession to secure repayment of any aforesaid loans, unearned advances or any other sums or claims due the Company from Representative and in the event such loans, unearned advances, sums or claims are not paid when due, the Company shall be entitled, without further notice to Representative, to sell or dispose of any such securities or investments on such terms and conditions as the Company, it its sole discretion determines to be the best then available, use of the net proceeds therefrom to satisfy payment of such owed sums, claims, loans and all interest accrued thereon, and remit the remaining proceeds, if any, to Representative; provided however, Representative shall remain personally liable for the excess of any such owed loans, unearned advances, sums, or claims over such net proceeds. In addition, Company is granted a lien on all commissions now or thereafter due to Representative, such lien to secure repayment on any such advances made by Company to Representative and any and all sums now or hereafter due the Company from the Representative, and for any other claims by Company against him, now existing or hereafter arising. For the purpose of such lien, Representative hereby assigns all such commissions to the Company. The Company shall be entitled to apply all such commissions toward the reduction of such advances, sums or claims until the same have been satisfied in full. These liens and this assignment shall survive the termination of this Agreement.

7.  Termination.  Unless otherwise agreed upon in writing by Company, this Agreement may be terminated by either party without cause at any time with 10 days prior written notice. Company may terminate this agreement immediately for "cause" in the event Representative: (i) is

declared a bankrupt, makes an assignment for the benefit of creditors, or has a receiver or trustee appointed for his property; (ii) fails to comply with any of the terms, conditions and obligations of this Agreement; (iii), conducts himself in any manner which the Company, in its unrestricted discretion, determines to be detrimental to its business or reputation; or (iv) in any way acquires, obtains, or engages in any interest, affiliation or employment relating to the solicitation of the purchase or sale of securities or investments, either direct or indirect, without the prior written consent of Company.

8.  Indemnification.  Representative shall indemnify and hold harmless the Company and its officers, members, managers, employees, agents, contractors, sublicensees, affiliates, subsidiaries, successors and assigns from and against any and all damages, liabilities, costs, expenses, claims and/or judgments, including, without limitation, reasonable attorneys' fees and disbursements (collectively the "Claims") which any of them may suffer from or incur and which arise or result primarily from (i) any gross negligence or willful misconduct of Representative arising from or connected with Representative carrying out any of his/ her duties under this Agreement, (ii) or (ii) the breach by Representative of any of his/her obligations, agreements or duties under this Agreement.

9.  Confidentiality.  Company has developed confidential personal and professional relationships with individuals and firms with respect to the business in which it is engaged. In order to protect the security of Confidential Information (as hereafter defined) and to avoid the misappropriation, dissemination or unauthorized use thereof, Representative agrees that during the term of his/her association and thereafter, except in the performance of Representative's duties for Company, Representative will not directly or indirectly use or disclose, or permit the use or disclosure of, such Confidential Information without the express written consent of Company.  As used in this Agreement, the term "Confidential Information" means all information including, but not limited to, technical or non-technical data; formulas; computer programs; devices; methods; techniques; drawings; processes; financial data; personnel data; client specific information (*e.g.*, customer or prospect names and addresses, customer account information, customer financial information, etc.); incentive or other compensation plans; production and sales information; supplier specific information; cost information; marketing plans and strategies; and "Trade Secrets" under the Uniform Trade Secrets Act or other state or federal law which is (i) disclosed to, discovered or made known to Representative as a consequence of or through his/her association hereunder with Company and (ii) not generally known to persons, corporations, organizations or others outside of the Company.

10. Conflicts.  For and during the term of Representative's engagement and in order to protect Company's Confidential Information, Representative shall not, directly or indirectly, as a consultant, agent, registered representative, officer or in any other capacity, engage or participate in, or assist any other person with respect to, any business that is in competition in any manner whatsoever with the business of Company.

11. Restrictive Covenants.

a)  Except as otherwise may be agreed upon in writing between Company and Representative, in the event Representative's engagement hereunder is terminated by either party, and regardless of the cause of or lack of cause for such termination, and in order to protect Company's Trade Secrets and Confidential Information and Company's clients' private and confidential information, Representative agrees: for a

Confidential

period of 2 years commencing on the date of the termination of Representative's association with Company, Representative will not on behalf of himself/herself or any other person or other business enterprise, directly or indirectly, (A) solicit or attempt to solicit, or assist any other person or other business enterprise in the solicitation of or attempt to solicit, any customer or prospect of Company (a "Company Account") with respect to which Representative had contact with or learned of at any time during the twelve months preceding the termination of Representative's association; (B) accept, service or receive any commission or other payment attributable to any Company Account; or (C) disrupt or seek to disrupt, in any manner, any contractual relationship then existing between Company and any Company Account. Notwithstanding the foregoing, if Representative becomes employed elsewhere in the financial services or insurance industries, nothing contained in this Agreement shall preclude Representative from soliciting customers who were Representative's customers prior to the time that Representative became associated with Company; provided that a written list of such customers is provided to Company not later than ten (10) days after this Agreement is signed by Representative. If Representative does not provide such written list within the ten (10) day period, Representative shall be prohibited from soliciting any customers that otherwise would have been included on the list.

b) Representative agrees that during his/her association with Company and for 12 months thereafter, Representative will not, either directly or indirectly (whether personally or through another business entity or person), without the express written permission of Company, recruit, solicit, or induce, or encourage others to recruit, solicit or induce, any employee or person registered or associated with Company to terminate his/her employment or such association, as applicable, or otherwise cease his/her relationship with Company.

