Joseph G. Adams (#018210)
Carlie Tovrea (#029709)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
E-Mail: jgadams@swlaw.com
          ctovrea@swlaw.com

Charles J. Harder  (admitted *pro hac vice*)
Dilan A. Esper (admitted *pro hac vice*)
Jordan Susman (admitted *pro hac vice*)
HARDER MIRELL & ABRAMS L.L.P.
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90067
Telephone:  (424) 203-1600
E-mail:  CHarder@hmafirm.com
          DEsper@hmafirm.com
          JSusman@hmafirm.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife, Investment Services Corporation, an Arizona corporation, and BRICFM, LLC, dba Corner of Paradise Ice Cream Store, a California limited liability company,<br><br>            Plaintiffs,<br><br>    v.<br><br>Financial Industry Regulatory Authority, Inc., a Delaware corporation,<br>            Defendant. | Case No. 14-cv-02490-PHX-ROS<br><br>**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT FINRA**<br><br>**(Oral Argument Requested)** |

# I.   STATEMENT OF FACTS

Defendant FINRA's motion for summary judgment must fail because it attempts to usurp the powers of a trial jury.  The undisputed facts show that FINRA conducted a lengthy, dragnet-style inquiry into large swaths of documents and computer files of numerous businesses affiliated with the Plaintiffs, interviewed numerous witnesses and, as of the fall of 2013, had found *nothing*, and had not been able to bring a prosecution or a disciplinary action against Plaintiffs.  While FINRA's expensive and time-consuming investigation stalled, articles started to appear in a financial publication falsely accusing Plaintiffs of all sorts of wrongdoing.  These stories included information known only to FINRA—such as a confidential and sensitive referral that FINRA made to the Securities and Exchange Commission ("SEC"), and the date on which FINRA commenced its inquiry into Plaintiffs' conduct.

Plaintiffs John and Justine Hurry and their entities, Investment Services Corporation, and BRICFM, LLC (collectively, the "Hurrys" or "Plaintiffs") complained to FINRA about the leaks, which could *only* have come from FINRA.  The articles, however, continued to come out, and FINRA purported to investigate itself through its ombudsman's office.  FINRA's internal investigation was a sham that made no serious attempt to investigate the leaks and therefore reached a preordained conclusion that FINRA was not the source of the leaks.  The FINRA investigators did not interview numerous material witnesses, and did not investigate the most likely methods of leaking— through FINRA employees' personal e-mail accounts, phones, and travel records.

While FINRA employees made statements to the ombudsman's office and amongst themselves admitting that leaks occur all the time at FINRA, and the SEC stated to FINRA that it believed FINRA was the source of the leak, the official "party line" at FINRA was that FINRA does not leak.  FINRA then told the Hurrys the position that FINRA has maintained throughout this litigation: that FINRA does not leak.

There is ample evidence from which a jury can conclude that FINRA's "party line" position is false, and that FINRA was the source of the leaks.  This evidence includes:

4815-8899-6940.1

(1) the reporter, William Meagher, received a secret internal FINRA referral to the SEC and the date on which FINRA's inquiry into the Hurrys commenced, both of which were conceded by FINRA's witnesses to be unavailable to anyone in Mr. Hurry's businesses;

(2) FINRA employees internally discussed the leaks and admitted that leaking was common at FINRA, and then gave false deposition testimony regarding these statements;

(3) FINRA deliberately conducted a whitewashed internal investigation of the leaks in which FINRA did not review personal e-mail accounts and cell phones of employees or their travel, did not interview the lead investigator into the Hurrys' activities, and did not interview any representatives of the Hurrys or the SEC, even though FINRA now conveniently claims that the SEC and FINRA were the sources of the leaks; and

(4) the SEC, which FINRA claims was the source of the leaks to Meagher, investigated the leak and informed FINRA that the SEC believed the leak came from FINRA.

In addition, FINRA has asserted broad privileges to prevent discovery, and thereby cut itself off from making a number of arguments in this litigation.  Under longstanding authority, a party may not assert that matters are privileged in discovery but then adduce evidence on those same matters to obtain summary judgment or prevail at trial.  Yet this is exactly what FINRA has done here.  Most importantly, FINRA took the position during discovery that its communications with the SEC regarding leak investigations were off limits.  Now, of course, FINRA points the finger at the SEC as a possible leaker.  This is legally impermissible.

When FINRA is not blaming the SEC for the leaks, it is blaming Eric Miller, a renegade ex-employee of the Hurrys' stock brokerage who fancied himself a whistleblower and testified at deposition that he gave Meagher extensive information about the Hurrys.  However, FINRA's argument that Miller was Meagher's sole source has a fatal flaw: Meagher published confidential information that Miller did not have access to, including the date that FINRA commenced its inquiry into the Hurrys and the

1  sensitive and confidential referral from FINRA to the SEC.  Thus, all roads lead back to

2  FINRA.

3       There is a triable issue of fact whether FINRA's position that it never leaks to

4  reporters and did not communicate with Meagher is false.  Consequently, the jury must

5  determine if FINRA is engaging in a cover-up, and if so, whether FINRA is doing so in

6  order to suppress the fact that it leaked defamatory statements about the Hurrys because it

7  was frustrated at the progress of its attempts to bring disciplinary proceedings. Only a jury

8  can decide this.  Summary judgment should be denied.

