Joseph G. Adams (#018210)
Carlie Tovrea (#029709)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: jgadams@swlaw.com
        ctovrea@swlaw.com

Charles J. Harder  (admitted *pro hac vice*)
Dilan A. Esper (admitted *pro hac vice*)
Jordan Susman (admitted *pro hac vice*)
HARDER MIRELL & ABRAMS L.L.P.
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90067
Telephone:  (424) 203-1600
E-mail:  CHarder@hmafirm.com
         DEsper@hmafirm.com
         JSusman@hmafirm.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife, Investment Services Corporation, an Arizona corporation, and BRICFM, LLC, dba Corner of Paradise Ice Cream Store, a California limited liability company,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Financial Industry Regulatory Authority, Inc., a Delaware corporation,<br><br>                    Defendant. | Case No. 14-cv-02490-PHX-ROS<br><br>**PLAINTIFFS' RESPONSE TO SEPARATE STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT FINRA** |

4844-5318-3052

Plaintiffs John J. Hurry and Justine Hurry, Investment Services Corporation, and BRICFM, LLC (the "Hurrys") hereby respond to Defendant Financial Industry Regulatory Authority, Inc.'s ("FINRA") Separate Statement of Facts ("FSOF") filed in support of its motion for summary judgment herein. This statement is filed solely for the purpose of this motion, and all "undisputed" facts are undisputed for the sake of argument only with respect to this motion. The Hurrys are not admitting any facts that are listed herein as "undisputed," but are merely choosing not to dispute them for purposes of this motion. Nothing herein should be taken as an admission by the Hurrys in this case or in any other legal matter.

**Response to FSOF**

FSOF 1.    The Hurrys do not dispute Paragraph 1 of the FSOF.

FSOF 2.    The Hurrys do not dispute Paragraph 2 of the FSOF.

FSOF 3.    The Hurrys do not dispute Paragraph 3 of the FSOF.

FSOF 4.    In response to Paragraph 4 of the FSOF, the Hurrys object that Ex. 2 is hearsay offered for the truth of the matter asserted. The Hurrys do not dispute that this was Miller's characterization of his contracts with FINRA.

FSOF 5.    In response to Paragraph 5 of the FSOF, the Hurrys object to FINRA's statement as argumentative. The Hurrys do not dispute that the SEC halted trading in Biozoom stocks.

FSOF 6.    The Hurrys do not dispute Paragraph 6 of the FSOF.

FSOF 7.    The Hurrys do not dispute Paragraph 7 of the FSOF.

FSOF 8.    The Hurrys do not dispute Paragraph 8 of the FSOF.

FSOF 9.    In response to Paragraph 9 of the FSOF, the Hurrys do not dispute that this is the title of the article. However, whether the Biozoom allegations are true is hearsay not within any exception.

FSOF 10.   The Hurrys do not dispute Paragraph 10 of the FSOF.

FSOF 11.   The Hurrys dispute Paragraph 11 of the FSOF. The September 2013 article may not explicitly name Biozoom, but it is unclear what specific trades

Meagher is referring to (and thus it is possible that Meagher was writing about Biozoom as well as other alleged "pump and dump" schemes).

FSOF 12. In response to Paragraph 12 of the FSOF, the Hurrys do not dispute that these are the instances in which Scottsdale Capital Advisors ("SCA") is named in the article. Other statements in the article may also be referring to SCA by implication.

FSOF 13. In response to Paragraph 13 of the FSOF, the Hurrys do not dispute that Meagher sent the email to Condon. The Hurrys object to Condon Dec. Ex. A as hearsay offered for the truth of the matter asserted.

FSOF 14. In response to Paragraph 14 of the FSOF, the Hurrys do not dispute that Condon denied an official, on the record comment from FINRA. The Hurrys object to Condon Dec. Ex. A as hearsay offered for the truth of the matter asserted.

FSOF 15. In response to Paragraph 15 of the FSOF, the Hurrys do not dispute that the quoted words appeared. The Hurrys object to FINRA's characterization of the email as a "disclaimer" as this is argument. The Hurrys object to Ex. 5 as hearsay offered for the truth of the matter asserted.

FSOF 16. In response to Paragraph 16 of the FSOF, the Hurrys do not dispute that this is the title of the article. The Hurrys object to the last sentence of Paragraph 16 as argument or characterization.

