# Exhibit 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

JOHN J. HURRY and JUSTINE HURRY,      )
as husband and wife; INVESTMENT        )
SERVICES CORPORATION, an Arizona       )
corporation, et al.,                   )
                                       )
          Plaintiffs,                  )
                                       ) No.
vs.                                    ) 14-cv-02490-
                                       ) PHX-ROS
FINANCIAL INDUSTRY REGULATORY          )
AUTHORITY, INC., a Delaware            )
corporation,                           )
                                       )
          Defendant.                   )
_____)


          CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


          VIDEOTAPED DEPOSITION OF ERIC JOSEPH MILLER

                    Phoenix, Arizona
                    February 28, 2017
                       12:00 p.m.




                                   Prepared By:
                    Robin L. B. Osterode, RPR, CSR
                              AZ CR No. 50695
                    mg reporting - Court Reporters
                    2415 East Camelback Road, Suite 700
                              Phoenix, AZ 85016
                    602.512.1300(t)  888.515.8661(f)
                              mgreporting.com

1      Q.    Did you see the original legal opinion
2   letter is my question?
3      A.    No.  I wasn't in compliance.
4      Q.    Okay.  And did you see -- and the basis for
5   your knowledge that he withdrew that letter is
6   something you heard from Henry Diekmann.  Correct?
7      A.    That's correct.
8      Q.    Did you discuss this issue with
9   Mr. Meagher?
10      A.    No.  No.  I discussed it with Jay Noiman.
11      Q.    Do you know who at Scottsdale Capital would
12   have had access to Mr. Wise's original legal opinion
13   letter?
14      A.    I would have no idea who has access to
15   what.
16      Q.    Would you have had permitted access to that
17   letter?
18      A.    No.
19      Q.    Did you ever access that letter?
20      A.    No.
21      Q.    And then when Mr. Wise withdrew his letter,
22   do you know how he withdrew the letter?
23      A.    I don't recall.  I just remember the
24   conversation.
25      Q.    Going down to the next sentence, it says,

1    "Wise sent an e-mail to Scottsdale that, in part,

2    read, 'It has been brought to our attention that the

3    SEC recently suspended trading in Biozoom.  It also

4    has been brought to our attention that Tavella and

5    Goldman may have provided inaccurate or misleading

6    documentation to Scottsdale and'" -- pardon me --

7    "'to this firm.'"

8            Do you see that?

9       A.   I do see that.

10      Q.   Did you see an e-mail sent to Mr. -- sent

11   by Mr. Wise to Scottsdale that stated that?

12      A.   No.

13      Q.   Do you know who that letter -- that e-mail

14   was sent to?

15      A.   No idea.

16      Q.   Did you discuss this issue with

17   Mr. Meagher?

18      A.   No, I do not believe so.

19      Q.   Who, in your opinion, would Mr. Wise have

20   sent that e-mail to?

21      A.   Compliance.

22      Q.   And who worked in compliance in 2013?

23      A.   It would be Henry Diekmann and Mike Cruz.

24      Q.   So flipping the page, it says, "A person

25   who has spoken with investigators said that the six

1    shareholders who held Scottsdale accounts opened them

2    within the same week."

3            Do you see that?

4    A.    Yes.

5    Q.    And to the best of your knowledge, you're

6    the source for that sentence.  Correct?

7    A.    Yes.

8    Q.    Okay.  And it says you spoke with

9    investigators.  Which investigators did you speak

10   with?

11   A.    I don't recall.  You've already asked me

12   that and I don't recall the names.

13   Q.    So is it your understanding that you had a

14   conversation -- the Starbucks conversation, the

15   45-minute to one-hour conversation you had with FINRA

16   and the SEC, to your mind, that was a conversation

17   with the investigators?

18   A.    Correct.

19   Q.    And that occurred prior to this article

20   being published?

21   A.    Correct.

22   Q.    Approximately how long before this article

23   was published did you have that conversation?

24   A.    I don't recall.

25   Q.    It doesn't help you by knowing that this

1   article was published on December 6, 2013?

2       A.    I don't recall.

3       Q.    Just trying to refresh your memory.

4       A.    And I understand that, and I do not recall.

5       Q.    Thank you.  I'm entitled to your best

6   recollection.

7       A.    Yup.

8       Q.    And I don't want you to speculate.  Thank

9   you.

10             "A person familiar" -- the next paragraph,

11  "A person familiar with the investigative document

12  said the handwriting on the account applications for

13  the Biozoom shareholders was the same."

14             Do you see that?

15      A.    Yes.

16      Q.    Did you see the account applications

17  referred to in this paragraph?

18      A.    I saw, perhaps, two out of five.

19      Q.    You did not see all five?

20      A.    I don't recall.

21      Q.    Well, how many did you see?

22      A.    I would say two.  I was handed a couple to

23  get done, Scarpino was handed a couple to get done.

24      Q.    Who handed it to you?

25      A.    I was either handed by Scarpino -- or by

1    Scarpino.

2         Q.    And what does it mean to "get done"?

3         A.    To be -- fill out every piece of

4    information on it.

5         Q.    Okay.  And do you recall if the handwriting

6    on the two applications that you recall seeing was

7    the same?

8         A.    I don't recall anything along those lines.

9         Q.    So do you believe that you're the source

10   for this statement in this article?

11        A.    I do not believe so.

12        Q.    Okay.  And then continuing with that

13   sentence, "The answers to questions on their foreign

14   due diligence packages were very similar and they

15   held accounts at the same banks in Cypress,

16   Switzerland, and Panama."

17             Do you see that?

18        A.    Yes.

19        Q.    Do you recall if the answers to the

20   questions on their foreign due diligence packages

21   were very similar?

22        A.    They were similar, but I don't recall them

23   having the same addresses for banks.  I don't -- that

24   would have been something that would have stuck out.

25   I don't recall it.

1   Q.   That's something that would have stuck out,
2   though?
3   A.   It would have stuck out.  I don't recall
4   that.
5   Q.   So do you believe you're the source --
6   A.   No.
7   Q.   -- of this statement in this article?
8   A.   No.
9   Q.   Do you know who would have had access to
10  that information at Scottsdale?
11  A.   Only somebody who had access to all the
12  accounts.
13  Q.   And who would that be?
14  A.   There was Liz and Jay.
15  Q.   Jay Noiman?
16  A.   Yes.
17  Q.   And his title was?
18  A.   I don't know what his title was.  He
19  moved -- he answered to -- second-in-command, for
20  lack of a better word.  I don't know what the heck
21  his title was.
22  Q.   Jay was second-in-command?
23  A.   I would -- yeah.
24  Q.   Okay.  Who was first-in-command?
25  A.   Either Liz or him, and that's all -- I

83

1    don't know.  I don't remember the exact chain.

2         Q.    Okay.

3         A.    But those were the two that you went to for

4    questions, not to your peers.  You went to these two.

5         Q.    And Liz Arndt?

6         A.    That would be correct, White or Arndt.  I

7    don't know which name she was going by.

8         Q.    One being a maiden?

9         A.    Something along those lines.  Not my

10   problem.

11        Q.    Fair enough.

12              So to the best of your knowledge, though,

13   they're the two people that would have had access to

14   that information?

15        A.    Correct.

16        Q.    Moving on, next paragraph, "The e-mail

17   addresses" -- "addresses they furnished for their

18   trading accounts were open within a week of each

19   other."

20        A.    Yes.

21        Q.    Do you recall that detail?

22        A.    I recall Ted Ashton digging through that

23   and finding out that they were all opened within a

24   short amount of time with each other through a -- and

25   I don't know the exact wording -- through a computer

84

1   channel that was in a localized area.  That's what I

2   mean.

3       Q.    What --

4       A.    I don't know how to explain it.  I'm not

5   technically inclined for it.  I remember Ted Ashton

6   finding out what the -- not the URL, but it's like

7   45.27. -- whatever that address was.

8       Q.    ISP address?

9       A.    That would be -- and I can't say for sure,

10  but I'm assuming you and I are saying the same thing.

11      Q.    I'm not sure.

12      A.    I can't answer it, then.

13      Q.    Okay.

14      A.    But I can -- I can say that he went through

15  that and we had that conversation.

16      Q.    Well, let me ask you this, did you have a

17  conversation with Mr. Meagher about the -- the e-mail

18  addresses of these Biozoom shareholders?

19      A.    I don't recall that.

20      Q.    Who at Scottsdale would have known this

21  issue about these e-mail addresses?

22      A.    It was talked about throughout the office.

23      Q.    Okay.  And "The addresses" -- I'm just

24  reading here.  "The addresses are all so similar, all

25  containing the account holder's last name."

85

1              Do you see that?

2      A.     Uh-huh.

3      Q.     Yes?

4      A.     Yes.

5      Q.     Okay.  Do -- do you recall that being true?

6      A.     Again, I only saw two.

7      Q.     And who would have known that information

8  at Scottsdale?

9      A.     The same two people that I mentioned,

10  Liz Arndt/Liz White and Jay Noiman.

11      Q.     Okay.  So going down two paragraphs where

12  there's the -- begins a quote, "These shareholders

13  were brought in for this.  It's as simple as that."

14  You said you believe you're the source for that

15  quote.  Correct?

16      A.     Yes.

17      Q.     Is that a -- does that quote you

18  accurately?

19      A.     It's an opinion.  I don't recall the exact

20  of any of it.

21      Q.     Okay.  What do you mean, "These

22  shareholders were brought in for this"?  What did you

23  mean by that statement?

24      A.     Well, define the question better and I'll

25  answer it for you.

1      Q.    You write, "These shareholders were brought

2  in for this."  What is "this"?

3      A.    Well, generally, with the way this deal was

4  investigated, my understanding was, firstly, 100

5  percent of the stock was owned by one individual and

6  they needed some shills to be able to put shares into

7  their name to get them under the limits that were

8  required for affiliate status.

9      Q.    And on what basis did you believe that to

10  be true?  Well, let me ask -- strike that.

11          Did you believe that statement to be true

12  at that time?

13      A.    Yes.

14      Q.    On what basis?

15      A.    It was quite evident that this wasn't a

16  standard deal.

17      Q.    What about it was not standard?

18      A.    When everybody comes in at the same time

19  with -- with paperwork that's similar and opens up

20  their accounts and then deposits large quantities of

21  the same security and the same type of promotions

22  going on and stock goes through the roof, it tends to

23  look like that.

24      Q.    And were you aware of all -- of the truth

25  of all the statements you just said in that sentence?

1       A.    It was supposition.  I was guessing, but it
2    was based on what I had seen before.
3       Q.    Sitting here today, do you still believe
4    that statement is true?
5       A.    Yes.
6       Q.    It says here, keep reading, "They are
7    retired teachers, a deli owner."
8             Do you see that?
9       A.    Yes.
10      Q.    And that -- this quote, again, comes from
11   you, to the best of your knowledge.  Correct?
12      A.    Yes.
13      Q.    Okay.  How did you know they were retired
14   teachers?
15      A.    It was on their new account form.  There
16   was one that was a deli owner and there was another
17   one that was a teacher.
18      Q.    Did you see all the new account forms?
19      A.    No, and there's only two listed on here
20   that I mentioned.
21      Q.    So these are the two?
22      A.    I would say so.
23      Q.    But it says here, "They are retired
24   teachers," plural, "a deli owner."  That would --
25   that would indicate --

88

1     A.    I wasn't aware --

2     Q.    -- that you saw more than three.

3     A.    It --

4     Q.    -- that you saw at least three?

5     A.    It may indicate that, but it's not

6  accurate.

7          THE REPORTER:  Please, Mr. Miller.

8  BY MR. SUSMAN:

9     Q.    Yeah.

10          Please, you were saying?

11    A.    It may indicate that, but that's not the

12  case.

13    Q.    So, really, what the -- so the quote's

14  inaccurate, then, to the best of your knowledge?

15    A.    Uh-huh.  Correct.

16    Q.    Okay.  If the quote were to be accurate, it

17  would say, "One is a retired teacher.  One is a deli

18  owner."  Correct?

19    A.    Correct.

20    Q.    And the rest, you actually did not know

21  what their stated profession was.  Correct?

22    A.    No.  It was talked about in the office.

23    Q.    "They only trade Biozoom and they're

24  directing trades using traders' lingo."

25          Did you communicate with any of these

1   Biozoom shareholders?

2       A.    I was sitting in the trading department one

3   of the last days before Biozoom was shut down with a

4   Tim Scarpino, we were the only ones in the office, it

5   was pre-trading, and the text messages were coming up

6   from AOL, dozens of them, I don't know the exact

7   number, laddering trades and setting up for the

8   morning activity.

9       Q.    Okay.  What does "laddering trades" mean?

10      A.    Let's say you've got a stock at a dime and

11  you start laying in your trades, you've got a ton of

12  it, or any amount of it, and you want to get rid of

13  it, but you want to make sure you take advantage of

14  the best pricing you can.  If there's activity that

15  would take out a 10, an 11, a 12, you would place

16  orders in there to sell at those respective levels.

17      Q.    And you said "using traders' lingo."  What

18  did you mean by that?

19      A.    Words like "ladder the trades."

20      Q.    Did you see the use of that terminology?

21      A.    I can't recall exactly, but I was sitting

22  there -- we were completely unsupervised.  I'm

23  sitting there watching Scarpino plug in trades, and

24  that was where I was sitting.

25      Q.    So this did not -- these -- these are

1    A.    Yeah.  I -- that I do, yes.

2    Q.    And what did she say precisely?

3    A.    I don't recall.

4    Q.    Okay.  What about Henry Diekmann, did you

5 talk to him about what happened to his OTR?

6    A.    No.  Henry was smart enough to keep his

7 mouth shut.

8    Q.    Fair enough.  So did Henry talk to you

9 about his OTR?

10    A.    No.

11    Q.    What about Jay Noiman, is he smart enough

12 to keep his mouth shut?

13    A.    I can't attest to how smart that boy is or

14 not.

15    Q.    Did he discuss with you what happened at

16 his OTR?

17    A.    I don't recall details.  I remember him

18 talking about things.  I don't recall.  I cannot tell

19 you detail.

20    Q.    Do you -- do you recall if the -- if the

21 issue of the Biozoom shares trading came up at his

22 OTR?

23    A.    I don't recall.

24    Q.    Okay.  What about Michael Cruz?

25    A.    Rarely ever spoke with him.

118

```
 1        Q.      Did you discuss his OTR with him?
 2        A.      Absolutely not.
 3        Q.      What about Adam Fiandaca, did you --
 4        A.      I didn't even know he had one.  My
 5    memory -- I don't recall, and I don't recall him
 6    having one.
 7        Q.      So the statement at the -- the bottom of
 8    the page where it says, "A source who has spoken to
 9    investigators said Scottsdale staff members who have
10    talked with FINRA regarding Biozoom trades are" --
11    and it lists a number of names, including Adam
12    Fiandaca.
13              Would you have been the source of that
14    information?
15        A.      No.
16        Q.      And you don't know if it was true or not?
17        A.      I have no idea who spoke with them about
18    it.  I mean, unless I was privy to a conversation.
19        Q.      What about Ted Ashton, do you know if he
20    had --
21        A.      No, I -- I -- if I had to guess, I would
22    say no.
23        Q.      I don't want you to guess.
24        A.      I don't -- the answer is that I have no
25    idea what he had.
```

1    Q.    You don't know if he was OTR'd?

2    A.    Huh-uh.

3          Was he?

4    Q.    Like I said, we can have that beer and we

5    can discuss, but not here.  I'm asking questions.

6          MR. BRANDON:  Can I get in on that beer?

7          MR. SUSMAN:  Me and you are going to need

8    something stronger.

9    Q.    Flipping the page, "Scarpino" -- do you see

10   this?  I'm on the last page there.  "Scarpino, who

11   processed the Argentine accounts, resigned from his

12   position at Scottsdale."

13         Do you see that?

14   A.    Just point it to me.  Where --

15   Q.    Yeah.  It's the second paragraph of the--

16   A.    "A person familiar..."  "account" -- no,

17   I'm on the wrong page.  I'm sorry.

18   Q.    That's okay.  Last page, second paragraph.

19   It starts "Scarpino."

20   A.    Oh, "Scarpino, who processed the Argentine

21   accounts" --

22   Q.    Yeah.  It says, "resigned from his position

23   at Scottsdale."  Do you know if that's true?

24   A.    He was there one day, he put in a two-week

25   notice, and he was gone.

1     Q.    So to the best of your knowledge, it is

2  true?

3     A.    Yeah.

4     Q.    "He declined comment for this story."  Do

5  you know if that's true or not?

6     A.    I had no conversation with him after he

7  left.

8     Q.    "Ashton, who was a compliance analyst, also

9  is no longer with the firm."

10         Do you see that?

11    A.    "Ashton, who was a compliance" -- yeah.

12    Q.    Do you know if that's -- the statements

13  therein are true?

14    A.    I have no idea.  It would be confirmed by

15  looking at his BrokerCheck.  I don't know.  I know

16  he's no longer there, but I don't know when the hell

17  it happened.

18    Q.    Do you know if in December 2013 John Hurry

19  was in negotiations to buy Wilson-Davis & Company?

20    A.    I don't believe I was aware of that.

21    Q.    Did you ever become aware of that fact?

22    A.    Yeah.  He told me about it a few times.

23    Q.    When did he tell you about that?

24    A.    I don't recall the first time.

25         MR. HOTCHKISS:  Jordan, we've been going

123

1     Q.    Okay.  Did you characterize the visit by
2   FINRA that day as a raid?
3     A.    No.
4     Q.    How did you characterize it -- or sitting
5   here today, how would you characterize it?
6     A.    Came in to review whatever they come in to
7   review.
8     Q.    Was it a visit from FINRA?
9     A.    Yes.
10     Q.    Was it an audit?
11     A.    I don't know.  I don't know the term of
12   what an audit is involved with FINRA.
13     Q.    And it says here, "While" -- the second
14   paragraph, "While representatives from the" -- "from
15   FINRA were expected at the end of the month for a
16   scheduled two-week exam" -- were you aware that there
17   was a scheduled two-week exam by FINRA at Scottsdale
18   Capital?
19     A.    I don't recall.
20     Q.    Do you know if you were the source of that
21   information?
22     A.    I don't recall.
23     Q.    "This visit had nothing to do with that
24   appointment."
25           Do you see that?

124

1    A.    "This visit" -- yeah.  Yes, I see that.

2    Q.    Okay.  Do you know if you're the source of

3  that information?

4    A.    I don't believe so.

5    Q.    Okay.

6    A.    No.

7    Q.    "The investigators asked for files relating

8  to overseas clients in omnibus accounts which are

9  owned in the names of other brokerage firms."

10         Do you see that?

11    A.    Yes, I do.

12    Q.    Were you the person who provided that

13  information to Mr. Meagher, to the best of your

14  knowledge?

15    A.    I don't recall.

16    Q.    Were you present at the time that FINRA

17  arrived on March 10, 2014?

18    A.    Yes.

19    Q.    Who else was present?

20    A.    The whole office.

21    Q.    Do you know which individuals?

22    A.    We had, at that time, I would guess, 18

23  employees.  I -- I -- I would assume all of them were

24  there.

25    Q.    All 18?

125

1       A.    I don't know the number being 18.  I
2   remember at one point we had 18 employees.  As to the
3   accuracy of that number, 15 or 14 or otherwise, I
4   don't know, but I didn't know of anybody --
5       Q.    Would it be fair to say the majority --
6       A.    I -- yeah, I would say there was no --
7       Q.    -- of employees were there?
8             MR. HOTCHKISS:  Let him finish.
9             THE WITNESS:  Sorry.
10  BY MR. SUSMAN:
11      Q.    Would it be fair to say that the majority
12  of the employees were present when FINRA arrived on
13  March 10, 2014?
14      A.    Yes.
15      Q.    And it says, "The investigators asked for
16  files" -- "the investigators" -- how many people
17  arrived at FINRA on March 10, 2014?
18      A.    A number more than five and less than 15.
19  It was a -- it was a rather large number of
20  individuals.
21      Q.    And do you recall them asking for files
22  relating to overseas clients in omnibus accounts?
23      A.    I don't recall that.
24      Q.    So if you're the source of this
25  information, on what basis did you make that

126

1   statement to Mr. Meagher?

2           MR. BRANDON:  I object to the form.

3   BY MR. SUSMAN:

4       Q.    You can answer.

5       A.    Can you restate it?  I don't --

6       Q.    Yeah, of course.

7       A.    I want to make sure I understand it.

8       Q.    So it says here, "Investigators asked for

9   files relating to overseas clients in omnibus

10  accounts."  Correct?

11      A.    That's what it says.

12      Q.    And you believe you're the source of that

13  information in this article.  Correct?

14      A.    I don't recall that detail.  I don't recall

15  that detail.

16      Q.    So you don't recall FINRA asking for files

17  related to overseas clients in omnibus accounts.

18  Correct?

19      A.    I don't recall.

20      Q.    Do you recall telling Mr. Meagher that

21  FINRA asked for files related to overseas clients in

22  omnibus accounts?

