# Exhibit 5

```
 1          IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF ARIZONA

 3    -------------------------------

 4    JOHN J. HURRY AND JUSTINE HURRY,

 5    as husband and wife, INVESTMENT

 6    SERVICES CORPORATION, an Arizona

 7    corporation,

 8            Plaintiffs,

 9    V.                              Case No.

10    FINANCIAL INDUSTRY REGULATORY        14-cv-02490

11    AUTHORITY, INC., a Delaware          PHX-ROS

12    corporation,

13            Defendant.

14    -------------------------------

15            VIDEOTAPED DEPOSITION OF

16                 NANCY CONDON

17               ON BEHALF OF

18    FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

19               February 22, 2017

20                  8:58 a.m.

21              Washington, DC 20037

22    Denise D. Vickery, CRR/RMR        JOB NO. J0524742
```



1          A.    That the information likely came from a

2    different source based on other -- just based on

3    things I had heard.

4          Q.    What sorts of things have you heard

5    that you're basing that on?

6          A.    That there was a tipper involved.

7          Q.    Who told you that?

8          A.    Someone in OFD -- I heard it through

9    OFDMI.

10         Q.    And you don't remember the specific

11   person who told you?

12         A.    It may have been Cam Funkhouser or it

13   may have been Brad Bennett.  I'm just -- I don't

14   recall.  One of the two.

15         Q.    Let's suppose you did -- not in this

16   case but in any situation in your job, let's suppose

17   you received an inquiry from a reporter that raised

18   a concern that the reporter did have sources within

19   FINRA.

20              What would you do in that situation?

21                   MR. DAVIS:  Object to the form of

22   the question.



```
 1                    THE WITNESS:  You have to
 2  understand that reporters always try to make you
 3  think that they have information that they don't
 4  have.  I've been doing this a really long time, and
 5  I'm not going to believe a reporter when they're
 6  trying to goad me into getting information.
 7                    We do not -- we deal in very much
 8  in black and white.  We don't provide confidential
 9  firm information.  We don't make statements about
10  firms at all.  We don't do that, or individuals.
11  BY MR. ESPER:
12       Q.   Has there ever been a situation with
13  respect to any matter that you've dealt with at
14  FINRA where you formed a belief that a source within
15  FINRA, not within your department and not the CEO,
16  was making unauthorized statements to a reporter?
17                    MR. DAVIS:  I object to the form
18  of the question.  I also advise the witness not to
19  answer as this line of questioning exceeds the
20  limitations on discovery with respect to topic 2 of
21  the 30(b)(6) notice as reflected in the court's
22  order dated July 25, 2016, document 105 in this
```



1   case.

2                   MR. ESPER:  Counsel, is there a

3   privilege claim here?

4                   MR. DAVIS:  No.  The claim is that

5   the request exceeds an enforcement -- excuse me --

6   exceeds an order limiting discovery that has been

7   placed on this matter by the court in her order

8   dated July 25, 2016.

9                   MR. ESPER:  What's the basis for

10  your contention that you can instruct a witness not

11  to answer a deposition question with respect to an

12  issue of scope of discovery?

13                  MR. DAVIS:  My basis is the plain

14  language of Federal Rule of Civil Procedure

15  30(c)(2).

16                  MR. ESPER:  And your contention is

17  Rule 30(c)(2) permits you to instruct a witness not

18  to answer on an issue of scope?

19                  MR. DAVIS:  Yes.  It's not my

20  contention.  That's what it says.

21                  MR. ESPER:  Madam Reporter, on any

22  instruction not to answer, would you please mark the



1   transcript so we can condense it?  Thank you.

2   BY MR. ESPER:

3       Q.   Does FINRA have any policies with

4   respect to what action should be taken by the media

5   relations department in the event that someone

6   suspects that someone in FINRA is making

7   unauthorized statements to the press?

8       A.   The media relations department doesn't

9   take action, but an individual can be subject to

10  discipline up to, and including, termination.

11      Q.   Are you aware of any FINRA employee

12  who's ever been disciplined for unauthorized

13  statements to the press?

14              MR. DAVIS:  I object and I'm going

15  to advise the witness not to answer on the grounds

16  the question exceeds the limitation enforced by the

17  court on discovery regarding topic 2.

18              MR. ESPER:  Counsel, this question

19  isn't about topic 2.

20              MR. DAVIS:  Dilan, you're asking

21  whether she has knowledge of anyone being punished

22  essentially for conveying confidential information.



1   This -- this topic has already been presented to the

2   court, and she's already concluded that what is

3   relevant for this case is information and knowledge

4   regarding the disclosure of confidential information

5   regarding the plaintiff or his entities to

6   Mr. Meagher or The Deal.

7                      If you want to ask the witness

8   about those questions, she's prepared to testify

9   about them.

10                     MR. ESPER:  Counsel, your position

11  apparently is that if FINRA leaks like a sieve, I

12  can't discover that.  That is not what -- your

13  contention is even if FINRA has one million leaks to

14  the news media this past year, I cannot discover it

15  because that has no probative value to whether they

16  leaked in this case.

17                     Is that your contention, sir?

18                     MR. DAVIS:  My contention is that

19  this line of questioning has been evaluated by the

20  court.  She's ruled on it, and I would ask that you

21  conform your questions to the limitations placed on

22  the questioning by the court.



1                          MR. ESPER:  The court never

2    limited questioning.  The court limited topics in

3    the 30(b)(6) notice.  This line of questioning

4    hasn't been presented to the court and, as I said,

5    counsel, your position is absurd.

6                          And I just want to say for the

7    record that I don't think there's any federal judge

8    in America who would say that the question of

9    whether an organization has a leaking problem is

10   irrelevant to the issue of whether they leaked in

11   this case.

12                         So if you continue to take this

13   position and instruct -- obstruct the deposition and

14   instruct your witness not to answer on these issues,

15   my client intends to hold your client responsible

16   for the fees that will surely be incurred in

17   attempting to take another deposition where we get

18   into these questions.

19                         I've come all the way to

20   Washington, DC.  If we have to come here again, it's

21   going to be at your client's expense.  So I would

22   ask that rather than taking a calculated position to



1   obstruct any inquiry into whether FINRA engages in

2   any leaks outside this case, that you'll allow me to

3   ask the questions.  We don't even know what the

4   witness is going to say.

5                     MR. DAVIS:  All right.  Your --

6   your statement has been made on the record.

7                     MR. ESPER:  Read back the

8   question.

9                     (The reporter read the record on

10  page 28 lines 11-13.)

11                    MR. DAVIS:  And I object and

12  advise the witness not to answer on the grounds that

13  the question exceeds limitation on discovery placed

14  on this deposition and this case by her order dated

15  July 25, 2016.

16                    MR. ESPER:  You're advising the

17  witness not to answer.  Are you instructing the

18  witness not to answer?

