George Brandon (No. 017947) george.brandon@squirepb.com
Gregory A. Davis (No. 025976) gregory.davis@squirepb.com
Gregory Schneider (No. 029660) gregory.schneider@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona  85004
Telephone: (602) 528-4000
Facsimile: (602) 253-8129

Attorneys for Defendants Financial Industry Regulatory Authority, Inc. and Scott Andersen

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife; Investment Services Corporation, an Arizona corporation, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Financial Industry Regulatory Authority, Inc., a Delaware corporation, <br><br> Defendant. | Case No. 14-cv-02490-PHX-ROS <br><br> **REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, FINRA** <br><br> **(Oral Argument Requested)** |

## Introduction

The only articles Mr. Meagher published that allegedly contain defamatory information are the articles dated December 6, 2013, March 20, 2014, and April 16, 2014 (the "Alleged Defamatory Articles").  The Hurrys do not dispute that there is no evidence that FINRA was Mr. Meagher's source for the Alleged Defamatory Articles.  Instead, the Hurrys devote the entirety of their Response to arguing that FINRA was the source for Mr. Meagher's September 13, 2013 article (the "Non-Defamatory Article").  But that argument is unsupported by the evidence.  It is also immaterial whether FINRA was Mr. Meagher's source for the Non-Defamatory Article because no reasonable juror could conclude based on that fact alone that it is more likely than not that FINRA was also Mr.

Meagher's source for the Alleged Defamatory Articles, especially considering that:

- Mr. Meagher declared in emails and his articles that FINRA was not his source [*See* FINRA's Separate Statement of Material Facts ("SOF") at ¶¶ 15, 23, 24, 28, 34];
- FINRA's internal investigation concluded that FINRA was not Mr. Meagher's source [*See id*. at ¶¶ 37–39];
- Former Scottsdale Capital Advisors ("SCA") employee Eric Miller admitted to being Mr. Meagher's source [*See id*. at ¶¶ 17, 27, 31–33]; and
- The information in the Alleged Defamatory Articles was publically available for months before it was published by Mr. Meagher. [*See id*. at ¶ 19.]

Summary judgment to FINRA is also warranted because the Hurrys cannot show that FINRA is vicariously liable for its employees' alleged defamatory statements. *See Phx. Newspapers v. Church*, 24 Ariz. App. 287, 301 (1975). The Hurrys' reliance on *res ipsa loquitur* is misplaced because *res ipsa loquitur* is not a theory of vicarious liability. Only *respondeat superior* is, and the Hurrys cannot establish that.

Nor can the Hurrys establish causation without identifying the specific defamatory statements allegedly made by a FINRA employee. Even with the benefit of substantial discovery, the Hurrys cannot answer basic threshold questions at the core of their case: What did FINRA purportedly tell Mr. Meagher, and who at FINRA was involved?

## **Argument**

### **I. No reasonable juror could conclude that FINRA was Mr. Meagher's source.**

There is no evidence that FINRA published defamatory information to Mr. Meagher, but there is substantial evidence that Mr. Meagher's sources for the Alleged Defamatory Articles were Mr. Miller and publicly-available documents filed by the SEC in its lawsuit regarding the pump-and-dump of Biozoom stock (the "Biozoom Action").

#### **A. There is no evidence that FINRA published defamatory information.**

Despite nearly three years of litigation, the production of 84,700 pages of documents, and the depositions of 13 witnesses, the Hurrys do not have a single piece of evidence connecting FINRA to Mr. Meagher's Alleged Defamatory Articles. Summary judgment to FINRA is warranted for this reason alone. *See Summers v. A. Teichert & Son*, 127 F.3d 1150, 1152 (9th Cir. 1997) (To avoid summary judgment the party with the

- 2 -

burden of proof at trial must "introduce some significant probative evidence tending to support the complaint."); see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. There is ample evidence that FINRA was not Mr. Meagher's source.

The evidence affirmatively shows that FINRA was not Mr. Meagher's source. Mr. Meagher acknowledged in an email to FINRA that "you are certainly correct in that I did not learn about a probe that tied to trading in Biozoom from Finra [sic]." [SOF at ¶ 23.] Mr. Meagher also explained in each of the three Alleged Defamatory Articles that the information he published did not come from FINRA. [*See id*. at ¶¶ 24, 28, 34.]