12. <u>Remedies</u>. Company and Representative agree that the remedy at law for any breach of Sections 9, 10 or 11 will be inadequate and that, in addition to any other remedies Company may have available to it under law, Company shall be entitled to temporary and permanent injunctive relief. Representative shall pay all costs and expenses, including without limitation, court costs, investigation costs, expert witness fees, and attorneys' fees, incurred by the Company in connection with the successful enforcement by the Company of its rights under this Agreement.

13. <u>Miscellaneous</u>.

a) This Agreement shall not be assigned, delegated or transferred without the prior written consent of Company. The terms may not be changed except in writing duly signed by the Company and the Representative.

b) This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona. If any of the provisions of this Agreement are held unlawful, void or unenforceable, such event shall not affect the enforceability of the remaining provisions.

c) This Agreement shall be executed in one original part of which each copy shall be deemed an original.

(Remainder of Page Intentionally Left Blank)

Confidential

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day, month and year first above written.

REPRESENTATIVE

By signing the below, the undersigned Representative further agrees he/she has read and understands the Firm's Policies and Procedures.

Signature _____

Print Name _Eric Miller_____

SCOTTSDALE CAPITAL ADVISORS CORP

_____

John Hurry, President

# EXHIBIT 24

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                        SUPERIOR COURT
NORTHERN DISTRICT                                        Docket No.

**Scottsdale Capital Advisors Corp.**
**and**
**John Hurry**

v.

**The Deal, LLC and William Meagher**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiffs Scottsdale Capital Advisors Corp. ("SCA") and John Hurry

("Mr. Hurry") (collectively "Plaintiffs") with Complaint against Defendants The Deal, LLC

("The Deal") and William Meagher ("Mr. Meagher") (collectively, "Defendants") and shows the

Court the following:

### PARTIES

1.      Plaintiff SCA is an Arizona corporation, having its principal place of business at

7170 E. McDonald Dr. #6, Scottsdale, Arizona  85253. At all relevant times, SCA was and is a

securities broker dealer engaged in the business of holding and trading in securities and was and

is a registered member firm of the Financial Industry Regulatory Authority, Inc. ("FINRA"), a

private corporation which regulates the securities industry.

2.      Plaintiff Mr. Hurry is an individual residing in Glenbrook, Nevada who maintains

a business office in Glenbrook, Nevada.  At all relevant times, Mr. Hurry was and is an executive

officer of SCA.  Mr. Hurry and SCA do substantial business in the micro-cap and small cap

securities sector.

3.      On information and belief, Defendant The Deal is a Delaware limited liability

company, having its address and principal place of business at 14 Wall St., 15th Floor, New

York, NY 10005.  On information and belief, The Deal publishes print and electronic publications concerning the financial sector, including *The DealFlow Report* ("DealFlow") and *The Deal Pipeline* ("Pipeline").  On information and belief, The Deal's publications are physically and electronically distributed to subscribers by The Deal and its parent/affiliate, TheStreet.com.  On information and belief, The Deal's publications, including DealFlow and Pipeline, enjoy a substantial circulation, especially to members of and those with an interest in the financial sector (especially the micro-cap and small cap securities sector), and are distributed to paid subscribers in New Hampshire.

4.      On information and belief, Defendant Mr. Meagher is an individual residing in California who is employed as a writer by The Deal and TheStreet.com.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to N.H. R.S.A. 491:7.

6.      The Court has personal jurisdiction over Defendants because they committed tortious acts in New Hampshire.  On information and belief, Defendants publish online content for distribution to paid subscribers within the state of New Hampshire, thereby availing themselves of New Hampshire law and the benefit of conducting activities in the forum state.

7.      New Hampshire has a strong interest in this litigation, as the tortious acts caused injury in New Hampshire.

8.      Having the case heard in New Hampshire provides the Plaintiffs with an effective and convenient forum to obtain relief, and the acts of the Defendants are intertwined, such that interstate judicial efficiency is served by avoiding multiple lawsuits.

## FACTUAL BACKGROUND

9.       On December 6, 2013, an article written by Mr. Meagher appeared in Deal Pipeline entitled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says" ("December 6 Article"). See Exhibit A. The December 6 Article falsely stated that Plaintiffs and their affiliated companies were being criminally investigated and being investigated by securities regulators. The December 6 Article further falsely stated that Plaintiffs engaged in favoritism towards shareholders of a company named Biozoom, including by allowing them to trade in violation of SCA policies and giving them special perks. The December 6 Article also falsely stated that Plaintiffs ignored "red flags" with respect to Biozoom transactions.

10.       On March 20, 2014, an article written by Mr. Meagher appeared in Deal Pipeline entitled "SEC requests default judgment in $34M Biozoom pump-and-dump case" ("March 20 Article"). See Exhibit B. The March 20 Article falsely stated that Plaintiffs and their affiliated companies were being investigated by the FBI, and were the targets of criminal and securities investigations. The March 20 Article also falsely stated that Plaintiffs were involved in a "pump and dump" scheme with Biozoom. (According to Wikipedia, "'[p]ump and dump' (P&D) is a form of microcap stock fraud that involves artificially inflating the price of an owned stock through false and misleading positive statements, in order to sell the cheaply purchased stock at a higher price".) See https://en.wikipedia.org/wiki/Pump_and_dump.

11.       On April 16, 2014, an article written by Mr. Meagher appeared in Deal Pipeline entitled "Finra focusing on money-laundering violations" ("April 16 Article"). See Exhibit C. The April 16 Article repeated the false claim that Plaintiffs and their affiliated companies were under FBI investigation.