9  **II.    FACTS AND EVIDENCE THAT CREATE A GENUINE DISPUTE OF**

10  **MATERIAL FACT**

11       This case arises out of a lengthy course of conduct by FINRA to pin some charge,

12  any charge, on the Hurrys.  John and Justine Hurry operate a number of businesses in the

13  Scottsdale, Arizona area, including Scottsdale Capital Advisors ("SCA") and Alpine

14  Securities: two stock brokerages that are members of FINRA, the self-regulatory entity

15  which regulates the sale of securities based on a delegation of authority from the SEC.

16       On November 12, 2012, FINRA conducted a raid of the Hurrys' offices in

17  Scottsdale, Arizona.  As part of that raid, FINRA demanded and obtained access to the

18  Hurrys' computers and office files, as well as computers belonging to affiliated entities

19  who were not FINRA broker-dealers.  [*See* Plaintiffs' Response to Separate Statement of

20  Material Facts ("PSOF") at ¶ 73]  In December 2012, when Alpine Securities, a securities

21  brokerage firm purchased by John Hurry, applied for permission to provide retail margin

22  account services, FINRA demanded that Mr. Hurry produce his personal banking records.

23  [*Id.* at ¶ 74].  In 2012-13, the Nevada Secretary of State's Securities Division issued 24

24  subpoenas directed to the Hurrys.  *No prosecution* ever resulted from these subpoenas.

25  The Hurrys believe these subpoenas were issued at the behest of or in coordination with

26  FINRA.  [*Id.* at ¶ 75]  Starting in June 2013, FINRA conducted on-the-record interviews

27  of the Hurrys' personnel, attempting to obtain evidence of wrongdoing.  [*Id.* at ¶ 76]

28

- 3 -

1    As of September 2013 through April 2014, FINRA was unable to discipline or

2    prosecute the Hurrys based on any of these investigations.  [*Id.* at ¶ 77]  Starting in

3    September 2013, a series of articles concerning the Hurrys appeared in *The Deal*, a

4    financial publication, authored by William Meagher.  [PSOF at ¶ 7-8]  On September 17,

5    2013, Meagher published an article that purported to quote "internal documents" from

6    FINRA obtained from FINRA's Office of Fraud Detection and Market Intelligence,

7    detailing an inquiry that FINRA was making into SCA's activity.  On December 6, 2013,

8    Meagher published an article claiming that SCA and Alpine Securities were under

9    investigation by the FBI, FINRA and the SEC.  The December 6, 2013 article included

10   false allegations that the Hurrys were being investigated by the FBI and the SEC, as well

11   as false allegations that SCA clients who traded the stocks of Biozoom received special

12   perks from the Hurrys.[1]  The December 6, 2013 article also falsely stated that the Hurrys

13   ignored "red flags" in the trading of Biozoom.   Meagher published another defamatory

14   article on March 20, 2014 claiming, falsely, that the Hurrys were involved in a "pump and

15   dump" scheme.

16   Meagher's articles contained numerous details that could only have come from

17   FINRA and could not have come from anyone affiliated with the Hurrys, including a

18   referral from FINRA to the SEC and the date on which FINRA's inquiries were

19   commenced.  [*Id.* at ¶ 50]  Meagher's stories also contained numerous defamatory

20   statements, and FINRA has not claimed otherwise in this litigation.

21   In response to the stories, the Hurrys contacted FINRA and demanded to know if

22   FINRA was leaking information to the press.  [*Id.* at ¶ 36]  In response, FINRA's

23   ombudsman's office purported to commence an investigation of the leaks.  [*Id.* at ¶ 37]

24   The ombudsman's office quickly concluded the leaks did not come from FINRA and did

25   not investigate that possibility further.  [*Id.* at ¶ 38]   The ombudsman's office took no

26

27   [1] FINRA asserted the investigatory privilege in discovery to preclude discovery regarding
     any investigations of the Hurrys and is not contesting that Meagher published false and
28   defamatory statements of and concerning the Hurrys as alleged in the Second Amended
     Complaint.

steps to determine if communications occurred between FINRA employees and Meagher using any personal smart phones, personal e-mail accounts, or in person communications with Meagher, despite the fact that the ombudsman's office knew that information was more likely to be transmitted to Meagher by such means.  [*Id.* at ¶ 60]  The ombudsman never spoke to Scott Andersen about the leaks, despite the fact that he was head of FINRA's investigation of the Hurrys.  [*Id.* at ¶ 61]  The ombudsman also never spoke to Nancy Condon, who was head of FINRA's press relations office and the person responsible for enforcing FINRA's policy of not leaking confidential information to the press.  [*Id.* at ¶ 62]  The ombudsman never investigated the possibility that the leak came from the SEC, even though FINRA now claims that the SEC was the leaker and even though the ombudsman suspected that the SEC could be involved.  [*Id.* at ¶ 64]  The ombudsman's office also did not look at any of Meagher's other articles to determine if they contained information that came from FINRA.  [*Id.* at ¶ 65]  The ombudsman had no experience in conducting a leak investigation, and made no attempt to involve anyone with experience in that area.  [*Id.* at ¶ 67]  Unsurprisingly, the ombudsman conveniently came to the conclusion that FINRA wanted—that FINRA didn't leak anything to Meagher.