FSOF 17. In response to Paragraph 17 of the FSOF, the Hurrys dispute that Miller was the source for the article, or that Miller claimed to be the source for the article. There is no evidence in the record that he was the only source. Also, the Hurrys dispute the accuracy of Miller's alleged statements to Meagher.

Additionally, even if Miller's testimony is fully credited, he testified that he was not the source for several statements in Meagher's articles, including comments made about SCA clients' account opening forms (Ex. 1 (Miller Depo. 78:24-88:22)), statements regarding FINRA's on the record interviews with other SCA employees (Ex. 1 (Miller Depo. 118:07-119:02)), statements regarding FINRA's investigation (Ex. 1 (Miller Depo.

- 3 -

1  128:02-130:10)), Claims that SCA clients who traded in Biozoom shares were given
2  special perks (Ex. 1 (Miller Depo. 136:23-138:23)), and statements about FINRA's raid of
3  SCA's offices (Ex. 1 (Miller Depo. 124:7-15, 126:8-127:24).
4         The Hurrys object to Paragraph 17 as improper conclusion (not a statement of
5  fact).
6         <u>FSOF 18.</u>  In response to Paragraph 18 of the FSOF, the Hurrys dispute that
7  Meagher's only sources were Miller and the July 3, 2013 SEC complaint.  There is
8  extensive evidence as discussed in the papers that FINRA was also a source.  The Hurrys
9  object to Paragraph 18 as improper opinion or conclusion.  The Hurrys object to Ex. 7 as
10  hearsay offered for the truth of the matter asserted.
11         <u>FSOF 19.</u>  In response to Paragraph 19 of the FSOF, the Hurrys do not
12  dispute that Meagher's article contained publication information.  The Hurrys do dispute
13  that this constituted "much" of what Meagher published (and that this statement is
14  argument, not fact) or that he did not also publish confidential information.
15         <u>FSOF 20.</u>  The Hurrys do not dispute Paragraph 20 of the FSOF.  The Hurrys
16  object to Ong Dec. Ex. A as hearsay offered for the truth of the matter asserted.
17         <u>FSOF 21.</u>  In response to Paragraph 21 of the FSOF, the Hurrys do not
18  dispute that Ong said this in an email.  Extensive circumstantial evidence supports an
19  inference that FINRA provided information to Meagher through non-official channels.
20  The Hurrys object to Ong Dec. Ex. A as hearsay offered for the truth of the matter
21  asserted.
22         <u>FSOF 22.</u>  In response to Paragraph 22 of the FSOF, the Hurrys do not
23  dispute that Meagher said the words to Ong that "you are certainly correct in that I did not
24  learn about a probe that tied to trading in Biozoom from Finra [sic]."  The Hurrys object
25  to Ong Dec. Ex. A as hearsay offered for the truth of the matter asserted.
26         <u>FSOF 23.</u>  In response to Paragraph 23 of the FSOF the Hurrys do not dispute
27  that Meagher said this to Ong.  The Hurrys object to Ong Dec. Ex. A as hearsay offered
28  for the truth of the matter asserted.

4844-5318-3052

FSOF 24. In response to Paragraph 24 of the FSOF, the Hurrys do not dispute that Meagher said this. The Hurrys object to the words "to that end" as argument. The Hurrys object to Ex. 7 as hearsay offered for the truth of the matter asserted.

FSOF 25. In response to Paragraph 25 of the FSOF, the Hurrys do not dispute that this is the title of the article. The truth of the headline would be hearsay.

FSOF 26. In response to Paragraph 26 of the FSOF, the Hurrys object that the entire paragraph is argument. The article speaks for itself.

FSOF 27. In response to Paragraph 27 of the FSOF, the Hurrys dispute the paragraph in that there is no evidence that the information in the December 16, 2013 article was "obtained from" Miller. The Hurrys do not dispute that Miller was **a** source, but the information could have been obtained from other sources as well.

Additionally, even if Miller's testimony is fully credited, he testified that he was not the source for several statements in Meagher's articles, including comments made about SCA clients' account opening forms (Ex. 1 (Miller Depo. 78:24-88:22)), statements regarding FINRA's on the record interviews with other SCA employees (Ex. 1 (Miller Depo. 118:07-119:02)), statements regarding FINRA's investigation (Ex. 1 (Miller Depo. 128:02-130:10)), claims that SCA clients who traded in Biozoom shares were given special perks (Ex. 1 (Miller Depo. 136:23-138:23)), and statements about FINRA's raid of SCA's offices (Ex. 1 (Miller Depo. 124:7-15, 126:8-127:24).