23      A.    I do not recall that, no.

24      Q.    The next paragraph, "That person said that

25  a group of FINRA investigators hauled away copies of

127

```
 1   documents regarding omnibus accounts at Scottsdale
 2   that included those owned in the names of
 3   Belize-based Titan International Securities, Inc.,
 4   and Cayman Islands-based Caledonian Global Financial
 5   Services, Inc., and a Cayman account linked to
 6   Scottsdale owner John Hurry."
 7           Do you see that?
 8       A.   Yes, I do.
 9       Q.   Do you recall if FINRA investigators took
10   copies of documents regarding omnibus accounts at
11   Scottsdale?
12       A.   I recall them taking away copies of
13   documents.  I don't know what was inside of any of
14   those.
15       Q.   So you don't know if they were documents
16   regarding omnibus accounts?
17       A.   I have no knowledge of that.
18       Q.   Do you have -- do you recall if you were
19   the person that said, "FINRA investigators hauled
20   away copies of documents regarding omnibus accounts"?
21       A.   I don't believe so.
22       Q.   Okay.  Do you have any idea who would have
23   been the source of that information?
24       A.   I would -- I don't know the answer to that.
25   I was not -- that was not at my level of
```

1   understanding of operations.

2       Q.    Turning to page 4, right below the middle

3   of the page, paragraph beginning "Scottsdale is

4   already the subject of investigations by FINRA, the

5   SEC, and the FBI pertaining to an unusual 34 million

6   pump and dump."

7           Do you see that?

8       A.    Yes, I do see that.

9       Q.    What's your understanding of the term "pump

10  and dump"?

11      A.    It's an industry term meaning take shares

12  of a company that you have, promote them through --

13  either internally or through third parties to get

14  them up in value, and then sell into that market that

15  you've created.

16      Q.    Are pump and dumps always illegal?

17          MR. HOTCHKISS:  Objection to the form.

18  BY MR. SUSMAN:

19      Q.    In your -- in your opinion, do you believe

20  that pump and dumps are always illegal?

21          MR. BRANDON:  I still -- I object to the

22  form.

23          You can answer.

24  BY MR. SUSMAN:

25      Q.    You can still answer.

1        A.    I don't know if all are, but generally
2    referred to, yes.
3        Q.    So in April -- on April 2014, were you
4    aware that Scottsdale was the subject of
5    investigation by FINRA pertaining to a pump and dump
6    involving Biozoom?
7        A.    When was this?
8        Q.    This is April 2014.
9        A.    No, huh-uh.
10       Q.    So to the best of your knowledge, you would
11   not be the source of that statement that --
12       A.    Yes.
13       Q.    You would not be the source?
14       A.    To the best of my knowledge, I would not be
15   the source of that.
16       Q.    Okay.  And then, again, to be clear for the
17   record, Scottsdale's -- were you aware in April 2014
18   if Scottsdale was already the subject of an
19   investigation by the SEC pertaining to a pump and
20   dump involving Biozoom?
21       A.    No knowledge whatsoever.
22       Q.    So you would not be the source of this
23   statement?
24       A.    No, I would not be the source of that.
25       Q.    And then, to round that out, in April 2014,

130

1   were you aware if Scottsdale was already the subject

2   of an investigation by the FBI pertaining to a pump

3   and dump involving Biozoom?

4         A.    No.

5         Q.    So to the best of your knowledge, you would

6   not be the source --

7         A.    Correct.

8         Q.    -- of any of the statements in that -- in

9   that sentence?

10        A.    Correct.

11        Q.    It says here, next paragraph, "The

12   firms" -- and by "the firms," I believe it's

13   referring to Scottsdale Capital and Alpine

14   Securities.

15              Do you see that?

16        A.    Yes.

17        Q.    So it's your understanding that "the firms"

18   refers to Scottsdale and Alpine?

19        A.    Yes, I see that phrase.

20        Q.    And is it your understanding that that's

21   what "the firms" refers to in that sentence?

22        A.    Yeah.  I can imagine that that's what it

23   means.  I --

24        Q.    I'm asking for your understanding.

25        A.    Yeah.  Understood.

1    Q.    "The firms have provided security officials

2  with documents pertaining to the Biozoom trades and

3  shareholders."

4            Do you see that?

5    A.    Yes.

6    Q.    Do you know if that statement was true in

7  April 2014?

8    A.    I do not know the knowledge or extent of

9  that, so --

10    Q.    Were you the source of that information to

11  Mr. Meagher?

12    A.    No.

13    Q.    Okay.  And just to continue reading, "The

14  firms have provided security officials with documents

15  pertaining to the Biozoom trades and shareholders,

16  including those sought under a request from the SEC

17  and FINRA that employees turn over all personal notes

18  regarding Biozoom."

19            Were you aware of a -- and -- strike that.

20            In April 2014, were you aware of any

21  request by the SEC that employees at Scottsdale or

22  Alpine turn over personal notes regarding Biozoom?

23    A.    No, I was not aware of anything along those

24  lines.

25    Q.    So you were not aware of a request from

135

1   home countries as to stocks.  As to reference to what

2   was done at that firm, Scottsdale, the answer would

3   be true.

4       Q.    That, at Scottsdale, none of the Biozoom

5   shareholders deposited or traded in any other

6   shops -- stocks.  Correct?

7       A.    That is correct.

8       Q.    How did you have access to the information

9   of what stocks they -- they deposited or traded in in

10  Scottsdale?

11      A.    You can pull any account up as a broker

12  there and see what their position record was.

13      Q.    Did you pull up the information for each

14  one of the Argentine Biozoom shareholders?

15      A.    I don't recall.

16      Q.    So how do you know if that statement is

17  true or false?

18      A.    The two that I saw did.  The two that I had

19  seen, yes.

20      Q.    But you didn't pull up the information for

21  the other --

22      A.    No, never.

23      Q.    -- Biozoom shareholders?

24            Pardon?

25      A.    No, I did not.

136

1    Q.    So, in your opinion, were you the source of

2    the statement in this article?

3    A.    To the extent of the two accounts that I

4    was aware of, yes.  To the extent of anything else,

5    it is not.

6    Q.    So where it says, "None of the Argentines

7    listed 'investor' as their profession and none of

8    them deposited or traded in any other stocks," that

9    would not be you because you did not see that

10   information for all --

11   A.    That's correct.

12   Q.    -- for all the Biozoom shareholders.  That

13   would not be you.  Correct?

14   A.    That's correct.

15   Q.    It would have to be someone else.  Correct?

16   A.    Correct.

17   Q.    Just to round out that article, if you look

18   at the last page.

19   A.    Is this 13, again?

20   Q.    "FINRA Focusing on Money Laundering

21   Violations."

22   A.    Yeah.  Got it.

23   Q.    Last page, top paragraph, "Scottsdale

24   Advisors is said to have given the Biozoom

25   shareholders perks that were not available to other

1    clients.  They submitted trade orders by e-mail or

2    instant messaging, which the firm did not allow for

3    most clients."

4            Do you see that?

5        A.    Yes.

6        Q.    Do you believe you're the source of that

7    information?

8        A.    Yes.

9        Q.    Okay.  And you believe that to be true at

10   the time?

11       A.    Yes.

12       Q.    And it's your understanding that Biozoom

13   shareholders were also charged commissions of just

14   2 percent while other clients paid 4 percent to 4.5

15   percent?

16       A.    Yes.

17       Q.    That's your understanding, that that was

18   true --

19       A.    That was my understanding.

20       Q.    -- in April of 2014?

21       A.    Yes.

22       Q.    Based upon reasons you previously

23   testified --

24       A.    Yes.

25       Q.    -- to today?

138

1        A.     Yes.

2        Q.     Okay.  And the next paragraph, "The Biozoom

3   shareholders were also allowed to wire funds from

4   their accounts to banks in Cypress, Switzerland,

5   Panama, and Belize, despite a standing anti-money

6   laundering policy at Scottsdale that usually allows

7   clients to wire funds to U.S. banks or institutions

8   in the country" -- "country where they live."

9              Do you see that?

10       A.     Yes.

11       Q.     And do you know if that statement was true

12   as of April 2014?

13       A.     I don't know the answer as to Cypress,

14   Switzerland, Panama, or Belize.  I've answered that

15   already.

16       Q.     Okay.  And do you believe you're the source

17   for that information?

18       A.     No.

19       Q.     Do you know who was the source for that

20   information?

21       A.     No, I do not.

22       Q.     Suffice it to say, it was not you?

23       A.     Correct.

24       Q.     This is the "SEC Request Default Judgment

25   in $34 Million Biozoom Pump-and-Dump Case."  Do you

139

1   know what that is?

2       A.    12.

3       Q.    12.  Thank you.

4             MR. BRANDON:  Just one second.

5             MR. SUSMAN:  I've got a copy if you need

6   it.

7             MR. BRANDON:  Thank you.  Oh, I'll try and

8   find mine, if I may.

9             MR. SUSMAN:  Fair enough.

10      Q.    All right.  So Exhibit 12, the headline's

11  "SEC Request Default Judgment in $34 Million Biozoom

12  Pump-and-Dump Case" by Bill Meagher.

13            If you go down to a paragraph that begins

14  "Scottsdale Advisors is said to have given perks that

15  were not available to other clients.  They submitted

16  trade orders by e-mail or instant messaging, which

17  the firm did not allow for most clients."

18            Do you recall --

19      A.    This is the same as the last question.

20      Q.    It's the last -- it's the same

21  allegations --

22      A.    Yeah.

23      Q.    -- same as the previous article we just

24  looked at?

25      A.    Correct.  This is verbatim.  Correct.

# Exhibit 2

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3     --------------------------------x

4    JOHN J. HURRY AND JUSTINE HURRY,)

5    as Husband and Wife,
     Investment Services Corporation,)

6    an Arizona Corporation,
          Plaintiffs     ) Case No.:

7         V.          ) 14-CV-02490-PHX-ROS

8    FINANCIAL INDUSTRY REGULATORY  ) FRCP 30b(6)

9    AUTHORITY, INC., a Delaware
     Corporation,          )

10         Defendant     ) Page 1-170

11    --------------------------------x

12

13

14

15    VIDEOTAPED DEPOSITION OF CINDY FOSTER-NICHOLAS

16         Thursday, February 23, 2017

17            Washington, DC

18

19

20   Reported by:  Sherry L. Brooks

21          Certified LiveNote Reporter

22   Job No.  J0524737



1      A.     I don't recall the exact conversation.

2      Q.     I'm sorry.  You don't recall the exact

3   conversation is your testimony, correct?

4      A.     I recall talking about the investigation.

5   I don't remember the specific --

6             (Whereupon, there was an interruption.)

7             BY MR. ESPER:

8      Q.     I'm sorry.  I think we better just start

9   the answer again to that.  Go ahead.

10      A.     Can you repeat the question?

11      Q.     The question is:  What do you recall Mr.

12   Rufino telling you, even in general terms, about how

13   to conduct the investigation of Mr. Cruz's complaint?

14      A.     I don't recall the specific conversation.

15   I recall speaking to him about the investigation.

16      Q.     But you don't recall specifically what he

17   may have told you?

18      A.     It would have -- no.

19      Q.     Okay.  Did you, in conducting your

20   investigation, try to find out any information about

21   John Hurry?

22      A.     No.  Can you rephrase?

1    Q.    Sure.   In conducting your investigation,

2  did you seek out any information regarding John

3  Hurry?

4    A.    Other than who he was and the firms that

5  he owned, no.

6    Q.    Okay.   Did you seek to speak to any of

7  John Hurry's employees?

8    A.    I spoke to one person regarding the status

9  of our investigation, and that is the only time I

10  spoke to anyone there.

11    Q.    Okay.   And I understand.   So I'm going to

12  exclude any inquires about either status or results.

13        I'm solely dealing with your investigatory

14  function here where you're trying to find out what

15  actually happened, who may have communicated to Mr.

16  Meagher.   So this is what we're focused on.

17        In that capacity, did you speak to any

18  employee of any of Mr. Hurry's businesses in

19  performing your investigation?

20    A.    No.

21    Q.    Is it your belief that one of the

22  potential sources of Mr. Meagher was somebody who



```
 1   worked for one of Mr. Hurry's businesses?

 2       A.    It's possible.

 3       Q.    But you did nothing to talk to any

 4   potential witnesses who could have confirmed or

 5   denied that, correct?

 6             MR. DAVIS:  Object to form.

 7       A.    Are you -- I did not speak to anyone at

 8   the firm, if that's your question.

 9             BY MR. ESPER:

10       Q.    Including anyone who might have -- be a

11   material witness to communications between someone at

12   Mr. Hurry's firm and Bill Meagher, right?

13       A.    I did not speak to Mr. Meagher.  I did not

14   speak to anyone at the firm.

15       Q.    Why didn't you speak to Mr. Meagher?

16       A.    I had all the information that he had

17   written in the articles.  My goal was to determine

18   whether or not the information in the articles were

19   nonpublic.

20       Q.    So you didn't think it was relevant to

21   your investigation to call up Mr. Meagher and ask

22   him, do you have any sources in FINRA?
```

 1       A.      No.

 2       Q.      Why didn't you think that was relevant?

 3       A.      My goal was to investigate the information

 4   that appeared in public print in the articles and to

 5   determine whether or not that information could have

 6   come from FINRA.

 7       Q.      And a statement from Mr. Meagher that it

 8   either did or did not come from FINRA would not have

 9   any relevance to that investigation?

10       A.      I can't answer the question any

11   differently.  I did not speak to Mr. Meagher.

12       Q.      Did anyone at FINRA tell you not to speak

13   to Mr. Meagher?

14       A.      Absolutely not.

15       Q.      Did anyone at FINRA impose any constraint

16   on your investigation?

17       A.      No.

18       Q.      Who is your superior at FINRA?

19       A.      I report to the Audit Committee of the

20   Board of Governors.

21       Q.      So you don't have a specific single person

22   on the organizational chart that you report to?



1      A.    I report to the Chair of the Audit

2  Committee of the Board of Governors.

3      Q.    Okay.  So who is the Chair of the Audit

4  Committee with the Board of Governors?

5      A.    Today, it's Leslie Seidman.

6      Q.    Okay.  And who was the Chair in 2014?

7      A.    Jim Burton.

8      Q.    Jim Burton.  And has Mr. Burton ever

9  instructed you not to interview a specific witness in

10  a FINRA ombudsman investigation?

11      A.    Absolutely not.

12      Q.    Okay.  Has he ever even participated in

13  any FINRA ombudsman investigation?

14      A.    No.

15      Q.    Okay.  So is it fair to say that you have

16  the final say with respect to any decision to

17  interview or not interview a particular witness in an

18  investigation?

19      A.    Yes.

20      Q.    Okay.  Now, in addition to not speaking to

21  Mr. Meagher, you testified a moment ago that you did

22  not speak to anyone who was an employee of Mr. Hurry



1   with respect to the issue of your investigation as

2   opposed to reporting the status or other

3   administerial acts; is that correct?

4        A.    Yes.

5        Q.    So if you believed that one of the

6   possibilities was that a leak could have come from

7   Mr. Hurry's businesses, why did you not contact Mr.

8   Cruz or someone else in Mr. Hurry's organization and

9   ask to speak to people who could -- who potentially

10  had known about the investigation and have spoken to

11  Mr. Meagher?

12            MR. DAVIS:   Object to form.  Misrepresents

13  testimony regarding time frame of her belief.

14       A.    I didn't have any inclination as to where

15  the information for the articles were coming from.  I

16  didn't believe -- when I started this investigation,

17  we started it without any indication as to where it

18  came from.

19            That's -- we set out to find out if the

20  information came from FINRA.

21            BY MR. ESPER:

22       Q.    Isn't it correct, though, that just based



1   information and we reviewed those sources.

2        Q.    Okay.  So what were the possible sources

3   of the information that -- before -- we're talking

4   about before you analyzed the phone records and all.

5            What were the possible sources of the

6   information that you set out to investigate?

7        A.    Regulatory information.  At that time we

8   didn't know if any of the information had already

9   been in the public domain.  We didn't know if there

10  were other disciplinary actions that had been

11  finalized that caused that information.

12           So we looked for public information.  We

13  looked for regulatory information or any source of

14  information where the author could have gotten the

15  information.

16       Q.    And you came to the conclusion that at

17  least some of the information fell within FINRA's

18  definition of nonpublic information; is that correct?

19       A.    That's true.

20       Q.    And then once you determined that it was

21  nonpublic information, did you not do an analysis of

22  what the potential sources could be; who potentially



1   had access to the nonpublic information?

2            MR. DAVIS:  Object to form.

3        A.    We looked -- we initiated an investigation

4   to determine where that information resided within

5   FINRA and who may have had access to it.

6            BY MR. ESPER:

7        Q.    Did you do any investigation of where that

8   information might have resided outside of FINRA?

9        A.    Yes.

10       Q.    Okay.  And what did you conclude?

11       A.    That some of the information resided with

12   the SEC and some resided at the firm.

13       Q.    Okay.  And let's take the SEC.  Did you do

14   any investigation to determine whether a leak of

15   information could have occurred from the SEC to Mr.

16   Meagher?

17       A.    No.

18       Q.    So you neither confirmed nor eliminated

19   that as a possible source of the leak, correct?

20       A.    Correct.

21       Q.    Okay.  And now did you do any

22   investigation to determine whether the source of the

1    information came from within Mr. Hurry's firms?

2        A.    We -- we did determine -- or not directly

3    to Mr. Hurry, but we did find out that some of the

4    information was provided by a tipster.

5        Q.    Okay.  But I'm interested in the process

6    now.  We'll get to your conclusions.

7              But just as a matter of process, I asked a

8    question about the SEC.  And you seemed to understand

9    that you didn't investigate the specific possibility

10   of where the leak might have come from in the SEC.

11   That was not something your office did.

12             So what I'm asking is:  With respect to

13   the Hurrys, did your office set out to do any

14   investigation as to potential sources within the

15   Hurrys's businesses?

16       A.    No.

17             MR. ESPER:  Okay.  Let's take a break.

18             THE VIDEOGRAPHER:  We are off the record

19   at 9:46.

20             (A break was taken.)

21             THE VIDEOGRAPHER:  We are back on the

22   record at 9:56.



1          MR. ESPER:  And while we were off the

2   record, I've been informed that the witness wishes to

3   clarify a couple of matters with respect to her

4   testimony.  I will yield to my colleague, Mr. Davis,

5   to ask her a few questions to get the clarifications.

6          MR. DAVIS:  Thank you.

7          EXAMINATION BY COUNSEL FOR DEFENDANT

8          BY MR. DAVIS:

9   Q.     Ms. Foster, you previously testified

10  regarding the identity of the Chair of the audit

11  committee.

12          Do you remember that?

13  A.     Yes.

14  Q.     And would you like to clarify your

15  testimony in that regard?

16  A.     At the time that I initiated my

17  investigation, the Chair of the audit committee would

18  have been either Jim Burton or John Davidson.  I

19  don't recall speaking to Jim Burton about this

20  investigation.  I definitely spoke to John Davidson

21  about it.

22  Q.     And you also previously testified that you



1       Q.      Okay.  And what did Mr. Munshi tell you

2   regarding whether or not the SEC was involved in a

3   leak?

4       A.      Nothing.

5       Q.      Did Mr. Munshi provide any information as

6   to identities of people at the SEC who would have had

7   access to the information that was leaked to Mr.

8   Meagher?

9       A.      No.

10      Q.      Did Mr. Munshi -- did you ask Mr. Munshi

11  for any internal SEC records regarding communications

12  with Mr. Meagher?

13      A.      No.

14      Q.      Did you ask Mr. Munshi for any advice as

15  to how FINRA should conduct its investigation?

16      A.      No.

17      Q.      Did you ask Mr. Munshi to investigate

18  whether any leak occurred from the SEC?

19      A.      I don't recall.

20      Q.      Other than the topic of how the

21  investigation was being conducted, your

22  investigation, and reports on the status of the



1    investigation, do you recall any other topics that

2    you discussed with Mr. Munshi regarding the subject

3    matter of leaked information to Mr. Meagher?

4         A.    Can you restate the question?

5         Q.    Sure.  I'm excluding two things.  First of

6    all, what you just testified to.  You discussed --

7    you testified about discussions with Mr. Munshi

8    regarding the conduct of your investigation, who you

9    were speaking to, what information you were seeking,

10   and you gave testimony on that subject area.

11              And then the second thing is -- I'm

12   assuming.  Maybe I should lay a foundation for this.

13              You also discussed the status of your

14   investigation with Mr. Munshi, correct?

15        A.    Yes.

16        Q.    Okay.  So I want to exclude those two

17   subject areas:  Information about the conduct of your

18   investigation and information about the status of

19   your investigation.

20        A.    Okay.

21        Q.    And I want to know if there were any other

22   subject matters that related to the subject of leaks



1    to Mr. Meagher that you discussed with Mr. Munshi in

2    those conversations?

3         A.    The only other thing we discussed was a

4    request for information that the SEC asked for.  They

5    asked for information.  We provided it.  That was it.

6         Q.    And what information did they ask for?

7               MR. DAVIS:  I'm going to object and

8    instruct the witness not to answer.