19                    MR. DAVIS:  I'm advising the

20  witness not to answer.

21                    Would you like to follow my

22  advice?



```
 1                      THE WITNESS:  Yes.

 2   BY MR. ESPER:

 3        Q.   You may -- you may answer the question

 4   then.  You have not been instructed not to answer.

 5   So you may answer the question.

 6                      MR. DAVIS:  She just says she's

 7   taking my advice.

 8                      THE WITNESS:  I'm taking his

 9   advice.

10   BY MR. ESPER:

11        Q.   You are compelled under the -- under

12   the deposition notice to answer the questions

13   truthfully.  If your counsel wants to instruct not

14   to answer, that has a legal effect, but his advice

15   to you not to answer is not -- does not mean

16   anything here nor there.  So he needs to instruct

17   you not to answer if he is taking the position that

18   this question can't be answered.

19                      MR. DAVIS:  I will instruct her

20   not to answer.

21                      MR. ESPER:  Okay.  Let's talk

22   about topic number 1.  I tend not to mark exhibits
```



1   that much because they're Bates stamped and I can

2   refer to them anyway, but I will mark this one.  Is

3   there a convention for marking exhibits that I

4   should follow, counsel?

5                   MR. DAVIS:  I -- if you want to go

6   off the record for a second, I know we were

7   sequentially numbering them but -- and I e-mailed my

8   colleague to figure out what our last number was,

9   but I don't know if he's --

10                  MR. ESPER:  Let's go off the

11  record.

12                  THE VIDEOGRAPHER:  Off the record

13  at 9:33 a.m.

14                  (A brief recess was taken.)

15                  THE VIDEOGRAPHER:  Back on the

16  record at 9:33 a.m.

17                  MR. ESPER:  We're going to mark as

18  Exhibit 201.

19                  (Document marked for

20  identification purposes as Exhibit 201.)

21                  THE WITNESS:  (Reviewing

22  document).



 1  ascribed to the terms 'confidential' or 'non-public'

 2  in that time period."

 3          So with respect to disclosure of

 4  examinations, which is mentioned in this topic, is

 5  it fair to say that FINRA's policy is that the

 6  existence of examinations is non-public information

 7  that cannot be disclosed to the press; correct?

 8                  MR. DAVIS:  Object to the form.

 9                  You can answer.

10                  THE WITNESS:  Yes, I don't have

11  access to that information.

12  BY MR. ESPER:

13      Q.   And not only is it FINRA's policy that

14  your office can't disclose it, it's FINRA's policy

15  that other persons within FINRA are not permitted to

16  disclose examinations to the press either; correct?

17                  MR. DAVIS:  Object to the form.

18                  THE WITNESS:  Correct.

19  BY MR. ESPER:

20      Q.   And it is FINRA's policy that with

21  respect to specific government investigations, as

22  mentioned in this topic, that specific government



1   investigations are not to be disclosed to the press

2   because they constitute non-public information;

3   correct?

4              MR. DAVIS:  Object to the form.

5              THE WITNESS:  Correct.

6   BY MR. ESPER:

7        Q.   In your experience, does FINRA follow

8   these policies?

9        A.   Absolutely.

10       Q.   Every time?

11             MR. DAVIS:  I'm going to object to

12  the form of the question.  I'm going to instruct the

13  witness not to answer to the extent that the answer

14  calls for disclosure of information relating to --

15  that is unrelated to Mr. Hurry, his businesses, or

16  The Deal Pipeline.

17             MR. ESPER:  Counsel, may I ask

18  where in topic 1 is there a limitation on the

19  subject area to Mr. Hurry, The Deal Pipeline, etc.?

20             MR. DAVIS:  The limitation that

21  I'm referencing is the limitation from the court's

22  July 25, 2016 order, topic 1, and as far as I can



1   understand it, but admittedly it's about 15 lines

2   long, refers to what FINRA's policies are, which

3   certainly the witness can testify about today and

4   she's prepared to testify about.

5   BY MR. ESPER:

6        Q.   Does FINRA have any unwritten policies?

7                  MR. DAVIS:  Object to the form of

8   the question.

9                  You can answer if you understand

10  it.

11                 THE WITNESS:  Yeah, I need a

12  little more clarification, please.

13  BY MR. ESPER:

14       Q.   Is every policy that your office

15  follows with respect to how it deals with reporters

16  written down somewhere in one of these sets of

17  guidelines, codes of conduct, etc., that FINRA

18  publishes, or are there some things that your office

19  does on a regular basis that you would consider to

20  be your office's policy that are not written down?

21                 MR. DAVIS:  I object to the form

22  of the question.



1                    THE WITNESS:  My office does not

2      provide non-public confidential information about

3      firms and individuals.

4      BY MR. ESPER:

5           Q.    That's not my question.

6                    I'm just asking as a general matter any

7      type of policy.  It could be a policy regarding

8      whether employees can be late to work.  It could be

9      a dress code.  It could be a policy with respect to

10     whether the coffee maker gets cleaned out at night.

11                   Are there actions that your office

12     expects to be regularly done on a daily basis or a

13     weekly basis that are not written down in some

14     policy manual but which you consider to be a policy

15     of your office, yes or no?

16                    MR. DAVIS:  I object to the form

17     of the question.

18                    THE WITNESS:  I don't have a

19     policy that guides my steps from the elevator to my

20     desk every single day.

21                    In general, we follow the policies

22     that are outlined here.  I mean, we adhere to them.



1                    THE WITNESS:  I'm sorry.

2     BY MR. ESPER:

3          Q.    Now let's go back.  "This Meagher guy

4     is a jerk."

5                  Why did you say that?

6          A.    I believe we've already covered this.

7                  I said that he -- his demeanor was such

8     that he repeatedly asked the same questions and that

9     it was his tone and some of the language he used

10    when he asked them.

11         Q.    What did you mean by "This is a

12    sensitive issue and they should keep their pie holes

13    closed"?

14         A.    It meant -- it meant that the fact that

15    he claimed to have referrals was a sensitive issue

16    because they were -- they were non-public.  It was

17    non-public information.

18         Q.    Who should keep their pie holes closed?

19         A.    I guess anyone speaking to it.  I

20    didn't -- I don't know.  I don't know.  To tell you

21    the truth, I'm not really sure what that referred to

22    at this point.



1          Q.    That's not the only reference to, for

2     lack of a better word, keeping quiet in this e-mail.

3     There's also a capitalized session -- section that

4     says "We need to not say anything."

5          A.    Correct.

6          Q.    What does that refer to?

7          A.    We don't -- we're not going to comment

8     on it externally until -- until we figure out what's

9     going on here.