The Hurrys' argument (at 15) that Mr. Meagher's statements are inadmissible is without merit. The Hurrys put Mr. Meagher's articles at issue by contending they are defamatory, and therefore cannot selectively exclude portions of them. Mr. Meagher's emails to FINRA's Media and External Communications staff are business records of FINRA and are therefore admissible. [*See* SOF Ex. 10 at ¶ 3;] Fed. R. Evid. 803(6). Mr. Meagher also invoked the reporter's privilege and cannot be compelled to testify regarding his sources. His written statements denying that FINRA was his source are the most probative available evidence on the issue of FINRA's alleged publication, and thus fall within the residual exception to the rule against hearsay. *See* Fed. R. Evid. 807.

Consistent with Mr. Meagher's statements, FINRA's Ombudsman concluded after an internal investigation that there was "no evidence that FINRA staff leaked information" to Mr. Meagher. [*See* SOF at ¶ 39.][1] That conclusion was made only after, among other things, (1) interviewing eight FINRA employees, (2) reviewing every email FINRA and Mr. Meagher exchanged between January 1, 2012 and December 31, 2013, (3) reviewing every email FINRA exchanged with anyone using the domain "thedeal.com" between January 1, 2012 and December 31, 2013, (4) conducting a keyword-driven search for any other emails discussing Mr. Meagher's queries, and (5) reviewing FINRA telephone records for calls to/from Mr. Meagher. [*See id*. at ¶ 38.]

### C. Mr. Meagher's sources were Mr. Miller and public documents.

The record is also replete with evidence identifying Mr. Meagher's sources as Mr.

---

[1] Contrary to the Hurrys' assertion, the Ombudsman's Final Case Summary is admissible as a business record of FINRA. [*See* SOF Ex. 13 at ¶¶ 13–14]; Fed. R. Evid. 803(6).

- 3 -

Miller and documents in the Biozoom Action. [*See id.* at ¶¶ 17–19, 27, 31–33.]

Mr. Miller admitted in sworn deposition testimony that dozens of statements published in the Alleged Defamatory Articles came directly from him, and that he was the "person with knowledge of the investigations" that Mr. Meagher quoted as saying "[t]hese shareholders were brought in for this. It's as simple as that. . . . They were straw men for whoever is behind this whole thing." [*See id.* at ¶ 17.]

The Hurrys do not dispute that Mr. Miller was the source of the alleged defamatory statements that they erroneously attributed to FINRA. Instead, the Hurrys inexplicably argue (at 2) that Mr. Miller's deposition testimony should not be considered. [*See* Hurrys' Controverting Statement of Facts ("CSOF") at ¶ 48.] But Rule 56 expressly provides that summary judgment may be supported by "citing to particular parts of material in the record, including depositions . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Hurrys' argument that Mr. Miller's testimony is inadmissible hearsay is also meritless. Mr. Miller's testimony is not offered to prove the truth of the information he shared with Mr. Meagher. It is being offered to prove that he, and not a FINRA employee, was Mr. Meagher's source for the Alleged Defamatory Articles.

The Hurrys' contention (at 15) that FINRA has failed to "prove [its] claim that it never leaked to Meagher" because Mr. Miller did not admit to being the source for every statement in the Alleged Defamatory Articles misstates the summary judgment standard. It is the Hurrys that asserted claims in this case, and it is therefore the Hurrys that must present "significantly probative" evidence that FINRA was Mr. Meagher's source for the Alleged Defamatory Articles. See *Liberty Lobby*, 477 U.S. at 249–50.

The Hurrys also misrepresent Mr. Miller's deposition testimony. The Hurrys cite Mr. Miller's deposition transcript at 136:23–138:23 for the proposition that he denied being Mr. Meagher's source for the "[c]laim that SCA clients who traded in Biozoom shares were given special perks." [*See* CSOF at ¶ 17.] But that portion of the transcript shows that Mr. Miller expressly admitted telling Mr. Meagher about these special perks:

> **Q:** Last page, top paragraph, "Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients."