12.     The statements in the December 6, March 20, and April 16 Articles are false and defamatory. Mr. Hurry and his companies, including SCA, enjoy an excellent reputation, and at all times conduct themselves in accordance with high ethical standards, and had not been under any criminal or regulatory investigation at the time that Mr. Meagher's articles were published. Plaintiffs were not involved in any "pump and dump" scheme and never gave special treatment to Biozoom shareholders.

13.     The defamatory statements made by Defendants have substantially harmed Plaintiffs' business relationships. Plaintiffs and their affiliated companies have seen brokerage and bank accounts closed, longstanding banking relationships severed, proposed business transactions halted, and investments hampered, delayed, or declined as a result of the defamatory statements made by Defendants. In addition to causing actual damages, the defamatory statements constituted defamation per se because they were the type that would tend to injure Plaintiffs in their trade or business.

## COUNT I – DEFAMATION

14.     Plaintiffs incorporate by this reference Paragraphs 1 through 13 of this Complaint as though fully set forth herein.

15.     Defendants have published false and defamatory statements of fact about Plaintiffs.

16.     The false and defamatory statements were made without the privilege to do so and concern the personal, professional and business reputations of SCA and Mr. Hurry.

17.     As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

## COUNT II – INVASION OF PRIVACY, FALSE LIGHT

18.     Plaintiffs incorporate by this reference Paragraphs 1 through 17 of this Complaint as though fully set forth herein.

19.     Defendants published private information that portrayed Plaintiffs in a false light.

20.     The false light in which Defendants placed Plaintiffs would be highly offensive to a reasonable person.

21.     Defendants knew that the assertions they published were false and/or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed by those assertions.

22.     As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

## COUNT III – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

23.     Plaintiffs incorporate by this reference Paragraphs 1 through 22 of this Complaint as though fully set forth herein.

24.     Defendants knew that Plaintiffs, being securities broker dealers engaged in the business of holding and trading in securities, had business relationships which would have been completed had it not been for Defendants' unlawful acts.

25.     Defendants, through the misconduct alleged herein, intended to harm Plaintiffs by intentionally and unjustifiably interfering with their actual business relationships.

26.     On information and belief, as a direct result of Defendants' publication of defamatory statements about Plaintiffs, Plaintiffs have lost business relationships and/or Plaintiffs' existing business relationships have been harmed.

27.     As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

## COUNT IV – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

28.     Plaintiffs incorporate by this reference Paragraphs 1 through 27 of this Complaint as though fully set forth herein.

29.     Defendants knew that Plaintiffs, being securities broker dealers engaged in the business of holding and trading in securities, had a reasonable expectation of entering into valid business relationships, which would have been completed had it not been for Defendants' unlawful acts.

30.     Defendants, through the misconduct alleged herein, intended to harm Plaintiffs by intentionally and unjustifiably interfering with their prospective business relationships.

31.     On information and belief, as a direct result of Defendants' publication of defamatory statements about Plaintiffs, Plaintiffs have lost business relationships and/or Plaintiffs' prospective business relationships have been harmed.

32.     As a direct and proximate result of Defendants' conduct, SCA and Mr. Hurry have suffered economic losses in an amount that will be established at trial.

WHEREFORE, Plaintiffs SCA and Mr. Hurry, respectfully request:

A.     An award of general, special, and enhanced compensatory damages within the jurisdictional limits of the Court;

B.     An injunction enjoining the further publication of the false statements in Defendants' articles;

C.     An award of attorneys' fees in connection with this matter;

D.    An award of interest and all costs incurred in connection with this matter; and

E.    Such other and further relief as may be appropriate based on the allegations

herein.

## JURY DEMAND

**PLAINTIFFS SCOTTSDALE CAPITAL ADVISORS CORP. AND JOHN HURRY**

**DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

SCOTTSDALE CAPITAL ADVISORS CORP.
AND JOHN HURRY
By their attorneys
DEVINE, MILLIMET & BRANCH, P.A.

Dated: 11/18/16    By: _____

George R. Moore, Esquire
NH Bar No. 1791
111 Amherst Street
Manchester, NH   03101
603-669-1000

HARDER, MIRELL & ABRAMS, LLP

Dated: 11/18/16    By: _____

Charles J. Harder (CAB # 184593)
*Pro Hac Vice* to be filed
Jordan Susman (CAB # 246116)
*Pro Hac Vice* to be filed
132 South Rodeo Drive, 4th Floor
Beverly Hills, CA   90212
424-203-1600

# EXHIBIT A

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

# The Deal Pipeline

[RETURN TO ARTICLE]

## PIPEs

Share    Reprint    Save to My Articles

## FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says

By Bill Meagher    Updated 09:05 PM, Dec-06-2013 ET

The FBI, the Securities and Exchange Commission and the Financial Industry Regulatory Authority have opened investigations into the involvement of Scottsdale Capital Advisors and Alpine Securities in the trading of Biozoom Inc., according to a person familiar with those investigations.

Investors in Biozoom lost some $300 million after the SEC halted trading in the stock in June. The commission cited "a lack of current and accurate information" about the stock and suspicions that the company and some shareholders may have illegally sold unregistered shares to the public.

Before it allowed trading in Biozoom to resume in July, the SEC obtained an emergency order from the U.S. District Court in Manhattan, freezing almost $16 million in cash in U.S. brokerage accounts.

Another $17 million in trading revenues connected to sales of Biozoom shares was wired overseas before the court order, the SEC claimed in its court filing. Another $8 million in wire transfers requested by Biozoom shareholders were halted by the broker-dealers before they could go overseas.