Employees at both FINRA and the SEC suspected that FINRA was leaking. Michelle Ong, who worked for Condon in the press office, told the ombudsman that leaks occur "all the time" at FINRA, in response to questions about the leaks of information to Meagher concerning the Hurrys and whether such leaks were common at FINRA.  [*Id.* at ¶ 57]  Ong also stated in an e-mail that Meagher "certainly has his sources", again in the context of a discussion about the leaks of information about the Hurrys.  [*Id.* at ¶ 58]  The SEC informed FINRA that the SEC believed the leaks came from FINRA.  [*Id.* at ¶ 68]  When Andersen and the ombudsman were asked at their depositions about these communications, FINRA conveniently asserted privileges and prevented the Hurrys from inquiring into this area.  [*Id.* at ¶ 78-81]

III.    ARGUMENT

1.  **There Is a Triable Issue of Fact as to Whether FINRA Covered Up Its
    Communications with Meagher, Which Would Permit a Reasonable Juror
    to Infer that FINRA Made Defamatory Statements to Meagher.**

FINRA's position in this motion is that there is no evidence that anyone at FINRA talked to Meagher, and Meagher could have obtained all the information he published somewhere else. However, there are genuine issues of material fact as to these issues. Meagher received information (regarding the confidential SEC referral and the date on which the FINRA inquiry commenced) which could **only** have come **from FINRA** and could not have come from Miller. Nonetheless, FINRA went to great lengths to deny this fact and stonewall the Hurrys from finding out the truth. This gives rise to a triable issue of fact as to whether the information Meagher published came from FINRA.

First, the FINRA ombudsman conducted an investigation designed to reach a foregone conclusion and which deliberately did not seek to review the materials that actually would have shown whether there were leaks to Meagher. Specifically, the ombudsman issued a report purporting to exonerate FINRA despite not speaking to key witnesses (including Scott Andersen, who ran FINRA's investigation of the Hurrys[2]) and despite not seeking records that would be most likely to show that a leak occurred (i.e., the personal e-mail, cell phone, and travel records of the persons who had access to the confidential information leaked to Meagher). The ombudsman and one of her subordinates testified that they knew that they could not rule out FINRA as the source of the leaks without obtaining these materials, but they deliberately limited their inquiry and reported that FINRA did not leak to Meagher anyway.[3]

---

[2] PSOF at ¶ 61. Andersen testified as follows: "Q.· · Were you ever contacted by the ombudsman's office regarding the accusation that there were leaks coming from FINRA? A.· · I don't recollect being contacted by the ombudsman…. Q.· · Did you ever provide any documents to the ombudsman's office relating to any leak investigation relating to the Hurrys' matter? A.· · No. Q. Did anyone in your office provide any documents to the ombudsman's office in response to a request relating to the Hurrys' matter? A.· · Not that I am aware of." *Id*, PSOF, Ex. 4 (Andersen Depo. 48:12-49:16)

[3] PSOF at ¶ 60. Cook testified as follows: "Q. Isn't it true that you knew during the investigation that one potential route a leaker could take was using a personal email address to provide information to Mr. Meagher?  A. Yes.  Q. And you deliberately decided not to ask for personal email information?... A. Correct.  Q. And you knew that -

4815-8899-6940.1

Second, FINRA employees have given testimony that is at odds with the truth and deliberately calculated to prevent discovery of any leaks regarding FINRA investigations. Michelle Ong, a member of FINRA's public relations department, commented in response to internal discussions whether anyone at FINRA was leaking to Meagher, that Meagher "definitely has his sources." Then, when interviewed by the ombudsman investigating this case and asked about the allegations that FINRA had leaked information regarding the Hurrys to Meagher and whether such leaks are common at FINRA, Ong said leaks occur "all the time".[4]  It is obvious from the context of these statements (and certainly a triable issue of fact) that Ong believed that leaking to reporters is common at FINRA and that FINRA was leaking to Meagher information about the Hurrys.

At her deposition, however, Ong gave obviously false testimony, denying that her statements—which clearly were made in the context of discussions of the leaking of information concerning the Hurrys—were anything more than musings about leaks in general and she never believed that FINRA leaked anything.  By denying the obvious and asserting the manifestly untrue, Ong's testimony lacks any credibility. "The courts have long recognized that summary judgment is singularly inappropriate where credibility is at issue." *S.E.C. v. Koracorp Industries, Inc.*, 575 F.2d 692, 699 (9th Cir. 1978).