The Hurrys object to Paragraph 27 as improper opinion or conclusion. The Hurrys object to Paragraph 27 as argument—the article speaks for itself.

FSOF 28. In response to Paragraph 28 of the FSOF, the Hurrys do not dispute that Meagher said this. Notably, FINRA has not produced any evidence as to a request for comment by Meagher or a denial of comment by FINRA.

FSOF 29. In response to Paragraph 29 of the FSOF, the Hurrys do not dispute that this is the title of the article.

FSOF 30. In response to Paragraph 30 of the FSOF, the Hurrys object to the paragraph as argument and improper opinion or conclusion. The article speaks for itself.

FSOF 31. In response to Paragraph 31 of the FSOF, the Hurrys object to the paragraph as argumentative and improper opinion or conclusion. The article speaks for itself. The Hurrys dispute that the information set forth in the article was information that Miller "gave him." There is no evidence that Miller was anything other than a source for Meagher, not the source.

Additionally, even if Miller's testimony is fully credited, he testified that he was not the source for several statements in Meagher's articles, including comments made about SCA clients' account opening forms (Ex. 1 (Miller Depo. 78:24-88:22)), statements regarding FINRA's on the record interviews with other SCA employees (Ex. 1 (Miller Depo. 118:07-119:02)), statements regarding FINRA's investigation (Ex. 1 (Miller Depo. 128:02-130:10)), claims that SCA clients who traded in Biozoom shares were given special perks (Ex. 1 (Miller Depo. 136:23-138:23)), and statements about FINRA's raid of SCA's offices (Ex. 1 (Miller Depo. 124:7-15, 126:8-127:24).

FSOF 32. In response to Paragraph 32 of the FSOF, the Hurrys do not dispute that the April 16, 2014 article discussed the unannounced FINRA examination of SCA. The Hurrys object to the paragraph as argumentative and improper opinion or conclusion. The article speaks for itself.

FSOF 33. In response to Paragraph 33 of the FSOF, the Hurrys dispute the paragraph. Miller testified that he was **a** source. There is no evidence that he was the sole source of the "new information."

Additionally, even if Miller's testimony is fully credited, he testified that he was not the source for several statements in Meagher's articles, including comments made about SCA clients' account opening forms (Ex. 1 (Miller Depo. 78:24-88:22)), statements regarding FINRA's on the record interviews with other SCA employees (Ex. 1 (Miller Depo. 118:07-119:02)), statements regarding FINRA's investigation (Ex. 1 (Miller Depo. 128:02-130:10)), claims that SCA clients who traded in Biozoom shares were given special perks (Ex. 1 (Miller Depo. 136:23-138:23)), and statements about FINRA's raid of SCA's offices (Ex. 1 (Miller Depo. 124:7-15, 126:8-127:24).

1    The Hurrys object to Paragraph 33 as argument.

2    <u>FSOF 34.</u>    In response to Paragraph 34 of the FSOF, the Hurrys do not dispute that the article says this.  Notably, FINRA has not produced any evidence of a request for comment by Meagher or a denial of comment by FINRA.  The Hurrys object to Ex. 12 as hearsay offered for the truth of the matter asserted.

<u>FSOF 35.</u>    In response to Paragraph 35, the Hurrys partially dispute the paragraph.  The Hurrys were unaware of Miller's communications with FINRA and with Meagher.  However the Hurrys sued FINRA over Meagher's stories because information was contained in the articles that could only have come from FINRA, and FINRA repeatedly denied speaking to Meagher even in the face of that fact.

<u>FSOF 36.</u>    In response to Paragraph 36 of the FSOF, the Hurrys partially dispute the paragraph.  The Hurrys' counsel did request an investigation of the leak.  There is no evidence the FINRA ombudsman's office is impartial or independent, and there is significant evidence that the ombudsman's investigation was incomplete and designed to produce a whitewash.

<u>FSOF 37.</u>    In response to Paragraph 37 of the FSOF, the Hurrys partially dispute the paragraph.  The Hurrys do not dispute that the ombudsman's office conducted an investigation.  The Hurrys dispute whether the incomplete or inadequate investigation complied with the Hurrys' request.