9               MR. ESPER:  You don't hold that privilege,

10   Counsel.  If you want to get an SEC lawyer in, that

11   person can instruct her not to answer.  You do not

12   hold that privilege.

13              MR. DAVIS:  And I understand your position

14   and I'm absolutely, you know, willing to have this

15   argument with you, if you would like.

16              But questions of an SRO's representative

17   that is established at the behest of Congress and the

18   SEC regarding an SEC internal investigation is not

19   appropriate.

20              You've certainly subpoenaed the SEC.  You

21   can ask them these questions.  If they want to answer

22   them, they can.  But our witness will not be



1  answering questions regarding the SEC's

2  investigation.

3              MR. ESPER:  What's the legal authority for

4  that position?

5              MR. DAVIS:  The investigatory privilege.

6              MR. ESPER:  So you are claiming -- who is

7  the holder of this investigatory privilege, your

8  client or the SEC?

9              MR. DAVIS:  My client cannot be compelled

10  to discuss these matters regarding the SEC's

11  privilege.

12              MR. ESPER:  So your contention is that the

13  SEC did not waive its privilege by discussing its

14  internal investigations with your client?

15              MR. DAVIS:  With an SRO, no, of course

16  not.

17              MR. ESPER:  Why?  Is there a lawyer/client

18  privilege that applies to communications between

19  FINRA and the SEC?

20              MR. DAVIS:  The SEC -- as part of its

21  regulatory function, the SEC is having communications

22  with an SRO regarding investigatory activity.  That's



1   information that related to investigations of leaks

2   to Mr. Meagher, did he request any such information

3   from you?

4        A.    I'm not going to answer the question based

5   on advice of counsel.

6             MR. ESPER:  He hasn't instructed you on

7   this one.

8             MR. DAVIS:  Let's take a break, Dilan.

9             THE VIDEOGRAPHER:  Off the record at

10  10:16.

11            (A break was taken.)

12            THE VIDEOGRAPHER:  We're back on the

13  record at 10:23.

14            MR. ESPER:  You might as well just read

15  back the last question.

16            (The reporter read back the requested

17  testimony.)

18       A.    Yes.

19            BY MR. ESPER:

20       Q.    What information did he request from you?

21       A.    A list of individuals to whom FINRA had

22  sent emails for a specified time frame, which I don't



```
1    recall the time frame exactly.

2         Q.    So these are individuals to whom FINRA

3    sent emails, correct?

4         A.    At the SEC.

5         Q.    Individuals at the SEC to whom FINRA has

6    sent emails?

7         A.    Yes.

8         Q.    Did he tell you why he wanted that

9    information?

10        A.    No.

11        Q.    Okay.  Did he request any other

12   information, other than that list, again, being very

13   careful to limit your information -- your answer to

14   information that's relevant to the investigation of

15   these leaks.

16        A.    No.

17        Q.    Okay.  And when you say he requested a

18   list of individuals, it was just a list.  It wasn't

19   the specific emails themselves, correct?

20        A.    Correct.

21        Q.    Other than that communication requesting

22   the list of individuals, was there any other occasion
```



1   in which the SEC Inspector General's office requested

2   from you information relating to the investigation of

3   leaks to Mr. Meagher?

4        A.    He may have requested information that we

5   developed.  We may have shared it with him such as an

6   analysis of the articles.  I don't recall exactly

7   what information we shared with him.

8        Q.    Did he ever tell you in so many terms that

9   the SEC was doing its own leak investigation?

10       A.    I think so, yes.

11       Q.    Did you connect these two facts?  Did you

12   believe that the reason he was asking for a list of

13   individuals at the SEC to whom FINRA sent emails and

14   analysis of the article was because the SEC was

15   conducting its own investigation into the leaks?

16       A.    I didn't ask.  I don't know that I gave it

17   a lot of thought.

18       Q.    Okay.  Did you ever receive any report

19   from the SEC stating any conclusions regarding an

20   investigation of leaks?

21       A.    No.

22       Q.    Did you ever receive, even in the form of



1   an oral report, even in the form of hearsay from

2   someone at the FINRA office, any information

3   regarding conclusions the SEC would have -- had drawn

4   regarding an internal leak investigation?

5         A.   I -- I'm trying to think. I may -- I

6   think -- I may have heard that they did not find any

7   evidence of a leak.

8         Q.   They did not find any evidence of a leak

9   at the SEC; is that correct?

10         MR. DAVIS: Object to form and foundation.

11         A.   I don't know firsthand. But in terms of

12   hearsay, I may have heard that.

13         BY MR. ESPER:

14         Q.   You believe you heard that?

15         A.   This is 2017. I don't recall specifics.

16         Q.   Do you remember who told you that?

17         A.   No.

18         Q.   Do you recall approximately when you heard

19   about the SEC's conclusion that there had not been a

20   leak?

21         A.   No.

22         MR. DAVIS: Object to form.



1          BY MR. ESPER:

2     Q.     Do you know who at FINRA would have

3  received any information regarding an SEC

4  investigation into whether there were leaks from the

5  SEC?

6     A.     No.   I have no direct knowledge.

7     Q.     Even without direct knowledge, is there --

8  based on -- you know, you have worked in a lot of

9  departments in FINRA.

10          Based on your experience at FINRA, is

11  there a particular department at FINRA or a

12  particular person at FINRA who would, in the normal

13  course of things, receive such a report if such a

14  report were made?

15     A.     I would have to say the Office of General

16  Counsel.   I don't know.   That would be who I would

17  send it to.

18     Q.     Did you ever have any discussions with

19  anyone else at FINRA regarding the issue of whether

20  the SEC was conducting an investigation into leaks to

21  Mr. Meagher?

22     A.     There may have been a discussion about, I



1   wonder if they're looking; I wonder what they found.

2   But in terms of -- but nothing specific.

3       Q.    Do you recall who you had that discussion

4   with?

5       A.    It would have probably have been my staff.

6       Q.    Okay.  Did you have any such discussions

7   with any of your superiors at FINRA?

8       A.    I don't recall.

9       Q.    Did FINRA -- you indicated that the SEC

10  Inspector General's office made requests of

11  information from you.

12          Did they make any requests of information

13  to your staff?

14      A.    All of the requests would have had to come

15  through me.

16      Q.    Okay.  Were you asked -- and this is a yes

17  or no because I don't want to get into the substance

18  of communications.

19          Were you asked by FINRA's litigation

20  counsel in this case to participate in any searches

21  for relevant documents that might have to be produced

22  in this case?



1      A.    No.

2      Q.    So for instance, we got -- we did receive

3  -- and we will get into these in this deposition.

4           We received some documents that came from

5  the FINRA ombudsman's office such as your report and

6  some emails.  You did not have any role in searching

7  for any of those documents?

8      A.    No.

9      Q.    Okay.  So nobody -- suffice it to say --

10 well, did -- the requests from the Inspector

11 General's office for the list of individuals at the

12 SEC to whom FINRA sent emails, did that come by way

13 of an email or did that come in a phone conversation?

14     A.    I know I got requests by phone.  I don't

15 know if I received requests by email.  I don't

16 recall.

17     Q.    But as far as you know, nobody has asked

18 you to search through your email communications with

19 the SEC Inspector General's office to determine

20 whether there's anything that is relevant to this

21 case; is that correct?

22     A.    Yes.



1  Munshi.  Did you take notes of any of those

2  conversations that I just referenced?

3      A.    I don't know.

4      Q.    If you took notes of any, I'll call them

5  for purposes of this question, relevant

6  communications with Mr. Munshi, would they have been

7  transcribed?

8      A.    Yes.

9      Q.    And if they had been transcribed, where

10 would they be filed in FINRA's system?

11     A.    EP.

12     Q.    So any relevant, as I've defined the term

13 in my previous question, communications with Mr.

14 Munshi there would be transcribed notes in the EP

15 file; is that correct?

16     A.     If they were pertinent to the

17 investigation.

18          MR. ESPER:  Okay.  Off the record for a

19 couple of seconds.

20          THE VIDEOGRAPHER:  Off the record at

21 10:43.

22          (Discussion held off the record.)



1          THE VIDEOGRAPHER:  Back on the record at

2    10:48.

3          BY MR. ESPER:

4      Q.    So what I want to do now is have you take

5    me through the process your office went through in

6    investigating the leaks.

7          I think you testified earlier that one of

8    the things you did was determine whether there was

9    any nonpublic information referenced in the stories,

10   correct?

11     A.    Yes.

12     Q.    And that's a prerequisite.  Because if

13   there was no nonpublic information requested (sic) in

14   the stories, there's nothing to investigate, correct?

15     A.    Correct.

16     Q.    So you determined that there was nonpublic

17   information in the stories?

18     A.    In one story.

19     Q.    In one story.  And what was the nonpublic

20   information that you determined was in the story?

21     A.    It was information about an internal

22   investigation that had been referred to the SEC.



1      Q.    Okay.  And that's the only nonpublic

2   information that you determined was in any of Mr.

3   Meagher's stories?

4            MR. DAVIS:  Object to form.

5      A.    We found that in at least one article

6   there was information -- confidential information

7   that was developed in the course of a FINRA

8   investigation.

9            BY MR. ESPER:

10     Q.    And that's the only nonpublic information

11   that you identified in any of Mr. Meagher's stories?

12           MR. DAVIS:  Object to form.

13     A.    That I recall at the moment?

14           BY MR. ESPER:

15     Q.    Yes.

16     A.    That I recall.  That's my answer.

17     Q.    That's your recollection, okay.  So now I

18   want you to look at a document.  And it's Bates

19   number FINRA 3247 and 3248.  And I have a courtesy

20   copy here for counsel.

21           MR. DAVIS:  Thank you.

22           MR. ESPER:  I will just confirm with

1  counsel that the black marks, the redactions on this,

2  came from your office and were not in the original;

3  is that correct?

4          MR. DAVIS:  That's correct.

5          BY MR. ESPER:

6      Q.    Okay.  So other than the blacked out

7  redactions, is this a true copy of the case summary

8  prepared by your office in the leak investigation?

9          MR. DAVIS:  Object to form.

10         Go ahead.

11     A.    It was prepared by my office, yes.

12         BY MR. ESPER:

13     Q.    And it's a true copy.  There's nothing on

14 this document that jumps out at you as saying, that

15 wasn't in that document?

16     A.    No.

17     Q.    So let's go down to the bottom paragraph

18 of page 3247.  It reads:  "Notwithstanding that the

19 information contained in the latter three articles

20 could have been provided by the tipster or other

21 personnel at the BD, the FINRA -- redacted -- that

22 were the source of the first article should not have



```
 1   second.

 2               THE WITNESS:  Okay.

 3               THE VIDEOGRAPHER:  Off the record at

 4   10:53.

 5               (Discussion held off the record.)

 6               THE VIDEOGRAPHER:  Back on the record at

 7   10:54.

 8               MR. ESPER:  Okay.  So I want to, first of

 9   all, clarify with counsel that if I were to seek the

10   specific words that are redacted in this document he

11   would assert the investigatory privilege and instruct

12   not to answer; is that correct?

13               MR. DAVIS:  That's correct.

14               BY MR. ESPER:

15        Q.     However, can you confirm to me that the

16   general substance of what is redacted at the bottom

17   of page 3247 is some sort of internal regulatory

18   documents of FINRA?

19        A.     Correct.

20        Q.     Okay.  So for purposes of my next line of

21   questioning, I'm going to refer to whatever is under

22   this redaction as the internal regulatory documents.
```



1   And you will know what I'm talking about?

2       A.    Yes.

3       Q.    Okay.  Now, the substance of what your

4   summary said here is that the internal regulatory

5   documents should not have been known by this tipster

6   who had come to FINRA with -- providing information

7   about Scottsdale Capital; is that correct?

8       A.    To the best of our knowledge, correct.

9       Q.    And what is the basis for that conclusion?

10      A.    It's information -- I don't want to speak

11  about an internal investigation.  So I'm trying to

12  figure out the best way to phrase it.

13            It's information that the tipster did not

14  provide to us or to FINRA -- I should say to the

15  FINRA regulatory team.

16      Q.    Okay.  And furthermore, these internal

17  regulatory documents are not documents that you would

18  expect some employee of Scottsdale Capital who didn't

19  work for FINRA to have any access to.

20            Is that fair to say?

21      A.    To my knowledge, no one at the firm had

22  access to the documents.



1    Q.    And indeed, because they were nonpublic

2    information and, in fact, they're so sensitive that

3    we have an issue about redacting them in this case,

4    these were sensitive documents that not only would

5    you not expect anybody at Scottsdale Capital to have,

6    but it would have been a serious violation of FINRA's

7    policies if any employee at Scottsdale Capital had

8    access to these internal regulatory documents,

9    correct?

10    A.    Could you restate the question?

11    Q.    These internal regulatory documents are

12    considered extremely sensitive by FINRA, correct?

13    A.    Correct.

14    Q.    And they contain what FINRA calls,

15    nonpublic information, correct?

16    A.    Correct.

17    Q.    And they -- therefore, if they had been

18    actually disclosed to the person we're calling the

19    tipster in this document, that would have been a

20    serious violation of FINRA's policies and procedures,

21    correct?

22    A.    Correct.



1     Q.     So you as the ombudsman are looking at an

2  article from Mr. Meagher and you -- based on what we

3  just went through, you concluded that that internal

4  regulatory information simply could not have come

5  from the tipster, correct?

6     A.     Not to my knowledge, correct.

7     Q.     But it's more than your knowledge.  Based

8  on your experience -- let me put it another way.

9          If it turned out that you did your

10  investigation and, for whatever reason, there was

11  some smoking gun document that showed that the

12  tipster actually did get access to these internal

13  regulatory reports and provided them to Mr. Meagher,

14  that would have surprised you greatly, correct?

15     A.     Yes.

16     Q.     You had, based on all of your experience,

17  a fair degree of certainty that these internal

18  regulatory documents could not have been given to Mr.

19  Meagher by the tipster?

20     A.     Yes.

21     Q.     Okay.  So am I correct in concluding that

22  one of your main tasks in this investigation you were



1  conducted -- conducting was to determine, if the

2  tipster didn't provide these internal regulatory

3  documents to Mr. Meagher, did anyone at FINRA provide

4  them?

5         Is that a correct summary?

6         MR. DAVIS:   Object to form.

7     A.    My job was to determine whether or not the

8  information that was in the article was nonpublic and

9  whether or not there was any evidence to indicate

10 that it came from FINRA.

11        BY MR. ESPER:

12    Q.    And sitting here now, you -- based on all

13 of your experience, based on the investigation you

14 conducted, based on everything you know about that

15 goes on in FINRA, you do not believe that these

16 internal regulatory documents were turned over to Mr.

17 Meagher by the tipster, correct?

18    A.    Information in the first article --

19    Q.    First article.

20    A.    -- does not appear to have come from the

21 tipster.

22    Q.    So information in the first article does



1   not appear to have come from the tipster, correct?

2       A.    Yes.

3       Q.    And that's what you believe as the

4   investigator and based an on all of your experience

5   at FINRA?

6       A.    Yes.

7       Q.    Okay.  So now we've already covered this

8   to a great extent.  But do you have a belief as to

9   whether that regulatory information we've been

10  talking about came from the SEC to Mr. Meagher?

11      A.    I believe that it could have.  I don't

12  know.

13      Q.    And you didn't perform any investigation

14  to determine whether it did, correct?

15      A.    That's correct.

16      Q.    Do you know how many people at the SEC

17  have access to what we're calling the regulatory

18  information?

19      A.    I do not.

20      Q.    Did you make any attempt to determine who

21  at the SEC had access to the regulatory information?

22      A.    We -- yes, from internal resources.  Yes.



1    Q.    Okay.  And did you come up with any sort

2  of a list of people at the SEC who could have had

3  access to the regulatory information?

4    A.    Did I -- could you repeat the question?

5    Q.    So you indicated that from internal

6  sources -- which I'll first ask that.

7         When you said, "internal sources," that

8  means you made an investigation within FINRA to

9  determine who at the SEC might have access to the

10  regulatory information; is that correct?

11    A.    Correct.

12    Q.    Okay.  So I'm wondering if that

13  investigation that I referred to in that previous

14  question generated any sort of a list of potential

15  people at the SEC who had acces?

16    A.    If it did, it would be in the EP file.  I

17  don't recall.

18    Q.    Okay.  And did you contact any of the

19  people who were identified as people at the SEC who

20  potentially had access to the regulatory information

21  as part of your leak investigation?

22         MR. DAVIS:  Object to form.

1      A.    No.

2            BY MR. ESPER:

3      Q.    And did you have any discussions with Mr.

4  Munshi about whether -- Mr. Munshi, excuse me --

5  about whether any of these people who FINRA

6  identified as SEC people who were potentially having

7  access to this information -- did you have any

8  discussions with Mr. Munshi regarding whether any of

9  those people leaked information?

10     A.    I don't remember having a conversation

11 with him about that.  I don't know.

12     Q.    Did you ever ask Mr. Munshi to investigate

13 whether any of these people who are referenced in my

14 previous question, the people who FINRA identified as

15 people at the SEC who have potentially had access to

16 the regulatory information -- did you ask Mr. Munshi

17 to conduct an investigation as to whether they leaked

18 it?

19     A.    No.

20     Q.    As of now, you have no information from

21 which you can either confirm or deny that any of

22 those people identified by FINRA as SEC personnel who



1  potentially had access to the regulatory information

2  leaked it to Mr. Meagher, right?

3      A.    No.

4      Q.    You can confirm?

5      A.    Well, can you restate the question?

6      Q.    Okay.  As of now -- let me make it easier.

7      As of now, you do not know whether any of

8  those people who were identified as (sic) FINRA as

9  SEC personnel who potentially had access to the

10  regulatory information -- you do not know whether any

11  of them leaked the information to Mr. Meagher?

12      A.    I don't know that we identified people.  I

13  know we made an attempt.  And you'll have to restate

14  the rest of the question.  That was a long question.

15      Q.    If you don't know you identified people,

16  let's go on that for a second.

17      Why did you make the attempt to identify

18  people at the SEC who potentially had access to the

19  regulatory information?

20      A.    Exploratory.  Just -- we're trying to find

21  out who has access to the information and we're

22  looking at all of the possibilities.



1    Q.    Did you make a similar attempt with

2  respect to Scottsdale Capital to identify people

3  within Scottsdale Capital who could potentially have

4  access to the regulatory information?

5    A.    No.

6    Q.    Okay.  And the reason you didn't do that

7  is because in the normal course of things nobody at

8  Scottsdale Capital should have had access to this

9  highly-sensitive information, right?

10   A.    To the best of my knowledge.

11   Q.    And that's why you didn't explore that

12  question with SCA, but you did explore that question

13  with the SEC, correct?

14   A.    I didn't explore the question with the

15  SEC.  We asked questions internally as to who or how

16  many people at the SEC had access to the system.  I

17  don't know if that resulted in a list of names.  I

18  don't recall.

19   Q.    Why didn't you just call up Mr. Munshi and

20  ask him who had access to the regulatory information

21  in the SEC?

22   A.    During the course of conversations with



1    Mr. Munshi, we probably did ask questions.  But he

2    provided no information.

3         Q.    So he refused to answer?

4         A.    He can.

5         Q.    And he did.  He did refuse to answer

6    whether there were people in the SEC who had access

7    to this information, correct?

8         A.    I never -- we never specifically asked him

9    that question.  We may have asked general questions

10   about the SEC and investigations.  The SEC -- my

11   conversations with the SEC was (sic) about providing

12   him the details of our investigation.

13        Q.    But this is a yes or no question.

14              Did you or did you not ask for Mr. Munshi

15   to identify people at the SEC who potentially had

16   access to the regulatory information?

17        A.    Actually, no.  I never asked that

18   question.

19        Q.    Why didn't you ask him?

20        A.    My job was to look at whether or not the

21   leak came from FINRA.  I was not trying to ascertain

22   or prove that a leak came from the SEC.



1    A.    Yes.

2    Q.    Okay.  So you indicated that you had

3  repeated oral communications with Chris Cook and

4  Jasmine Abraham about these interviews.

5        Do you recall having any communications

6  regarding the interview with Michelle Ong?

7    A.    A general recollection of the

8  conversation.

9    Q.    Okay.  Was the issue of Ong stating

10 anything along the lines of, quote, leaks occur all

11 the time, discussed between you and Mr. Cook and Ms.

12 Abraham?

13   A.    Not to my knowledge.

14   Q.    Okay.  Does it concern you at all that in

15 this written summary of the interview it contains the

16 language Ong noted that, quote, leaks occur all the

17 time, end quote?

18   A.    No.

19   Q.    Why doesn't it concern you?

20   A.    Because she works in corporate

21 communications.  There is no indication that this is

22 anything other than a general statement.



1    Q.    What do you mean by, "a general

2  statement"?

3    A.    It just says, "leaks occur all the time."

4  There's no context.  And she works in corporate

5  communications.  So on the surface, I'm not alarmed.

6    Q.    So you think it's perfectly okay that an

7  employee in FINRA's corporate communications

8  department tells one of your investigators that,

9  "leaks occur all the time"?