10         Q.    Okay.

11         A.    And we wouldn't say anything anyway.

12         Q.    Okay.  "There is a leak someplace.  We

13    need to not say anything until we know where it's

14    coming from either the SEC or us."

15              Does that statement reflect what your

16    state of mind was on December 4, 2013?

17                   MR. DAVIS:  Object to the form.

18                   THE WITNESS:  Yes.  I mean, at

19    that point, I didn't realize that there was someone

20    who had separately provided information.  I didn't

21    know that, I guess, could have come from other

22    sources as well.  So I just assumed that it might be



1   the SEC or FINRA because that's where the referrals

2   were going.

3   BY MR. ESPER:

4          Q.   And --

5          A.   But it could have been the firm as well

6   or the -- the person that gave us the tip, the

7   tipper.

8          Q.   Well, you assumed that it had to come

9   from the SEC or FINRA, did you not, because those

10  are the two entities that have access to the

11  non-public referrals that you've been testifying to;

12  correct?

13         A.   Well, I --

14                  MR. DAVIS:  Object to the form.

15                  THE WITNESS:  I assume that

16  because that's the only information I have -- I had

17  at the time.  I am in media relations.  I am not in

18  a regulatory department.  I don't know who has --

19  who had access to all the information.

20                  Clearly there was a person outside

21  of the SEC or FINRA who had that -- who had

22  information and was providing information.  So it



1   could have come from anywhere.  I just didn't know

2   the list of people.  So I said the SEC or FINRA,

3   which was my knowledge at the time.

4   BY MR. ESPER:

5       Q.   So your testimony is sometime after

6   December 4th, somebody advised you of the existence

7   of a tipster within Mr. Hurry's businesses; correct?

8       A.   I don't know anything about the

9   tipster.

10      Q.   But somebody told you there was one --

11              MR. DAVIS:  I object.

12  BY MR. ESPER:

13      Q.   -- correct?

14              MR. DAVIS:  I object on the

15  grounds of the attorney-client privilege.

16              MR. ESPER:  That --

17              MR. DAVIS:  You can -- you can

18  answer a yes or no question that you were advised of

19  something.  You shouldn't identify the contents of

20  any communications to the extent that they were had

21  with your attorney.

22              MR. ESPER:  That's fair.



NANCY CONDON                                    February 22, 2017
HURRY vs FINANCIAL INDUSTRY REGULATORY                      109

1   BY MR. ESPER:

2           Q.    The question is foundational.  I don't

3   know want to know about attorneys who told you

4   things or anything like that.

5                I just -- for foundational purposes, at

6   some point you became aware from some source or

7   other that there -- there was possibly a tipster

8   from some -- some part of the Hurrys' organizations;

9   is that correct, yes or no?

10          A.    That is not correct.

11          Q.    That is not correct.  Okay.

12               You've referred earlier to the

13  possibility of a tipster in your testimony; correct?

14          A.    Correct.

15          Q.    And is -- I'll first ask a yes or no,

16  and if the answer to this is yes, I won't go

17  further.

18               But is the source of that information

19  something you received from counsel?

20          A.    No.

21          Q.    Okay.  Then what is the basis for your

22  belief that there was a tipster?



1          A.    I had not heard about anyone else.

2    That was the only -- that was what I surmised.

3          Q.    Right.  So you surmised based on the

4    information you -- you had that as of December 4,

5    2013, you believed there was a leak someplace and it

6    was either the SEC or FINRA; right?

7                     MR. DAVIS:  Object to the form.

8                     THE WITNESS:  As I have said, that

9    is the information I had at the time.

10   BY MR. ESPER:

11         Q.    So that was your conclusion.  That's

12   why you wrote either the SEC or us; right?  Because

13   that's what you believed as of December 4, 2013?

14         A.    Correct.

15         Q.    Okay.  So the next sentence says "The

16   SEC accused us of leaking it."

17         A.    I do not recall --

18                     MR. DAVIS:  There's no question

19   pending.

20                     THE WITNESS:  Okay.  I'm sorry.

21   BY MR. ESPER:

22         Q.    Your counsel is correct.  (Laugh).



 1                  But the question is going to be --

 2                       MR. DAVIS:  I imagined.

 3     BY MR. ESPER:

 4          Q.   -- do you recall what the source of the

 5     information was that produced the statement "The SEC

 6     accused us of leaking it" in this e-mail?

 7          A.   No, I don't.

 8          Q.   Do you -- just as a general matter, do

 9     you have any regular communications or contacts at

10     the SEC whom you speak to?

11          A.   No.

12          Q.   So if you had received a call or an

13     e-mail from the SEC accusing FINRA of leaking this

14     information, you would remember it, wouldn't you?

15          A.   I have never --

16                       MR. DAVIS:  Object to form.

17                       THE WITNESS:  I have never

18     received such an e-mail or a call.

19     BY MR. ESPER:

20          Q.   So you were willing to say in December

21     13 -- 2013 that the SEC accused FINRA of leaking

22     this information and yet you have no idea what



1    prompted you to say that?

2                   MR. DAVIS:  Object to the form.

3                   THE WITNESS:  It was four years

4    ago and I don't -- I cannot recall where it came

5    from.  Someone must have mentioned it.  That's all I

6    can say.

7    BY MR. ESPER:

8         Q.   Okay.  But based on your testimony

9    today, is it fair to say that you would consider

10   personally, you would consider the leaking of

11   referral information to a reporter by someone at

12   FINRA to be a significant violation of FINRA's

13   policies; correct?

14        A.   I would say that was correct, and I

15   have never heard of it happening.

16        Q.   And you would say -- you would have --

17   if I had been asking you that question on

18   December 4, 2013, you would have said the same

19   thing; right?

20        A.   That I had never heard of it happening?

21        Q.   That if something like that had

22   happened, that it would be considered a significant



1    violation of FINRA's policies?

2         A.   Yes, and that I had never heard of it

3    happening.

4         Q.   Yeah.  So --

5         A.   And still have not.

6         Q.   But you're nonetheless telling me that

7    you said in an e-mail "The SEC accused us of leaking

8    it" of the significant violation of FINRA's

9    policies, but you have no recollection of where you

10   got that from?

11                   MR. DAVIS:  Object to the form.

12   Asked and answered.

13                   THE WITNESS:  And as I've said, it

14   could have come from any number of sources.  It

15   didn't have to be just the SEC or FINRA.  This is

16   all I had knowledge of.  This is not my area.  I am

17   in media relations.

18                   The department in charge of this

19   is OFDMI.  If I hear a piece of information, I will

20   pass it along.  The SEC did not directly communicate

21   that to me, as I have said.

22                   But as we have discussed, this is



 1  not -- it would not necessarily just have been from

 2  the SEC or FINRA.  But at the time, I had no -- that

 3  is the only information that I had.  So I was

 4  passing it along.