- 4 -

|   |   |
|---|---|
| **A:** | Yes. |
| **Q:** | Do you believe you're the source of that information? |
| **A:** | Yes.  [CSOF Ex. 1 at 136:23–137:8.][2] |

Nevertheless, the fact that Mr. Miller may have denied being Mr. Meagher's source for some statements in the Alleged Defamatory Articles is not evidence that Mr. Meagher's source was FINRA.  Indeed, information that Mr. Miller denied conveying to Mr. Meagher was included in public documents filed in the Biozoom Action nearly six months before Mr. Meagher published the first of his Alleged Defamatory Articles.  [*See* SOF at ¶ 19.]  Mr. Meagher even expressly stated in that article that he was repeating information originating from public documents in the Biozoom Action.  [*See id*. at ¶ 18.]

The Hurrys have not identified a single defamatory statement that Mr. Meagher could not have obtained from Mr. Miller or the documents filed in the Biozoom Action.

## II. The Hurrys' unreasonable inferences do not defeat summary judgment.

### A. Mr. Meagher's September 13, 2013 article is irrelevant.

The Hurrys' repeated assertions that FINRA must have been the source for Mr. Meagher's Non-Defamatory Article because it purportedly "contained numerous details that could only have come from FINRA . . . ." is contrary to the evidence.  The Non-Defamatory Article described information contained in Fraud Surveillance Reports that both FINRA and the SEC possessed.  [*See* SOF at ¶ 10.]  There is no evidence that any information published in the Non-Defamatory Article was known by FINRA alone.

The Hurrys' ask (at 8–9) the Court to ignore that the SEC may be Mr. Meagher's source for the Non-Defamatory Article merely because FINRA asserted privileges during discovery.  That argument is an untimely discovery motion, as this Court previously held. [*See* Order Dated April 10, 2017 (Doc. 164).]  Furthermore, FINRA did not prevent its Ombudsman from testifying about her communications with the SEC.  Portions of the Ombudsman's deposition transcript that the Hurrys cited plainly show that she testified at length regarding her conversations with the SEC.  [*See* CSOF Ex. 2 at 59:14–70:17.]

Mr. Meagher's source for the Non-Defamatory Article is also beside the point

---

[2] The Hurrys also mischaracterize Mr. Miller's deposition testimony as a denial when his answer was "I don't recall."  [*See e.g.*, CSOF ¶ 17, Ex. 1 at 124:7–15.]

- 5 -

because it is unreasonable to infer that FINRA published defamatory information about SCA's involvement in the pump-and-dump of Biozoom stock merely because Mr. Meagher obtained truthful information regarding SCA's involvement in the trading of other companies' stock.  See *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Asso.*, 809 F.2d 626, 631 (9th Cir. 1987).[3]  That is especially true here where there is no evidence regarding the motive for the alleged leak of the Fraud Surveillance Reports.  That SCA was only one of 29 different companies identified in the Non-Defamatory Article runs counter to the Hurrys' unsupported theory that the alleged leak of the Fraud Surveillance Reports was motivated by animus towards SCA or the Hurrys.

### B.    There is no evidence that leaks at FINRA are common or occurred.

The Hurrys' assertion (at 5) that FINRA employee Michelle Ong "told the ombudsman that leaks occur all the time at FINRA" is the exact opposite of what the evidence shows.  Ms. Ong testified at her deposition that she does not believe leaks ever occur at FINRA, and that she only told the Ombudsman that leaks occur in the media. [*See* SOF at ¶¶ 46–7.]  It is unreasonable to infer that "Ong gave obviously false testimony," as the Hurrys do (at 7), merely because her sworn testimony is contrary to the Hurrys' theory of the case.  Indeed, there is no evidence supporting the Hurrys' interpretation of the Ombudsman's ambiguous summary of Ms. Ong's interview.

The Hurrys' argument (at 7) that "[t]here is extensive evidence in the record that the SEC informed FINRA that the SEC did not leak and that FINRA did," is a gross overstatement.  No SEC witness or document states that the SEC (1) completed its leak investigation, (2) ruled out the SEC as the source of the leak, or (3) accused FINRA of leaking information to Mr. Meagher.  On the contrary, the only document from the SEC acknowledges that as of March 2017, its "investigation relating to whether Mr. Meagher received non-public information from the SEC" was then still "ongoing."  [*Id.* at ¶ 41.] The Hurrys contend that the testimony of FINRA employees Cindy Foster-Nicholas and Christopher Cook confirms their argument that the SEC did not leak.  But the Hurrys

---

[3] The Hurrys cite *Hillyard v. Citizens Medical Center*, 2012 WL 4794558 (Kansas App. 2012) for its interpretation of *T.W. Elec. Serv.*  *Hillyard* is unpublished and should not have been cited.  Also, in *Hillyard* summary judgment to the defendant was affirmed.