The SEC also ordered the broker-dealers involved in the transactions, Arizona-based Scottsdale Capital, Salt Lake City-based Alpine and Legend Securities Inc. of New York, to preserve all of their records connected to the Biozoom transactions.

The regulator charged eight Argentine citizens with illegal sales of unregistered shares of Biozoom. The complaint also named two other Argentines who owned shares of Biozoom but did not sell them prior to the asset freeze. ·

Biozoom, which lists Kassel, Germany, as its headquarters, purports to manufacture a "biofeedback device" that consumers can use to monitor and analyze data related to their health. The company went public in February through a reverse merger with registered shell company Entertainment Art Inc. and raised $1.15 million in a private placement to an investor whose identity was not disclosed.

The stock was the subject of an unusual promotion four months later. Recommendations for Biozoom stock appeared in at least 13 e-mail newsletters, according to Hotstocked.com, a website that tracks stock promotions. Legal disclaimers that accompanied the promotions claimed that no compensation had been paid

for the stock-friendly hype. Legal disclaimers in penny stock newsletters often identify the companies that pay for stock promotions and sometimes provide details of the compensation, as is required under securities law. Some stock promotion budgets run as high as $3 million.

One of the promotions claimed that Biozoom's "hand held device for the non-invasive transdermal analysis of antioxidants and other biomarkers in the human body... replaces expensive, time consuming and invasive blood tests."

"Future applications, future roll-out markets and applications are even more impressive," another newsletter stated. "Relevant biomarkers can and will be identified and analyzed for things such as cholesterol, alcohol, various illegal drugs, smoke, poisons, and blood pressure - to name a few. The unit is being further developed to measure blood sugar levels, tapping into a staggering $220 billion a year diabetes market in the U.S. and 350 million people with diabetes around the world."

Biozoom stock was also promoted in an unusual advertising campaign that made use of mainstream media outlets, including the New York Times and USA Today. In June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

A full-page black and white ad in USA Today could have cost $125,000, according to information that the newspaper distributes to advertisers. A similar New York Times ad would run $80,000 to $100,000, according to a newspaper spokesperson.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

Biozoom started trading with a thin volume of about 10,000 shares a day. The $1.10 share price implied a market value of $108.6 million for the company.

But when the promotion began to pick up speed, the shares rose to $1.50 on their way to an intraday high of $4.50 and a market cap of $421.5 million. Trading volume jumped as high as 11.7 million shares.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, giving Biozoom a market capitalization of just $9.56 million. Investors lost more than $300 million.

Finra and SEC officials declined to comment for this story. An FBI spokesman would neither confirm nor deny the existence of a criminal probe tied to Biozoom trading.

But a source who has spoken to investigators said the investigations are ongoing. The probes by Finra and the SEC began in May, prior to the trading halt.

The brokerage firm Scottsdale Capital is owned by Scottsdale Capital Advisors Holdings LLC and the Hurry Family Irrevocable Trust. Alpine is owned by SCA Clearing LLC. Both Scottsdale and Alpine are controlled by John Hurry, who is a director of both companies. Hurry's wife Justine is a director with Scottsdale and a minority owner.

The home pages of both Scottsdale Capital's and Alpine's websites feature the same motto, "At the top of the Small Cap Market," along with a photo of a mountain peak. For Scottsdale, it is a desert mountain. For Alpine, it's a snow capped peak.

The SEC complaint alleges that six of the shareholders named in the action, Magdalena Tavella, Adriana Bagattin, Daniela Goldman, Mariano Graciarena, Fernando Loureyro and Mariano Ferrari, opened accounts at Scottsdale between May 10 and June 14. The other shareholders named by the SEC — Andres Ficicchia, Gonzalo Blaya, Lucia Hernando and Cecilia De Lorenzo — opened trading accounts at Legend Securities from January through March, according to the SEC. Ficicchia also had an account at Scottsdale.

In all, the Biozoom shareholders deposited 20.1 million shares in the trading accounts which represented 100% of the share float that did not carry a trading restriction. Those shares represented about 33% of the total shares in the company.

None of the Biozoom shareholders, contacted by e-mail, responded to a request for comment from The Deal.

Legend Securities is owned by Stocktrade Network Inc., Chris Cacace, Salvatore Caruso, **Anthony** Fusco and Mark Sulavka, according to Finra records.

The SEC claims that when the Argentine shareholders opened their trading accounts at Scottsdale and Legend, they provided documents and sales receipts purporting to show that they had bought their shares between Feb. 19 and March 15 from the original shareholders of shell company Entertainment Art. But the SEC states in its complaint that all of the Entertainment Art shareholders sold their shares to Medford Financial Ltd. in 2009. Medford in turn was purchased by Le Mond Capital, a British Virgin Islands-based firm, for $430,000 last year. Le Mond was controlled by Sara Deutsch, who became CEO of Entertainment Art.

When the reverse merger took place in February, Deutsch paid $50,000 and 39 million shares to complete the transaction with four German entities for intellectual property that became the basis for Biozoom. The deal left her with 20.1 million shares. Deutsch became a director and assistant secretary for Biozoom, and in doing so, became what the SEC considers to be a control person.

The commission alleges that the shares Deutsch controlled were the shares that were actually distributed to the Argentine shareholders and that the stock sale agreements they used to help open the trading accounts at Scottsdale and Legend were fakes. Since Deutsch was a control person, any shares she distributed would be restricted and not free trading.

Deutsch ran a restaurant in Buenos Aires along with Magdalena Tavella called Magdalena's Party, according to the SEC complaint. Tavella was one of the Biozoom shareholders who traded through Scottsdale.