Third, FINRA's treatment of whether the SEC had any role in the leaks to Meagher adds additional suspicion.  There is extensive evidence in the record that the SEC informed FINRA that the SEC did not leak and that FINRA did. [PSOF at ¶ 68][5] This

---

- knowing that - - by deciding not to ask for personal information you might fail to obtain evidence that would show that the source of the leak was within FINRA?... A. Correct." PSOF Ex. 3 (Cook Depo. 66:19-67:12)

[4] The specific question asked of Ong was "Have there been any other incidents in the past few years in which members of the media allege that they were in possession of confidential FINRA documents?" [PSOF Ex. 8 (Blackett Decl., Ex. A)] Ong replied that "leaks occur all the time." *Id*. However, at her deposition, Ong falsely testified that her statement did not concern FINRA leaks but concerned the general subject of leaks to the media by anyone. [PSOF at ¶ 57].

[5] *See also* PSOF at ¶ 71.  Foster-Nicholas, the ombudsman, admitted at deposition that "I may have heard that [the SEC's internal investigation] did not find any evidence of a leak."  PSOF Ex. 2 (Foster-Nicholas Depo. 62:6-7.).

Cook, who worked for Foster-Nicholas in the ombudsman's office and conducted FINRA's investigation, testified:  "Q. Did you have any communications with the SEC

1    includes e-mails to FINRA personnel and a report that was discussed by the SEC and

2    FINRA's ombudsman's office.  However, the ombudsman's office did not attempt to

3    determine if the SEC was responsible for the leak before purporting to exonerate FINRA.[6]

4    In addition, FINRA asserted a privilege to block discovery of communications between

5    FINRA and the SEC concerning the leak investigation.

6          These actions—the phony ombudsman's investigation, the false testimony of Ong,

7    and pointing the finger at the SEC as a potential leaker while ignoring the SEC's own

8    statements that they were not the source as well as failing to make any attempt to

9    determine if, in fact, the leak came from the SEC—are facts from which a reasonable

10   juror can infer that FINRA is covering up its own involvement in the leaks.  There is,

11   therefore, a triable issue of fact that FINRA did just that.

12         FINRA's arguments to the contrary are without merit.  First, FINRA claims that

13   the Hurrys' own witnesses do not know who at FINRA leaked the information.  This

14   argument is a red herring because there is no reason why the Hurrys would have personal

15   knowledge of secret communications between FINRA and a reporter.

16         Second, FINRA argues in favor of its SEC theory with a carefully crafted

17   statement:  "No disclosed SEC document or witness accuses FINRA of leaking

18   information."  In fact, documents and testimony show that the SEC told FINRA that the

19   SEC suspected and maybe concluded that the leaks came from FINRA. [PSOF at ¶ 68]

20   FINRA's ombudsman failed to investigate this possibility before clearing FINRA.

21         Third, as a matter of law, FINRA's assertion of a privilege in discovery in response

22   to questions about its communications with the SEC relating to the leak investigation

23   precludes it from now waiving the privilege and claiming that the SEC was the source of

24   the leaks.  For instance, Cindy Foster-Nicholas, the FINRA ombudsman, was asked at her

---

26   regarding the issue of whether the SEC may have leaked these reports? A: Yes. Q. And
     what did the SEC tell you?  A. They did not provide details, other than to say they had not
     found any evidence on their side."  PSOF Ex. 3 (Cook Depo. 48:18-49:2).

27   [6] PSOF at ¶ 64.  Cook testified:  "Q. And did you take any action to determine whether the
28   SEC was the source of any of the disclosure of regulatory information of Mr. Meagher?
     A. No."  [PSOF Ex. 3 (Cook Depo. 21:1-5)]

1  deposition about communications she had with the SEC regarding the SEC's investigation

2  of leaks to Meagher.  FINRA responded by invoking the investigatory privilege and

3  refusing to answer.  [PSOF at ¶ 85]  Scott Andersen, who investigated the Hurrys on

4  behalf of FINRA, was asked flat out if he had any communications with the SEC

5  regarding the subject matter of the leaks to Meagher, and FINRA asserted a privilege and

6  instructed him not to answer.  [*Id.* at ¶ 81]  Andersen was also asked whether the SEC had

7  any access to information that was leaked to Meagher, and again he was instructed not to

8  answer the question.  [*Id.*]

9          A party may not assert a privilege at one point in litigation and then later attempt to

10  offer evidence on subjects covered by its earlier assertion of privilege.  *See Columbia*

11  *Pictures Television, Inc. v. Krypton Broadcasting*, 259 F.3d 1186, 1196 (9th Cir. 2001)

12  (trial court properly precluded assertion of "advice of counsel" defense after privilege was

13  asserted with respect to counsel's advice in discovery), *cert. denied sub nom.*, *Feltner v.*

14  *Columbia Pictures Television, Inc.*, 534 U.S. 1127 (2002) ; *C&W Construction Co. v.*

15  *Brotherhood of Carpenters & Joiners*, 108 F.R.D. 389, 392 (D. Hawaii 1985) (party who

16  asserted Fifth Amendment in discovery could not adduce evidence on subject matters

17  covered by invocation at trial); *United States v. Talco Contractors*, 153 F.R.D. 501, 506-

18  07 (W.D.N.Y. 1994) (witness who asserted Fifth Amendment in tax case could not later

19  waive the Fifth Amendment and testify); *Dairy America, Inc. v. Hartford Casualty*

20  *Insurance Co.*, 2010 WL 2923895 at *2 (E.D. Cal. Jul. 23, 2010) (excluding legal bills

21  where privilege asserted in discovery).