<u>FSOF 38.</u>    In response to Paragraph 38 of the FSOF, the Hurrys dispute the paragraph.  The ombudsman's office did not conduct a thorough investigation, as the ombudsman took no steps to determine if communications occurred between FINRA employees and Meagher using any personal cell phones, personal e-mails, or in person communications with Meagher, despite the fact that the ombudsman's office was aware that information was more likely to be transmitted to Meagher by such means.  Ex. 2 (Foster-Nicholas Depo. 117:03-124:21, 133:14-135:19, 165:11-22); Ex. 3 (Cook Depo. 65:08-66:07, 66:19-67:17).  Essentially, the ombudsman's office only investigated mechanisms that no reasonable leaker would use to leak information (because it could so

1    easily be accessed by the leaker's employer). Additionally, there is reason to doubt that
2    the ombudsman's office took the steps that it claimed it took. Scott Andersen, who led the
3    investigation of the Hurrys, had never even heard of the ombudsman's investigators, and
4    the investigators did not even interview him. Ex. 4 (Andersen Depo. 28:25-29:11, 48:12-
5    50:08, 122:01-22). The ombudsman also did not talk to Nancy Condon, the Vice
6    President for Media and External Communication at FINRA. Ex. 5 (Condon Depo.
7    120:12-121:09). The ombudsman did not speak to the Hurrys or anyone at SCA (including
8    Miller). Ex. 2 (Foster-Nicholas Depo. 33:13-36:19); Ex. 3 (Cook Depo. 61:08-63:08).
9    The ombudsman's office thought the leaks could have come from the SEC but did nothing
10   to investigate that possibility. Ex. 2 (Foster-Nicholas Depo. 80:07-83:14). The
11   ombudsman's office also did not review any other articles from Meagher to determine if
12   he had sources within FINRA. Ex. 2 (Foster-Nicholas Depo. 113:11-116:05). The
13   ombudsman's office did not review on the record FINRA interviews to see if confidential
14   information from those interviews made their way into Meagher's stories. Ex. 2 (Foster-
15   Nicholas Depo. 153:07-155:03); Ex. 3 (Cook Depo. 63:14-64:06). Finally, despite having
16   no experience conducting a leak investigation, the ombudsman's office did not seek
17   assistance from any person or entity which had expertise in that area. Ex. 3 (Cook Depo.
18   31:20-33:22).

19         FSOF 39.    In response to Paragraph 39 of the FSOF, the Hurrys do not
20   dispute that this is what the ombudsman's office concluded. The Hurrys object to Foster
21   Dec. Ex. C as hearsay offered for the truth of the matter asserted.

22         FSOF 40.    The Hurrys do not dispute Paragraph 40 of the FSOF. The Hurrys
23   do not accept the conclusions of an incomplete internal investigation.

24         FSOF 41.    In response to Paragraph 41 of the FSOF, the Hurrys dispute the
25   paragraph. The SEC told FINRA that it believed that FINRA was the source of leaks to
26   Meagher. Ex. 5 (Condon Depo. 112:04-113:06, 114:06-115:12); Ex. 2 (Foster-Nicholas
27   Depo. 61:08-64:08); Ex. 3 (Cook Depo. 48:15-50:12, 51:15-52:01). Further, the fact that
28   an investigation is not concluded, for purposes of asserting a privilege (the purpose of the

1  March 28, 2017 letter), does not mean that the SEC has not reached any conclusions
2  regarding whether FINRA leaked or it did not.  The Hurrys object to Ex. 14 as hearsay
3  offered for the truth of the matter asserted.

4        <u>FSOF 42.</u>   In response to Paragraph 42 of the FSOF, the Hurrys dispute the
5  paragraph.  There was oral testimony and written evidence of communications between
6  FINRA and the SEC concerning the SEC's leak investigation, including statements by the
7  SEC to FINRA that the SEC thought FINRA was responsible for leaks to Meagher.  Ex. 3
8  (Cook Depo. 48:18-49:2); Ex. 2 (Foster-Nicholas Depo. 54:21-55:5, 60:2-61:10, 61:18-
9  62:12).

10        <u>FSOF 43.</u>   In response to Paragraph 43 of the FSOF, the Hurrys dispute the
11  paragraph.  The Hurrys understand this to mean that FINRA meant that the witnesses had
12  no direct personal knowledge of communications between FINRA and Meagher, and that
13  fact is undisputed.  The Hurrys would obviously not be party to any such communications.