10        MR. DAVIS:  Object to foundation and form.

11    A.    I was not present at the conversation, so

12  I don't know the context that this came up.

13        BY MR. ESPER:

14    Q.    You see the words that, "leaks occur all

15  the time" are in quotes?

16    A.    Um-hum.

17        MR. DAVIS:  You have to answer yes or no.

18    A.    I'm sorry.  Yes.

19        BY MR. ESPER:

20    Q.    Okay.  Did your office have a practice of

21  putting words in these reports in quotation marks

22  when they reflected an exact quotation from the



1   witness?

2       A.    I can't speak for the person who wrote

3   these notes.  It appears to me that if it's in quotes

4   it's an indication that it's an exact quote.

5       Q.    And then it goes on to state:  "But she

6   has never confirmed such information with a reporter

7   unless it is in the public domain, e.g., an

8   investigation has been recorded via a Well's

9   Disclosure and BrokerCheck."

10          So first of all, let's lay a foundation,

11  as we lawyers like to say.  Can you tell me what a

12  Well's Disclosure and BrokerCheck is?

13      A.    I can give you a general description.

14  It's a request that goes out to a particular

15  individual -- firm or individual that FINRA may be

16  investigating to disclose information.

17      Q.    And Well's Disclosures, as opposed to some

18  of the other stuff we've been talking about earlier

19  in this deposition -- Well's Disclosures are a matter

20  of public record, right?

21      A.    That's correct.

22      Q.    So when a Well's Disclosure is made, at



1   that point, FINRA is permitted under its public

2   information policies to publicly state that fact,

3   correct?

4        A.    I can tell you that the information is

5   already in the public domain on BrokerChecks, so it

6   would be okay to provide information that is already

7   available.

8        Q.    And if there was a news article that

9   reported that a Well's Disclosure had been made, that

10  would not be a piece of nonpublic information that

11  would cause you to investigate a leak, correct?

12       A.    That's correct.

13       Q.    Okay.  So a Well's Disclosure, does that

14  come from FINRA?

15       A.    Well, it could come from any number of

16  regulatory agencies.  But in this case, it would -- I

17  assumed it was a FINRA Well's notice.

18       Q.    Okay.  So if Ong is referring to a FINRA

19  Well's notice at the end of this summary in paragraph

20  7(a), then that would suggest that her statement

21  that, "leaks occur all the time" refers to leaks from

22  FINRA, doesn't it?



1  what we're calling the regulatory information in the

2  first story, correct?

3      A.     To the best of my knowledge, yes.  I don't

4  recall.  I know when we first did the initial review

5  it was the first article that we had concerns about.

6      Q.     Okay.  Did you review any articles by Mr.

7  Meagher that did not concern Mr. Hurry's businesses

8  to determine if any of those articles also attributed

9  any information to FINRA?

10     A.     I don't recall.  I know that there was

11  information in the other articles that we were

12  initially concerned about, but we found that there

13  were other sources for that information.

14     Q.     Okay.  I asked a confusing question, so I

15  will try again.

16            There is a set of articles that you

17  clearly reviewed that were written by Mr. Meagher

18  regarding the Hurrys' businesses, correct?

19     A.     Yes.

20     Q.     And you looked in those articles to

21  determine whether there was any nonpublic

22  information, as FINRA defines it, in those articles,



```
 1   correct?

 2        A.    Yes.

 3        Q.    Now, what I'm asking is:  Mr. Meagher is a

 4   financial journalist, right?

 5        A.    Correct.

 6        Q.    So he publishes -- or his newspaper

 7   publishes -- I guess it's an online -- his website

 8   publishes numerous articles that he writes about the

 9   financial industry, correct?

10        A.    Yes.

11        Q.    So what I'm wondering is, outside of the

12   articles that were written about Mr. Hurry, did you

13   look at any of Mr. Meagher's other work product to

14   see if he ever used terms like -- such as a source in

15   FINRA stated or other terms that would indicate that

16   he had received leaks from FINRA?

17        A.    I don't recall.

18        Q.    Okay.  And did you ever look at any of Mr.

19   Meagher's other work product to determine whether

20   there was -- even if it wasn't explicitly sourced to

21   FINRA, whether there was what you would call

22   nonpublic information in those articles that Mr.
```



1   Meagher could have received from FINRA?

2        A.    I don't know.

3        Q.    If, in fact, there were articles by Mr.

4   Meagher concerning other businesses in which he

5   stated that he had sources within FINRA, would that

6   have been a fact relevant to your investigation of

7   this potential leak?

8             MR. DAVIS:  Object to form.

9        A.    Can you restate the question?

10            BY MR. ESPER:

11       Q.    If there was another article out there in

12  which Mr. Meagher stated, a source in FINRA stated

13  that, and then relayed some piece of nonpublic

14  information, would that be a fact that you would

15  consider relevant to your investigation of this

16  alleged leak?

17            MR. DAVIS:  Object to form.

18       A.    If it's unrelated, I would have stayed the

19  course with this investigation and I would have

20  escalated that other information.

21            BY MR. ESPER:

22       Q.    But Mr. -- a statement by Mr. Meagher, if

1  he had made one, that he had potential sources within

2  FINRA is not something you would consider relevant to

3  your investigation?

4      A.     Oh, yes.  Yes.

5      Q.     So my question is:  Did you make any

6  investigation to determine whether Mr. Meagher has

7  ever in any context said that he has a source within

8  FINRA?

9      A.     I don't recall.

10     Q.     Okay.  And if there were -- let's say,

11  there were 20 stories, hypothetically, in which Mr.

12  Meagher referred to another -- with respect to other

13  investigations, other broker/dealers -- whatever --

14  other reporting, referred to nonpublic FINRA

15  information similar to the confidential regulatory

16  information that we're talking about in this case,

17  would that be a fact that you would consider relevant

18  to your investigation if it were true?

19          MR. DAVIS:  Object to form.

20     A.     If I were aware of it, I would certainly

21  consider it.

22          BY MR. ESPER:



1     Q.     And did you make any attempt to determine

2   whether Mr. Meagher, in fact, did regularly report on

3   the contents of nonpublic FINRA information in his

4   stories?

5     A.     I don't recall.

6     Q.     Okay.   Just a few more things regarding

7   the report.   Take a look at the second page, 3248 of

8   the ombudsman report, FINRA 3248 Bates number.

9          And on this page you testified, I think,

10  in general terms to a lot of this.

11    A.     Um-hum.

12    Q.     But this is a list of the various things

13  that your office did to determine potentially the

14  source of the leak, correct?

15    A.     Yes.

16    Q.     So let's take the first one:   "Obtained in

17  emails provided by FINRA's senior managers that

18  included emails to and from the reporter, internal

19  emails discussing the reporter's queries, and

20  regulatory staff requests for copies of -- redacted

21  -- during initial planning of various routine

22  examinations."



1          Do you see that?

2     A.    Um-hum -- yes.

3     Q.    So the emails that you obtained, did those

4  include personal emails?

5     A.    Only to the extent that someone sent an

6  email to FINRA from a personal address.

7     Q.    Okay.  So if, for instance -- and again,

8  I'm not saying this did happen.

9          But if, hypothetical, a FINRA senior

10  manager had a Gmail account that was a personal email

11  account, you did not have access to those

12  communications, correct?

13     A.    Only if they sent it from their FINRA

14  account.

15     Q.    So if somebody had a communication between

16  their personal Gmail account and Mr. Meagher, that

17  would not have been an email that you would have

18  reviewed, correct?

19     A.    No.

20     Q.    That's not correct?

21     A.    No.  I would not have reviewed it.

22     Q.    Okay.  So as you sit here right now, you



1  do not know whether any of the FINRA senior managers

2  referenced in this first bullet point paragraph had

3  communications between personal email accounts and

4  Mr. Meagher, correct?

5      A.    No.

6      Q.    That's correct.  You do not know?

7      A.    I would not have access to personal email

8  accounts.

9      Q.    Okay.  And did you ask any FINRA senior

10 managers to allow you to have access to personal

11 email accounts as part of your investigation?

12     A.    I did not.

13     Q.    Why didn't you?

14     A.    I didn't see any need to ask for that

15 information at the time.

16     Q.    As FINRA's ombudsman, you are responsible

17 for investigating any leak that is brought to FINRA

18 -- any accusation of a leak -- I shouldn't say a

19 leak.

20          You are responsible as ombudsman to

21 investigate any accusation of a leak of nonpublic

22 information that's brought to FINRA's attention by a



1   broker/dealer, correct?

2        A.    Correct.

3        Q.    Do you have an opinion as FINRA's

4   ombudsman and a person who is tasked with leak

5   investigations as to whether someone who is leaking

6   confidential information to the media would prefer to

7   do it from a FINRA email account or from a personal

8   email account?

9              MR. DAVIS:   Objection.   Foundation.

10             You can answer.

11       A.    Restate the question, please.

12             BY MR. ESPER:

13       Q.    Okay.   Based on your job and your

14   experience in the job as FINRA's ombudsman tasked

15   with the assignment of investigating leaks when leaks

16   are called to FINRA's attention, do you have a

17   professional opinion about whether someone who is

18   leaking nonpublic information is more likely to do it

19   using a FINRA email account or a personal email

20   account?

21             MR. DAVIS:   Foundation.

22       A.    I don't.



```
 1          BY MR. ESPER:
 2     Q.    Has it ever occurred to you that someone
 3  might leak information, confidential information,
 4  from a personal email account rather than a FINRA
 5  email account?
 6     A.    Of course, yes.
 7     Q.    So that was a possibility in your mind.
 8  And yet you took no action to determine whether it
 9  actually occurred, right?
10     A.    I did not check personal email accounts.
11     Q.    And you did not check that -- personal
12  email accounts, even though you understood that that
13  was a potential method of leaking information?
14     A.    If there was any information leading to
15  that, I would have considered that and dealt with it
16  appropriately at the point.  At this point, there was
17  no -- I did not do it.
18     Q.    What do you mean by, "if there was any
19  information leading to that"?
20     A.    You asked a hypothetical question.  In
21  that hypothetical question, I'm considering all of
22  the other information that I have:  Who had access to
```



1   the SERs (sic) (phonetic) report; their motivation;

2   what's to be gained for it.

3              There's a lot of things that I would

4   consider.  At that time, yes, it occurred to me.  No,

5   I did not check personal email accounts.

6        Q.    Did you do anything to satisfy yourself

7   that, in fact, no leaking occurred from personal

8   email accounts?

9        A.    I was tasked with determining whether I

10  could find any evidence in determining whether or not

11  the leak came from FINRA within FINRA, and I'm

12  comfortable that I did that based on the information

13  that was available to me.

14       Q.    So you believe that personal email

15  accounts were outside the scope of the task?

16       A.    I don't have access to personal email

17  accounts and no authority to ask for them.

18       Q.    And that's the reason you didn't ask for

19  them?

20       A.    Again, at the time I did not see a need to

21  ask for them.  If I did, I would have spoken to

22  senior management about it.



1      Q.     But you did not believe you had the

2   authority to get them?

3      A.     That doesn't mean that if I thought it was

4   necessary I wouldn't have explored it with senior

5   management.

6      Q.     Let's go to the -- down the list.  Number

7   3 -- it's not numbered, but the third bullet point:

8   "Reviewed FINRA, desktop, and Blackberry telephone

9   records for calls to and from the reporter and to and

10  from the tipster."

11            So the desktop I think I understand.  This

12  is the phone on top of the desk of each person who

13  has an office in FINRA, correct?  That's what you

14  mean by, "desktop"?

15     A.     Yes.

16     Q.     So if there was a phone call from

17  somebody's desktop phone in their office to Mr.

18  Meagher, it would have shown up on the phone records

19  that you reviewed, correct?

20     A.     Correct.

21     Q.     Okay.  Now, the Blackberries, these are

22  personal Blackberry devices that people have on their



1   possession who work for FINRA?

2       A.     Correct.

3       Q.     Are these devices owned by FINRA?

4       A.     Yes.

5       Q.     And FINRA pays the bills?

6       A.     Or they're leased by FINRA.

7       Q.     They may be leased, okay.  But FINRA pays

8   the bills?

9       A.     Yes.

10      Q.     And these are used by FINRA employees for

11  work-related communications, correct?

12      A.     Yes.

13      Q.     Did you ask anybody for the records of

14  their personal devices, not leased or owned by FINRA,

15  that contained a cellular communications capability?

16      A.     No.

17      Q.     And why didn't you?

18      A.     It wasn't within the scope of what I was

19  looking at.

20      Q.     And what -- who defined that scope?

21      A.     Can you rephrase?

22      Q.     Okay.  You just said that it wasn't within

1  the scope of what you were looking at.  That was your

2  statement.

3           So I want to know, who defined the scope

4  of what you were looking at?

5      A.    I guess I -- it was defined based on the

6  initial letter that came in from, I believe, Mr.

7  Cruz, to OGC and to myself.

8           And my investigation was based on whether

9  or not there was any evidence within FINRA that

10 pointed to the leak.

11     Q.    Did Mr. Cruz ask FINRA to confine its

12 investigation to FINRA owned or leased devices?

13     A.    No.

14     Q.    Indeed, did you not understand the

15 substance of what Mr. Cruz to be asking to be whether

16 any personnel in FINRA were involved in a leak

17 whether or not they were using FINRA devices?

18           Isn't that what Mr. Cruz was asking you?

19           MR. DAVIS:  Foundation.

20     A.    I believe that he was asking us to

21 investigate -- investigate a leak within FINRA.

22           THE WITNESS:  Can I have a break?



1    MR. ESPER:  Sure.  Of course.

2    THE VIDEOGRAPHER:  We're off the record at

3  12:06.

4    (A break was taken.)

5    THE VIDEOGRAPHER:  We're back on the

6  record at 12:14.

7    BY MR. ESPER:

8    Q.    So we were talking about personal devices

9  that did not fall within the third bulleted paragraph

10  of page 3248.

11    Do you recall that?

12    A.    Yes.

13    Q.    Okay.  Do you have a professional opinion

14  as FINRA's ombudsman tasked with the investigation of

15  the leak as to whether someone who is going to leak

16  nonpublic information to a reporter is more likely to

17  do it on a device that is paid for and controlled by

18  FINRA or on a personal cellular device?

19    MR. DAVIS:  Foundation and form.

20    A.    I think it could be done on either.

21    BY MR. ESPER:

22    Q.    But in your experience, are the employees



 1   access a portion of the confidential regulatory

 2   information.

 3          How would the fact that that person had a

 4   business need eliminate the person as a potential

 5   leaker?

 6       A.   It wouldn't.

 7       Q.   So isn't it true that in the end you are

 8   relying on the fact that you -- your office searched

 9   FINRA employees' work emails and their work phone

10   records to determine that none of the people who

11   accessed parts of the regulatory information

12   transmitted that information to Mr. Meagher?

13          MR. DAVIS:   Form.

14       A.   We determined that none of the individuals

15   who -- had accessed all of the information.

16          BY MR. ESPER:

17       Q.   So that's -- but there were people who

18   accessed parts of the information, correct?

19       A.   For business purposes or regulatory

20   purposes.

21       Q.   Okay.  But the fact that they accessed for

22   business or regulatory purposes you testified earlier



1   does not by itself prove that they didn't also then

2   take information and leak it, correct?  You needed

3   more than that?

4        A.    Correct.

5        Q.    So I'm trying to get at what the "more"

6   is.  You then cross-checked the FINRA work phone

7   records and FINRA work emails of those people who

8   accessed the information for ostensibly legitimate

9   purposes to ensure that they did not send out a FINRA

10  work email or make a call on the FINRA work telephone

11  to Mr. Meagher providing him with that information,

12  correct?

13       A.    Correct.

14       Q.    Did you do anything to determine whether

15  any FINRA employees met face-to-face with Mr.

16  Meagher?

17       A.    I don't recall.

18       Q.    Okay.  Do you know where Mr. Meagher

19  lives?

20       A.    California.

21       Q.    Right.  And FINRA's offices, of course,

22  are here in Washington, correct?



1        A.     We have an office in California.

2        Q.     Okay.

3        A.     Two offices in California.

4        Q.     Okay.  But some of the people we were just

5   talking about, the people who accessed parts of the

6   information, at least some of those people are not

7   officed in California, correct?

8        A.     Correct.

9        Q.     Some of these -- those people are members

10  of the FINRA enforcement division and are officed in

11  Washington, correct?

12       A.     I don't recall.

13       Q.     Okay.  Did you look at any travel records

14  of FINRA employees to determine whether anyone

15  traveled out to California where Mr. Meagher is

16  located during the time periods immediately prior to

17  the publication of Mr. Meagher's article?

18       A.     I don't -- I don't know.

19       Q.     If someone had, in fact, flown out to

20  Northern California within, say, a week prior to the

21  publication of Mr. Meagher's article in which the

22  confidential regulatory information was referenced,



1    would you consider that a fact that would then

2    require further investigation from your office with

3    respect to the purpose of the trip?

4         A.    People fly to California all the time.

5    The mere fact that they flew to California, and if

6    they had a business reason, it would not be a -- it

7    would not concern me.   No.

8         Q.    If you knew such a flight took place,

9    though, wouldn't you at least ask the employee what

10   the purpose of the trip is?

11        A.    If I was aware of the trip, yes.

12        Q.    And wouldn't you ask them, Did you meet

13   with Mr. Meagher?

14        A.    I don't know.

15        Q.    Okay.   Did you ever ask -- did your office

16   ever ask any FINRA employees whether they traveled to

17   California to meet with Mr. Meagher?

18        A.    I cannot answer definitively.   I don't

19   recall.

20        Q.    The last bulleted point:   "Verified that

21   reasonable procedures are followed to safeguard the

22   confidentiality of FINRA's SEC referral reports."



1      A.     I'm sorry.   Where are you reading?

2      Q.     The last bulleted point.

3      A.     Okay.

4      Q.     "Verified that reasonable procedures are

5  followed to safeguard the confidentiality of FINRA's

6  SEC referral reports."

7         What were the procedures in place to

8  safeguard the confidentiality of FINRA's SEC referral

9  reports?

10     A.     I don't recall all the procedures that

11  were in place.   At a high level I can tell you that

12  access is limited.   And any request for that

13  information has to be approved.   I'm sure there's

14  more.   I just haven't looked at that detail for

15  several years.

16     Q.     But you satisfied yourself before writing

17  this case summary that the procedures in place were

18  reasonable and did safeguard the confidentiality of

19  FINRA's SEC referral reports, correct?

20         MR. DAVIS:   Form.

21     A.     To the extent that you can safeguard any

22  form anywhere, yes.



```
 1   see if Mr. Cruz was right or not.  And this is a yes

 2   or no again.

 3        A.    I don't know.  I can't answer that yes or

 4   no.

 5              MR. DAVIS:  I don't know is probably

 6   sufficient.

 7              BY MR. ESPER:

 8        Q.    I don't know is an answer.

 9              Given that this was a specific issue that

10   Mr. Cruz raised, why didn't you consider it an

11   important thing for your office to do to go look at

12   the OTR interviews and see if Mr. Cruz's claim had

13   any merit?

14              MR. DAVIS:  Form.

15        A.    Whether or not the information came from

16   FINRA could be obtained internally.  We were able to

17   validate by looking at internal regulatory systems

18   whether or not the information was confidential or

19   nonpublic.  And we were able to ascertain where that

20   information came from.

21              THE WITNESS:  Can we take a break, please?

22              MR. ESPER:  Sure.
```



```
 1                 THE VIDEOGRAPHER:  We're off the record at
 2    12:50.
 3                 (A break was taken.)
 4                 THE VIDEOGRAPHER:  We're back on the
 5    record at 12:54.
 6                 BY MR. ESPER:
 7        Q.    You didn't have access to the
 8    on-the-record interviews while conducting your
 9    investigation, did you?
10        A.    I would have had access.  That's different
11    from -- well --
12        Q.    Are you permitted to review on-the-record
13    interviews if you deem them relevant to an --
14        A.    Yes.
15        Q.    -- ombudsman investigation?
16                 Have you ever in other cases -- and again,
17    yes or no.
18                 Have you ever in other cases that you've
19    investigated reviewed on-the-record interviews of
20    pending investigations?
21        A.    Yes.
22        Q.    And you were aware that Mr. Cruz had
```



1   specifically raised the issue of on-the-record

2   investigations as being relevant to the issue of

3   where the leak was coming from?

4        A.    Yes.

5              MR. DAVIS:  Form.

6              BY MR. ESPER:

7        Q.    But you did not deem it necessary to

8   review on-the-record interviews?

9        A.    I do not recall if staff reviewed the OTR.

10       Q.    Would Christopher Cook know if staff

11  reviewed the on-the-record interviews?

12             MR. DAVIS:  Foundation.

13       A.    You would have to ask him.  I don't know

14  if staff reviewed it.

15             BY MR. ESPER:

16       Q.    And even though you were testifying

17  regarding this subject matter at this deposition, you

18  didn't take any action to find out whether staff

19  reviewed the on-the-record interviews in preparation

20  for this deposition?