 5  BY MR. ESPER:

 6       Q.   But if the S -- your testimony is that

 7  you didn't receive any direct communication from the

 8  SEC accusing FINRA of the leak; correct?

 9       A.   Yes, as I have said.

10       Q.   Okay.  So do you have any idea who you

11  heard that from at FINRA?

12       A.   I have said that I do not recall.

13       Q.   Isn't it correct to say that as of

14  December 4, 2013, you believed that FINRA needed to

15  conduct an investigation to determine that there

16  were no employees of FINRA who were leaking

17  information to Mr. Meagher?

18       A.   No.

19                 MR. DAVIS:  Objection.  Form.

20                 THE WITNESS:  Sorry.

21                 MR. DAVIS:  It's okay.

22                 THE WITNESS:  No, that is not fair



1   to say.  What is fair to say is, we had received

2   numerous -- as I have said, we have received -- we

3   had received numerous inquiries from Mr. Meagher at

4   that time.  I was passing it along.  The fact that

5   they had gone on for a while concerned me.

6                   Now, I don't know what the

7   regulatory department on the other side knows.  So I

8   can only see it from my -- I could only see it from

9   my point -- my vantage point, which was that we had

10  received a number of inquiries, as I have said.

11                  It could be that the regulatory

12  side had more information.  They're not going to

13  tell me that information.  It's siloed.  You know, I

14  am just passing along that I am concerned.  That's

15  it.  I can't launch an investigation of their

16  processes or -- or -- I mean, maybe they knew.  I

17  don't know.  Maybe the SEC knew.  I don't know.  I

18  don't know what the individual had said.

19                  All I can tell you is, I had

20  received numerous inquiries from the reporter, and I

21  was passing that along.

22  BY MR. ESPER:



```
 1            Q.   Okay.  And did you have any oral

 2    discussions with Brad Bennett regarding the subject

 3    of this e-mail?

 4            A.   Not that I recall.  That was it.

 5            Q.   Did you -- he was off in a different

 6    department, of course, but did you ever have any

 7    oral communications with him?  Did you ever talk to

 8    him?

 9            A.   About?

10            Q.   About anything.  Just yes or no.

11            A.   Yes.

12            Q.   Frequently, infrequently?

13                      MR. DAVIS:  Object to the form of

14    the question.

15                      THE WITNESS:  Regularly.

16    BY MR. ESPER:

17            Q.   Okay.  But you don't recall any

18    discussions specifically about Mr. Meagher and

19    this -- this issue?

20            A.   No.

21            Q.   And when did Mr. Bennett leave FINRA?

22            A.   On the 3rd of February.
```



1          Q.   Of this year?

2          A.   Yes.

3          Q.   Okay.  During the time you've been at

4    FINRA, has the policy regarding communication of

5    non-public information ever changed?

6          A.   No.

7          Q.   And has the policy regarding --

8    remember we talked about who was authorized to speak

9    to the press, your office and the CEO.

10              Has that policy ever changed?

11         A.   No.

12         Q.   Okay.  Did you have any communications

13   with the ombudsman's office regarding the issue of

14   Mr. Meagher?

15         A.   I may have, but I honestly don't

16   recall.  I just don't remember.

17         Q.   You don't recall if Mr. Cook ever

18   contacted you with respect to Mr. Meagher?

19         A.   They may have.  Honestly, I just do not

20   -- I don't -- I don't recall.

21         Q.   Is it fair to say that the ombudsman's

22   office didn't ask you to conduct any investigation



1  with respect to the issue of Mr. Meagher's

2  communications?

3          A.   Ask me?

4          Q.   Yes.

5          A.   No, they did not.  No one asked me.

6          Q.   Okay.  Did they -- do you know if

7  anyone at the ombudsman's office asked anyone in

8  your department to conduct any investigation?

9          A.   I do know.  They did not.

10                 MR. ESPER:  I have nothing

11  further.

12                 MR. DAVIS:  Okay.  We'll read and

13  sign.

14                 THE VIDEOGRAPHER:  This concludes

15  today deposition.  Off the record at 11:44 a.m.

16

17

18          (Deposition concluded at 11:44 a.m.)

19

20                      *    *    *

21

22



**Exhibit 6**

## <u>DECLARATION OF MATTHEW BLACKETT</u>

I, MATTHEW BLACKETT, declare:

1.      I am an attorney at law duly licensed to practice before all the courts of the State of California.  I am an associate at Harder Mirell & Abrams LLP ("HMA"), attorneys of record for Plaintiffs in this action.  As an attorney at HMA, I have access to, and have personally worked on, the records and files in the action.  The files and records of HMA, as they pertain to the action, are prepared by HMA under my supervision, at or near the time of the events recorded.  As to the following facts, I know them to be true of my own knowledge or I have gained knowledge from records and files of HMA which are maintained in the ordinary course of the business of said law firm

2.      Attached hereto as Exhibit A is a true and correct copy of a document produced by FINRA from its files in this litigation and Bates numbered FINRA_00000001- FINRA_00000002, which was authenticated in depositions in this case.

3.      Attached hereto as Exhibit B is a true and correct copy of a document produced by FINRA from its files in this litigation and Bates numbered FINRA_00000428, which was authenticated in depositions in this case.

4.      Attached hereto as Exhibit C is a true and correct copy of a document produced by FINRA from its files in this litigation and Bates numbered FINRA_00001003- FINRA_00001005, which was authenticated in depositions in this case.

5.      Attached hereto as Exhibit D is a true and correct copy of a document produced by FINRA from its files in this litigation and Bates numbered FINRA_00003247- FINRA_00003248, which was authenticated in depositions in this case.

{00083221;2}

1    I declare under penalty of perjury under the laws of Arizona that the foregoing is

2 true.

3    Executed August 9, 2017.

4                                                    _____
                                                     MATTHEW BLACKETT

# Exhibit A

# FILED SEPARATELY UNDER SEAL

# Exhibit B

**From:**        Condon, Nancy
**To:**            Bennett, Brad
**Sent:**        04-Dec-13 8:34:20 AM
**Subject:**     RE: Questions regarding SCA Alpine

No need to exclude us.  Cam is going to tell you the same thing.  We have been dealing with this for months.  There is a leak someplace and we need to NOT SAY ANYTHING until we figure out where the leak is coming from – either the SEC or us.  The SEC accused us of leaking it – all I know is that it did not come from my office.  This is a sensitive issue and they should keep their pie-holes closed.  This Meagher guy is a jerk and is trying to get additional info from any place he can.  That is why we told you that you couldn't meet with him in Texas.