- 6 -

omit crucial details. When Ms. Foster-Nicholas testified that she "may have heard that [the SEC] did not find any evidence of a leak," she clarified that she could not recall "any specifics," including from whom she heard that information or when she heard it. [*See* CSOF Ex. 2 at 61:22–62:21.] When Mr. Cook was asked if the SEC even told him "that they conducted an investigation," he responded "[n]o." [*See* CSOF Ex. 3 at 49:03–05.]

The only evidence the Hurrys cite for the proposition that the SEC accused FINRA of leaking is the email of a FINRA employee recounting some now-forgotten gossip that "[s]omeone must have mentioned." [*See* CSOF at ¶ 68, Ex. 5 at 112:4–113:6.] But that email is inadmissible double hearsay. *See, e.g.*, *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 34 (1st Cir. 1998) ("[U]nattributed statements repeated by party-opponents cannot be admissible."); *Cedeck v. Hamiltonian Federal Sav. & Loan Ass'n*, 551 F.2d 1136, 1138 (8th Cir. 1977) ("That part of [declarant's] statement which contains a reiteration of what someone told him is not admissible as an admission by party-opponent since the author of the statement is unknown."). Furthermore, the author of the email in question, Nancy Condon, testified at her deposition that the SEC never told her that FINRA had leaked information. [*See* CSOF Ex. 5 at 112:12–18.]

### C. **FINRA's internal investigation is not evidence of a cover-up.**

The Hurrys call FINRA's internal investigation a "sham," "phony," "inadequate," "whitewashed," and "designed to reach a foregone conclusion." [*See* Response at 1, 2, 6, 13.] There is no evidence for this or for the Hurrys' insinuation that FINRA witnesses perjured themselves. [*See id.* at 13 (FINRA "sent its witnesses to testify that they did not speak to Meagher.").] The Hurrys also mislead the Court regarding what the evidence shows by contending (at 5) that "[t]he ombudsman also never spoke to [FINRA employee] Nancy Condon . . . ." There is no good faith basis for that claim. FINRA produced during discovery an Ombudsman interview summary of Nancy Condon (like that of Ms. Ong that the Hurrys submitted as Blackett Dec. Ex. A). And far from denying that she had been interviewed, Ms. Condon testified that she "may have" been interviewed, but that she "honestly [does not] recall." [*See* CSOF Ex. 5 at 120:12–20.]

That additional investigative steps by the Ombudsman may have resulted in a more certain conclusion is not evidence that FINRA engaged in a cover-up as the Hurrys

- 7 -

repeatedly allege. [*See* Response at 3, 10, 11, 16.]<sup>4</sup>

### D. **The Hurrys' motive argument is unsupported and without merit.**

The Hurrys' contention (at 16) that FINRA "had a motive to spread defamatory statements about the Hurrys" is based only on the fact that FINRA had investigated whether the Hurrys violated FINRA Rules. It is unreasonable to assume, however, that FINRA has a motive to defame every member it investigates. Indeed, despite that FINRA performs numerous investigations, there is no evidence of FINRA having defamed any of its members. Nor is there any evidence that FINRA's investigation of the Hurrys was motivated by personal animus as opposed to an objective and good faith belief that the Hurrys had engaged in misconduct.

Additionally, motive alone, as the Hurrys admit (at 16), cannot defeat summary judgment. *DiFolco v. MSNBC Cable L.L.C.* 831 F. Supp. 2d 634, 637–40 (S.D.N.Y. 2011). The Hurrys attempt to distinguish *DiFolco* (at 16) by arguing that there is "evidence of FINRA's cover-up of its role in leaking documents to Meagher, and the fact that Meagher published information that could only have come from FINRA." But what the Hurrys call "evidence of FINRA's cover-up" is just an unsubstantiated accusation predicated on the fact that FINRA's Ombudsman concluded that there was "no evidence that FINRA staff leaked information" to Mr. Meagher. [*See* SOF at ¶ 39.] Similarly, there is no evidence "that Meager published information that could only have come from FINRA." Rather, everything Mr. Meagher published was either known by the SEC, known by Mr. Miller, or contained in public documents filed in the Biozoom Action.