Miller Place, N.Y.-based securities attorney Randall Goulding supplied a legal opinion for all of the Biozoom shareholders, based in part on the stock sale documents portraying the transactions with original Entertainment Art shareholders, the SEC claimed in a court filing requesting the asset freeze. His opinion letter stated that the share certificates could be deposited without restrictions based on an exemption from registration provided by Rule 144 of the Securities Act. He said that the sellers were not affiliates of the company and had held the shares for more than four years and that the account holders were not individually or collectively the beneficial owner of more than 10% of the common shares of the company.

On June 19, Goulding e-mailed the general counsel for Legend saying, "I hereby withdraw all of my opinions issued for the securities of Biozoom, formerly Entertainment Art. Be advised that none of these opinions should be relied upon," according to the SEC

**San Antonio**-based securities lawyer David Wise, who had supplied a similar legal opinion letter to Scottsdale for Tavella and Goldman on May 20, withdrew his letter June 26. Wise sent an e-mail to Scottsdale that in part read, "It has been brought to our attention that the SEC recently suspended trading in Biozoom. It has also been brought to our attention that Tavella and Goldman may have provided inaccurate or misleading information and documentation to Scottsdale and to this firm."

A number of factors make it appear that the Biozoom shareholders were connected in an organized effort.

FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says - Deal Pipeline

A person who has spoken with investigators said that the six shareholders who held Scottsdale accounts opened them within the same week. The SEC complaint states that all of the shareholders live in Buenos Aires.

A person familiar with the investigative documents said the handwriting on the account applications for the Biozoom shareholders was the same, the answers to questions on their foreign due diligence packages were very similar and they held accounts at the same banks in Cyprus, Switzerland and Panama.

Moreover, the e-mail addresses they furnished for their trading accounts were opened within a week of each other, according to Whois.com, a website that furnishes information on domain registrations. The addresses are also similar, all containing the account holders' last names

The shareholders with accounts at Legend were also from Buenos Aires.

According to a declaration filed with the court by Ricky Sachar, an assistant director of enforcement for the SEC, all of the shareholder's e-mail accounts were opened with the same regional Internet registry. All of the Biozoom trades were made from May 16 to June 17 and no other stocks were deposited or traded through the accounts at either Scottsdale or Legend. Also, all of the Biozoom trades were ordered using either e-mail or instant messaging accounts.

"These shareholders were brought in for this. It's as simple as that," said a person with knowledge of the investigations. "They are retired teachers, a deli owner, but they come in with millions of shares of stock. They only trade Biozoom and they are directing trades using traders' lingo, telling them which market makers to use for the trades? Come on. They were straw men for whoever is behind this whole thing."

That same person said the Biozoom shareholders who opened accounts with Scottsdale enjoyed perks that were not available to other Scottsdale clients.

Typical clients pay 4% per transaction, or 4.5% if their transactions are cleared through Alpine. Longtime clients who do a heavy volume of business may occasionally receive a discount of one percentage point. But Biozoom clients paid just 2%, the person said.

They were also allowed to place orders using instant messaging, which is generally forbidden under Scottsdale's internal policies. A person with knowledge of Scottsdale's operations said the policy was changed for the Biozoom shareholders by the broker-dealer's management after Biozoom shareholders complained.

A standing Scottsdale policy only allows clients to wire funds from their accounts to banks in the U.S. or to institutions in the country where they live. But the person said that Biozoom shareholders were allowed to send funds to Cyprus, Switzerland, Panama and Belize, despite the fact that all of them live in <u>Argentina</u> and all of them had signed documents agreeing to abide by Scottsdale's wire policy.

The same person said that several red flags were raised regarding the Biozoom trades at Scottsdale: They were large trades in a microcap stock with relatively little liquidity. Also, foreign nationals were wiring large sums out of the U.S., raising potential concerns about money laundering. Still, no follow-up occurred at the broker-dealer, the person said.

Finra, who has worked with the SEC on the probe, has had several "on-the-record" conversations with Scottsdale staff regarding the trading of Biozoom shares, the process by which the accounts were opened for the Argentine nationals and how assets were moved offshore, according to a person who has spoken with investigators. "OTRs", as they are known in the brokerage industry, are sessions in which Finra staff ask specific questions of registered representatives who must answer them or face disciplinary actions.

A source who has spoken to investigators said Scottsdale staff members who have talked with Finra regarding Biozoom trades are Timothy Scarpino, Tim Diblasi, Liz Arndt, Henry Diekmann, Jay Noiman, Michael Cruz, Adam Flandaca and Ted Ashton.

Finra also talked with John Hurry, that same source said.

Scarpino, who processed the Argentine accounts connected to the Biozoom trades, resigned from his position at Scottsdale. He declined comment for this story. Ashton, who was a compliance analyst, also is no longer with the firm. Efforts to reach him failed.

Arndt is the office manager and oversees trading. Noiman and Diekmann are in compliance, and Diblasi is chief operating officer. Cruz is chief counsel, and Flandaca handles wiring of funds.

Diekmann denied he participated in the OTRs with Finra in a very brief phone interview.

None of the other Scottsdale staff questioned by Finra returned phone calls from The Deal seeking comment regarding the OTR's about Biozoom.

Gerald Russello, a partner at the law firm of **Sidley Austin LLP** in New York, said that Scottsdale and Alpine would have no comment regarding Biozoom trading or the investigations by Finra, the SEC and the FBI. Russello is a securities lawyer and former SEC enforcement branch chief.