22          Importantly, and contrary to arguments made by FINRA in the pre-filing

23  conference, this doctrine is not a discovery sanction and has nothing to do with whether

24  the assertion of privilege was well-founded.  *See Talco Contractors*, 153 F.R.D. at 505

25  (privilege in that case was properly asserted but still resulted in preclusion).  FINRA made

26  a tactical choice to assert broad privileges in discovery, including with respect to its

27  communications with the SEC relating to the leak investigation.  Having done so, FINRA

28  cannot now use those same communications to prevail on summary judgment.

**2. The Jury Is Entitled to Infer from FINRA's Conduct in Making and Propagating False Statements and Whitewashing Its Investigation of the Leaks that FINRA Leaked Defamatory Material to Meagher.**

It is well-established that when the jury determines that a party or witness has made materially false statements, a reasonable juror may infer that the remainder of the party's or witness's testimony is false as well.  This is a basic part of the function of the jury in determining credibility issues.  *See, e.g., Shouchen Yang v. Lynch*, 822 F.3d 504, 507 (9th Cir. 2016) (holding immigration tribunal can discount the credibility of all claims of an immigrant who gives false statements:  "*falsus in uno, falsus in omnibus*"); *Turner v. Calderon*, 281 F.3d 851, 866 (9th Cir. 2002) (upholding constitutionality of instruction to jury that they may discount the entirety of the testimony of witnesses who make a single materially false statement).

So long as the inference is reasonable, it is enough to defeat summary judgment.  "A reasonable inference is one which support[s] a viable legal theory…."  *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985) (holding a trial court may not weigh competing inferences so long as they are reasonable and must leave that function to the jury).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

These cases make clear that FINRA cannot obtain summary judgment based on its claim that the leaking of the SEC referral did not contain any defamatory content.  Even if true, if the jury believes that it was leaked by FINRA, then the jury can also reasonably conclude that FINRA adduced false testimony and acted to cover up its role in the leak.  The jury could therefore reasonably infer that FINRA is covering up other leaks as well.  *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987), cited by FINRA, is not to the contrary—it merely holds that inferences must be reasonable.  *See Hildyard v. Citizens Medical Center*, 2012 WL 4794558 at *8

1    (Kansas App. Oct. 5, 2012) (*T.W. Electrical Service* rejected any change in the summary

2    judgment procedure that would allow a trial court to resolve a credibility dispute).

3         The jury should and will have the opportunity to consider all the evidence,

4    including FINRA's claims that it did not leak materials to Meagher, the flawed

5    ombudsman's report, and the transparently false statements of FINRA witnesses.  The

6    jury can then decide that they believe that FINRA engaged in a pattern of deceptive

7    conduct to cover up its role in leaking defamatory information to Meagher.  Or, the jury

8    can accept FINRA's arguments that someone else must have leaked it.  Either way, the

9    Court should not invade the jury's province and deny the Hurrys' right to a trial.

10       **3. So Long As There Is a Triable Issue of Fact That a FINRA Employee
         Leaked the Information Acting Within the Scope of Employment, the
11       Hurrys Need Not Identify the Specific Leaker.**

12       FINRA argues that the Hurrys are required to identify the specific person within

13   FINRA to establish FINRA's liability.  This is incorrect.  So long as there is a triable issue

14   of fact that someone at FINRA must have injured the Hurrys, the Hurrys need not identify

15   the specific person who leaked to Meagher.  If the law were different, then corporate

16   tortfeasors in FINRA's position could simply adhere to a code of silence in discovery and

17   thereby defeat all lawsuits where FINRA unlawfully leaks confidential information.

18       "Res ipsa loquitur (meaning the thing speaks for itself) is a rule of circumstantial

19   inference of responsibility for an injury….  A plaintiff who establishes the elements of res

20   ipsa loquitur can avoid summary judgment and reach the jury without direct proof of

21   negligence." *Lowrey v. Montgomery Kone, Inc.*, 202 Ariz. 190, 192, 42 P.3d 621, 623

22   (Ariz. App. Div. 1 2002) (internal quotation omitted).  Under Arizona law, a defamation

23   claim brought by a private figure is adjudicated under a negligence standard.  *Peagler v.*

24   *Phoenix Newspapers, Inc.*, 114 Ariz. 309, 315, 560 P.2d 1216, 1222 (Ariz. 1977).