14        <u>FSOF 44.</u>   The Hurrys do not dispute Paragraph 44 of the FSOF.

15        <u>FSOF 45.</u>   In response to Paragraph 45 of the FSOF, the Hurrys do not
16  dispute that the suit was filed.  The Hurrys object to Paragraph 45 in that whether the
17  complaint can be construed to encompass any defamatory statements in the September
18  2013 article is a legal issue and not an undisputed fact.

19        <u>FSOF 46.</u>   In response to Paragraph 46 of the FSOF, the Hurrys dispute the
20  paragraph.  Ong made a statement to the FINRA ombudsman's office, in response to a
21  question concerning the alleged leaks to Meagher in this case and whether such leaks were
22  a common occurrence ("Have there been any other incidents in the past few years in
23  which members of the media allege that they were in possession of confidential FINRA
24  documents?").  Ong responded that leaks occur all the time.  Ex. 3 (Cook Depo. 40:15-
25  41:10).  The statement would not make sense in this context if it were just talking about
26  the subject of media leaks in general.  Her disavowal of that statement is not credible and
27  in any event presents a jury question.  Further, the jury will be entitled to infer that
28

- 9 -

1   FINRA's and Ong's non-credible testimony on this issue indicates they are hiding
2   something on the issue of leaks to Meagher.

3         <u>FSOF 47.</u>   In response to Paragraph 47 of the FSOF, the Hurrys dispute the
4   paragraph.  Ong made a statement to the FINRA ombudsman's office, in response to a
5   question concerning the alleged leaks to Meagher in this case and whether such leaks were
6   a common occurrence ("Have there been any other incidents in the past few years in
7   which members of the media allege that they were in possession of confidential FINRA
8   documents?").  Ong responded that leaks occur all the time.  Ex. 3 (Cook Depo. 40:15-
9   41:10).  The statement would not make sense in this context if it were just talking about
10  the subject of media leaks in general.  Her disavowal of that statement is not credible and
11  in any event presents a jury question.  Further, the jury will be entitled to infer that
12  FINRA's and Ong's non-credible testimony on this issue indicates they are hiding
13  something on the issue of leaks to Meagher.  The Hurrys object to Ex. 25 as hearsay
14  offered for the truth of the matter asserted.

15        <u>FSOF 48.</u>   In response to Paragraph 48 of the FSOF, the Hurrys do not
16  dispute that Ong said what is quoted.  The Hurrys object to the paragraph as argument.
17  The Hurrys object to the paragraph as improper opinion or conclusion—there is no
18  evidence in the record that Ong was referring to Miller.  The Hurrys object to Ex. 8 as
19  hearsay offered for the truth of the matter asserted.

20        <u>FSOF 49.</u>   In response to Paragraph 49 of the FSOF, the Hurrys do not
21  dispute that Ong did not state in her email that those sources were within FINRA.  The
22  Hurrys do not dispute the quote from Ong's deposition.

23        The Hurrys otherwise dispute Paragraph 49.  The context of the email was a
24  discussion of whether FINRA leaked any information to Meagher.  Thus, Ong's denials
25  that she was talking about sources within FINRA present a jury question as to her
26  credibility.  Further, the jury will be entitled to infer that FINRA's and Ong's non-credible
27  testimony on this issue indicate they are hiding something on the issue of leaks to
28  Meagher.

4844-5318-3052

**ADDITIONAL MATERIAL FACTS SUBMITTED BY PLAINTIFFS**

50. The information published by Meagher included information that Hurry did not have access to, including the FINRA referral document and the date the investigation commenced. Ex. 4 (Andersen Depo. 76:01-76:05, 96:12-96:17); Ex. 2 (Foster-Nicholas Depo. 71:07-72:15, 76:03-80:06); Ex. 3 (Cook Depo. 18:15-19:22); Ex. 6 (Blackett Decl., Ex. D [FINRA_00003247-FINRA_00003248]).

51. The SEC referral document is considered highly sensitive non-public information within FINRA. Ex. 4 (Andersen Depo. 76:01-05); Ex. 2 (Foster-Nicholas Depo. 71:07-72:15).

52. The date the investigation commenced is considered non-public information within FINRA. Ex. 4 (Andersen Depo. 96:12-97:16).