21       A.    No.

22       Q.    Is it -- are your staff empowered to

1    review on-the-record interviews of a pending

2    investigation without communicating that fact to you?

3         A.    I would -- yes.

4         Q.    So let's go quickly back to Exhibit 204,

5    which was the deposition notice.

6         A.    Okay.

7         Q.    And I just want you to look at paragraph

8    5.  I believe we've covered paragraph 3 and paragraph

9    4 fairly thoroughly.

10             So looking at paragraph 5, it has

11   citations to the complaint and the answer.  Did you

12   review those documents before coming here today?

13        A.    The complaint?

14        Q.    The complaint and the answer, which are

15   cited in these.

16        A.    No, I did not.

17        Q.    So you have no idea what paragraphs 190

18   and 191 of the complaint say?

19        A.    No, I don't.

20        Q.    Okay.  Do you have any knowledge at all

21   about the subject of Mr. Bennett's disputed

22   communications of December 4th, 2013?

1      A.    Only that he denied that the leak came

2  from FINRA.

3      Q.    Mr. Bennett denied that the leak came from

4  FINRA?

5      A.    I believe so.

6      Q.    Did you talk to Mr. Bennett before

7  testifying today about what he said on December 4th,

8  2013?

9      A.    I did not.

10      Q.    Okay.  Does Mr. Bennett still work at

11  FINRA?

12      A.    No, he does not.

13      Q.    When did he leave FINRA?

14      A.    I cannot tell you the exact date.

15      Q.    Was it in February of 2017?

16      A.    I believe that it was.

17      Q.    Did -- and I realize this is a kind of --

18  well, let me put it this way:  Was Mr. Bennett

19  terminated by FINRA?

20      A.    I have no knowledge.

21      Q.    Okay.  As far as you know, Mr. Bennett is

22  still on good terms with FINRA, correct?



1        Q.      So FINRA --

2        A.      -- if needed.

3        Q.      Go ahead.  I'm sorry.  I didn't let you

4   finish.

5        A.      If needed.

6        Q.      Okay.  So FINRA reserves the right to

7   request from its employees information about their

8   personal cell phone use if such use related to FINRA

9   work; is that correct?

10       A.      It depends on the circumstances.  Not

11  generally.  There has to be a reason, a need.

12       Q.      But if -- in the event of a sufficient

13  need, FINRA has the right to request information from

14  FINRA employees' personal cell phones with respect to

15  FINRA business.

16               Is that a correct summary?

17       A.      Yes.

18       Q.      Would an ombudsman investigation

19  constitute a sufficient need to do that under FINRA's

20  policies?

21               MR. DAVIS:  Form.

22       A.      That decision would be made by senior



1    management, corporate management, OGC, other -- the

2    office of the CEO.

3              BY MR. ESPER:

4        Q.    So you don't personally have the power to

5    obtain any FINRA employees's personal cell phone

6    records; is that correct?

7        A.    No.

8        Q.    That's not correct?

9        A.    No, I don't have the authority to obtain

10   personal telephone records.

11       Q.    Did you ever seek that authority with

12   respect to the investigation of Mr. Meagher's

13   stories?

14       A.    No.

15       Q.    Have you ever sought that authority with

16   respect to any investigation you've ever conducted at

17   FINRA?

18       A.    I don't recall.

19       Q.    Have you ever received that authority with

20   respect to any investigation you've ever conducted at

21   FINRA?

22       A.    No.



1          MR. ESPER:  Okay.  No further questions.

2          MR. DAVIS:  We will read and sign.

3          THE REPORTER:  Would you like a copy, Mr.

4    Davis?

5          MR. DAVIS:  Yes, thank you.

6          THE VIDEOGRAPHER:  We're off the record at

7    1:15.

8          (Signature having not been waived, the

9    videotaped deposition of Cindy Foster-Nicholas was

10   concluded at 1:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22



# Exhibit 3

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3      -------------------------------x

4
       JOHN J. HURRY AND JUSTINE HURRY,)
5      as Husband and Wife,
       Investment Services Corporation,)
6      an Arizona Corporation,
                  Plaintiffs          )  Case No.:
7
                       V.             )  14-CV-02490-PHX-ROS
8
       FINANCIAL INDUSTRY REGULATORY  )  FRCP 30b(6)
9      AUTHORITY, INC., a Delaware
       Corporation,                   )
10
                  Defendant           )  Page 1-72
11
       -------------------------------x
12

13

14

15         VIDEOTAPED DEPOSITION OF CHRISTOPHER COOK

16              Thursday, February 23, 2017

17                   Washington, DC

18

19

20     Reported by:  Sherry L. Brooks

21                   Certified LiveNote Reporter

22     Job No.  J0524737



1   were done by counsel in this case, have you seen this

2   document before?

3       A.    Yes.

4       Q.    And what is it?

5       A.    It is a written summary of our

6   understanding of what came to us and the steps we

7   took in our conclusion in terms of our review.

8       Q.    Okay.  And did you author this document?

9       A.    Yes.

10      Q.    Okay.  Now, I want to skip down to the

11  last paragraph on 3247, the first page of this

12  document --

13      A.    Alright.

14      Q.    -- and I will represent to you that

15  because of a dispute as to what we can and can't

16  discover in this case, Mr. Davis and I agreed to a

17  convention where the thing that is redacted in this

18  paragraph is referred to as the regulatory

19  information.

20           Do you understand that?

21      A.    I couldn't say because I don't know what's

22  written in here.



1       Q.      Okay.   That's fine.   But I'm going to ask

2  you questions about this paragraph.

3              And if I'm referring to -- if I say the,

4  "regulatory information," you should assume that I'm

5  referring to that which is blacked out in this

6  paragraph.

7              Do you understand the convention?

8       A.      Understood.

9       Q.      Okay.   So the paragraph reads:

10  "Notwithstanding that the information contained in

11  the latter three articles could have been provided by

12  the tipster or other personnel at the BD, the FINRA

13  -- redacted -- that were the source of the first

14  article should not have been known by the tipster."

15              Is it your recollection that there was a

16  tipster within Mr. Hurry's businesses that was

17  5providing information to FINRA?

18       A.      Yes.

19       Q.      And is it further your recollection that

20  you concluded that the -- what we're calling the

21  regulatory information could not have come from the

22  tipster?



1        A.     Correct.

2        Q.     Okay.  And other than the tipster from

3   whom it could not have come from, who had access --

4   first of all, what agencies had access to the

5   regulatory information?

6        A.     Well, to my knowledge, the Securities and

7   Exchange Commission, as well as potentially the

8   Treasury and the FBI because it's my understanding

9   they have people inside the SEC and they may have

10  access to it.  But I couldn't tell you for sure.  The

11  only one I know is the SEC.

12       Q.     Okay.  And FINRA, of course, also has

13  access to it, correct?

14       A.     Correct.

15       Q.     And other than FINRA, the SEC, and then

16  potentially, as you said, the Treasury and IRS (sic)?

17       A.     No, FBI.

18       Q.     Okay.  So other than FINRA, the SEC, and

19  potentially the Treasury and the FBI, there are no

20  other persons or entities that have access to the

21  regulatory information, correct?

22       A.     Not that I'm aware of.



1       Q.      Did you take any steps to determine

2   whether the FBI, in fact, had access to this

3   particular regulatory information?

4       A.      No.

5       Q.      Why didn't you?

6       A.      It wasn't deemed to be something within

7   the scope of our review.

8       Q.      What was the scope of your review?

9       A.      To determine whether anyone from within

10  FINRA was the source.

11      Q.      So if it had turned out that the FBI was

12  the source to Mr. Meagher, that wouldn't have been

13  relevant to your investigation?

14      A.      Not necessarily.

15      Q.      Why not?

16      A.      Maybe there could have been more than one

17  source.

18      Q.      And did you take any action to determine

19  whether the Treasury Department was the source of any

20  of the disclosures of regulatory information to Mr.

21  Meagher?

22      A.      No.



1      Q.     Okay.   And did you take any action to

2   determine whether the SEC was the source of any of

3   the disclosure of regulatory information of Mr.

4   Meagher?

5      A.     No.

6      Q.     And why didn't you take any action with

7   respect to the SEC being a potential source?

8      A.     Same answer as with the Treasury.

9      Q.     Did Ms. Foster instruct you not to make

10  any determination as to whether the SEC was a

11  potential source of the regulatory information to Mr.

12  Meagher?

13     A.     Not that I recall.

14     Q.     Did you have any conversations with Ms.

15  Foster where you discussed the possibility that the

16  SEC was a source for Mr. Meagher's articles?

17     A.     I believe I did, yes.

18     Q.     And what was the substance of those

19  communications?

20     A.     I couldn't tell you details.   But there

21  are periodically news articles that SEC sources

22  discuss, other things confidential, at the SEC.



1          So I think I raised concerns that they

2    could be doing this also, but, again, our focus was

3    on FINRA.

4          Q.    Okay.   What -- these news articles that

5    quote SEC sources, where have they appeared?

6          A.    I couldn't tell you.   Probably The Wall

7    Street Journal would have a number of them.   It

8    happens periodically.   So not really any specific

9    ones.   Although I know there's one that comes to mind

10   from that time frame, but I don't remember what it

11   was concerning.

12         Q.    Okay.   You read The Wall Street Journal

13   periodically?

14         A.    Periodically.

15         Q.    What other financial publications do you

16   read?

17         A.    Mostly, I read what FINRA provides, news

18   clippings from various publications.   So I usually

19   read that.

20         Q.    So FINRA provides a sampling of news

21   clippings from financial publications and then you

22   review those provided articles?



1      Q.    Yes or no?

2      A.    I'd say -- I don't know if I could answer

3  it.  Say the question again and let me see.

4      Q.    Is it fair to say that there were any

5  number of methods that a determined leaker could have

6  used to ensure that their leak of information to Mr.

7  Meagher would not be detected by the FINRA

8  ombudsman's office?

9            MR. DAVIS:  Form.

10           You can answer.

11     A.    Okay.  Yes.

12           BY MR. ESPER:

13     Q.    Now with respect to the third bulleted

14  paragraph, it reads:  "Reviewed FINRA desktop and

15  Blackberry telephone records for calls to and from

16  the reporter and to and from the tipster."

17           These are phones that are either owned by

18  or leased by or controlled by FINRA, correct?

19     A.    Correct.

20     Q.    And your office did not request any

21  telephone records from personal telephones of FINRA

22  employees, correct?



1        A.      Correct.

2        Q.      So if the FINRA -- if a FINRA employee had

3   called Mr. Meagher on a home landline telephone, your

4   investigation would not have revealed that, correct?

5        A.      Correct.

6        Q.      And if the FINRA employee had called Mr.

7   Meagher on a personal cell phone, that would not be

8   something that your investigation would have

9   detected, correct?

10       A.      Correct.

11       Q.      Is there any reason why your office did

12  not request personal telephone records from any of

13  the FINRA employees?

14              MR. DAVIS:   Foundation.

15       A.      I think it goes back to, you know, there's

16  a number of ways that they could have done it if they

17  were going to avoid (sic) and we were doing a

18  reasonable search.

19              BY MR. ESPER:

20       Q.      In any of your jobs before this

21  investigation, have you had any experience at all

22  with any situation where someone was accused of



1    leaking confidential information to a reporter?

2        A.    No.

3        Q.    Did you do anything to research the

4    methods that people who leak information to reporters

5    generally use?

6              MR. DAVIS:   Form.

7        A.    Not that I recall.

8              BY MR. ESPER:

9        Q.    So sitting here now, you don't know

10   whether a leaker is more likely to use a form of

11   communication that can be detected by his or her

12   employer or a form of communication that is unlikely

13   to be detected by his or her employer?

14             MR. DAVIS:   Form.

15       A.    You're asking me if I know which one?

16             BY MR. ESPER:

17       Q.    Do you know -- do you have any knowledge

18   on the subject of whether people who leak

19   confidential information to reporters are more likely

20   to use methodologies that can be detected by their

21   employer or methodologies that cannot be detected by

22   their employer?



1          MR. DAVIS:  Form.

2      A.    I do not know.

3          BY MR. ESPER:

4      Q.    Okay.  Is there anyone on the ombudsman

5  staff who has had any experience with investigating

6  news leaks outside of this particular investigation?

7          MR. DAVIS:  Foundation.

8      A.    Not to my knowledge.

9          BY MR. ESPER:

10     Q.    Okay.  Did you ever have a discussion

11 about bringing in an outside investigator who did

12 have experience investigating news leaks in the

13 conduct (sic) of this investigation?

14     A.    No, not to my knowledge.

15     Q.    Why not?

16     A.    The discussion never came up.

17     Q.    Did it concern you that the team that was

18 investigating this investigation didn't have enough

19 experience with investigating news leaks to be able

20 to do it properly?

21         MR. DAVIS:  Form.

22     A.    No.



```
 1              BY MR. ESPER:

 2      Q.    Take a look at the next to last bulleted

 3   paragraph --

 4      A.    Where it starts, "identified staff"?

 5      Q.    Yes.  And there's a number of redactions,

 6   but we'll try and get around it.

 7      A.    Right.  Let me just read it a second.

 8      Q.    Sure.  Take your time.

 9      A.    Okay.

10      Q.    Okay.  So the gist of this, because we're

11   trying to not get into privileged information or

12   information that FINRA claims a privilege on.

13              The gist of this is that the nature of the

14   information that was apparently leaked to -- or

15   communicated, I should say, to Mr. Meagher is

16   information that only certain people are allowed to

17   access, correct?

18      A.    Correct.

19      Q.    So you conducted an investigation to

20   determine whether any of those people who potentially

21   had access to this information did access it before

22   Mr. Meagher ran this story; is that correct?
```



1      Q.     Okay.   And you reviewed their FINRA

2  emails?

3      A.     Well, we reviewed emails that were looking

4  at key information.   So it's more broadly than those

5  people, but they were -- they would have been

6  included among that, yes.

7      Q.     Okay.   But if one or more of the authors

8  of these documents communicated their substance to

9  Mr. Meagher in a face-to-face meeting, the only

10  evidence that you would have in that situation that

11  that didn't happen is their say-so, correct?

12          MR. DAVIS:   Form.

13      A.     Most likely.

14          BY MR. ESPER:

15      Q.     And if they communicated the substance of

16  these documents to Mr. Meagher by means of a personal

17  cell phone, the only evidence you would have that

18  that did not happen is that they told your office

19  that it didn't happen, correct?

20          MR. DAVIS:   Form.

21      A.     Correct.

22          BY MR. ESPER:



1      Q.    And if they communicated it by means of a

2  personal Gmail account, the only evidence that you

3  would have that that did not happen is that they

4  denied it in their interviews, correct?

5              MR. DAVIS:  Form.

6      A.    Other than the other steps we took,

7  correct.

8              BY MR. ESPER:

9      Q.    Okay.  And the other steps would not have

10  included a review of any emails from a personal Gmail

11  account, correct?

12             MR. DAVIS:  Form.

13     A.    For those that didn't go to FINRA, correct

14  -- to or from FINRA, correct.

15             BY MR. ESPER:

16     Q.    Did you interview Michelle Ong as part of

17  your investigation?

18     A.    Yes.

19     Q.    Was Jasmine Abraham present at the

20  interview?

21     A.    Yes.

22     Q.    Did you take notes of the interview?



```
 1      A.    I don't recall.

 2      Q.    Did Ms. Abraham take notes?

 3      A.    Yes.

 4      Q.    Okay.  And were Ms. Abraham's notes used

 5 to prepare a summary document containing Ms. Ong's

 6 answers to the questions at the interview?

 7      A.    Yes.  She prepared them.

 8      Q.    Okay.  I want you to take a look at pages

 9 FINRA 1 and FINRA 2.  Take your time to review it.

10      A.    Okay.  Okay.

11      Q.    Have you seen this before?

12      A.    Yes.

13      Q.    What is it?

14      A.    It is the summary that Jasmine wrote up

15 about our interview of Michelle Ong.

16      Q.    Okay.  In your experience working with

17 her, are Jasmine's summaries of interviews that she

18 conducts generally accurate?

19            MR. DAVIS:  Foundation.

20      A.    Yes.

21            BY MR. ESPER:

22      Q.    And you were at this same interview,
```



1  correct?

2      A.    Yes.

3      Q.    And having looked at it and comparing it

4  with your own recollection of the interview, do you

5  have any reason to believe that anything on this

6  document is inaccurate?

7          MR. DAVIS:   Form.

8      A.    No.

9          BY MR. ESPER:

10     Q.    Okay.   And take a look at paragraph 7 and

11 the answer.   Would you read that into the record,

12 please?

13     A.    Yes.   "Ong knew" -- do you want me to read

14 the question also?

15     Q.    The question and answer.

16     A.    "QUESTION:   7) Have there been any other

17 incidents in the past few years in which members of

18 the media allege that they were in possession of

19 confidential FINRA documents?"

20          "ANSWER:   Ong noted that, 'leaks occur all

21 the time,' but she has never confirmed such

22 information with a reporter unless it is in the



1    public domain, e.g., an investigation has been

2    reported via a Well's Disclosure and BrokerCheck."

3        Q.    And leaks appear all the time is in

4    quotes.   That's right?

5        A.    Right.

6        Q.    That's a direct quote from what Ms. Ong

7    said in the interview, right?

8        A.    I don't recall.  But generally our

9    practice is, if we're putting it in quotes, that's

10   what it would be.

11       Q.    So you believe, sitting here today, that

12   Jasmine put quotes around that because that was an

13   exact quote of Ms. Ong's words, correct?

14       A.    That would be my recollection today.

15            MR. DAVIS:  Form.

16            THE WITNESS:  Sorry.

17            MR. DAVIS:  That's okay.

18            BY MR. ESPER:

19       Q.    Okay.  So with respect to the question,

20   who came up with that question?

21       A.    Jasmine and I drafted them together, as I

22   recall.



1      Q.     And Ms. Foster approved the questions?

2      A.     As I recall, yes.

3      Q.     And since you were part of the drafting of

4   that question, what was your purpose in asking that

5   question?

6      A.     Let me read it again.  It's been a couple

7   of years.  Oh.  We wanted to understand if this is

8   the first time they were hearing of such a leak, you

9   know, if -- we wanted to know if there was a pattern

10  or something like that.

11     Q.     Because if there was, in fact, a pattern,

12  that would have been probative information for your

13  investigation, right?

14            MR. DAVIS:  Form.

15     A.     Correct.

16            BY MR. ESPER:

17     Q.     And if there was a pattern, all other

18  things being equal, that would lead an investigator

19  in the ombudsman's office to be more inclined to

20  believe that a potential leak came from FINRA,

21  correct?

22            MR. DAVIS:  Form.



1       A.      Not necessarily.  Facts and circumstances,

2   but --

3              BY MR. ESPER:

4       Q.      But it's certainly something you would

5   take into account in making any conclusion that a

6   leak did or did not come from FINRA, correct?

7       A.      Yes.  We'd take it into account.

8       Q.      And the flip side is also true.  If FINRA

9   had a pattern of practice of never, ever leaking

10  anything, of keeping their secrets at all times, of

11  never disseminating nonpublic information, that would

12  make you more skeptical of a claim that FINRA leaked

13  in a particular situation, right?

14      A.      Not necessarily because things can happen

15  for the first time.

16      Q.      But you certainly wanted to know whether

17  either of those things were true as a part of your

18  investigation, right?

19      A.      Yes.

20      Q.      Okay.  And Ms. Ong responded to that

21  question by saying, "leaks occur all the time."

22              Do you remember her saying that?



1      A.    No.

2      Q.    Do you have any reason to doubt she said

3  it?

4      A.    No.

5      Q.    Does it concern you that she said it?

6            MR. DAVIS:   Form.   Foundation.

7  Misrepresents testimony.

8            You can answer.

9            BY MR. ESPER:

10     Q.    You can answer.

11     A.    No, because I don't recall the context in

12 what (sic) it was said, assuming it was said.

13     Q.    Do you have any reason to believe it

14 wasn't said in response -- direct response to

15 Question No. 7?

16           MR. DAVIS:   Form.

17     A.    No.

18           BY MR. ESPER:

19     Q.    Your office's practice would typically be

20 to put the answer to the question right under the

21 question, correct?

22     A.     Correct.



CHRISTOPHER COOK                           February 23, 2017
Hurry vs Financial Industry Regulatory                    45

1       Q.    So when you read this document, you

2  believe that it is representing that that answer

3  under paragraph 7 was given to the question stated in

4  paragraph 7, correct?

5              MR. DAVIS:  Form.

6       A.    Correct.

7              BY MR. ESPER:

8       Q.    Okay.  Do you know if your office followed

9  up on Ms. Ong's statement that leaks occur all the

10  time in any way?

11             MR. DAVIS:  Form.

12      A.    I do not recall.

13             BY MR. ESPER:

14      Q.    And take a look at the last portion of the

15  response given to paragraph 7 where it talks about a

16  Well's Disclosure.

17             Do you see that?

18      A.    Right.  Let me just read it one more time.

19      Q.    Sure.

20      A.    Okay.

21      Q.    So a Well's Disclosure is something that

22  is disclosed by FINRA, correct?