**From:** Bennett, Brad
**Sent:** Wednesday, December 04, 2013 8:24 AM
**To:** Ong, Michelle; Hopper, Jessica; Funkhouser, Cameron; Condon, Nancy; McCarthy, Joseph
**Cc:** Andersen, Scott M; Stanland, Christina L.; Lane, Paul; Park, Bill; Whelan, Jacqueline D.; Schroeder, Susan; Gordy, Emily
**Subject:** RE: Questions regarding SCA Alpine

Time for everyone to take a deep breath.  Cam, Jessica and I will talk about what I should say to Russello in response and then I will let the group know the proposed plan of action.

**From:** Ong, Michelle
**Sent:** Tuesday, December 03, 2013 9:56 PM
**To:** Hopper, Jessica; Bennett, Brad; Funkhouser, Cameron; Condon, Nancy; McCarthy, Joseph
**Cc:** Andersen, Scott M; Stanland, Christina L.; Lane, Paul; Park, Bill; Whelan, Jacqueline D.; Schroeder, Susan; Gordy, Emily
**Subject:** Re: Questions regarding SCA Alpine

Nancy and I have had issues with thedeal.com over the past couple months and with this reporter in particular - he definitely has his source(s). It better not be from within. If he calls us trying to dig for information, Nancy and I will give him our standard 'we do not confirm the existence of investigations'

**From:** Hopper, Jessica
**Sent:** Tuesday, December 03, 2013 09:25 PM Eastern Standard Time
**To:** Bennett, Brad; Funkhouser, Cameron; Condon, Nancy; Ong, Michelle; McCarthy, Joseph
**Cc:** Andersen, Scott M; Stanland, Christina L.; Lane, Paul; Park, Bill; Whelan, Jacqueline D.; Schroeder, Susan; Gordy, Emily
**Subject:** RE: Questions regarding SCA Alpine

Copying Joe McCarthy (thanks, Scott.)

**From:** Hopper, Jessica
**Sent:** Tuesday, December 03, 2013 9:12 PM
**To:** Bennett, Brad; Funkhouser, Cameron; Condon, Nancy; Ong, Michelle
**Cc:** Andersen, Scott M; Stanland, Christina L.; Lane, Paul; Park, Bill; Whelan, Jacqueline D.; Schroeder, Susan; Gordy, Emily
**Subject:** FW: Questions regarding SCA Alpine

All, please see below. A reporter from TheDesl.com is asking Scottsdale questions about our and other investigations of it. Our staff did not leak, of course. The questions are quite detailed, and Scottsdale's counsel is concerned.

-----Original Message-----
**From:** Andersen, Scott M

# Exhibit C

**From:**      Ong, Michelle
**To:**      Hopper, Jessica
**Sent:**      03-Dec-13 10:00:34 PM
**Subject:**      Re: Questions regarding SCA Alpine

OMG - you must have ESP or something because I was JUST about to tell you 'that guy is a real A-hole btw!!' and then I was going to let you decide whether I was talking about the reporter, Cam, or both ;-)

**From**: Hopper, Jessica
**Sent**: Tuesday, December 03, 2013 09:58 PM Eastern Standard Time
**To**: Ong, Michelle
**Subject**: RE: Questions regarding SCA Alpine

It's not from within. Cam already wrote me back (with Brad) and was a bit exercised about my including all the people on this email. I let him know that it was an FYI to those who SHOULD know, which is press staff (you and Nancy), the regional director who owns the relationship with the firm, and the staff working on the investigation. Insane.

**From:** Ong, Michelle
**Sent:** Tuesday, December 03, 2013 9:56 PM
**To:** Hopper, Jessica; Bennett, Brad; Funkhouser, Cameron; Condon, Nancy; McCarthy, Joseph
**Cc:** Andersen, Scott M; Stanland, Christina L.; Lane, Paul; Park, Bill; Whelan, Jacqueline D.; Schroeder, Susan; Gordy, Emily
**Subject:** Re: Questions regarding SCA Alpine

Nancy and I have had issues with thedeal.com over the past couple months and with this reporter in particular - he definitely has his source(s). It better not be from within. If he calls us trying to dig for information, Nancy and I will give him our standard 'we do not confirm the existence of investigations'

**From:** Hopper, Jessica
**Sent:** Tuesday, December 03, 2013 09:25 PM Eastern Standard Time
**To**: Bennett, Brad; Funkhouser, Cameron; Condon, Nancy; Ong, Michelle; McCarthy, Joseph
**Cc:** Andersen, Scott M; Stanland, Christina L.; Lane, Paul; Park, Bill; Whelan, Jacqueline D.; Schroeder, Susan; Gordy, Emily
**Subject:** RE: Questions regarding SCA Alpine

Copying Joe McCarthy (thanks, Scott.)

**From:** Hopper, Jessica
**Sent:** Tuesday, December 03, 2013 9:12 PM
**To:** Bennett, Brad; Funkhouser, Cameron; Condon, Nancy; Ong, Michelle
**Cc:** Andersen, Scott M; Stanland, Christina L.; Lane, Paul; Park, Bill; Whelan, Jacqueline D.; Schroeder, Susan; Gordy, Emily
**Subject:** FW: Questions regarding SCA Alpine

All, please see below. A reporter from TheDesl.com is asking Scottsdale questions about our and other investigations of it. Our staff did not leak, of course. The questions are quite detailed, and Scottsdale's counsel is concerned.

-----Original Message-----
**From:** Andersen, Scott M
**Sent:** Tuesday, December 03, 2013 08:03 PM Eastern Standard Time
**To:** Hopper, Jessica
**Cc:** Whelan, Jacqueline D.
**Subject:** Fw: Questions regarding SCA Alpine

CONFIDENTIAL

FINRA_00001003

Jessica, please see the email I received today from Gerald Russello pertaining to Scottsdale and Alpine.

**From**: Russello, Gerald [mailto:grussello@sidley.com]
**Sent**: Tuesday, December 03, 2013 05:34 PM Eastern Standard Time
**To**: Andersen, Scott M
**Cc**: Stanland, Christina L.
**Subject**: FW: Questions regarding SCA Alpine

Scott,

We received the below questions from a reporter asking for comment. As you will see, the questions are extremely detailed and indicate a knowledge of the Staff's investigation and the questions the Staff has posed to SCA and its employees. SCA is extremely concerned that confidential information has been leaked that may be damaging to the firm or its employees. Please advise as to whether the Staff is aware of this information being provided to the reporter. We plan to advise the Ombudsman and if necessary others within FINRA, of this matter, as it raises questions as to the integrity of the Staff's investigative process and ability to maintain confidentiality.