No witness or document says that FINRA was Mr. Meagher's source for the Alleged Defamatory Articles. Mr. Meagher acknowledged that FINRA was not his source for the Alleged Defamatory Articles. [*See id.* at ¶¶ 15, 23, 24, 28, 34.] FINRA's Ombudsman confirmed FINRA was not Mr. Meagher's source for the Alleged Defamatory Articles. [*See id.* at ¶¶ 37–9.] Mr. Miller admitted that he was the source for the Alleged Defamatory Articles. [*See id.* at ¶¶ 17, 27, 33.] And the information in the

---

<sup>4</sup> The Hurrys falsely imply that the Ombudsman was tasked with determining who allegedly leaked information. It was not. The Ombudsman's investigation was limited to "find[ing] out if the information came from FINRA." [*See* CSOF Ex. 2 at 37:19–20.]

- 8 -

Alleged Defamatory Articles was publicly available in the Biozoom Action for months prior to Mr. Meagher's publication. [*See id*. at ¶ 19.] Summary judgment to FINRA is warranted because no reasonable juror could consider all this evidence and still conclude that it is more likely than not that FINRA was Mr. Meagher's source for the Alleged Defamatory Articles. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.")

### III.     There is no evidence that any alleged damages are attributable to FINRA.

Summary judgment should also be granted to FINRA because there is no evidence that the Hurrys' alleged damages are attributable to FINRA.

#### A.     FINRA is not liable for alleged employee misconduct.

##### 1.     The Hurrys fail to satisfy the doctrine of *respondeat superior*.

FINRA is only "liable for defamatory statements made by an employee acting within the scope of his employment." *Phx. Newspapers*, 24 Ariz. App. at 301. The Hurrys present no evidence identifying the specific FINRA employee that purportedly published information to Mr. Meagher. They therefore also fail to present evidence that the alleged publication was made within the scope of that employee's employment.

The Hurrys cite (at 14) *Phx. Newspapers* for the proposition that the "specific author of a defamatory statement within an organization [need not] be identified." But in *Phx. Newspapers* the "specific author of [the] defamatory statement" had been identified as the newspaper's foreign affairs editor. See *Phx. Newspapers*, 24 Ariz. App. at 299. *Phx. Newspapers* stands merely for the proposition that an editor of a newspaper is acting within the scope of his employment when he publishes an editorial. See *id*. at 301 ("Under the facts of this case no sound argument can be made that defendant Padev's activities concerning the writing and publishing of the editorial were not within the scope of his employment with the defendant corporation."). The Hurrys have not identified Mr. Meagher's alleged source within FINRA, and thus have not presented any evidence that the alleged publication by that source was performed within the scope of his or her employment. That the identity of the alleged offending employee must be known for vicarious liability to attach under the doctrine of *respondeat superior* is made plain in the

- 9 -

Restatement (Third) of Agency § 7.07, which is the law in Arizona.  *See* Restatement (Third) of Agency § 7.07, cmt. b ("Respondeat superior is a basis for vicarious liability when an ***identifiable employee-actor*** commits a tort in an interaction with a third party.") (emphasis added); *see Engler v. Gulf Interstate Engineering, Inc.*, 230 Ariz. 55, 58 (2012) ("[T]he Restatement (Third) [of Agency] § 7.07 sets forth the appropriate test for evaluating whether an employee is acting within the scope of employment . . . .").

The Hurrys contend (at 14, n. 8) that publication by ***any*** FINRA employee to Mr. Meagher was performed within the scope of employment because FINRA has "detailed policies and procedures with respect to the gathering and dissemination of non-public information."  But whether FINRA has policies regarding the dissemination of truthful non-public information is irrelevant.  "An employee's tortious conduct falls outside the scope of employment when the employee engages in an independent course of action that does not further the employer's purposes . . . ." *Engler*, 230 Ariz. at 58.  The making of a defamatory statement by a FINRA employee is "an independent course of action that does not further [FINRA's] purpose," and there is no evidence here to the contrary.