Richard Kirby, a partner with **K&L Gates LLP** in Washington who represents Legend Securities, said he does not know if the SEC is concerned with how Legend conducted itself with regards to the Biozoom trades, but he said that Legend had not filed any notice with Finra regarding an SEC investigation.

Kirby also said that Legend alerted the SEC to its concerns regarding Biozoom and that the broker-dealer had acted on its own to freeze accounts tied to the Argentine nationals prior to the SEC action July 7.

While Legend did complete a June 13 $600,000 wire transfer for Luciana Hernando to Hellenic Bank Public Co. in Lemesos, Cyprus, it refused Hernando's request to move $2 million to the same bank on June 17. Legend also refused a wire request from Blaya June 14 to transfer almost $3.5 million to a bank in Geneva, according to the SEC complaint.

Meanwhile, John Hurry, who controls both Scottsdale and Alpine, is in negotiations to buy Salt Lake City-based broker-dealer **Wilson-Davis & Co.**, according to a person with knowledge of the deal.

Representatives of Wilson-Davis did not return phone calls from The Deal seeking comment. Scottsdale representatives declined to comment.

Share    Reprint    Save to My Articles

Privacy  |  Terms and Conditions  |  My Account  |  Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

# EXHIBIT B

SEC requests default judgment in $34M Biozoom pump-and-dump case By Bill Meagher Updated 04:10 PM, Mar-20-2014 ET

The **Securities and Exchange Commission** plans to request a default judgment against the 10 Argentine residents who have been named as defendants in the $34 million Biozoom Inc. pump-and-dump case after two law firms representing the Argentines asked to withdraw from the case.

The SEC filed a letter Tuesday, March 18, with Judge Naomi Buchwald in the U.S. District Court in Manhattan, stating that it planned to request the judgment because the defendants had failed to respond to the lawsuit by court ordered deadlines.

Four days earlier, attorney Marc Agnifilo had informed the court that his firm, New York-based Brafman & Associates PC, would withdraw as counsel to the Argentines.

Brafman is the second firm that has represented the group charged with selling 20.3 million shares of Biozoom without proper registration. In September, **McLaughlin & Stern LLP** also withdrew.

Brafman is a high-profile criminal defense firm that has counted crime boss Salvatore "Sammy the Bull" Gravano, rapper Sean Combs and former International Monetary Fund chief Dominique **Strauss**-Kahn among its clients.

Agnifilo declined to comment on the firm's withdrawal from the Biozoom case. In his letter to the court, he said that Brafman had been told by the Argentines that it would be retained, but that a retainer agreement was never signed.

Those named as defendants are Magdalena Tavella, Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, Mariano Pablo Ferrari, Mariano Graciarena and Fernando Loureyro.

None of them responded to e-mails requesting comment.

A person familiar with the case said that Buenos Aires-based lawyer Juan Ignacio Prada has been seeking representation for the group. Prada did not respond to a request for comment.

Patrick Bryan, assistant chief litigation counsel for the SEC, said the commission will file paperwork to pursue the default judgment in the next month. He declined to comment further.

The SEC filed the lawsuit last July, claiming that the Argentines had opened brokerage accounts at Arizona-based Scottsdale Capital Advisors and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the stock was purchased from shareholders in Entertainment Arts Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

In its complaint, the SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation.

The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

The promotion was unusual in the form it took. It included advertising in mainstream media outlets, including the New York Times and **USA Today**. In June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other

details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

The FBI and the Financial Industry Regulatory Authority have been investigating the involvement of Scottsdale and Alpine Securities, its Salt Lake City-based clearing firm, in connection with the Biozoom stock sales since May, according to a person with knowledge of the probe.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under an unusual request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

Finra has scheduled an audit of Scottsdale at the end March, according to a person familiar with the investigation.

Representatives of the SEC, Finra, Scottsdale and Alpine declined to comment. An FBI spokesman said the agency will neither confirm nor deny the existence of an investigation.

Read more: http://pipeline.thedeal.com/tdd/ViewArticle.dl?id=10007955861#ixzz2wbopcwyV

# EXHIBIT C



[RETURN TO ARTICLE]

## Law

Share     Reprint   Save to My Articles

# Finra focusing on money-laundering violations

By Bill Meagher  Updated 07:00 PM, Apr-16-2014 ET

On March 10, the staff at Scottsdale Capital Advisors was startled when their receptionist called out into the office, "Finra is here!"

While representatives from the Financial Industry Regulatory Authority were expected at the end of the month for a scheduled two-week exam, this visit had nothing to do with that appointment. Rather, the investigators asked for files relating to overseas clients and omnibus accounts, which are owned in the names of other brokerage firms, according to a person familiar with the raid.

That person said that a group of Finra investigators hauled away copies of documents regarding omnibus accounts at Scottsdale that included those owned in the names of Belize-based Titan International Securities Inc. and Cayman Islands-based Caledonian Global Financial Services Inc., and a Cayman account linked to Scottsdale owner John Hurry.

Gerald Russello, a partner with the law firm of Sidley Austin LLP who represents Scottsdale, declined to comment. Representatives of Titan International did not return a phone call seeking comment.

Caledonian Global CEO Kobi Dorenbush said his firm had not been contacted by any U.S. regulators.

The action at Scottsdale's Arizona offices came a month after brokerage firm Brown Brothers Harriman & Co. was fined a record $8 million by Finra in a settlement over alleged violations of anti-money laundering regulations. Finra also levied a $25,000 fine and a one-month suspension from the securities industry against Harold Crawford, the New York-based firm's former anti-money-laundering compliance officer.