25       "At present, Arizona law holds three elements to be necessary to the application of

26   res ipsa loquitur:  (1) the accident must be of a kind that ordinarily does not occur in the

27   absence of negligence; (2) the accident must be caused by an agency or instrumentality

28   subject to the control of the defendant; (3) the plaintiff must not be in a position to show

- 11 -

the particular circumstances that caused the offending agency or instrumentality to operate to her injury." *Lowrey*, 202 Ariz. at 192, 42 P.3d at 623 (footnotes omitted).  Thus, in *Lowrey*, summary judgment was denied with respect to a suit regarding an elevator malfunction where the defendant controlled the elevator and plaintiff's experts would not have had the opportunity to inspect it until months later.

All three prongs of the res ipsa loquitur test are met here.  First, a publication such as Meagher's will not ordinarily publish statements attributed to sources in the absence of such statements being made to it.  Second, there is a triable issue of fact as to whether the leaks came from a FINRA employee, as discussed above.  Third, the Hurrys are not in a position to show the particular circumstances of the leaks to Meagher; FINRA was in such a position but instead used its ombudsman's office to conduct a sham investigation that purported to exonerate FINRA while not examining any of the evidence (the personal e-mail accounts, cell phone records, and travel records) or speaking to the key witnesses (Scott Andersen, who headed the FINRA investigation, anyone affiliated with the Hurrys, or anyone at the SEC) that would have exposed a leaker.  [PSOF at ¶ 60-67]

FINRA argues that it cannot be held responsible for the leaks because there is the possibility that the SEC leaked to Meagher, or that the defamatory statements were leaked by Miller alone.  However, this argument was specifically rejected in *Jackson v. H.H. Robertson Co.*, 118 Ariz. 29, 32, 574 P.2d 822, 825 (Ariz. 1978), which held that res ipsa loquitur applied where two subcontractors were sued based on an accident where debris fell from the fourth floor at a construction site, and the plaintiff did not know which subcontractor was responsible for the debris.  The Court held:  "So long as he confines his suit to those defendants who it is reasonable to believe caused him harm, an injured plaintiff should not be denied a chance to recover merely because he cannot show what defendant or combination of defendants are responsible for his injury."  *Id.*

The reasoning behind these cases is clear:  defendants in circumstances where there may be multiple tortfeasors are not permitted to simply point the finger at someone else while stonewalling the plaintiff's efforts to learn what happened.  This is exactly what

1  FINRA is doing here: FINRA conducted an inadequate internal investigation, asserted

2  privileges with respect to the Hurrys' efforts to learn about its communications with the

3  SEC, and then sent its witnesses to testify that they did not speak to Meagher, were not

4  aware of any leaks, and that information must have come from the SEC.[7]

5       Numerous other cases further demonstrate this principle.  Perhaps the most famous

6  is *Summers v. Tice*, 199 P.2d 1 (Cal. 1948), a case from the California Supreme Court that

7  involved a shooting on a hunting trip.  Each of the defendants, in an effort to escape

8  liability, blamed the other defendant for the plaintiff's injuries, and then argued that the

9  plaintiff had failed to establish who injured him.  The Court rejected these arguments and

10  held that each of the defendants was required to come forward with evidence that he was

11  not the shooter.  *Id.* at 5; *accord Ybarra v. Spangard*, 154 P.2d 687, 689 (1945) (in a

12  medical malpractice case, where a patient suffered injuries while unconscious during

13  medical treatment, all members of the surgery team could be liable for his injuries).

14       *Summers* has been repeatedly followed in Arizona.  *See e.g., Salica v. Tucson*

15  *Heart Hospital- Carondelet, LLC*, 224 Ariz. 414, 418, 231 P.3d 946, 950 (Ariz. App. Div.

16  2 2010) (applying *Summers* and holding that where there are multiple tortfeasors, a

17  plaintiff need merely prove that the defendant's conduct was a substantial factor in his

18  injury); *see also, Piner v. Superior Court*, 192 Ariz. 182, 186, 962 P.2d 913 (Ariz. 1998)

19  (citing *Summers* with approval).

20       Thus, under Arizona law, the Hurrys need not identify which specific individual

21  was the leaker.  So long as there is a triable issue of fact as to whether someone at FINRA

22  leaked information to Meagher, it is up to the jury to determine whether the leaks

23  occurred, and whether such leaks were a substantial factor in causing the Hurrys' injuries.

24       The cases cited by FINRA do not address this situation and are easily

25  distinguished.  *Turner v. Devlin*, 174 Ariz. 201, 204, 848 P.2d 286, 289 (Ariz. 1993) held

26  that statements accusing a police officer who conducted an investigation of brutality

27  _____

28  [7] It is undisputed that there were leaks which could not have come from Miller, FINRA's other designated culprit.

1   constituted a matter of public concern under the defamation law. *Desert Palm Surgical*

2   *Group, P.L.C. v. Petta*, 236 Ariz. 568, 580, 343 P.3d 438, 450 (Ariz. App. Div. 1 2015)

3   held that triable issues of fact required a jury trial as to whether consumer complaints

4   about medical practice posted on the internet were defamatory.  The Court in *Phoenix*

5   *Newspapers, Inc. v. Church*, 24 Ariz. App. 287, 301, 537 P.2d 1345, 1359 (Ariz. App.