53. Scott Andersen, who supervised the investigation at FINRA, was not party to any discussions about leaks to Meagher coming from SCA or Miller. Ex. 4 (Andersen Depo. 81:21-82:05, 85:06-86:10).

54. Condon said information was leaked to Meagher which had to come either from FINRA or the SEC. Ex. 5 (Condon Depo. 106:11-108:03).

55. The FINRA ombudsman's office was so certain the leaks to Meagher did not come from the Hurrys that it did not even investigate the possibility. Ex. 2 (Foster-Nicholas Depo. 83:17-84:10).

56. The FINRA ombudsman's office investigator, Christopher Cook, believed that Meagher either possessed or had seen internal FINRA reports. Ex. 3 (Cook Depo. 48:15-17).

57. Ong said that leaks occur all the time as part of an interview conducted by the ombudsman's office regarding the allegations of FINRA leaking to Meagher and whether such leaks were common at FINRA ("Have there been any other incidents in the past few years in which members of the media allege that they were in possession of confidential FINRA documents?"). At her deposition, Ong testified that her statement did

- 11 -

1   not concern FINRA leaks but concerned the general subject of leaks to the media by
2   anyone.  Ex. 2 (Foster-Nicholas Depo. 104:20-105:4); Ex. 3 (Cook Depo. 38:16-44:14);
3   Ex. 6 (Blackett Decl., Ex. A [FINRA 00000001-FINRA 00000002]); Ex. 7 (Ong Depo.
4   22:05-24:10).

5       58.   Ong said that Meagher definitely has his sources, in response to a
6   discussion as to whether FINRA was involved in leaking confidential information to
7   Meagher.  Ex. 7 (Ong Depo. 34:13-37:09); Ex. 6 (Blackett Decl., Ex. C [FINRA
8   00001003-FINRA 00001005]).

9       59.   Scott Andersen, who headed the FINRA investigation of Plaintiffs, had
10  never heard of the ombudsman's investigators.  Ex. 4 (Andersen Depo. 28:25-29:11).

11      60.   The ombudsman's office took no steps to determine if communications
12  occurred between FINRA employees and Meagher using any personal cell phones,
13  personal e-mails, or in person communications with Meagher, despite the fact that the
14  ombudsman's office was aware that information was more likely to be transmitted to
15  Meagher by such means.  Ex. 2 (Foster-Nicholas Depo. 117:03-124:21, 133:14-135:19,
16  165:11-22);  Ex. 3 (Cook Depo. 65:08-66:07, 66:19-67:17).

17      61.   Scott Andersen, who led the investigation of the Hurrys, had never heard
18  of the ombudsman's investigators, and that they did not interview him.   Ex. 4 (Andersen
19  Depo. 28:25-29:11, 48:12-50:08, 122:01-22).

20      62.   The ombudsman did not talk to Nancy Condon.  Ex. 5 (Condon Depo.
21  120:12-121:09).

22      63.   The ombudsman did not speak to the Hurrys or anyone at SCA.  Ex. 2
23  (Foster-Nicholas Depo. 33:13-36:19); Ex. 3 (Cook Depo. 61:08-63:08).

24      64.   The ombudsman's office thought the leaks could have come from the
25  SEC but did nothing to investigate that possibility.  Ex. 2 (Foster-Nicholas Depo. 80:07-
26  83:14); Ex. 3 (Cook Depo. 21:1-5).

65. The ombudsman's office did not review any other articles from Meagher to determine if he had sources within FINRA. Ex. 2 (Foster-Nicholas Depo. 113:11-116:05).

66. The ombudsman's office did not review on the record FINRA interviews to see if confidential information from those interviews made their way into Meagher's stories. Ex. 2 (Foster-Nicholas Depo. 153:07-155:03); Ex. 3 (Cook Depo. 63:14-64:06).

67. Despite having no experience conducting a leak investigation, the ombudsman's office did not seek assistance from any person or entity with expertise in that area. Ex. 3 (Cook Depo. 31:20-33:22).

68. The SEC believed that FINRA was the source of the leaks to Meagher. Ex. 5 (Condon Depo. 112:04-113:06, 114:06-115:12); Ex. 6 (Blackett Decl., Ex. B [FINRA 00000428]).