1  know the disclosure is required, you know, when it's

2  appropriate.

3      Q.    Okay.  Okay.  Take a look at pages FINRA

4  380 and 381.

5      A.    Two separate emails, okay.  Okay.

6      Q.    Have you seen this document before?

7      A.    I don't recall being there, too.  But,

8  yeah, it looks familiar.

9      Q.    Is this a document you reviewed in

10 preparation for this deposition?

11     A.    No.

12     Q.    Is this a document you reviewed as part of

13 the investigation of the potential leak?

14     A.    I believe so.

15     Q.    Okay.  Would you read the first paragraph

16 of Mr. Meagher's email to Ms. Ong for the record?

17     A.    "Bill, I received your voicemail.  As

18 Nancy and others here have told you, we have not

19 provided this information to you and have nothing for

20 you on it."

21     Q.    Okay.  I may have asked the wrong -- the

22 first paragraph of Mr. Meagher's email to Ms. Ong.



1        A.    I'm sorry.  His response:  "Michelle, I

2    appreciate you getting back to me, and I will write

3    that you declined to comment.  BTW, this is nothing

4    to do with the internal FINRA reports that I had

5    previously asked Nancy about."

6        Q.    Does it -- did you take into account in

7    your investigation the fact that Mr. Meagher had

8    specifically stated to Ms. Ong that he had possessed

9    internal FINRA reports?

10            MR. DAVIS:  Form.

11       A.    Well, it doesn't say that he had access to

12   them.  He just says the reported stories had nothing

13   to do with those reports that he asked about.

14            BY MR. ESPER:

15       Q.    Do you believe that Mr. Meagher possessed

16   internal FINRA reports?

17       A.    Either possessed or had seen them, yes.

18       Q.    Okay.  Did you have any communications

19   with the SEC regarding the issue of whether the SEC

20   may have leaked these reports?

21       A.    Yes.

22       Q.    And what did the SEC tell you?



1        A.    They did not provide details, other than

2   to say they had not found any evidence on their side.

3        Q.    Did they tell you that they conducted an

4   investigation?

5        A.    No.

6        Q.    Who did you speak with?

7        A.    It was -- I might butcher his name -- Kai,

8   K-A-I, I believe, Munshi, M-U-N-S-H-I, if I recall

9   correctly.

10       Q.    That's good because you have settled a

11  spelling issue from the previous deposition.

12       A.    Okay.  Well, hopefully that's correct.

13       Q.    Okay.  How many conversations did you have

14  with Mr. Munshi regarding the issue of leaks to Mr.

15  Meagher?

16       A.    Two, maybe three.

17       Q.    And other than the issue of -- that they

18  hadn't found anything on their end, do you recall any

19  other topics you discussed with Mr. Munshi relating

20  to the issue of the leaks to Mr. Meagher?

21       A.    Yeah.  In each of the meetings, he had

22  asked for an update from us as to what steps we had



1   taken.  So it was mostly a one-way discussion in that

2   respect.

3            And we basically went over the -- what you

4   have in, what, 3247, 3248.

5       Q.    Did Mr. Munshi opine on whether the FINRA

6   investigation was satisfactory?

7       A.    At the second on-site meeting, I believe

8   so.

9       Q.    What did he say?

10      A.    I think he said something -- and I -- it

11  was something like he thought it was very thorough or

12  something to that effect.

13      Q.    Other than your communications with Mr.

14  Munshi, did anyone else tell you any information

15  about conclusions the SEC may have made about who the

16  leaker was?

17      A.    No.

18      Q.    Did you ever have any conversations with

19  Ms. Foster about that subject?

20      A.    About any other -- about the subject

21  again, though --

22      Q.    Okay.  The subject matter is anything that



1   the SEC may have said about any investigation that

2   they conducted internally.

3          And I'm wondering -- you just testified

4   you didn't hear anything else from the SEC, other

5   than what you already testified to.

6          I'm wondering if Cindy Foster, for

7   instance, may have talked to you about any

8   investigation the SEC was doing?

9       A.    Not to my recollection.

10      Q.    Okay.   And did anyone else at FINRA talk

11  to you about any investigation the SEC was doing into

12  a potential leaker?

13      A.    Not to my recollection.   I'm pretty sure

14  no.

15      Q.    Did you ever request that the SEC provide

16  you with any information from their internal

17  investigations regarding a leak?

18      A.    I believe at the on-site meeting they said

19  if they found something, they might share it with us.

20  But that's a hazy recollection.

21      Q.    And then they never shared anything with

22  you that they found?



1       A.      Correct.

2       Q.      Okay.  Did everyone you speak (sic) with

3   at FINRA during the investigation cooperate fully in

4   the investigation?

5       A.      Yes.

6       Q.      Did anyone refuse an interview?

7       A.      No.

8       Q.      Did anyone refuse to provide emails?

9       A.      No.

10      Q.      Did you make any determination that any

11  witness was untruthful?

12      A.      No.

13      Q.      Other than the typewritten summaries like

14  the one in Ms. Ong's interview that we already looked

15  at, are there any handwritten notes of those

16  meetings?

17      A.      I do not believe so.

18      Q.      Why not?

19      A.      Our general practice was, if we weren't

20  typing directly into the system where we captured the

21  case, it would be to transcribe the notes into the

22  system either in a Word document or directly into the



CHRISTOPHER COOK                          February 23, 2017
Hurry vs Financial Industry Regulatory                    53

1   system as what we call a case note and then shred the

2   draft working notes.

3        Q.    And there were no recordings of the

4   interviews?

5        A.    No.

6        Q.    Other than Ms. Ong, did anyone else in any

7   of the interviews discuss any sort of opinion

8   regarding the frequency with which leaks happen at

9   FINRA?

10            MR. DAVIS:  Form.

11       A.    Not to my recollection.

12            BY MR. ESPER:

13       Q.    When you investigated this matter, did you

14   review -- other than the four stories that Meagher

15   wrote that the Hurrys complained about, did you

16   review any of Meagher's other stories to determine

17   whether he might have any sources within FINRA?

18       A.    Yes.

19       Q.    And how many such stories did you review?

20       A.    To my recollection, we found two other

21   articles around that.

22       Q.    Okay.  So you found two other articles in



1      Q.     Right, and I understand that.  But what

2  I'm getting at is, even if you couldn't find any

3  evidence of a leak, did you express any concern to

4  your colleagues at FINRA that the reporter must have

5  gotten this information from somewhere and that FINRA

6  needs to make sure that there are no leaks coming

7  from FINRA?

8            MR. DAVIS:  Form.

9      A.     I don't recall.

10           BY MR. ESPER:

11     Q.     And given that there was a second article

12 that you also had concerns about, did you express

13 after now knowing that there were two articles that

14 you had concerns with and that you were investigating

15 -- did you express to any of your colleagues at FINRA

16 that even if your investigation wasn't able to

17 identify a specific leaker that FINRA should look

18 into this matter further about whether there were

19 people leaking information from FINRA?

20     A.     I do not believe so.

21     Q.     Okay.  And why not?

22     A.     Based on the steps we had taken already,



1   we were finding no evidence.

2            MR. ESPER:  Okay.  Let's take a break.

3            THE VIDEOGRAPHER:  Off the record at 2:41.

4            (A break was taken.)

5            THE VIDEOGRAPHER:  We're back on the

6   record at 2:51.

7            BY MR. ESPER:

8        Q.    Did you make any requests to talk to any

9   persons at Scottsdale Capital regarding whether they

10  were a source for Mr. Meagher?

11       A.    No.

12       Q.    Why not?

13       A.    It -- we knew of one person and we didn't

14  see a need to talk to others.  And we did not talk to

15  that person.

16       Q.    And that person was the tipster that's

17  referred to in this document, correct?

18       A.    That's correct.

19       Q.    And you did not speak to the tipster

20  regarding whether the tipster participated in any

21  communications with Mr. Meagher, correct?

22       A.    Correct.



1   Q.    And the reason you didn't talk to the

2   tipster is because this information -- this

3   restricted information, this regulatory information

4   that is referred to and redacted out of this

5   document, that information is information the tipster

6   did not have access to, correct?

7   A.    Partially correct.

8   Q.    Okay.  How is it not correct?

9   A.    In terms of -- some of the information

10  that was put out there in the public was aside from

11  that confidential information such as the -- let me

12  see if I can point to it.

13        But there was certain information -- like

14  the March 2014 on-site surprise visit.  There were

15  certain things out there that were -- FINRA didn't

16  publicize that were out there.

17  Q.    Understood.  Nobody from FINRA is supposed

18  to say that they had the on-site visit.  But

19  certainly somebody who worked at SCA could say to a

20  reporter there was an on-site visit here, correct?

21  A.    Correct.

22  Q.    So -- but with respect to the regulatory



1  information that we're talking about that is redacted

2  out of the ombudsman's summary that you're looking

3  at, that information is not information that the

4  tipster had access to, correct?

5       A.    Correct.

6       Q.    So it had to come from somebody who either

7  authored it or had access to it, correct?

8       A.    Correct.

9       Q.    Sitting here now, do you have any belief

10  as to who leaked the regulatory information redacted

11  out of the ombudsman's summary on page 3247 to The

12  Deal?

13      A.    No.

14      Q.    In your investigation, did you review any

15  on-the-record interviews with members of the Hurry

16  businesses?

17      A.    Not that I recall.

18      Q.    Why didn't you review them?

19      A.    I don't recall.  I could assume, but --

20      Q.    Well, don't speculate.  But if you have a

21  reason to believe something, you can tell me that.

22      A.    Well, a reason to believe would be that it



1    would not point to a source of a leak most likely.

2        Q.    Okay.  But you do not know -- having not

3    reviewed those on-the-record interviews, you do not

4    know if there's any content in those interviews that

5    could have pointed to the source of the leak?

6        A.    Correct.

7        Q.    Mr. Cook, if you were tasked with another

8    allegation of an alleged leak from FINRA today and

9    you had to investigate it, is there anything that you

10   would do differently from what you did in this

11   investigation?

12            MR. DAVIS:  Form.

13       A.    I guess it would be speculation because it

14   would depend on the facts and circumstances.

15            BY MR. ESPER:

16       Q.    Do you feel you learned anything about

17   procedures and practices for investigating leaks from

18   conducting this investigation?

19            MR. DAVIS:  Form.

20       A.    Not to my recollection.

21            BY MR. ESPER:

22       Q.    You don't feel in retrospect that you



1    should have asked for personal emails from FINRA

2    employees?

3         A.    No.

4         Q.    You don't feel in retrospect that you

5    should have asked for personal telephone records of

6    FINRA employees?

7         A.    No.

8         Q.    Did you investigate whether anybody with

9    access to the regulatory information traveled to

10   California in the days running up to Mr. Meagher's

11   story?

12        A.    Do I have any such knowledge, no.

13        Q.    Did you investigate that fact?

14        A.    No.

15        Q.    Did it occur to you during your

16   investigation that somebody may have met with Mr.

17   Meagher face-to-face and provided him with regulatory

18   information?

19        A.    Yeah.  I believe we considered that a

20   possibility.

21        Q.    And you knew that Mr. Meagher was located

22   in California, correct?



1    A.    I know that's where an office is.  I don't

2    know if that's his sole office, but yes.

3    Q.    So why didn't you request travel records

4    of the FINRA employees with access to this

5    information to see if they were in California at the

6    relevant time?

7    A.    I'd have to speculate.  I don't recall.

8    Q.    Isn't it true that your office was fully

9    aware that a leaker could have used a personal email

10   address to leak information to Mr. Meagher and made a

11   calculated decision not to investigate that?

12        MR. DAVIS:  Form.

13   A.    Restate the question.

14        BY MR. ESPER:

15   Q.    Isn't it true -- well, let's split it into

16   two parts.

17        Isn't it true that your office -- let's

18   make it you.

19        Isn't it true that you knew during the

20   investigation that one potential route a leaker could

21   take was using a personal email address to provide

22   information to Mr. Meagher?



1       A.    Yes.

2       Q.    And you deliberately decided not to ask

3  for personal email information?

4             MR. DAVIS:   Form.

5       A.    Correct.

6             BY MR. ESPER:

7       Q.    And you knew that -- knowing that -- by

8  deciding not to ask for personal information you

9  might fail to obtain evidence that would show that

10 the source of the leak was within FINRA?

11            MR. DAVIS:   Form.

12      A.    Correct.

13            BY MR. ESPER:

14      Q.    Okay.  And would your answer be the same

15 with respect to personal cell phone information?

16            MR. DAVIS:   Form.

17      A.    Yes.

18            MR. ESPER:   I have no further questions.

19            MR. DAVIS:   We will read and sign.

20            THE VIDEOGRAPHER:   This concludes the

21 videotaped deposition of Christopher Cook.

22            We're off the record at 2:59.



# Exhibit 4

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
-----------------------------
John J. Hurry and Justine
Hurry, as husband and wife,
Investment Services Corporation,
An Arizona corporation,

                Plaintiffs,

        vs.            No. 14-cv-02490-PHX-ROS

Financial Industry Regulatory
Authority, Inc. A Delaware
Corporation,

                Defendant.
-----------------------------


   CONFIDENTIAL VIDEOTAPED DEPOSITION OF SCOTT

                   ANDERSEN

              New York, New York

           Monday, February 27, 2017


Reported by:
Yaffa Kaplan
JOB NO. 0524728



1                   S. Andersen - Confidential

2          A.     February of 2015.

3          Q.     We need to get a clear record.  I

4    realize you testified to that when you thought you

5    were answering a different question, but now:  Why

6    did you leave FINRA?

7          A.     I resigned my position to start my law

8    practice.

9          Q.     And your law practice is what you are

10   doing now?

11         A.     It is.

12         Q.     And is it a sole practitionership or are

13   you at a firm?

14         A.     Sole practictionership.

15         Q.     Is that here in New York City?

16         A.     It is.

17         Q.     What kind of law practice is it?

18         A.     Securities.

19         Q.     Securities work?

20         A.     Yes.

21         Q.     Litigation or transactional?

22         A.     Litigation and compliance services are

23   provided.

24         Q.     Have you ever sued FINRA?

25                MR. WALL:  Objection.  Beyond the scope



```
 1              S. Andersen - Confidential
 2       of the deposition.
 3       A.    No.
 4              MR. WALL:  And you don't have to answer
 5       that.
 6              MR. ESPER:  You haven't instructed.
 7  DI   Q.    Before you left FINRA, did you receive
 8  any negative reviews of your performance?
 9              MR. WALL:  Objection.  Beyond the scope
10       of the deposition.
11              You don't have to answer questions
12       regarding internal matters at FINRA.
13              MR. ESPER:  I know this is a little bit
14       of me being maybe overly precise:  But if you
15       are going to instruct not to answer, just for
16       a clear record just in case there is ever a
17       litigation before Judge Silver about this I
18       would ask that you use the magic words "I
19       instruct you not to answer" just so I have a
20       clear transcript.
21              MR. WALL:  When I say "you don't have to
22       answer," you don't have to answer but I will
23       add that you are instructed not to answer.
24              MR. ESPER:  Thank you, Counsel.
25       Q.    Do you know who Cindy Foster is?
```



1                    S. Andersen - Confidential

2        A.    I don't.

3        Q.    Do you know --

4        A.    At least I don't recollect that name.

5        Q.    Do you understand who worked at the

6   ombudsman office at FINRA while you were there?

7        A.    I did know somebody there, but it wasn't

8   -- it was a male; it wasn't a female.  And I can't

9   recall the individual's name.

10        Q.    Christopher Cook maybe?

11        A.    That may be it.

12        Q.    Do you know who Nancy Condon is?

13        A.    I do.

14        Q.    Who is Nancy Condon?

15        A.    She is the head of the press department.

16   DI   Q.    If Ms. Condon testified that you were in

17   fact terminated by FINRA for performance-related

18   reasons, would your testimony here be that her

19   testimony was incorrect?

20             MR. WALL:  Objection.

21             I instruct you not to answer the

22        question.  Beyond the scope.  You don't have

23        to comment on other witnesses' testimony.

24             MR. ESPER:  Can we go off the record for

25        a second.



```
 1          S. Andersen - Confidential

 2          THE VIDEOGRAPHER:  It's now 11:38, we

 3    are we are off the record.

 4          (Discussion off the record.)

 5          (Recess taken.)

 6          THE VIDEOGRAPHER:  It's now 11:45, we

 7    are back on the record.

 8          MR. ESPER:  I want the record to reflect

 9    the following:  That Mr. Wall is instructing

10    his client not to answer questions about the

11    nature of his exit from FINRA.

12          This is an issue that has already been

13    litigated by the parties.  And in the July 25,

14    2016 order of the court, the court reviewed

15    the deposition topics that my side had

16    proposed and in fact cut us back in various

17    ways, but in cutting us back specifically

18    permitted a topic area which then got

19    reflected in our Rule 30(b)6 notice in this

20    case on, "The employment history EG warning,

21    censure, reprimand, suspension, termination

22    pertaining to current or former FINRA

23    employee, Scott Andersen, relating in any way

24    to communications between him or any FINRA

25    employees or agents who reported to or were
```



1                    S. Andersen - Confidential

2        Q.    Do you still talk to him?

3        A.    I have spoken to him since I left FINRA.

4        Q.    When is the last time you spoke to him?

5        A.    I was at a deposition representing a

6    client and I ran into him there and we spoke.

7        Q.    Did you talk about this case?

8        A.    We did not.

9        Q.    Have you ever talked to Mr. Bennett

10   about this case?

11       A.    I don't believe so.

12       Q.    Have you ever -- other than lawyers,

13   have you ever talked to anybody at FINRA about this

14   case?

15       A.    You said other than lawyers?

16       Q.    Other than lawyers because obviously you

17   could have had privileged communications with

18   lawyers and I don't want to get into that.

19       A.    I don't believe so.

20       Q.    Did you review any documents in

21   preparation for this deposition?

22       A.    I did not.

23       Q.    Did you bring any documents to this

24   deposition?

25       A.    I did not.



1                    S. Andersen - Confidential

2          Q.    I assume, yes or no, that you spoke to

3     Mr. Wall regarding this deposition?

4          A.    I did.

5          Q.    Yes or no, did you speak to any other

6     attorneys regarding this deposition?

7          A.    Yes.

8          Q.    And other than those communications with

9     attorneys, did you speak to anyone about this

10    deposition?

11         A.    I did not.

12         Q.    Were you ever contacted by the

13    ombudsman's office regarding the accusation that

14    there were leaks coming from FINRA?

15         A.    I don't recollect being contacted by the

16    ombudsman.

17         Q.    Did anyone on your team get contacted by

18    the ombudsman's office regarding any potential

19    leaks from FINRA relating to the Hurrys'

20    businesses?

21         A.    When you are referring to "team," are

22    you referring to people who I supervised or

23    specifically people who were working on the

24    investigation with me?

25         Q.    Well, let's go the broader.  The people



```
 1              S. Andersen - Confidential
 2    you supervised.
 3         A.    I am not aware of.
 4         Q.    Are you aware of any communications
 5    between the ombudsman's office and your superiors
 6    regarding potential leaks in this investigation,
 7    the Hurry -- investigation of the Hurrys?
 8         A.    I am not.
 9         Q.    Did you ever provide any documents to
10    the ombudsman's office relating to any leak
11    investigation relating to the Hurrys' matter?
12         A.    No.
13         Q.    Did anyone in your office provide any
14    documents to the ombudsman's office in response to
15    a request relating to the Hurrys' matter?
16         A.    Not that I am aware of.
17         Q.    And did any members of your team provide
18    any documents to the ombudsman's office as part of
19    an investigation into any leaking in the Hurrys'
20    matter?
21         A.    Not that I am aware of.
22         Q.    At any time did anyone at FINRA, other
23    than a lawyer, ever ask you whether you were
24    involved in any leaking of information relating to
25    the Hurrys to a news reporter?
```



1                    S. Andersen - Confidential

2          A.    I don't believe so.

3          Q.    Did anyone ever ask you, anyone at FINRA

4     other than a lawyer ever ask you, whether any

5     members of your Enforcement team were involved in

6     any leaking of material relating to the Hurrys to a

7     news reporter?

8          A.    Not that I recollect.

9          Q.    Who is Tom Mallett?

10         A.    Tom was the associate director in Member

11    Reg based in Denver.  I believe that's his title,

12    by the way.

13         Q.    Associate director?

14         A.    Of Member Regulation in Denver.

15         Q.    Have you ever heard him referred to as

16    head of surveillance?

17         A.    He could have had that title instead.

18         Q.    Was Tom Mallett in the Denver office

19    while you were at FINRA?

20         A.    Yes.

21         Q.    What did you understand Tom Mallett's

22    job duties to be?

23         A.    Well, if he was surveillance director,

24    there is a whole variety of things he is required

25    to do in that capacity relating to the interaction



1              S. Andersen - Confidential

2    with broker/dealer members.  But I am not aware of

3    the specificities of what that title is, other than

4    he supervised people that were contact sources for

5    member firms at FINRA.