Gerald


Gerald J. Russello
Partner
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5716
grussello@sidley.com



**From**: Bill Meagher [mailto:bmeagher@thedeal.com]
**Sent**: Tuesday, December 03, 2013 5:12 PM
**To**: Russello, Gerald
**Subject**: Questions regarding SCA Alpine

Hi Gerald,

Here are the questions. I am on a deadline for tomorrow morning. Should SCA/Alpine have any response to my questions, I will treat them as direct quotes offered via email so there are no misunderstandings. Should there be a response that requires a follow up, I will direct it to you. Should the company/John Hurry offer a quote, pls include attribution. Thank you for your timely response.

1. Does either SCA or Alpine have any response to Finra, SEC and FBI looking into their conduct in connection to trading in Biozoom?
2. Have SCA/Alpine staff spoken to Finra officials?
3. Have SCA/Alpine staff spoken to SEC officials?
4. Have SCA/Alpine staff spoken to FBI officials?
5. Have records regarding Biozoom shareholder accounts, trades and wire transfers been preserved unaltered?
6. Was SCA, Alpine or any of its staff/ownership involved in Biozoom beyond the servicing of the accounts? The SEC is looking at that angle.
7. Does SCA, Alpine or any staff/ownership have any knowledge of how the Biozoom trading was done beyond public record? There are allegations that the Argentine nationals who are Biozoom shareholders are "straw players". Does anyone associated with either SCA or Alpine know anything connected to these allegations?
8. Why were internal policies at SCA/Alpine changed for Biozoom shareholders? Specifically, why were they

allowed to trade via instant messenger and email, why did they receive transactional discounts and why were wire transfers allowed to non-domiciled countries?

9.     How is James Panther associated with SCA/Alpine? What was his role in bringing Biozoom shareholders to SCA?

10.   Why did Scarpino and Ted Ashton leave SCA?

11.   When will the purchase of Wilson Davis by John Hurry close?

12.   What are the terms of the sale?

13.   What is the status of the new broker-dealer firm in the Caymans headed up by Hurry?

Best,

Bill

**BILL MEAGHER** | Associate Editor

*The DealFlow Report* | 707-992-0725 x36 | bmeagher@thedeal.com

www.thedeal.com

*Click here to view me on LinkedIn* | *Follow us on Twitter!* @TheDealNewsroom



\* *Need help? Contact Client Services at customerservice@thedeal.com*

\* *Read about developing events in First Take*

\* *Sign up for newsletters here*

---------------------------------------------------------------------------------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.
*************************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.


*************************************************************************************************

**Exhibit D**

FINRA Office of the Ombudsman
Scottsdale Capital Case (OMB-2014-2530):  Case Summary
Page 1 of 2

In January 2014, D. Michael Cruz, President and Chief Counsel for BD Scottsdale Capital
Advisors Corp. ("Scottsdale") sent a letter to Office of the General Counsel's Bob Colby and the
Office of the Ombudsman ("OMB") with a concern that FINRA staff may have been the source
for two articles published by The Deal Pipeline which disclosed confidential FINRA investigative
information.  The articles were written by the same reporter – Bill Meagher.  Mr. Cruz was
seeking assurances that FINRA reasonably safeguards information it obtains from
Broker/Dealers ("BD" or "BDs") and does not inappropriately provide the information to third
parties.

The first of the two articles initially provided by Scottsdale was published on September 17,
2013 and discussed several entities, including Scottsdale, which are suspected by regulators of
involvement in pump-and-dump trading.  The article noted that the author's source of
information originated from a half-dozen referral reports sent by FINRA to the U.S. Securities &
Exchange Commission ("SEC").  OMB reviewed ███████████ and an email in which the
reporter claimed that he had reviewed the reports, and concluded that the reporter had obtained
copies of █████ confidential FINRA reports.

In the second article that was published on December 6, 2013, the reporter claimed that
Scottsdale and its affiliate BD Alpine Securities are under investigation by the Federal Bureau of
Investigation, the SEC, and FINRA for suspicious trading in Biozoom.  The author asserted that
his source of information was "a person familiar with those investigations".  OMB reviewed
STAR records and learned that nearly all the information in this article had originally been
provided to FINRA by a tipster who is a current employee at Scottsdale, and had been secretly
providing information to the Office of Fraud Detection and Market Intelligence and SEC staff
between June 2013 and December 2013.

In March 2014, the president/counsel sent to FINRA a March 20, 2014 article that contained
new purportedly confidential information regarding a FINRA examination that was scheduled to
commence later that month.  The article also asserted that FINRA and the SEC have required
the BD to provide all its employees' personal notes regarding Biozoom and ordered the BD not
to destroy any Biozoom records.  OMB reviewed FINRA's System for Tracking Activity for
Regulatory Policy & Operations ("STAR") and the Exam Element Toolbox ("EET") and
interviewed District Office management, and learned that the routine examination had been
announced to the BD on or before February 20, 2014.

Subsequently, Scottsdale's president/counsel forwarded to FINRA a fourth article that was
published on April 16, 2014, in which reporter Meagher provided a summation of his earlier
articles, but also discussed a purported March 10, 2014 onsite surprise visit by FINRA staff to
Scottsdale wherein the staff obtained documents regarding certain omnibus accounts of the BD.
OMB reviewed STAR records and interviewed staff, and learned that FINRA staff did make an
unannounced visit – on March 24, 2014 – seeking certain BD records.  Thus, aside from the
erroneous date of the visit, OMB found that the article's information was accurate.

Notwithstanding that the information contained in the latter three articles could have been
provided by the tipster or other personnel at the BD, the FINRA ███████████████ that
were the source of the first article should not have been known by the tipster.  Therefore, OMB
conducted a review to determine whether there was any evidence that one or more FINRA
employees were the source of the information provided to the reporter for any of the four
published articles.  OMB conducted the following steps to investigate the matter:

FINRA Office of the Ombudsman
Scottsdale Capital Case (OMB-2014-2530):  Case Summary
Page 2 of 2

- Obtained emails provided by FINRA senior managers that included emails to/from the reporter, internal emails discussing the reporter's queries, and regulatory staff requests for copies of ████████████████ during initial planning of various routine examinations.
- Conducted a keyword-driven search that resulted in a review of more than 3,000 FINRA emails seeking to determine whether any inappropriate communications had occurred between staff and the tipster or any persons associated with The Deal publishing company.
- Reviewed FINRA desktop and blackberry telephone records for calls to/from the reporter and to/from the tipster.
- Conducted an internet search to determine which information in the articles was publicly available.
- Interviewed key FINRA managers.
- Reviewed STAR, SRO Investigation Referral System ("SIRS", SEC's internet-based system that allows regulators to electronically transmit regulatory referrals to the SEC), Enterprise Search, Enterprise Desktop, and EET.
- Identified staff who would have had access to one or more, or all of █████████. More than 100 FINRA staff had access to ██████████, and more than 60 employees across three departments had access to ███████.  OMB subsequently interviewed 6 key employees from among the 60 who had access to ████ ██████, along with 2 employees from Media Relations who had been contacted by the reporter.
- Verified that reasonable procedures are followed to safeguard the confidentiality of FINRA's SEC referral reports.