That an employer is not liable for an employee's defamation is made plain by illustration 10 of Restatement § 7.07, which contemplates nearly the exact events the Hurrys theorize—without evidence—occurred here:

> P Insurance Co. furnishes telephones to its office staff with the direction that they may be used only when necessary to an employee's work. A, a claims processor, uses the telephone P Insurance Co. provides to make statements defamatory of T, a personal enemy of A's. The recipients of A's defamatory statements are unrelated to P Insurance Co.'s business. P Insurance Co. is not subject to liability to T. A's conduct in defaming T was not within the scope of A's employment. A acted only for A's own purposes.

Restatement (Third) of Agency § 7.07, illus. 10.

### 2. *Res ipsa loquitur* is not a substitute for *respondeat superior*.

The Hurrys' protracted discussion (at 11–13) of *res ipsa loquitur* is irrelevant and does not preclude granting summary judgment to FINRA.  *Res ipsa loquitur* is a doctrine that infers negligence from the nature of an accident.  *Respondeat superior* is a doctrine of vicarious liability.  The former is not a substitute for the latter.  Whether it is reasonable to infer that a FINRA employee engaged in tortious conduct—the only

- 10 -

question that *res ipsa loquitur* could possibly answer—is immaterial here without further evidence that FINRA is vicariously liable for that unknown employee's alleged conduct.

Additionally, the Hurrys have not even met the basic requirements for invoking *res ipsa loquitur* because there is no evidence that publication of the alleged defamatory statements "must [have been] caused by an agency or instrumentality subject to the control of [FINRA] . . . ." *Lowrey v. Montgomery Kone, Inc.*, 202 Ariz. 190, 192 (App. 2002). Mr. Meagher had multiple, known, non-FINRA sources for the Alleged Defamatory Articles, and the Hurrys have not identified any information in those articles that was known by FINRA alone. [*See* SOF at ¶¶ 17–19, 27, 31–33.]

### B.     The Hurrys fail to present evidence of causation.

The Hurrys must present evidence of causation to avoid summary judgment. *See Morris v. Warner*, 160 Ariz. 55, 62 (App. 1988). They contend (at 15) that "the standard [for proving causation] is whether FINRA's leaks were a substantial factor in causing the Hurrys' injury." But the Hurrys do not provide any authority for the assertion that the "substantial factor" test for causation applies in defamation cases.

The "substantial factor" test only applies "when multiple tortfeasors are alleged to have created an indivisible injury[,] . . . each defendant's role is potentially indeterminable[, and] . . . it is certain that between them they did it all." *Salica v. Tucson Heart Hosp.-Carondelet, L.L.C.*, 224 Ariz. 414, 418 (App. 2010). There is no evidence that this is a multiple tortfeasor case because the Hurrys have not identified a single allegedly defamatory statement published by FINRA. The Hurrys gloss over their lack of evidence by suggesting that causation "will be a jury question." "[B]ut the party cannot leave causation to the jury's speculation." *Id*. at 419. The Hurrys were required to "present[] facts from which a causal relationship may be inferred." *Id.* Without any evidence identifying the specific alleged defamatory statements attributable to FINRA, no reasonable juror could possibly apportion fault amongst the multiple alleged tortfeasors.

### Conclusion

For the foregoing reasons, FINRA respectfully requests that the Court grant it summary judgment on both of the Hurrys' remaining claims.

- 11 -

RESPECTFULLY SUBMITTED this 31st day of August, 2017.

*/s/ Gregory A. Davis*
George Brandon
Gregory A. Davis
Gregory Schneider
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
Attorneys for Defendants Financial Industry Regulatory Authority, Inc. and Scott M. Andersen

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2017, I electronically filed the foregoing document with the Court using the CM/ECF System for filing and service on plaintiffs as listed below:

| | |
|---|---|
| Joseph G. Adams<br>Carlie Tovrea<br>Snell & Wilmer L.L.P.<br>One Arizona Center<br>400 East Van Buren, Suite 1900<br>Phoenix, Arizona 85004-2022 | Charles J. Harder<br>Jordan Susman<br>Harder Mirell & Abrams LLP<br>132 S. Rodeo Drive, Fourth Floor<br>Beverly Hills, California 90212 |

*Attorneys for Plaintiffs*

*/s/ Sara Ramirez*