Finra said that, from January 2009 to June 2013, Brown Brothers executed trades or delivered securities in transactions involving at least 6 billion penny stock shares, with many of those transactions made through omnibus accounts on behalf of clients that the firm could not identify. Some of the $845 million in proceeds were allegedly wired to Switzerland, Guernsey and Jersey, countries with strong bank secrecy laws. Those locations and transactions should have raised red flags with Brown Brothers and prompted the firm to file suspicious activity reports under federal anti-money-laundering regulations, according to Finra.

Brown Brothers agreed to the settlement without admitting or denying Finra's findings. The firm also issued a statement saying it had changed its procedures for handling low-priced securities and for surveillance of

activity in low-priced securities to "mitigate a possible recurrence of this matter." Brown Brothers also said that the activity covered by the settlement represented a small part of its investor services business and did not involve its investment management or private banking business.

Some violations of anti-money-laundering regulations have been closely linked with stock manipulation and pump-and-dumps of microcap stocks, both of which have been identified as priority areas for enforcement action by Finra and the **Securities and Exchange Commission**.

Finra's action against Brown Brothers has gotten the attention of broker-dealers, anti-money laundering consultants and lawyers for two reasons. The fine, the largest ever handed down for an anti-money-laundering violation by Finra, has served notice that the regulator is serious about firms cleaning up their anti-money-laundering programs. And the fact that Crawford was fined for the company's alleged failure to create an effective anti-money-laundering program is seen by some as unfair.

"Finra has served notice that there is personal responsibility for a company failing to implement an adequate program," said Kevin Petrasic, a partner in the Washington office of law firm **Paul Hastings LLP**, whose practice includes anti-money-laundering litigation.

"It is a no-win situation and a bit draconian," he said. "AML compliance officers are in a barbell on this. They want to put a program in place, and Finra expects that program to work, but sometimes the senior management doesn't want to pay for the resources, so they choose not to implement the program, and the AML officers are in the middle between management and the regulators. Who wants that job?"

In Crawford's case, he went to Brown Brothers' management and proposed changes that would affect the anti-money-laundering program, according to documents that Finra staff filed in their administrative action. In November 2011, Crawford and other Brown Brothers compliance staff are said to have recommended that the firm stop executing trades for penny stocks below a certain threshold value. They are also said to have recommended that the firm require omnibus account clients that wished to offer brokerage services to their own customers to set up a disclosed subaccounts.

Brown Brothers did not change how it handled penny stocks until last June, according to Finra.

Omnibus accounts are often held in the name of foreign financial intermediaries who, in turn, are handling stocks for clients that might not be known to the U.S. broker-dealer. Finra has told broker-dealers that it is important to know who are the actual investors behind the omnibus accounts.

Anti-money laundering regulations are designed to keep money made in illegal activities from being made to look as if it is the product of legitimate endeavors. With Finra, they center on Rule 3310. It requires each brokerage firm to implement a compliance plan that is approved by a member of senior management in writing. The plan must be designed to detect and assure the reporting of suspicious transactions. The plan must also comply with the Bank Secrecy Act and include an annual independent compliance test. Firms are also required to identify to Finra an individual or group responsible for the day-to-day operation of the anti-money-laundering program.

Each year in January, Finra issues its Regulatory and Examination Priorities Letter which details issues where the regulator plans to devote resources. In 2012, the letter named microcap stock fraud as an enforcement priority.

"As a part of their anti-money laundering responsibilities, member firms are obligated to monitor suspicious activity and to file Suspicious Activity Reports where warranted," the 2012 letter stated.

Last year, efforts against money laundering received their own paragraph in the letter.

"Finra examiners continue to focus on AML compliance, particularly at firms with higher-risk business models due to their clients, products and service mix or location in which they operate."

This year, Finra doubled the space in its letter devoted to efforts against money laundering. The regulator said it planned to focus on institutional business, as well as a trend of broker-dealers not pursing the identities of some shareholders in transactions disposing of large volumes of low-priced stocks.

"I think what is going on is obvious," said a former Finra official who now consults on anti-money-laundering issues. "Finra feels like these regulations have been on the books for what, 11, 12 years? The firms have had a chance to put AML programs in place, hire good people, and still there are problems. So Finra jumps the fines to get their attention. They are saying, 'We are serious and unless you take care of this, it is going to cost you some real money.'"

Paul Tyrrell, of counsel in the Boston office of law firm Sidley Austin LLP, said that some in the brokerage industry have been rattled by Finra's targeting of individuals for enforcement of anti-money-laundering rules.

"Where is the line being drawn?" he said. "I don't know and nobody else does either. What we are seeing in the [anti-money-laundering] exams is that Finra is being more robust, running it down to the end. They are asking what you did, and when you did it, and people are worried that Finra is now looking at AML officers, branch managers and even individual representatives."

For example, in March 2013, the regulator accused James Pilla, a registered representatives of Ameriprise Financial Services Inc., of failing to report red flags raised by penny stock trades in 26 of his client accounts and failing to meet face-to-face with 59 of his clients to verify their identities before opening their accounts. His actions allegedly violated Ameriprise's anti-money-laundering procedures. Finra suspended him for three months and fined him $15,000.

Finra filed 36 anti-money-laundering actions last year, down from 45 in 2012 and 38 in 2011. The regulator did not make anyone available to comment for this story.

Among its actions was a $1.4 million fine against **Oppenheimer Holdings Inc.** last August for alleged violations that included a failure to conduct due diligence on foreign financial intermediaries. Finra claims that from August 2008 through September 2010, Oppenheimer sold 1 billion unregistered penny stock shares on behalf of 13 clients, without performing due diligence on the status of the shares. The firm also allegedly failed to probe suspicious trading by a Bahamas-based broker-dealer. Oppenheimer agreed to pay the fine without admitting or denying Finra's allegations.