6   Div. 1 1975) held that in a defamation case regarding a public figure where actual malice

7   had to be shown, the actual malice of an identified newspaper employee could be imputed

8   to the newspaper; however, the court did not impose a requirement that the specific author

9   of a defamatory statement within an organization be identified.[8]

10      Where, as here, there is a triable issue of fact concerning the source of a

11  defamatory statement, summary judgment must be denied.

12
13  **4.  FINRA's Finger-Pointing at Eric Miller Does Not Work, Because Meagher Received Information that Could Not Have Come from Miller.**

14      FINRA argues that because the Hurrys' renegade ex-employee, Eric Miller,

15  testified that he made statements to Meagher regarding some of the content in FINRA's

16  articles, this makes Miller "the" source.  In addition to being based on a fundamental

17  misunderstanding of journalism (journalists often have multiple sources), FINRA's

18  argument ignores substantial evidence in the record that Meagher received information

19  that could not have come from Miller.  Specifically, Meagher published information from

20  a confidential secret referral from FINRA to the SEC, a fact conceded by FINRA's

21  ombudsman's office.  [PSOF at ¶ 50][9] This document was characterized by witnesses in

22
23  _____

[8] To the extent that FINRA argues that the Court cannot be sure that the leaker was acting within the scope of his or her employment with FINRA, this argument is not well taken.
24  An employer is liable in Arizona for torts committed by its employees, so long as the employees' acts are either controlled by the employer or subject to the employer's control.
    *Engler v. Gulf Interstate Engineering, Inc.*, 230 Ariz. 55, 57-58, 280 P.3d 599, 601-02
25  (Ariz. 2012).  In the case at bar, FINRA concedes it has detailed policies and procedures with respect to the gathering and dissemination of non-public information.  An
26  employee's dissemination of such information to the press would clearly be within FINRA's right to control the manner and means of its employees' performance.

27  [9] The ombudsman's report stated: "the FINRA [redacted, but the document is clearly referring to the SEC referral] that were the source of the first article should not have been
28  known by the tipster [Miller]."  PSOF Ex. 8 (Blackett Decl., Ex. D)

1   this case as extremely sensitive, non-public information. [*Id.* at ¶ 51] Miller, an employee

2   of the Hurrys at the time, did not have access to the secret referral and therefore was

3   incapable of passing it to Meagher.

4          Second, Meagher published the date when the inquiry into the Hurrys commenced.

5   Scott Andersen, who was in charge of FINRA's investigation, testified that this was non-

6   public information known only within FINRA.  [PSOF at ¶ 52]  Because Meagher

7   received information that could only have come from FINRA, the fact that Miller testified

8   to having leaked *some* information to Meagher does not prove FINRA's claim that it

9   never leaked to Meagher.  As stated above, in a multiple tortfeasor case like this one, the

10  Hurrys need not prove "but-for" causation—the standard is whether FINRA's leaks were

11  a substantial factor in causing the Hurrys' injury, which will be a jury question.  *Morris v.*

12  *Warner*, 160 Ariz. 55, 63, 770 P.2d 359, 367 (Ariz. App. Div. 2 1988), cited by FINRA, is

13  not applicable—*Morris* merely holds that truth is a defense in defamation actions.[10]

14         FINRA attempts to misdirect the Court by pointing to Meagher's statement to a

15  FINRA official that he did not learn about the Biozoom trade from FINRA.  This carefully

16  couched statement (which does *not* say that FINRA was not a source), made in an e-mail

17  by Meagher, is inadmissible hearsay.

18         Similarly, FINRA's identification of statements in Meagher's articles that could

19  have come from publicly available complaints does not come to grips with the

20  fundamental point that FINRA's denial that it spoke to Meagher is clearly false.  Meagher

21  reported information (the confidential SEC referral, and the date on which the inquiry was

22  opened) that could have only come from FINRA.

23         Finally, FINRA argues that its ombudsman's investigation establishes that FINRA

24  did not leak to Meagher.  However, the FINRA ombudsman's investigation was a

25  _____

26  [10] Notably, even if Miller's testimony as to what he supposedly leaked to Meagher is
    taken at face value, he denied leaking various facts reported by Meagher, which brings us
27  back to FINRA as the leaker.  Miller denied leaking claims about the account-opening
    forms of SCA clients, on the record interviews of certain SCA employees, supposed perks
28  granted to SCA clients who traded in Biozoom, and certain claims regarding the FINRA
    inquiry and FINRA's raid on SCA's offices.  [PSOF at ¶ 17]

1   deliberately crippled investigation that led to a foregone conclusion, and can be

2   considered by the jury in determining whether FINRA had something to hide.