69. Andersen never received any information that the leaks came from the SEC. Ex. 4 (Andersen Depo. 133:12-16).

70. The FINRA ombudsman concluded that neither the SEC nor FINRA leaked to Meagher. Ex. 2 (Foster-Nicholas Depo. 40:13-41:16); Ex. 6 (Blackett Decl., Ex. D [FINRA 00003247-FINRA 00003248]).

71. The SEC conducted its own investigation and told FINRA that it was not the source of leaks to Meagher. Ex. 2 (Foster-Nicholas Depo. 61:08-64:08); Ex. 3 (Cook Depo. 48:15-50:12, 51:15-52:01).

72. In 2012 and 2013, FINRA served a series of "Rule 8210" requests seeking vast quantities of documents and records from the Hurrys' businesses. Ex. 8 (Hurry Decl. ¶ 7).

73. On November 12, 2012, FINRA conducted a raid of the Hurrys' offices in Scottsdale, Arizona. As part of that raid, FINRA demanded and obtained access to the Hurrys' computers and office files as well as computers belonging to affiliated entities who were not FINRA broker-dealers. Ex. 8 (Hurry Decl. ¶ 3).

4844-5318-3052

74. In December 2012, when Alpine Securities, a securities brokerage purchased by John Hurry, applied for permission to provide retail margin account services, FINRA demanded that Hurry produce his personal banking records. Ex. 8 (Hurry Decl. ¶ 5).

75. In 2012 and 2013, the Nevada Secretary of State's Securities Division issued 24 subpoenas directed to the Hurrys. No prosecution ever resulted from these subpoenas. The Hurrys are informed and believe that these subpoenas were issued at the behest or in coordination with FINRA. Ex. 8 (Hurry Decl. ¶ 6).

76. Starting in June 2013, FINRA conducted numerous on the record interviews of the Hurrys' personnel, attempting to obtain evidence of wrongdoing. Ex. 8 (Hurry Decl. ¶ 8).

77. As of the September 2013-April 2014 period when Meagher published his stories, FINRA had performed the broadest conceivable dragnet search of the Hurrys and their businesses, and had been unable to bring a disciplinary action or court case against the Hurrys based on the results of the dragnet, despite obviously believing that the Hurrys must have done something wrong. FINRA had a motive to leak harmful information against the Hurrys. Ex. 8 (Hurry Decl. ¶ 9).

78. FINRA asserted privileges in discovery with respect to any details of its investigation of the Hurrys, including whether the investigation was seen by FINRA as successful, the amount FINRA spent on it, how many people were involved, and who the investigators were. Ex. 4 (Andersen Depo. 53:16-23, 60:21-63:23, 80:4-7).

79. FINRA asserted a privilege to obstruct discovery with respect to who its own investigator thought leaked information to Meagher. Ex. 4 (Andersen Depo. 80:22-81:6).

80. FINRA asserted a privilege to obstruct discovery with respect to whether any of Andersen's subordinates were disciplined for leaking to the press. Ex. 4 (Andersen Depo. 80:22-81:6).

4844-5318-3052

81. FINRA asserted a privilege to obstruct discovery with respect to communications between Andersen and the SEC concerning leaks. Ex. 4 (Andersen Depo. 86:20-87:15, 101:21-102:8).

82. FINRA asserted a privilege to obstruct discovery regarding who at FINRA had access to or knew about the information leaked to Meagher. Ex. 4 (Andersen Depo. 103:19-21, 106:24-25, 111:12-22).

83. FINRA obstructed discovery with respect to whether it terminated anyone for leaking to the media. Ex. 5 (Condon Depo. 26:12-32:20).

84. FINRA obstructed discovery with respect to whether it follows its own policies with respect to communication with the press (which include not leaking classified information). Ex. 5 (Condon Depo. 40:1-41:4).

85. FINRA asserted a privilege to obstruct discovery of communications between the ombudsman's office and the SEC regarding the leak investigation. Ex. 2 (Foster-Nicholas Depo. 55:07-08).

DATED this 9th day of August, 2017.

SNELL & WILMER L.L.P.

By: s/ Joseph G. Adams
Joseph G. Adams
Carlie Tovrea
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Charles J. Harder
Ryan J. Stonerock
Dilan A. Esper
Jordan Susman
HARDER MIRELL & ABRAMS LLP
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212

Attorneys for Plaintiffs

4844-5318-3052

**CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2017, I electronically transmitted the foregoing document to the U.S. District Court Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

By: s/ Mandy Garsha