6         Q.    And that last part when you say he

7    supervised people who were contact sources, that's

8    something you observed him doing personally when

9    you interacted with him at FINRA, right?

10        A.    Not that I am aware of.

11        Q.    Just with respect to your interactions,

12   can you tell me something about what you understood

13   Tom Mallett to be doing at FINRA?

14        A.    Yes, he was -- he was involved in the --

15   the Scottsdale inquiry.

16        Q.    The Scottsdale what?

17        A.    Inquiry.

18        Q.    Is there a difference in FINRA jargon

19   between an inquiry and an investigation?

20        A.    I don't think there is a strict

21   definitional difference between the two that FINRA

22   draws.  I think the terms could be used

23   interchangeably.

24        Q.    Can you just take me through -- let's

25   say that FINRA receives some sort of reliable tip



1               S. Andersen - Confidential

2      or some piece of information that a broker/dealer

3      could be violating its rules.  Is the first thing

4      that happens that FINRA opens an inquiry, is that

5      the terminology used?

6           A.   I don't know the details on how tips are

7      generally handled other than they go to the OFDMI

8      department.

9           Q.   What does OFDMI stand for?

10          A.   It's basically the fraud -- fraud and --

11     I would be guessing what the terms are at this

12     point.

13          Q.   Well, how is it -- what -- at what stage

14     would your office typically, the Enforcement office

15     typically, get involved with respect to some sort

16     of accusation out there of a broker/dealer engaging

17     in wrongdoing?

18          A.   When we are asked to.

19          Q.   And who asks you?

20          A.   It could be either a Member Regulation

21     or OFDMI.

22          Q.   And is there some sort of formal term

23     within FINRA for the stage in which the Enforcement

24     Department gets involved in a particular matter?

25          A.   Not that I am aware of.



1              S. Andersen - Confidential

2        Q.    But did you personally use the term

3    "inquiry" to refer to that?

4        A.    To refer to what?

5        Q.    What do you use the term "inquiry" to

6    mean at FINRA?

7        A.    What do I -- what did I personally use

8    it for?

9        Q.    Sure.

10       A.    To mean that there is an open

11   investigation.

12   DI  Q.    Just in terms of money spent let's say

13   as a metric, how would you compare the Scottsdale

14   Capital investigation to some of the other

15   investigations that you participated in at FINRA?

16            MR. WALL:  I am going to object and

17        advise him not to answer questions relating to

18        other investigations or discussion of the

19        investigation itself as beyond the scope and

20        also entering into privileged communications,

21        privileged activities.

22            So you do not have to answer that

23        question.

24            MR. ESPER:  Counsel, this goes to

25        motive.  The reality is that if FINRA leaked



1             S. Andersen - Confidential

2      this, we obviously are -- it's highly unlikely

3      that we are going to get somebody on the

4      record who said, I violated FINRA's policies

5      and leaked this.  So obviously our case is by

6      necessity one of eliminating alternatives,

7      circumstantial evidence, and motive.  It would

8      seem to me that if a particular investigation

9      was both important, involved, and expensive

10     and was also unsuccessful, that could -- or

11     needed a little push, that could supply the

12     necessary motive for any leaking.

13            MR. WALL:  I understand what you say,

14     but you are asking questions about internal

15     FINRA matters involving their investigations.

16     And those are privileged matters and Mr.

17     Andersen is not allowed to testify about such

18     matters.

19            MR. ESPER:  What's the authority for

20     claiming this is privileged?

21            MR. WALL:  I am not going to debate with

22     you caselaw on the record here today.  But

23     there is an investigatory privilege which

24     benefits FINRA and you are asking questions

25     about investigations, both the Hurry one and



```
 1                  S. Andersen - Confidential
 2    or others who are under our jurisdiction.
 3         Q.    Right.  But FINRA itself isn't under
 4    your jurisdiction, correct?
 5         A.    I worked for FINRA.
 6         Q.    But you aren't -- your role was
 7    different from the general counsel's role, correct?
 8         A.    That's true.
 9         Q.    In that the general counsel would
10    actually opine on whether FINRA's conduct was
11    within the law, correct?
12         A.    I assume so.  I haven't -- I haven't had
13    that conversation with anybody from the general
14    counsel's office as to whether some hypothetical
15    conduct by FINRA was lawful or not, but I assume
16    you are correct.
17         Q.    You understood that to be the general
18    counsel's role in FINRA?
19         A.    I think that's right.
20         Q.    And you understood your role to be a
21    different role from the general counsel's role,
22    right?
23         A.    Yes.  We brought the cases.
24         Q.    You brought the cases against the
25    broker/dealers and the people you mentioned in your
```



```
1              S. Andersen - Confidential
2     previous answer who were associated or affiliated
3     with them, et cetera, correct?
4         A.    Correct.
5         Q.    And you did not bring claims against
6     FINRA, correct?
7         A.    Correct.
8         Q.    And you also didn't write advice memos
9     for FINRA employees about whether their conduct was
10    within the law, correct?
11        A.    Correct.
12              MR. ESPER:  Okay, let's take a break.
13              THE VIDEOGRAPHER:  It's 12:27, this is
14         going to be the end of Disk 1 and we are off
15         the record.
16              (Discussion off the record.)
17              (Recess taken.)
18              THE VIDEOGRAPHER:  It's now 12:41, we
19         are back on the record and starting Disk
20         Number 2.
21    DI   Q.    Mr. Andersen, in conducting the
22    investigation, did you form an opinion about
23    whether Mr. Hurry has violated any of FINRA's
24    regulations?
25              MR. WALL:  Objection.  He does not have
```



1              S. Andersen - Confidential

2      to answer that question.

3           You are instructed not to answer

4      questions relating to both your opinions and

5      conclusions and work product, as well as the

6      internal workings of FINRA and the

7      investigation.

8           MR. ESPER:  Okay, I am going to go

9      through a series of these.  I want to make a

10     record.  So obviously if there is something I

11     say that triggers a different objection or

12     something I say that requires a colloquy, I am

13     not restricting you.  But if the objection is

14     the same, let's try and do a nice short

15     objection so that we can get through this part

16     of the deposition quickly.  Okay?

17          MR. WALL:  The instruction and the

18     objection will be the same to questions of

19     that nature.

20          MR. ESPER:  Right.  That's the record I

21     am trying to make, but if I say something that

22     -- I am not muzzling you.  If I say something

23     that requires a different objection, obviously

24     you need to make your record.  But if it's the

25     same objection, please just say same objection



```
 1                  S. Andersen - Confidential
 2          or same instruction or something so we can get
 3          through it.
 4     DI   Q.    In comparison to the other cases you
 5     worked on, how significant was the case against
 6     Scottsdale Capital?
 7               MR. WALL:  Same objection and
 8          instruction.
 9     DI   Q.    And did you feel any personal
10     disappointment at the fact that Mr. Hurry hasn't
11     yet been punished for any of the matters uncovered
12     in your investigation?
13               MR. WALL:  Same objections and
14          instruction.
15     DI   Q.    And with respect to your investigation,
16     did you have any conversations with anybody else at
17     FINRA where anybody else at FINRA expressed
18     disappointment over the results of the Hurry
19     investigation?
20               MR. WALL:  Same objections and
21          instruction.
22     DI   Q.    And how much money did FINRA spend while
23     you were there investigating Mr. Hurry?
24               MR. WALL:  Same objections and
25          instruction.
```



1                    S. Andersen - Confidential

2    DI   Q.    Did you ever speak to anyone, any

3    superior at FINRA who indicated any dissatisfaction

4    with the results of the investigation of Mr.

5    Hurry's businesses?

6              MR. WALL:  Same objections and

7         instruction.

8         Q.    Isn't it true that your office -- strike

9    that.

10   DI        isn't it true that your office leaked

11   information to Mr. Meagher because people in your

12   office were frustrated that Mr. Hurry was getting

13   away with violations of FINRA's regulations?

14             MR. WALL:  Same obstruction -- same

15        objection and instructions same.

16             MR. ESPER:  Freudian slip.

17   DI   Q.    And isn't it true that you personally,

18   Mr. Andersen, approved the leaking of information

19   to Mr. Meagher because you were frustrated that Mr.

20   Hurry was escaping punishment for violations of

21   FINRAs rules?

22             MR. WALL:  Same objections and

23        instruction.

24        Q.    Let's get back to Mr. Mallett.  Trying

25   to skirt around objections for now, yes or no, did



```
 1                S. Andersen - Confidential
 2    Mr. Mallett have a role in the investigation of Mr.
 3    Hurry?
 4         A.    Yes, he did.
 5    DI   Q.    Can you describe in general terms --
 6    don't get into specific conversations, don't get
 7    into specific investigations or interviews he might
 8    have conducted, but just in general terms what was
 9    his role?
10              MR. WALL:  And object again and instruct
11         him not to answer pertaining to the
12         investigation that was conducted.  If you want
13         to ask him in a general term without regard to
14         any particular investigation what was Mr.
15         Mallett's general role or his general duties
16         at FINRA I think he can answer that question,
17         but not as to a specific investigation.
18              MR. ESPER:  Counsel, it's foundational.
19         And the specific foundation I am trying to lay
20         is to get into an inquiry of who at FINRA were
21         potential leakers, who had access to the
22         confidential information that was leaked to
23         Mr. Meagher.  To do that at all -- I
24         understand your objections and I am not
25         actually asking the witness to tell me Mr.
```



```
1                 S. Andersen - Confidential

2      further action as they determine as appropriate.

3           Q.    And just to educate me a little and to

4      lay a foundation:  FINRA is a private company,

5      right?

6           A.    It is.

7           Q.    And so FINRA does not itself bring

8      prosecutions for violations of federal securities

9      laws, right?

10          A.    Wrong, it does.  FINRA is an SRO, a

11     self-regulatory organization, which has been

12     delegated by the SEC to assume some of the SEC's

13     responsibilities for enforcing both the federal

14     securities laws and FINRA rules, and particularly

15     against broker/dealers and associated persons of

16     broker/dealers.

17          Q.    So in what situations does FINRA

18     typically refer something to the SEC in the way you

19     were just testifying?

20          A.    There could be many different reasons

21     for it.  One, for example, could be in an instance

22     where the individual that there is evidence

23     suggesting may have violated a federal law is not

24     under FINRA jurisdiction.  That could be one

25     instance in which such referral is made.
```

1                      S. Andersen - Confidential

2          Q.    Who at FINRA -- I take it an SEC

3     referral when it does occur is nonpublic

4     information, correct?

5          A.    Yes.

6          Q.    In addition for it to be nonpublic, is

7     it limited to certain people and positions at FINRA

8     who can access the SEC referrals?

9          A.    I am sure it is, but I don't know the

10    limits or scope.

11         Q.    With respect to the people you worked

12    with -- first of all, I assume you had access to

13    SEC referrals as a general matter?

14         A.    I don't -- I don't know whether I did or

15    I did not.

16         Q.    During the course of your duties in one

17    case or another, you had accessed SEC referrals; is

18    that fair to say?

19         A.    SEC referrals are controlled by OFDMI

20    and my recollection is OFDMI limits access to those

21    referrals.  Whether I ever had access to an SEC

22    referral after the fact, I think it's probably fair

23    to assume that I have.

24         Q.    Can you tell me based on your personal

25    knowledge -- you mentioned OFDMI.  That's one group



```
 1              S. Andersen - Confidential
 2   of people who have access at least some of the time
 3   to SEC referrals, correct?
 4        A.    They oversee the referral process.  And
 5   in the instance that I was recollecting where I
 6   obtained access to a referral, I believe I obtained
 7   that access through OFDMI.  In other words, without
 8   their permission I didn't have access.
 9        Q.    Understood.
10              So based on that, one of the things you
11   could conclude is that someone at OFDMI did have
12   access in order to give you access, correct?
13        A.    In the example that I am thinking of,
14   yes, that's correct.
15        Q.    Do you know approximately how many
16   people at OFDMI had access to the referrals?
17        A.    I don't.
18        Q.    Other than you, has there ever been a
19   situation where any of your staff members received
20   access to an SEC referral?  And you can answer yes
21   or no because I see your counsel --
22        A.    Yes, I don't know the answer to that.
23        Q.    Were there ever situations, again yes or
24   no, where Mr. Bennett had access to an SEC
25   referral?
```



```
 1                  S. Andersen - Confidential
 2    through OFDMI.
 3         Q.    So it's at least possible that you would
 4    have to speculate on the specifics, but it is at
 5    least within the realm of possibility that Member
 6    Regulation personnel may have access to referrals?
 7         A.    Certainly if they are drafting
 8    referrals, they have access to it.
 9         Q.    Since it's called an SEC referral, I
10    assume it's sent to the SEC; is that correct?
11         A.    Yes, what I am describing here today
12    would be sent to the SEC.
13         Q.    Are there any other government agencies
14    that typically receive SEC referrals?
15         A.    No.  I mean, I have no idea, but it
16    would be misdirected, right?  If it's an SEC
17    referral, it would go to the SEC.
18         Q.    With respect to the one you remember
19    reviewing, do you know if anybody in the government
20    other than the SEC received that referral?
21         A.    I don't know.
22         Q.    And do you know if any other private
23    company other than FINRA received that referral?
24         A.    I don't know.
25    DI   Q.    Can you name the subordinates who worked
```



1              S. Andersen - Confidential

2     under you on the matter of the investigation of Mr.

3     Hurry?

4              MR. WALL:  I am going to object and

5          advise him not to answer questions dealing

6          with the investigation.  It's internal FINRA

7          matters within the investigatory privilege.

8          Q.    Do you know if any of the people who

9     worked under you ever spoke to reporters?

10         A.    I am not aware of any instance where

11    somebody who reported to me spoke to a reporter.

12         Q.    Leaving aside the FINRA policies that we

13    already discussed, did you have any office policy

14    itself for your subordinates not to speak to

15    reporters?

16         A.    The FINRA policy, everyone understood.

17    It was well-disseminated and everyone understood

18    what the rules were.  There were to be no

19    communications directly with the press.

20    DI   Q.    Did you ever discipline anybody or any

21    subordinate of yours for speaking to a reporter?

22             MR. WALL:  Same objections and advise

23         not to answer.  Going beyond the scope and

24         into internal FINRA matters.

25         Q.    Did you form any personal opinion as to



| 1 | S. Andersen - Confidential |

1                    S. Andersen - Confidential

2     whom Mr. Meagher's sources were with respect to his

3     articles about the Hurrys?

4              MR. WALL:  Same objections as earlier

5         and advise him he does not need to answer that

6         question.

7              MR. ESPER:  Counsel, you just advised

8         him not to answer whether he has formed any

9         personal opinion as to who the leakers were.

10        I mean, you are seriously contending that

11        that's either privileged or irrelevant?

12             MR. WALL:  You can answer that question.

13    A.    I haven't formed any opinion.

14    Q.    Did you ever speculate to anybody that

15    the leaks could have come from within Scottsdale

16    Capital?

17             MR. WALL:  Same objections as to

18        communications within FINRA communications

19        with counsel.  You can answer as to any other

20        communications you may have had.

21    Q.    I will exclude counsel.  Excluding

22    communications with lawyers who represented you,

23    did you ever speak to anyone and express any sort

24    of speculation that the leaks in this matter could

25    have come from Scottsdale Capital?



```
 1                 S. Andersen - Confidential
 2       A.    I don't recall a specific conversation.
 3       Q.    Do you recall in general terms having
 4    that conversation?
 5       A.    I don't recall.
 6       Q.    Yes or no, there was a tipster from
 7    within Scottsdale Capital from whom the Enforcement
 8    division received information relevant to its
 9    investigations of Mr. Hurry, correct?
10             MR. WALL:  Going to object and advise
11         him not to answer questions with regard to
12         FINRA's investigation.
13             MR. ESPER:  It's foundational and this
14         was -- this has been extensively deposed and
15         disclosed.
16             MR. WALL:  FINRA's investigation has not
17         been extensively disclosed and deposed.
18             MR. ESPER:  The fact that there was a
19         tipster has been.  That one fact again, and I
20         will say something clearly because I want -- I
21         want a real deposition.  I am not trying to
22         force FINRA into waivers of its positions.  I
23         disagree with some of its positions on the
24         investigatory privilege, but I am not trying
25         to force FINRA to waive it.
```



```
 1              S. Andersen - Confidential
 2          However, when something has been turned
 3    over to me in a document and then I get a
 4    report filed to the court saying that the
 5    issues relating to discovery of the identity
 6    of the tipster were mooted by the disclosure
 7    of the document and then I take a number of
 8    depositions last week in which we discussed
 9    the issue of a potential tipster, we don't get
10    into the investigation but we do mention the
11    fact that there was a tipster because it's
12    foundational to some issues like whether the
13    tipster was the person who leaked information
14    to FINRA, and now I come all the way to
15    New York to take the deposition of Mr.
16    Andersen, excuse me, and suddenly I get a
17    claim that I can't even discuss this already
18    extensively disclosed and discovered single
19    fact that there was a tipster, I have a
20    problem with that.  Because what it's going to
21    end up forcing me to do is go back to Judge
22    Silver, get an order saying that in fact I can
23    take this deposition, ask the same questions I
24    asked other witnesses, got answers from other
25    witnesses on, explore the same subject matter,
```



1        S. Andersen - Confidential

2    and fly back to New York at my client's

3    expense to take this deposition again.

4        So, you know, I would urge counsel -- I

5    understand the investigatory privilege claim

6    and I understand that when I get into matters

7    regarding what FINRA is doing and its

8    Enforcement action against the Hurrys, that I

9    am going to draw an objection.  I may disagree

10   with that, but I accept it.  And I have been

11   trying in good faith to stay away from that

12   and when I have gotten into that stuff, to

13   explain what I am doing and why I am there,

14   but when we are dealing with something

15   involving, you know, a fact that is already

16   established in this litigation and is a single

17   fact and I am not asking for any broader

18   waiver of FINRA's position with the

19   investigatory privilege, I am just asking that

20   I be allowed to ask questions premised on the

21   single disclosure fact that there was a

22   tipster, I have a problem with that because

23   that is -- that is very much going to

24   interfere with my ability to ask questions

25   about whether there are facts that would



```
 1              S. Andersen - Confidential
 2       indicate or not indicate the tipster is a
 3       potential leaker.
 4              MR. WALL:  Can you read the last
 5       question back, please.
 6              (Record read.)
 7              MR. WALL:  Okay, you can answer that
 8       question.
 9              THE WITNESS:  I can answer?
10              MR. WALL:  Yes.
11       A.    The answer is:  Correct.
12       Q.    And did you ever express to anyone the
13    possibility that that tipster was a source to Mr.
14    Meagher, other than communications that you might
15    have had with a lawyer representing you?
16       A.    I don't recollect.
17       Q.    Did Mr. Bennett ever speculate that the
18    tipster was a source of information to Mr. Meagher?
19       A.    I don't recollect.
20       Q.    Did anyone in the press office, media
21    relations office at FINRA ever speculate that the
22    tipster was the source of information to Mr.
23    Meagher?
24       A.    I don't know.
25       Q.    And did anyone in the ombudsman's office
```



```
 1              S. Andersen - Confidential
 2    ever express any sort of speculation that the
 3    tipster might have been a source of information to
 4    Mr. Meagher?
 5         A.    I don't know.
 6         Q.    Did you do anything to determine whether
 7    the type of information that was referenced to Mr.
 8    Meagher's story was information that the tipster
 9    might have had?
10         A.    I don't.
11         Q.    Sitting here now, do you have any
12    opinion as to whether the tipster was Mr. Meagher's
13    source?
14              MR. WALL:  You can answer if you have an
15         opinion.
16         A.    I don't know what the source was.
17 DI   Q.    Did you have any communications with the
18    SEC regarding Scottsdale Capital's claim that there
19    were leaks to Mr. Meagher?
20              MR. WALL:  Objection.  The
21         communications with the SEC, that is part of
22         investigatory privilege and you should not
23         answer questions regarding communications with
24         the SEC.
25 DI   Q.    Did the SEC ever inform you of the
```



```
 1                S. Andersen - Confidential
 2    existence of a report regarding whether there were
 3    leaks from the SEC to Mr. Meagher?
 4                MR. WALL:  Same objection and
 5          instruction.
 6    DI   Q.    Did you ever speak to Deborah Terasevich
 7    regard -- at the SEC regarding the issue of whether
 8    there were leaks to Mr. Meagher?
 9                MR. WALL:  Same objection and
10          instructions.
11    DI   Q.    Did you ever speak to an SEC employee
12    named Sachar, S-A-C-H-A-R, regarding whether there
13    were leaks to Mr. Meagher?
14                MR. WALL:  Same objection and
15          instruction.
16         Q.    Just to back up and ask a question that
17    won't draw an objection, did you ever see the
18    written report issued by the ombudsman regarding
19    the investigation of the leaks to Mr. Meagher, the
20    FINRA ombudsman?
21         A.    I did not.
22         Q.    Did you ever ask to see it?
23         A.    No.
24         Q.    Were you ever curious who the source of
25    the leak was?
```



```
 1                    S. Andersen - Confidential

 2        A.    Yes.

 3        Q.    Why were you curious?

 4        A.    To understand motive.

 5        Q.    What do you mean "to understand motive"?

 6        A.    To understand why somebody would do

 7    that.

 8        Q.    Were you in any way to any level

 9    concerned that the leak might have come from FINRA?

10        A.    You are asking me if I had any concerns

11    about that?

12        Q.    Yes.

13        A.    Not really.

14        Q.    If the ombudsman had come back and come

15    to you and produced evidence -- and this is a total

16    hypothetical.  I will warn you of that because in

17    fact the ombudsman report does not say this, so I

18    want to get that out of the way to begin.

19              Had the ombudsman come back to you with

20    a report that said and established based on

21    forensic evidence that the leak had come from

22    within your office, would that have been of concern

23    to you?

24              MR. WALL:  Objection to the

25         hypothetical.  Contrary to fact.
```



1                    S. Andersen - Confidential

2         A.    Correct.

3         Q.    Now, that e-mail refers to AML.  Is AML

4    an abbreviation that is used routinely at FINRA?