Our review found no evidence that unauthorized persons accessed the confidential ██████ reports, and there was no indication that staff had inappropriate communications with either the tipster or the reporter, or other persons at The Deal publishing company.  Accordingly, OMB has found no evidence that FINRA staff leaked information to the reporter.

OMB called the visitor (the BD's president and chief counsel) and informed him that OMB has completed its review and found no evidence that FINRA staff provided confidential information to the reporter.

# Exhibit 7

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3       -------------------------------

4       JOHN J. HURRY AND JUSTINE HURRY,

5       as husband and wife, INVESTMENT

6       SERVICES CORPORATION, an Arizona

7       corporation,

8                   Plaintiffs,

9       V.                              Case No.

10      FINANCIAL INDUSTRY REGULATORY        14-cv-02490

11      AUTHORITY, INC., a Delaware          PHX-ROS

12      corporation,

13                  Defendant.

14      -------------------------------

15              VIDEOTAPED DEPOSITION OF

16                    MICHELLE ONG

17

18              February 22, 2017

19                 12:54 p.m.

20            Washington, DC 20037

21

22      Denise D. Vickery, CRR/RMR       JOB NO. J0524733



 1    prepared by the ombudsman's office after the

 2    interview; correct?

 3                      MR. DAVIS:  Object to the form and

 4    foundation.

 5                      THE WITNESS:  Yes.

 6    BY MR. ESPER:

 7          Q.   Okay.  So I want you to look at

 8    paragraph 1C here.

 9                Would you read that for the record?

10          A.   C?  I'm so sorry.

11          Q.   Yeah, 1C.

12          A.   "Meagher is deemed by Ong to be overly

13    pushy and aggressive and not to be trusted."

14          Q.   So I think we've covered "overly pushy

15    and aggressive" but I want to focus on "not to be

16    trusted."

17                Is the only reason you felt that he was

18    not to be trusted because of what you testified

19    before, that he would skip from one person in the

20    media relations office to the other without telling

21    them who the prior contacts were?  Is that the only

22    reason you found him not to be trusted?



1        A.    Correct.

2                    MR. DAVIS:  Object to the form.

3                    THE WITNESS:  Correct.

4    BY MR. ESPER:

5        Q.    Okay.  I want you to look at 7A and

6    please read the question and the answer for the

7    record.

8        A.    "Have there been any other incidents in

9    the past few years in which members of the media

10   alleged that they were in possession of confidential

11   FINRA documents?"

12                    "Ong noted that leaks occur all the

13   time, but she has never confirmed such information

14   with a reporter unless it is in the public domain,

15   e.g., an investigation has been reported via a Wells

16   Disclosure and Brokerage Act."

17       Q.    First question is with respect to the

18   question portion of that.

19                    Is that a question that the ombudsman

20   asked you during the interview?

21       A.    I don't recall.

22       Q.    Okay.  Do you recall telling the



1   ombudsman that leaks happen all the time at FINRA?

2         A.   I don't recall.

3         Q.   Do you have any reason -- did you

4   review this -- did you receive this document shortly

5   after the interview?

6         A.   No.

7         Q.   When did you first see this document?

8         A.   Yesterday.

9         Q.   Okay.  Do you have any reason to

10  believe you didn't tell the ombudsman that leaks

11  happen all the time at FINRA?

12                MR. DAVIS:  Objection.  Form.

13                THE WITNESS:  I didn't say that.

14  BY MR. ESPER:

15        Q.   You deny saying that?

16        A.   You added words at the end.  I just

17  want to --

18        Q.   Okay.

19        A.   I didn't say that.

20        Q.   Let's take the exact words that are

21  written on this that says "Leaks happen all the

22  time."



1            Do you have any reason to believe you

2    did not say that to the ombudsman?

3        A.   I don't recall saying that to the

4    ombudsman.  However, I didn't say it in the context,

5    I don't believe, that you're saying.

6        Q.   What is your best recollection or

7    belief as to the context of those words?

8        A.   Sitting here now, I would almost -- I'm

9    positive I meant leaks occur all the time in the

10   media.

11       Q.   Do you have any reason to believe that

12   the words of paragraph 7 that are put as a question

13   to you that those were not -- that was not the

14   question that was asked of you by the ombudsman that

15   elicited that response?

16                  MR. DAVIS:  Object to the form.

17                  THE WITNESS:  I don't recall the

18   question.

19   BY MR. ESPER:

20       Q.   But you certainly didn't look at

21   paragraph 7 and the light bulb -- the proverbial

22   light bulb came on in your head and you said, he



 1   didn't ask me that; right?

 2          A.   Sorry.  Could you repeat that again?

 3          Q.   You didn't look at paragraph 7 and

 4   immediately say, that's not something I was asked at

 5   the interview; right?

 6          A.   No.

 7          Q.   It's plausible to you that the

 8   ombudsman did ask you that question at the

 9   interview; correct?

10          A.   Perhaps.

11          Q.   Okay.  Is it your belief that leaks

12   occur all the time at FINRA?

13          A.   No.

14          Q.   Is it your belief that leaks ever occur

15   at FINRA?

16          A.   No.

17          Q.   Okay.  Weren't you afraid that by

18   saying leaks occur all the time in response to a

19   question that was about non-public information being

20   in the hands of the reporters that the ombudsman

21   might infer that you were referring to leaks

22   occurring all the time at FINRA?

1          A.   Yes.

2          Q.   Okay.  And other than the

3    communications with Meagher that are the subject of

4    this lawsuit, did you have other contacts with

5    TheDeal.com?

6          A.   Yes.

7          Q.   Okay.  And have you had contacts with

8    other reporters at TheDeal.com besides Meagher?

9          A.   I believe so.

10          Q.   Okay.  And would you say you've had

11   more than 50 e-mail or phone contacts with

12   TheDeal.com over the past three years?

13          A.   No.

14          Q.   Okay.  So is it fair to say this is an

15   organization that you occasionally have dealings

16   with, but it's not an organization that you

17   constantly have dealings with; is that a fair

18   statement?

19                    MR. DAVIS:  Object to the form.

20                    THE WITNESS:  Yes.

21   BY MR. ESPER:

22          Q.   Okay.  So do you recall having any



1    issues with any reporter at TheDeal.com other than

2    Meagher?

3         A.    No.

4         Q.    And do you recall having any issues

5    with Meagher other than the issues you've already

6    talked about with respect to his being pushy, etc.?

7         A.    No.

8         Q.    Okay.  So you don't know -- sitting

9    here, you don't know why you would have said "Nancy

10   and I have had issues with TheDeal.com" other than

11   the information you've already testified to?