In December, Finra fined COR Clearing LLC of Omaha, Neb., $1 million over allegations that, for three years beginning in 2009, the firm failed to establish and implement anti-money-laundering policies and for a time in 2012, its anti-money-laundering program had almost collapsed. COR accepted the penalty without admitting or denying the allegations.

Both COR and Oppenheimer were required to hire independent consultants to monitor and evaluate their anti-money-laundering programs.

World Trade Financial Corp., a San Diego-based brokerage firm, was the subject of a $250,000 fine after Finra alleged it violated anti-money-laundering regulations by not setting up and enforcing supervisory procedures. From March 2009 to August 2011, World Trade bought and sold 27.5 billion shares of a dozen different penny stocks on behalf of one client. Those shares were unregistered and not eligible for an exemption from registration requirements, according to Finra. The transactions generated $61 million in proceeds for the client. The business generated by those transactions was the lion's share of World Trade's business.

The firm accepted the fine without admitting or denying the allegations.

The link between anti-money-laundering regulations involving omnibus accounts and penny stock trading is a growing topic of conversation in the brokerage industry.

Case 2:14-cv-02490-ROS Document 173-6 Filed 07/07/17 Page 70 of 73

"It is what everybody is talking about, and the recent Brown Brothers bust has really made it obvious that's what Finra is worried about as well," said one brokerage firm executive.

The connection was brought into sharp focus by the SEC's recent lawsuit and emergency asset freeze order against John Babikian, a Canadian national who the commission claims is behind the now defunct stock promoter Awesome Penny Stocks.

At the SEC's request, the federal court in Manhattan froze assets belonging to Babikian including two homes in Los Angeles, farm and vineyard land in Oregon and a fractional interest in a corporate jet.

In its lawsuit filed last month, the SEC alleged that Babikian sold 1.3 million shares of coal mining company **America West Resources Inc.** on Feb. 23, 2012, in 90 minutes, after first promoting the stock to 700,000 subscribers to Awesome Penny Stocks' e-mail newsletters. He allegedly made $1.9 million, selling the shares through an omnibus account with Swiss bank Frankfurter Bankgesellschaft (Schweiz) AG maintained by Brown Brothers.

In a set of Finra internal records from 2012 and 2013 obtained by The Deal, the regulator said it has initiated probes of suspicious trading activity involving offshore entities tied to pump and dumps in **Toron Inc.**, U.S. Highland Inc., Bioflamex Corp., **Goff Corp.** and **Marine Drive Mobile Corp.** Those reports were furnished to the SEC.

The offshore brokerage firms cited by Finra in those reports include Caledonian Global, Caledonian Bank Ltd., Caledonian Securities Ltd., Clearwater Securities Inc., Legacy Global Markets SA, Argus Stockbrokers Ltd., CBH Compagnie Bancaire Helvetique SA, Bank Gutenberg AG, Sherman Capital, Rigi Capital and Verdmont Capital SA.

The regulator obtained trading records regarding the omnibus accounts from Scottsdale Capital, Brown Brothers, **Vertical Group**, Knight Execution and Clearing Services LLC, OC Securities Inc. and Ascendiant Capital Markets LLC, according to the Finra records.

Scottsdale is already the subject of investigations by Finra, the SEC and the FBI pertaining to an unusual $34 million pump and dump involving a German company known as Biozoom Inc., according to a person familiar with the situation. Scottsdale's clearing agency and related entity, Salt Lake City-based Alpine Securities is also a part of those probes.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under a request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

The SEC filed a lawsuit last July, claiming that a group of 10 Argentine nationals had opened brokerage accounts at Scottsdale and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the Biozoom stock was purchased from shareholders in Entertainment Art Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

The SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation. The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing anti-money-laundering policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

Share     Reprint     Save to My Articles

Privacy  |  Terms and Conditions  |  My Account  |  Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

# EXHIBIT 25

| Case | FINRA |
|---|---|
| Issue Code | MSJ EXHIBIT |

| ONG, MICHELLE 2/22/17 VOL 1 | | |
|---|---|---|
| 1 | 024:06 - 024:10 | 024:06      Q.   What is your best recollection or<br>07   belief as to the context of those words?<br>08      A.   Sitting here now, I would almost -- I'm<br>09   positive I meant leaks occur all the time in the<br>10   media. |
| 2 | 025:11 - 025:16 | 025:11      Q.   Okay.   Is it your belief that leaks<br>12   occur all the time at FINRA?<br>13      A.   No.<br>14      Q.   Is it your belief that leaks ever occur<br>15   at FINRA?<br>16      A.   No. |
| 3 | 045:04 - 045:11 | 045:04      Q.   Isn't it true that when you said that<br>05   Mr. Meagher definitely had his sources, you believed<br>06   that Mr. Meagher in fact had at least one person<br>07   within FINRA who was communicating non-public<br>08   information to him?<br>09      MR. DAVIS:   Objection.   Form.<br>10   Asked and answered.<br>11        THE WITNESS:   No. |
| 4 | 045:13 - 045:19 | 045:13      Q.   And isn't it true that you told the<br>14   ombudsman that leaks happen all the time because you<br>15   were aware of instances in which non-public<br>16   information had been leaked to The Deal Pipeline?<br>17      MR. DAVIS:   Objection.   Form.<br>18   Asked and answered.<br>19        THE WITNESS:   No. |