3       **5.  The Jury May Also Consider FINRA's Motive to Leak.**

4       As of 2013-14, when the leaks to Meagher took place, FINRA was clearly on a

5   mission to harm the Hurrys:  FINRA had raided their offices and searched their records

6   and the records of their affiliated companies; FINRA had served numerous document

7   demands on the Hurrys, including demands for their personal banking records; and

8   FINRA had conducted a number of on-the-record interviews with the Hurrys.  Despite

9   these intrusions, FINRA had been unable to attribute any wrongdoing to the Hurrys,

10  whom FINRA believed must have been guilty of something.

11      FINRA, therefore, had a motive to spread defamatory statements about the Hurrys.

12  In its motion, FINRA knocks down a strawman by arguing that "motive alone" cannot

13  defeat a summary judgment motion in a defamation case.  The Hurrys do not claim

14  otherwise.  However, the Hurrys will offer evidence of motive *in conjunction with* other

15  evidence in this case, including evidence of FINRA's cover-up of its role in leaking

16  documents to Meagher, and the fact that Meagher published information that could only

17  have come from FINRA.  The trier of fact can consider motive in conjunction with other

18  evidence in determining whether the inferences are reasonable.  *DiFolco v. MSNBC*

19  *Cable, LLC*, 831 F. Supp. 2d 634, 646 (S.D.N.Y. 2011), cited by FINRA, is not to the

20  contrary; it involved a claim by a plaintiff based on "bare allegations of motive and

21  opportunity alone".  *Id.*  As discussed herein, the Hurrys' allegations of motive will not be

22  made in a vacuum, but alongside evidence of FINRA's wrongdoing.

23      **6.  Summary Judgment Law Does Not Require This Court to Presume the**
       **Truth of FINRA's Implausible Statements and Deprive the Jury of the**

24         **Power to Judge FINRA's Credibility.**

25      FINRA makes one last argument in favor of summary judgment: that Ninth Circuit

26  case law bars a plaintiff from taking a case to the jury based on a contention that the

27  defendant's position lacks credibility.  The case cited by FINRA, *Frederick S. Wyle*

28  *Professional Corp. v. Texaco Inc.*, 764 F.2d 604, 608-09 (9th Cir. 1985), predates

- 16 -

1   *Anderson v. Liberty Lobby* and involved a claim to invalidate a preference under the

2   Bankruptcy Code, which requires a showing that the parties to the transaction knew that

3   the debtor was insolvent.  In *Frederick S. Wyle*, there was no evidence of such knowledge,

4   other than unspecified "rumors" that were floating around.  *Id.*  Nor had the plaintiff

5   shown any evidence that any of the witnesses were not credible.  *Id.*  Nonetheless, the

6   plaintiff hoped to get to trial and come up with some evidence at that time by impeaching

7   the witnesses.

8        *Frederick S. Wyle* is inapposite.  Here, there is evidence that FINRA falsified facts

9   about how the SEC referral and the date of commencement of the inquiry came into

10  Meagher's hands, offered false testimony from Ong, and deliberately produced a false,

11  white-washed ombudsman's report intended to exonerate FINRA.  In other words, there is

12  substantial evidence beyond mere "rumors" to support the Hurrys' challenges to FINRA's

13  credibility.  *See Buttino v. F.B.I.*, 801 F. Supp. 298, 303 n. 10 (N.D. Cal. 1992)

14  (describing *Frederick S. Wyle*'s holding as "the court there found that there was not a

15  genuine issue of material fact *in the absence of any reason to suspect the affiants'*

16  *credibility*") (emphasis added).

17       FINRA contends that, so long as the argument being made by the Hurrys includes a

18  claim that a witness is not credible, the argument should fail and summary judgment

19  should be granted, simply because FINRA produces declarations claiming that FINRA did

20  nothing wrong.  In other words, even false testimony purporting to exonerate FINRA

21  should result in an automatic summary judgment, and this should be the case even if a

22  reasonable jury, looking at all the evidence, would disbelieve FINRA's testimony and find

23  for the Hurrys.  This is not the law.

24  **IV.   CONCLUSION**

25       For the foregoing reasons, FINRA's motion for summary judgment should be

26  denied.

27

28

1        DATED this 9th day of August, 2017.

2

3                                       SNELL & WILMER L.L.P.

4

5                            By: s/ Joseph G. Adams
                                 Joseph G. Adams

6                                 Carlie Tovrea
                                 One Arizona Center

7                                 400 E. Van Buren, Suite 1900
                                 Phoenix, Arizona  85004-2202

8                                 Charles J. Harder

9                                 Dilan A. Esper
                                 Jordan Susman

10                               HARDER MIRELL & ABRAMS LLP
                               132 S. Rodeo Drive, Fourth Floor

11                               Beverly Hills, California 90212

12                               Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -

4815-8899-6940.1

1

**<u>CERTIFICATE OF SERVICE</u>**

2

3        I hereby certify that on August 9, 2017, I electronically transmitted the foregoing

4  document to the U.S. District Court Clerk's Office using the CM/ECF System for filing

5  and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

6

   By: <u>s/ Mandy Garsha</u>

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4815-8899-6940.1