5         A.    Yes.

6         Q.    What does that refer to?

7         A.    Anti-money laundering.

8         Q.    Without getting into any of the

9    substantive details, is it fair to say that one of

10   the subject matters of the Hurry investigation in

11   the most general terms possible was a possible

12   anti-money laundering violation?

13              MR. WALL:  You can answer that question.

14        A.    Yes.

15              MR. ESPER:  It's foundational to these

16        documents.

17              MR. WALL:  Right.  We won't go beyond

18        that, but that initial question he can answer.

19              MR. ESPER:  It's foundational to these

20        documents because obviously we are going to

21        get into what the article says.

22        Q.    So now I want you to take a look at the

23   article and I want you to go past the first page of

24   the article.

25              Go to the second page of the article and



1              S. Andersen - Confidential

2    now take a look at the paragraph -- the sixth

3    paragraph on this page.  And would you read that

4    paragraph, for the record?

5         A.    Yes.  I just want the record to be clear

6    I haven't read this article since I have been in

7    the sit-in here since it's been handed to me, but I

8    will read.  "But a source who has spoken to

9    investigators says the investigation is ongoing.

10   The probes by FINRA and the SEC began in May prior

11   to the trading halt."

12        Q.    I will go back and let you read the

13   article, but can I just ask one question on this:

14   The date on which FINRA does or does not conduct an

15   investigation is considered nonpublic information

16   by FINRA, correct?

17        A.    Yes, I believe so.

18        Q.    So now go back and read to yourself the

19   article.  Because the next question is going to

20   require you to know the context of, make sure that

21   you understand the whole article.

22             So you just read the entire article,

23   correct?

24        A.    I did.

25        Q.    Does that article contain information



1            S. Andersen - Confidential

2    which, as you understand it, would be classified as

3    nonpublic information by FINRA?

4            A.    The article contains information

5    pertaining to FINRA's investigation and, thus, I do

6    think it's information that is generally considered

7    by FINRA to be nonpublic.

8            Q.    So hypothetically -- and I know you have

9    indicated that earlier that you did not leak any

10   information to Mr. Meagher.  But hypothetically had

11   you been Mr. Meagher's source for the piece of

12   information, for instance, that the date on which

13   the investigation was opened, then you would have

14   been in violation of FINRA's policy to be giving

15   them that information, correct?

16           A.    Yes.

17           Q.    And I want you to go to the third page

18   of the article, fourth page of the exhibit, and

19   look at the third from the last paragraph down on

20   that page.  Can you read that for the record?

21           A.    "FINRA, who has worked with the SEC on

22   the probe, has had several on-the-record

23   conversations with Scottsdale staff regarding the

24   trading of Biozoom shares, the process by which the

25   accounts for the Argentine Nationals and how assets



```
 1              S. Andersen - Confidential
 2    were moved offshore according to a person who has
 3    spoken with investigators.  OTRs, as they are known
 4    in the brokerage industry, are sessions in which
 5    FINRA staff asked specific questions of registered
 6    representatives who must answer them or face
 7    disciplinary actions."
 8         Q.    So the first question is:  That last
 9    sentence you just read just explaining what OTR are
10    and quite apart from whether you ever conducted an
11    OTR of our clients or any investigation that you
12    did, is that statement about what OTR are accurate
13    or would you put it differently?
14         A.    I think it's generally accurate.  I may
15    not phrase it this way, but I think it is generally
16    accurate.
17         Q.    So just educate me a little bit, FINRA
18    is conducting an investigation so it goes to the
19    broker/dealer that it's investigating and it
20    interviews key personnel, correct?
21         A.    Yes.  Generally how it works instead of,
22    you know, issuing for example a subpoena for my
23    appearance today, there is something called an
24    8210, Rule 8210 notice, which identifies the person
25    and the date of testimony.  The individual has a
```



 1                S. Andersen - Confidential

 2    FINRA's policy against disseminating nonpublic

 3    information, correct?

 4         A.    If the decision was made by FINRA or

 5    FINRA staff.

 6         Q.    Sure.  And that gets to the next

 7    question, which is:  Other than FINRA and FINRA

 8    staff, who has access to on-the-record interviews?

 9         A.    I have a legal question to ask my

10    attorney about the scope of the investigation

11    privilege.

12         Q.    Take a break and ask him and come back.

13              THE VIDEOGRAPHER:  It's 2:44, we are off

14         the record.

15              (Discussion off the record.)

16              THE VIDEOGRAPHER:  It's now 2:47 p.m.,

17         we are back on the record.

18              THE WITNESS:  Can I just ask the court

19         reporter, would you read that last question

20         back.

21              (Record read.)

22         A.    When you say who has access to the

23    on-the-record interviews, are you talking about the

24    transcripts or are you talking about general

25    knowledge that the OTRs have occurred?



```
 1                 S. Andersen - Confidential
 2        Q.    Let's get to the very specific thing
 3   that's in this article.  The article, it's fair to
 4   say, lists a bunch of names of people who allegedly
 5   were subject to OTR interviews; is that a fair
 6   statement?
 7        A.    Yes.
 8        Q.    So who has access to the names of the
 9   people who are interviewed on the record in a FINRA
10   investigation that you are involved in?
11        A.    Besides FINRA and FINRA staff, the
12   individual who is deposed, that individual's
13   counsel, likely that individual's firm, and other
14   individuals from that individual's firm it's
15   possible could have access to that information.
16   And also it's possible that the SEC could have
17   access to that information as well.
18   DI  Q.    So did you inform the SEC who you
19   interviewed in this case?
20        A.    Did I myself personally?
21             MR. WALL:  Objection.  Instruct him not
22        to answer questions pertaining to the
23        particular investigation.
24             MR. ESPER:  So you are instructing him
25        not to answer?
```



```
1                    S. Andersen - Confidential
2                    MR. WALL:  Yes.
3    DI   Q.    Did anyone in your department provide
4    information as to who the identity of the
5    on-the-record interviewees were in the Hurrys'
6    investigation to the SEC?
7                    MR. WALL:  Objection.  Same objection,
8         same instruction.
9         Q.    And you mentioned people within FINRA.
10   Let's start with just departments before we get to
11   individuals.  Can you tell me for instance besides
12   the Enforcement Department, are there any other
13   departments at FINRA that have access to the
14   identity of on-the-record interviewees?
15        A.    You are talking generally, we are not
16   talking about specifically this investigation?
17        Q.    Generally we will start and then we will
18   narrow it down.
19        A.    Okay, very good.  Good.  So when you
20   have OTR being held, they may be conducted by
21   Member Regulation.  Now, Member Regulation recently
22   added a rule where they would have an attorney from
23   Enforcement participate in the OTR as well.  So it
24   would be generally speaking those two departments.
25   If it's an on-the-record interview being conducted
```



```
 1              S. Andersen - Confidential
 2    exclusively by the Enforcement Department, it may
 3    just be Enforcement staff.  It's possible that
 4    Member Reg could be assisting on the matter still
 5    and there could be Member Reg staff as well.
 6         Q.    Are there any other -- other than Member
 7    Regulation and Enforcement, are there any other
 8    departments at FINRA that would have access to the
 9    identities of on-the-record interviewees?
10         A.    It's possible if there has been
11    discussions with other departments concerning a
12    certain investigation or the scope of a certain
13    investigation, there -- it is possible that
14    departments could be involved in the calls.
15  DI Q.    Yes or no, did you ever share the
16    information regarding who was interviewed in the
17    Hurry matter with any departments other than your
18    department and Member Regulation?
19              MR. WALL:  Same objections as before
20         with regard to a particular investigation and
21         instruction not to answer.
22              MR. ESPER:  I am going to continue and
23         probably get some more objections and make my
24         record, but I want to make my record clear
25         here that the fundamental issue in this case
```



1          S. Andersen - Confidential

2    is in fact whether anyone in FINRA talked to

3    Mr. Meagher.  And that is the essential issue

4    and, I should be more precise, talked to Mr.

5    Meagher off the record regarding not -- what

6    FINRA calls nonpublic information.  That is

7    what is at the center of this case.

8          So if I cannot inquire as to who at

9    FINRA is in the universe of people who had the

10   information that was eventually provided to

11   Mr. Meagher, then it seems to me I am being

12   obstructed on a central matter on this case.

13   And I would caution counsel that a position

14   like that can result in an evidentiary

15   preclusion later on down the line, because we

16   have a situation where there is information

17   that is central to my case that I am being

18   denied discovery on.

19          I would also caution counsel that his

20   co-counsel Mr. Davis has indicated he would

21   like to file a summary judgment motion in this

22   case based on the contention which he already

23   represented to Judge Silver, that the

24   plaintiffs have no evidence according to him

25   of who the leaker is.  And in that respect, he



```
 1           S. Andersen - Confidential
 2    would be advised that we would of course bring
 3    to the court's attention the fact that our
 4    discovery into exactly who the leaker was was
 5    prevented in opposition to any such summary
 6    judgment motion.
 7           MR. WALL:  You have asked Mr. Andersen
 8    if he knows of any communications with Mr.
 9    Meagher and if he communicated with Mr.
10    Meagher and he has indicated he does not have
11    such knowledge and did not engage in any such
12    communications.
13           So at this point your questions are
14    open-ended and general as to identities of
15    people involved with various aspects of an
16    investigatory matter, which is subject to
17    privilege.  So you are not being obstructed.
18    Mr. Andersen is giving you information within
19    his knowledge with regard to the issue of
20    source that Mr. Meagher may have had or
21    sources he may have had.  And he has
22    identified multiple possible people in various
23    capacities in different situations, both
24    within and without FINRA, who may or may not
25    have information of the type that you are
```



1          S. Andersen - Confidential

2      requesting.  So he is giving you all the

3      information that he has on that subject that

4      is not within the privilege.

5              MR. ESPER:  Okay, fine.  No open-ended

6      and general.  Very specific yes or no.

7      Q.    Other than yourself, are you aware of

8  people at FINRA who had access in the Hurry

9  investigation to the names of people who were

10  interviewed on the record?

11              MR. WALL:  You can answer as to whether

12      you know the names of people without

13      identifying the people.

14      Q.    Right, yes.  It's a yes or no.

15      A.    Other than me, the question is other

16  than me did other people at FINRA know who was

17  being deposed in this investigation; is that your

18  question.

19      Q.    Yes.

20      A.    The answer is yes.

21  DI  Q.    Can you tell me each person at FINRA who

22  knew the names of the people who were interviewed

23  on the record?

24              MR. WALL:  Same objections as before and

25      same instruction.



800.211.DEPO (3376)
EsquireSolutions.com

1                S. Andersen - Confidential

2          Q.    Now, how about the date of the

3    investigation which we talked about earlier, the

4    date on which the investigation started; you

5    already testified that that is nonpublic

6    information, correct?  Can you review the context

7    of it?  It is on the second page of the exhibit,

8    sixth paragraph -- sixth paragraph from the top.

9                MR. WALL:  Same objection.  Misstates

10        testimony.

11                But you can answer.

12                And you are asking about a particular

13        date here as opposed to in general is the date

14        of an investigation nonpublic?

15                MR. ESPER:  Well, I am going to start

16        with in general is the date of investigation

17        nonpublic.  Then I am going to ask if this

18        date was in fact -- the date of this

19        investigation was in fact nonpublic.  And then

20        I am going to ask who has knowledge at FINRA

21        of the date in which the investigation is

22        commenced.  So I will give you the whole

23        preview here.

24                MR. WALL:  Are you representing that the

25        date of this investigation is not part of the



```
 1              S. Andersen - Confidential
 2    there other people investigating this matter before
 3    you got involved; yes or no?
 4              MR. WALL:  You can answer that.
 5         A.    I believe so.
 6         Q.    So you actually do not necessarily know
 7    whether you would have been able to tell me if I
 8    had been deposing you in December of 2013 when the
 9    actual FINRA investigation started; you just know
10    when your own involvement started?
11         A.    That's right.
12         Q.    Okay.
13         A.    Can I just clarify something?
14         Q.    Oh, go ahead.
15         A.    There may have been a -- a way to
16    discern an investment commencement date through
17    FINRA records and files.  I just want to make sure
18    you understand that.
19         Q.    That's exactly what I was about to add.
20              MR. WALL:  I think you said "discern an
21         investment commencement date" and I think you
22         meant discern an investigation commencement
23         date.
24              THE WITNESS:  Yes, forgive me.
25         Q.    That's what I was about to ask.  If you
```



```
 1              S. Andersen - Confidential
 2   had wanted to -- I don't know why you would want
 3   to, but if you wanted to know back in December of
 4   2013 when did FINRA start investigating the Hurrys,
 5   you could have obtained that information from FINRA
 6   system, correct?
 7        A.    I would have been able, I believe, to
 8   find some sort of commencement date.
 9   DI  Q.    And my question is:  Who at FINRA, to
10   your knowledge, has access to the commencement
11   dates of investigations?
12              MR. WALL:  Same objections as before and
13        don't answer the question.
14   DI  Q.    Does the SEC have access to the
15   commencement dates at FINRA investigations?
16              MR. WALL:  Same objections and
17        instruction.
18   DI  Q.    Does Scottsdale Capital Advisors have
19   access to the commencement dates of FINRA
20   investigations?
21              MR. WALL:  Same objections and
22        instruction.
23        Q.    Let's move to the next document.  One
24   more document and then we will take our five-minute
25   break.
```



1          S. Andersen - Confidential

2              This next document is Bates-numbered

3     FINRA 404 through 406.  It was produced in this

4     litigation.  I have a handy courtesy copy for my

5     worthy opponent and I am really just -- you can

6     read the whole thing for yourself if you need to

7     familiarize yourself, but I will tell you I am

8     really just interested in the third e-mail on the

9     first page for now, okay.

10         A.    You said the third e-mail?

11         Q.    The third e-mail on that first page is

12    what I am really interested in, but you can read

13    what you need to read to know what it's about.

14         A.    Okay.

15         Q.    So, first of all, you are listed as one

16    of the many recipients on the third e-mail.  Do you

17    see that?

18         A.    Yes.

19         Q.    Do you recall receiving this e-mail, the

20    third e-mail down?

21         A.    I believe I do recall it.

22         Q.    Okay.  And who is it from?

23         A.    Jessica Hopper.

24         Q.    And who is Jessica Hopper?

25         A.    She is the -- she was the head of



1                    S. Andersen - Confidential

2          Q.    Why did you think it was important to

3     tell Mr. McCarthy about this?

4          A.    The communications lines at the time at

5     FINRA between departments was a big focus, that

6     communications can be improved between Enforcement

7     and Member Reg.  And one of the things I was asked

8     to do when I was given my position was improve

9     communications between Enforcement and Member Reg.

10         Q.    I understand that.  I have been in those

11    situations in businesses where you have two teams

12    working on the same matter and sometimes they don't

13    talk to each other enough.

14         A.    Exactly.

15         Q.    So I understand that as a reason to do

16    this, but is there any specific reason other than

17    that relating to the nature of Mr. Russello's

18    allegation as to why you sent it on to Mr.

19    McCarthy?

20         A.    No, it was an FYI.

21         Q.    Because with respect to the other

22    communication we looked at, you said you were

23    escalating to Ms. Hopper.

24         A.    I would consider this escalation as

25    well, as he was a top official in the West.



1                    S. Andersen - Confidential

2          Q.    Did you ever have any conversations with

3    Mr. McCarthy as to whether he was doing any

4    investigations as to whether any leaks came from

5    his department?

6          A.    I don't believe so.

7          Q.    Did you ever ask Mr. McCarthy whether

8    any leaks had come from his department?

9          A.    I don't believe I had that conversation.

10         Q.    Did Mr. McCarthy ever ask you if any

11   leaks came from the Enforcement Department?

12         A.    I don't believe so.  I don't have any

13   recollection of any of that.

14         Q.    Did you have any conversations with the

15   ombudsman's office regarding Mr. McCarthy's

16   department and this investigation?

17         A.    Not that I can recollect.

18         Q.    Did Mr. McCarthy talk to you about any

19   communications with the ombudsman's office relating

20   to leaks of confidential information relating to

21   the Hurrys?

22         A.    I don't believe so.

23         Q.    Other than Ms. Hopper which you

24   characterized as an escalation and Mr. McCarthy

25   which you also characterized as an escalation,



1              S. Andersen - Confidential

2     anybody else that you escalated this matter to?

3          A.    Not that I can recollect.

4          Q.    And anybody at FINRA that you contacted

5     with respect to this matter that you wouldn't

6     characterize as an escalation, but that you

7     notified about Mr. Russello's complaint?

8          A.    Not -- it's possible.  I just -- I don't

9     have a recollection.

10              MR. WALL:  Just as a brief

11         clarification, the e-mail to Ms. Hopper also

12         copied Ms. Whelan.

13              MR. ESPER:  Right.  And the witness

14         testified that Ms. Whelan was the next level

15         up after Ms. Hopper, correct?

16         A.    Ms. Whelan was my direct boss.  Ms.

17    Hopper was her boss.

18         Q.    So you escalated it two levels to Ms.

19    Whelan and Ms. Hopper, correct?

20         A.    Yes.

21         Q.    And then you escalated to Mr. McCarthy?

22         A.    I did.

23         Q.    And there were no other escalations that

24    you can recall?

25         A.    That I can recall.  It's possible there



```
1                    S. Andersen - Confidential

2          A.    I did.

3          Q.    Did you -- and to be clear, these

4     telephone chrons are not in your possession,

5     custody or control anymore, correct?

6          A.    That's correct.

7          Q.    But as far as you know, they are in

8     FINRA's?

9          A.    Yes.

10               MR. ESPER:  Let's go off the record a

11         second.

12               THE VIDEOGRAPHER:  It's now 3:42, we are

13         off the record.

14               (Discussion off the record.)

15               THE VIDEOGRAPHER:  It's now 3:44, we are

16         back on the record.

17               MR. ESPER:  I want to make a point of

18         clarification, on the last set of e-mails I

19         may have misspoke about the date of the

20         publication of the story that related to the

21         Biozoom investigation.  That story was dated

22         on December the 9th.  The e-mails I was just

23         examining Mr. Andersen on were on December

24         4th, they concern an earlier December 3rd

25         inquiry by Mr. Russello regarding questions
```



1              S. Andersen - Confidential

2         that he had received by Mr. Meagher in advance

3         of Mr. Meagher's story.  So I just want that

4         to be clear on the record.

5         Q.    Have you heard from any source, anyone

6    say that the SEC leaked the information to Mr.

7    Meagher and Mr. Meagher's stories?

8              MR. WALL:  I take it you are excluding

9         lawyers?

10             MR. ESPER:  I will exclude lawyers for a

11        moment, yes.

12        Q.    Other than lawyers representing you,

13   have you heard from any source that the SEC leaked

14   information to Mr. Meagher for Mr. Meagher's story

15   about the Hurrys?

16        A.    I haven't.

17             MS. ESPER:  Okay, no further questions.

18             THE VIDEOGRAPHER:  Anyone else?

19             MR. ESPER:  I want to put a statement on

20        the record, but do you have any questions?

21             MR. WALL:  No.  No questions.

22             MR. ESPER:  I want to put a statement on

23        the record before I conclude.  I normally

24        don't do this, FINRA's able counsel can assure

25        you I haven't done this at any deposition so



1

2       far in this case, but there are a whole bunch

3       of instructions not to answer.  I just want to

4       put an express reservation of my client's

5       rights on the record, including the right to

6       seek the relief in the District Court which

7       may include recalling you as a witness, among

8       other remedies.  So I just want to say that

9       all our rights and remedies are reserved with

10      respect to this.

11             MR. WALL:  Thank you.

12             And I think, as you know, this is

13      designated confidential for purposes only of

14      this litigation.

15             THE VIDEOGRAPHER:  This concludes

16      today's proceeding.  We are going off the

17      record.  The time is now 3:46 p.m.  Thank you

18      very much.

19             [Time noted:  3:46 p.m.]

20

21      _____
                        SCOTT ANDERSEN.
        Subscribed and sworn to
22      before me this _____ day
        of _____, 2017.
23      _____
                Notary Public

24

25