12        A.    Correct.

13        Q.    Okay.  Now, the next few words of the

14   e-mail "He definitely has his sources."

15             What did you mean by that?

16        A.    I remember sometimes he would call and

17   he was very pushy and would say he would like to

18   speak to somebody to confirm something he had heard.

19        Q.    And you concluded from the fact that he

20   was calling to confirm something he had heard that

21   he definitely had his sources; correct?

22        A.    I believe so.



 1          Q.   And did you come to any conclusion as

 2   to where those sources were located?

 3          A.   No.

 4          Q.   Did you even wonder who his sources

 5   were?

 6          A.   Not particularly.

 7          Q.   So you weren't even curious.  As a

 8   media relations professional, you had this reporter

 9   calling you assertively claiming he had inside

10   information, and you didn't -- you didn't wonder at

11   all where he was getting his information from?  Is

12   that your testimony?

13          A.   I wouldn't know whether it's insider

14   information or not if they're calling me.

15          Q.   Why did you say "It better not be from

16   within"?

17          A.   I don't know the exact circumstances

18   that were going on that would make me say that.

19          Q.   Didn't you say that because you were

20   concerned that a leak could be coming from FINRA?

21                    MR. DAVIS:  Object to the form.

22                    THE WITNESS:  No.



```
1    BY MR. ESPER:

2         Q.   So why would you say "It better not be

3    from within"?  Why would you use that language if

4    you weren't concerned about a leak coming from

5    FINRA?

6         A.   I don't recall this e-mail, but since

7    you gave me time to read it, in the previous e-mail

8    it says "Our staff did not leak, of course."

9         So my guess would be I'm responding to

10   that kind of like in a funny way.  You can't say

11   that in e-mail that it's coming across that way, but

12   the tone, I would guess sitting here today, is more

13   like "It better not be from within."

14        Q.   What you just pointed to is Jessica

15   Hopper's e-mail down the chain; right?

16        A.   Uh-huh.

17        Q.   Where she -- she says "Our staff did

18   not leak, of course."

19        Why would you even suggest that the

20   leak would come from within after having just

21   received an assurance from Ms. Hopper that the staff

22   did not leak?
```



1               MR. DAVIS:  Object to the form.

2    Calls for speculation.

3               THE WITNESS:  I did not suggest

4    that.

5    BY MR. ESPER:

6        Q.   "It better not be from within."  That

7    does not suggest to you that the leak could be

8    coming from within?

9        A.   No.

10       Q.   Let's move up to the top e-mail, which

11   is a December 3, 2013 e-mail from you to Ms. Hopper.

12              First of all, who is Ms. Hopper?

13       A.   Ms. Hopper works in our enforcement

14   unit at FINRA.

15       Q.   Okay.  And why were you in

16   communication with her on this matter?

17       A.   I think this firm is within her

18   jurisdiction of her job.

19       Q.   The firm that Mr. Meagher was asking

20   about?

21       A.   The firm that's listed in the e-mail.

22       Q.   And would you read the e-mail at the



1    top of the chain?

2          A.   Sure.

3               "OMG.  You must have ESP or something

4    because I was just about to tell you that guy is a

5    real A-hole BTW -- by the way -- and then I was

6    going to let you decide whether I was talking about

7    the reporter, Cam, or both."  And then a wink.

8          Q.   And Cam is Cameron Funkhouser; correct?

9          A.   Correct.

10         Q.   Okay.  Were you talking about the

11   reporter, Mr. Funkhouser, or both?

12         A.   Sitting here today, the reporter.

13         Q.   So you do not believe that

14   Mr. Funkhouser is an asshole?

15              MR. DAVIS:  Object to the form.

16              THE WITNESS:  No.

17   BY MR. ESPER:

18         Q.   Ms. Ong, do you remember the content of

19   any communications -- well, first of all, did you --

20   even if the communication was simply "No comment,"

21   just yes or no, did you communicate with Mr. Meagher

22   at any time regarding the Hurrys' businesses?



**Exhibit 8**

**DECLARATION OF JOHN HURRY**

I, JOHN HURRY, declare:

    1.    I am a named Plaintiff in this action and hold an indirect ownership and, or beneficiary interest in a number of the business entities which were originally named as Plaintiffs in this action. I have personal knowledge of the facts set forth herein.

    2.    Among the other businesses that I hold an indirect ownership and, or beneficiary interest in are Scottsdale Capital Advisors, Inc. and Alpine Securities, Inc., two securities broker dealers which are members of FINRA, the self-regulatory entity which regulates the securities industry and which is the defendant herein.

    3.    On November 12, 2012, FINRA conducted a raid of the offices of my businesses in Scottsdale, Arizona, including Scottsdale Capital Advisors, Inc., Alpine Securities, Inc., and several other businesses that had nothing to do with FINRA's regulatory remit.

    4.    FINRA's raid was incredibly invasive. FINRA did not limit its raid to Scottsdale Capital Advisors, Inc. and Alpine Securities, Inc. FINRA did not ask for, or even seize, documents that only related to Scottsdale Capital Advisors, Inc. and Alpine Securities, Inc. Instead, as part of its raid, FINRA demanded and obtained access to Scottsdale Capital Advisors, Inc.'s and Alpine Securities, Inc.'s computers and office files as well as computers belonging to entities that were not FINRA broker-dealers.

    5.    In December 2012, when Alpine Securities, Inc. applied for permission to provide retail margin account services, FINRA demanded that I produce personal banking records in addition to the records of the company.

{00083158;4}

6.     In 2012-13, the Nevada Secretary of State's Securities Division issued 24 subpoenas directed to me and my businesses.  To my knowledge, no prosecution ever resulted from these subpoenas.  I am informed and believe, based on the content and timing of the subpoenas, that the Nevada subpoenas were issued at the behest or in coordination with FINRA.

7.     In 2012, 2013, and 2014, FINRA served a series of "Rule 8210" document requests seeking vast quantities of documents and records from my businesses.

8.     Starting in June 2013, FINRA conducted numerous on the record interviews of Scottsdale Capital Advisors, Inc.'s and Alpine Securities, Inc.'s personnel, attempting to obtain evidence of wrongdoing.

9.     As of the period between September 2013 and April 2014, when William Meagher's stories about my businesses were first published online, FINRA had not had any success in disciplining or prosecuting me or my businesses based on any of its investigations into the matters discussed in Mr. Meagher's stories.  I believe the context and timing of the stories by Mr. Meagher was a result of FINRA's frustration, at that time, that it had not been able to make any charges stick against me or my businesses.

I declare under penalty of perjury under the laws of Arizona that the foregoing is true.

Executed August 7, 2017.

_____
JOHN HURRY

{00083158;4}

- 2 -