**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **John J. Hurry, et al.,** | ) | |
| | ) | No.  **CV-14-02490-PHX-ROS** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | June 27, 2017 |
| **Financial Industry Regulatory** | ) | 2:41 p.m. |
| **Authority, Inc., a Delaware** | ) | |
| **corporation, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE ROSLYN O. SILVER, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**INTERIM RULE 16 STATUS CONFERENCE**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

For the Plaintiffs:
3        Snell & Wilmer LLP
         By:  **Joseph G. Adams,** Esq.
4        One Arizona Center
         400 E. Van Buren
5        Phoenix, AZ 85004

6        Harder LLP
         By:  **Dilan A. Esper,** Esq.
7        132 S Rodeo Dr., 4th Floor
         Beverly Hills, CA 90212
8
For the Defendants:
9        Squire Patton Boggs
         By:  **Gregory A. Davis,** Esq.
10       1 E. Washington Street, Suite 2700
         Phoenix, AZ 85004
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              (Proceedings commenced at 2:41 p.m.)

3              COURTROOM DEPUTY:  Civil Case No. 14-2490, Hurry,

4     et al. versus Financial Industry Regulatory Authority

5     Incorporated, et al., on for Interim Rule 16 Status Conference.

6              Counsel, please state your appearances for the record.

7              MR. ADAMS:  Good afternoon, Your Honor.  Joe Adams for

8     the plaintiffs.  And with me is my co-counsel, Dilan Esper, of

9     the Harder Mirell & Abrams firm in Los Angeles.

10             MR. DAVIS:  Good afternoon, Your Honor.  Greg Davis

11     from Squire Patton Boggs on behalf of FINRA.

12             THE COURT:  Thank you.  Counsel, I have your joint

13     report, and I have some questions.

14             Mr. Adams, I am aware that a former employee came

15     forward and said that he or she was the person who actually

16     leaked the information?

17             MR. ADAMS:  Your Honor --

18             THE COURT:  You may be seated.  It's probably better

19     that way.

20             MR. ADAMS:  Okay.  Thank you.

21             Your Honor, a former employee -- and I also -- to the

22     extent that Mr. Esper wants to weigh in, he has more detailed

23     knowledge.  But a former employee did come forward and admit

24     that he was a source, not necessarily the source of the

25     information.

```
 1              THE COURT:  Well, how are you going to be able to
 2     establish the causation?
 3              MR. ESPER:  Well, Your Honor --
 4              THE COURT:  In other words, if you -- even if you say
 5     there's another source and you're arguing that FINRA -- someone
 6     from FINRA was the other source, what are -- what do you have
 7     to establish the causation factor; that, in fact, the FINRA
 8     individual, whoever he or she was, caused the defamation?
 9              MR. ESPER:  Your Honor, several responses.
10              First of all, just to be clear on what Mr. Adams said,
11     it's not simply that Mr. Miller -- I shouldn't say his name.
12     The tipster.
13              THE COURT:  No.  Well, unless it's under seal or
14     something, you can say who it is.  Mr. Miller?
15              MR. ESPER:  Yeah, Mr. Miller.
16              He is -- has testified that he spoke to the reporter
17     at issue here.  He denied saying some of the things that were
18     reported by the reporter, and in fact, a number of the things
19     that were reported by the reporter, in fact, could not have
20     come from the tipster because they concerned the information
21     from things like internal FINRA reports which the tipster did
22     not have access to.
23              So there is a certainty that somebody else talked to
24     the reporter besides the tipster.
25              THE COURT:  And when you -- that's certainly your
```

1    conclusion, but tell me on the basis of what facts would I --

2    assuming this is a Rule 50 motion here made by the defendant at

3    trial, what facts would there be that would persuade me to rule

4    in your favor that the jury could find that FINRA was

5    responsible for the defamatory statements.

6              MR. ESPER:  Well, Your Honor, first of all, the -- so

7    we know that somebody other than the tipster talked to the

8    reporter.  And we know further --

9              THE COURT:  No, you know.  I don't know.  What

10   evidence do you have of that?

11             MR. ESPER:  Well, the evidence --

12             THE COURT:  I mean, and the reason why I'm asking all

13   of this is I have some real questions about whether or not you

14   can defeat summary judgment.  And I want the record to be clear

15   here for the purposes of your client as to whether or not it

16   really makes any sense to go forward with this, because they're

17   going to have to pay your bill.

18             And I certainly am not going to preclude you from

19   filing a motion -- or response to the summary judgment and

20   attempting to defeat it, but I had problems the last time we

21   had this hearing.  But they've only magnified since then

22   because I have carefully reviewed the file.  And I'm

23   starting -- begin at the beginning, and that is, this tipster

24   creates, I believe, a significant problem for you in

25   establishing that you have -- there is the causation, assuming

1  everything else.

2          MR. ESPER:  Yell, Your Honor, and I realize I need to

3  answer your question and I will answer this question, but I do

4  want to state for the record that causation is not a basis for

5  the present motion.  The present motion is going to argue that

6  we do not have sufficient evidence to establish a prima facie

7  case on the issue of whether there was any communications

8  between FINRA and the reporter.  That's the basis of the

9  defendants' motion.  It's not a causation motion.

10          THE COURT:  Well, I -- okay.  Maybe I'm

11 misunderstanding.  I thought you intended to file a motion for

12 summary judgment because you would be successful on the merits

13 of this case.  Am I -- have I misunderstood that?

14          MR. DAVIS:  You haven't, Your Honor.  And frankly, I

15 think that what Your Honor is suggesting is appropriate grounds

16 for summary judgment, and what Mr. Esper has recounted as the

17 grounds that we have proffered and that we discussed at our

18 hearing are the same thing and that Your Honor is exactly

19 right.

20          There is no evidence, and that -- I will answer your

21 question.  There is no evidence suggesting that FINRA and not

22 the tipster was the source of any defamatory information that

23 Mr. Meagher published.  And the confidential information that's

24 being referenced is information that plaintiffs admit is

25 non-defamatory, has nothing to do with this case and is a red

1    herring.

2           MR. ESPER:  Well, Your Honor, first of all, to

3    understand what we're going to be attempting to prove at trial,

4    you have to understand that what FINRA's story has been in this

5    litigation is we never had any communications with the

6    reporter.  They, in fact, commissioned a report by their

7    ombudsman's office in which they came -- supposed -- did a

8    supposedly detailed investigation that had all sorts of holes

9    in it.

10          It was superficially a detailed investigation that

11   said that -- it came to the conclusion that FINRA had no

12   communications with the reporter regarding our clients and

13   that -- what we will do is establish to the jury that FINRA is,

14   in fact, not telling the truth about that; that, in fact, there

15   are internal e-mails within FINRA in which people openly

16   discussed that there were -- there was leaking to the

17   publication that the reporter worked for; that there were, in

18   fact, people who spoke to the FINRA ombudsman who said things

19   like "Leaks happen all the time," which is the exact opposite

20   of the sworn testimony that the FINRA personnel gave in their

21   depositions, in which they said, "No, we've never heard of any

22   leaks.  No leaks happened here.  We don't talk to the press

23   except through our authorized channels."

24          So there's going to be a showing of a huge disconnect

25   between what FINRA says about --

1          THE COURT:  Okay.  And I've read that.

2          MR. ESPER:  -- and what actually happened.

3          THE COURT:  I've read that, and I appreciate your

4  enthusiasm for establishing that there is an issue of fact.

5  And I'm looking at page 2, and I see that on the bottom of

6  page 2, it says:  The ombudsman conceded at a deposition that

7  FINRA deliberately conducted an investigation that did not look

8  at any personal e-mail accounts, personal phone accounts, or

9  travel.

10          Okay.  Do you have those -- that documentation?

11          MR. ESPER:  I have the testimony of --

12          THE COURT:  No.  What I'm saying is, do these personal

13  e-mail accounts, personal phone accounts, and the travel, do

14  you have that evidence that would show what you are saying,

15  that, in fact -- what you are proposing?

16          MR. ESPER:  No, Your Honor.  We do not have the

17  evidence of the personal e-mail accounts of the FINRA

18  employees.  They're -- that was not a subject of discovery in

19  this case.

20          THE COURT:  But it's your position that that alone

21  establishes an issue of fact, that they are -- they are not

22  telling the truth?  That, in fact, they are the ones that

23  leaked this information which purportedly is defamatory?  Is

24  that it?

25          MR. ESPER:  It's not my position that one piece of

1    circumstantial evidence alone establishes that.  It's my

2    position --

3            THE COURT:  That's the first --

4            MR. ESPER:  -- that we have a mosaic.

5            THE COURT:  That's the first one.  What else?

6            MR. ESPER:  Well, we have, as I said, the statements

7    from FINRA's own personnel that leaks occur at FINRA all the

8    time, which is inconsistent with what the story that was told

9    at -- by FINRA's witnesses at deposition.

10            THE COURT:  Okay.  Let's stop there.

11            Is that a deposition where somebody said "Leaks occur

12    all the time"?

13            MR. ESPER:  It was a statement made by the public

14    relations person at FINRA to their ombudsman as part of the

15    ombudsman's investigation, which then at deposition that same

16    public relations person attempted to explain away in a rather

17    unconvincing fashion.

18            THE COURT:  Well, what you're saying, then, is that

19    someone at some point, you'll have evidence that an individual

20    said "Leaks occur all the time."  Then that individual's

21    deposition was taken and they basically said they didn't say

22    that or that isn't what they meant?

23            MR. ESPER:  That isn't what they meant is what they

24    said.  They did not deny saying it.  They said that isn't what

25    they meant.

1          But the context of the statement, that it was made in

2    response to the ombudsman's questions specifically about this

3    case, make their explanation at deposition look not credible

4    and, frankly, look like an organization that was trying to deny

5    the obvious with respect to their communications with

6    reporters.

7          We also have other evidence in this case.  We have the

8    fact that the Securities and Exchange Commission reported back

9    to FINRA personnel that they did an investigation and that they

10   concluded that they were not the leakers.  And the reason that

11   is important is -- and that they felt that FINRA was the

12   leakers.

13         THE COURT:  Wait, wait.  Let me stop there.

14         You said that someone from the Securities and Exchange

15   Commission will testify under oath that he or she knows that

16   FINRA actually leaked this information?

17         MR. ESPER:  The SEC refused to appear for deposition.

18         THE COURT:  Okay.

19         MR. ESPER:  However --

20         THE COURT:  Where --

21         MR. ESPER:  We would subpoena them for trial,

22   obviously, and we do have the evidence --

23         THE COURT:  Counsel, Counsel, you are making

24   statements that are factual.  That's why I'm asking.  So I want

25   the source of that information.  You basically said that

1   someone from the SEC said it was FINRA, but you don't have

2   that.  You're hoping that you'll subpoena somebody and that

3   person will testify to that?

4          MR. ESPER:  We have the evidence of that statement in

5   the form of sworn testimony from the FINRA personnel that that

6   statement was made by the SEC.

7          THE COURT:  All right.  So you have an admission by

8   FINRA that someone at FINRA said that the SEC thought it was

9   FINRA that leaked this information.  Right?

10          MR. ESPER:  Well, more than that.  That the SEC

11   conducted its own investigation as well and concluded that the

12   SEC was not the source of the leak.  And that's important

13   because there's only a limited number of people out there who

14   actually have access to these internal FINRA reports that were

15   leaked to the reporter.

16          So that if the SEC did not do it, then it must have --

17   essentially must have come from FINRA, and I --

18          THE COURT:  Okay.  But you said somebody's going to

19   say, from the SEC, that FINRA leaked it.

20          MR. ESPER:  Well, for purposes of summary judgment,

21   what we have is FINRA's admission that someone from the SEC

22   said that they conducted their investigation and concluded that

23   they were not the leaker.

24          For purposes -- but I took your question at the very

25   beginning of this hearing as broader.  What would I do if I was

1    presenting evidence to you in a Rule 50 motion at trial.  And

2    in that spirit, I'm saying that obviously if we went to trial

3    on this thing, we would go beyond what we would present at

4    summary judgment in terms of FINRA's position --

5            THE COURT:  No, you would be -- no, today's the day.

6    This is a trial by affidavit.  Okay?

7            MR. ESPER:  I understand that.

8            THE COURT:  So I'm not going to ask you to go further.

9    In fact, if you're going to respond to the motion for summary

10   judgment, you're going to have to offer up everything.  So the

11   discovery's finished, so everything in response to the motion

12   for summary judgment has to be admissible evidence, and that's

13   what we're talking about here today.

14           So what else do you have?

15           MR. ESPER:  Well, we also have the fact that the

16   people at FINRA themselves narrowed the universe of leakers

17   down to either FINRA or the SEC.  So it happened -- again,

18   based on this idea that there was information transmitted to

19   Mr. Meagher, the reporter, that literally could not have come

20   from the tipster.  And therefore --

21           THE COURT:  All right.  Tell me -- that's a

22   conclusion.  What is the -- what are the facts that would

23   establish that conclusion?

24           MR. ESPER:  That will come from deposition testimony

25   in which the -- Nancy Condon, the -- who's in charge of the

1    press office at FINRA, testified that those were the only two

2    possible sources of specific pieces of confidential information

3    that Mr. Meagher -- Mr. Meagher.  I keep mispronouncing his

4    name.  I apologize -- Mr. Meagher reported in his story.

5            THE COURT:  So you're offering her as a lay witness,

6    opinion testimony, where she says those are the only possible

7    sources?

8            MR. ESPER:  Well, I'm offering -- she would -- she is

9    in charge and, in fact, testified that she was in -- had

10   authority over enforcing the FINRA policy of not leaking

11   confidential information, which is contained in the FINRA guide

12   books and policy manuals that FINRA produced in this

13   litigation.

14           So she would certainly have grounds -- we would

15   certainly be able to lay a foundation that she would have

16   grounds to offer the opinion as to what constitutes information

17   within that policy that can't be transmitted to the media and

18   what falls outside of that policy.  It is literally her job to

19   decide whether specific pieces of information fall within that

20   policy or not.

21           THE COURT:  Okay.  Well, I got you there.  But is she

22   going to say that this leak, as you have indicated, had to have

23   come either from FINRA or the SEC?

24           MR. ESPER:  That was her testimony at deposition.

25           THE COURT:  Okay.  No other source?  Say, for example,

1   did somebody ask her whether or not it could have come from the

2   company?

3          MR. ESPER:  I believe I took her deposition, and I did

4   ask her that question.  And there was information in

5   Mr. Meagher's story that could not have come from the company.

6          Now, to be clear, because I anticipate what opposing

7   counsel is going to say here, there was also other information

8   in Mr. Meagher's story that could have come from the company.

9   The key point is, is that FINRA's contention all along has

10  been, "We never talked to Mr. Meagher."  It's been a flat

11  denial.  All of their witnesses in deposition maintained this

12  flat denial.

13         And if we can establish that denial is false, I

14  believe we create a jury question on exactly what it is that

15  FINRA did tell to Mr. Meagher and whether they had something to

16  hide.

17         THE COURT:  I'm with you on that.  I'm asking for

18  facts to get you there.

19         You've got -- you've got somebody who came forward

20  since I -- we had our last hearing who claims to have provided

21  this information.  And that's brand new to me, unless I missed

22  it at the last hearing.

23         And that, to me, would present a substantial problem

24  for you establishing one of the elements, assuming that you're

25  able to establish that the statements were defamatory, that --

1    assuming that someone from FINRA spoke to the reporter, that

2    the -- that conversation with the reporter caused the harm.

3    That's what I'm having a problem with.  Where are you going to

4    go with that?

5          MR. ESPER:  Well, Your Honor, as -- and I don't think

6    opposing counsel's statement really got to this.  Causation has

7    not been raised.  The issue of whether or not plaintiffs'

8    damages was actually caused by statements that may have been

9    made to -- by FINRA as opposed to statements that may have been

10   made by the tipster to the reporter is not a ground for summary

11   judgment, that the defendants have never asserted and is not a

12   ground that was discussed at our conference.

13         THE COURT:  Well, it sounds like -- it sounds like

14   he's going to raise it.  I don't know what your conversations

15   were, but what would be your response to it?

16         MR. ESPER:  My response would be, first of all, that

17   it seems to me that in the situation where you have -- in a

18   source journalist situation where you have initial sources, you

19   have confirming sources, you have -- it's not -- stories in the

20   press, in the financial press or any other sort of press,

21   necessarily come from one source.

22         The -- it would be a jury question to determine

23   whether the statements that were -- if the jury finds

24   statements were made by FINRA to the reporter, whether it was

25   those statements rather than the statements from -- that may

1   have come from the tipster or both, because you can have

2   concurrent causes, that were a substantial factor in

3   Mr. Hurry's damages.  It seems to me that's purely a jury

4   function.

5          The -- now, if no statements at all came from FINRA,

6   which is what we did discuss at our conference with counsel, if

7   we -- if our -- we failed to meet our burden to show that any

8   statements came from FINRA at all, that would defeat us.  But

9   if we show sufficient evidence to satisfy Your Honor that

10  there's a triable issue on statements coming from FINRA, it

11  seems to me it's up to the jury to then decide, well, how

12  does -- what constitutes a substantial factor, if anything, in

13  causing Mr. Hurry's damages.

14         THE COURT:  Okay.  I'm not going to go into what the

15  tipster said.  I know that the newspaper reporter's deposition

16  was taken sometime in -- after our hearing, last hearing?

17         MR. DAVIS:  The tipster's deposition was taken after

18  our hearing.

19         THE COURT:  Oh, the tipster's, okay.

20         MR. DAVIS:  The reporter, I believe, gave deposition

21  answers --

22         THE COURT:  And he refused --

23         MR. DAVIS:  -- in the form of written testimony.

24         THE COURT:  He refused to disclose?  Is that --

25         MR. DAVIS:  That's --

1          THE COURT:  He asserted the privilege?

2          MR. DAVIS:  That's correct.

3          THE COURT:  Okay.  So when did the tipster come

4     forward?

5          MR. DAVIS:  The tipster came forward -- I can find his

6     deposition if you like.

7          THE COURT:  That's okay.  But it wasn't very long ago?

8          MR. DAVIS:  It was prior to our last hearing because

9     this was referenced in the last joint status report, and --

10         THE COURT:  But his deposition hadn't been taken.

11         MR. DAVIS:  That's correct.

12         THE COURT:  Okay.  Well, a couple other questions.

13         How are you going to be able to establish, under

14    Arizona law, defamation unless you have identified who the

15    individual is?  In other words, if you are relying on

16    respondeat superior, somebody within the organization, and

17    we -- this has been around a long time.  Counsel, I haven't

18    seen you here before, but we started with a Mr. Anderson.

19    That's gone.  Dismissed.  Done.

20         Under Arizona law, my sense is -- and I haven't done

21    the research.  I've just been contemplating this issue -- is

22    you have to be able to identify someone before you can obtain

23    liability against a company.  So who -- how are you going to do

24    that?

25         MR. ESPER:  Well, Your Honor, the first thing I would

1    say, and I really am -- because I appreciate the spirit which

2    you're asking these questions.  I'm really only doing this to

3    preserve the record -- is that I do want to make clear that's

4    not a ground for summary judgment that was ever argued by

5    counsel on the other side and discussed in the meetings.  I

6    just want to say that for the record.

7              THE COURT:  Okay.

8              MR. ESPER:  But taking -- answering your question,

9    the -- it seems to me that -- I would have to look at the cases

10   to be sure that this is a viable theory.  But if you have a

11   situation -- I'll say a case in California, although with

12   totally just taking the point that this may not reflect Arizona

13   law.

14             But out in California we have a case called *Ybarra*

15   *versus Spangard*, which was a case where a whole bunch of

16   doctors operated on a patient and a sponge was left in the

17   patient.

18             THE COURT:  Respondeat superior?

19             MR. ESPER:  Yeah.

20             THE COURT:  Okay.

21             MR. ESPER:  And the -- all the doctors went to trial,

22   and of course, each one of them testified under oath that they

23   were not the ones that left the sponge in.

24             And in that circumstance, the Court very reasonably

25   held that, well, one of you had to have left the sponge in.

1    And therefore, we're not going to allow the defendants to get a

2    judgment on the grounds that the plaintiff failed to prove who

3    left the sponge in.

4            THE COURT:  Well, that's a -- that's a very clever

5    argument, but, you know, this is not -- this is obviously not

6    medical malpractice or respondeat superior.

7            At least in your situation, it had to be a doctor who

8    left the sponge in.  And who have you identified that -- who

9    actually disclosed the sponge here?  Who is it?

10           MR. ESPER:  Well, we don't know --

11           THE COURT:  Okay.

12           MR. ESPER:  -- based on the evidence --

13           THE COURT:  That's what I thought.

14           MR. ESPER:  -- and I will make that concession to you.

15           But I do -- but I will -- the concession I will not

16   make is that that necessarily has the effect that your question

17   implies.  It may very well be that there is a similar doctrine

18   that we can point to under Arizona law that would allow us to

19   say, well, if this leak must have come from FINRA, from

20   somebody at FINRA acting in the scope of their employment, but

21   we're just not able to identify the specific person that did

22   it, the organization should be liable.

23           THE COURT:  Okay.  We -- it seems like we have from

24   the beginning talked as if -- at least my conversations have

25   been with you, have been that FINRA doesn't dispute that some

1    of the publications were defamatory.  That is false.  Am I

2    right?  That some of the statements, in fact, are defamatory?

3            MR. DAVIS:  Frankly, Your Honor, I don't know.  We

4    have not asserted, and we are not asserting in our motion for

5    summary judgment, truth.  We're not trying to prove up the

6    truth of that, and frankly, a lot of that has to do with the

7    fact that FINRA wouldn't think it's appropriate to use

8    documents obtained in its regulatory function in a civil

9    lawsuit.  That hasn't been our position.

10           There are -- I mean, certainly there are some

11   statements that FINRA doesn't know if they're true, and that

12   they were published by Mr. Meagher.  Of course, there's no

13   evidence that any of that came from FINRA, and --

14           THE COURT:  So in other words, you're not -- in your

15   motion for summary judgment, you're going to assume -- assuming

16   that these are defamatory.

17           MR. DAVIS:  That's right.  That's right.  For all we

18   know, the tipper -- well, frankly, for all I know, because I

19   haven't seen the regulatory files, the tipper, when he was, you

20   know, explaining to the reporter all of these alleged misdeeds

21   that were happening at Scottsdale Capital Advisor, perhaps he

22   was lying.  Perhaps the SEC's complaint against the

23   shareholders of plaintiffs' company, in which they alleged the

24   same misdeeds, perhaps the SEC was wrong.  I don't know, and

25   we're not taking a position on that.

         What we are saying is that in light of the SEC's
complaint, which was six months prior to the publication of
these documents, in light of the tipper's admission that he was
the source of the statements contained in the three alleged
defamatory articles, that no reasonable juror can conclude that
despite all that, it's more likely than not that FINRA was the
source of the alleged defamatory information.

         And all of the discussion we've been having about the
SEC -- and I deny a lot of it -- as well as the argument that
counsel has made regarding what the facts are and what the
deposition testimony is, I mean, the SEC sent a letter to
opposing counsel saying that its investigation is ongoing,
so -- but in any event, all of that relates to the September
2013 article, an article that plaintiffs do not contend is
defamatory.

         They have sued the reporter here.  They don't mention
it --

         THE COURT:  Oh, is that right?  Let's see.  I have the
articles.

         So it's the December article, you said?

         MR. DAVIS:  No.  So the defamatory -- the alleged
defamatory articles are December 2013, March 2014, and
April 2014.

         The tipper admitted at his deposition that he was the
source that's referenced by Mr. Meagher in those articles.

1          THE COURT:  All of them?

2          MR. DAVIS:  There was -- I believe I found one

3     statement where he said he was not the source.  It was about

4     the FBI -- whether the FBI was investigating Scottsdale Capital

5     Advisors for Biozoom.  He testified that he did not tell the

6     reporter that the FBI was investigating.

7          And so --

8          THE COURT:  So but everything else that is alleged to

9     be defamatory, the tipster has said that he reported this?

10         MR. DAVIS:  That is -- that is correct, with one

11    exception.  There -- with respect to the circumstances where

12    the tipster says he doesn't recall if he was the source for a

13    particular paragraph, that same information can be found in a

14    complaint that the SEC filed against the shareholders -- or,

15    excuse me, against the clients of plaintiffs' company.

16         That complaint was filed in July 2013, so five months

17    prior to the publication.  And, in fact, the reporter

18    references in his December article, according to an SEC

19    complaint, blank.  Or it will say:  According to the

20    declaration of Ricky Sachar, who was a vice president for the

21    SEC.

22         And, quite honestly, it looks like the reporter may

23    have lifted just paragraphs from Mr. Sachar's declaration and

24    implanted them into his article because it looks extremely,

25    extremely similar.  The article --

1          THE COURT:  The tipster's name is?

2          MR. DAVIS:  Eric Miller.  Who worked -- he worked

3  twice for Scottsdale Capital Advisors.

4          THE COURT:  And what was his motivation?

5          MR. DAVIS:  He said, essentially, to bring this

6  information to light, to -- you know, to hope that Scottsdale

7  Capital Advisors would clean up its act, according to him.

8  That the source of transactions that Scottsdale Capital

9  Advisors was allowing to happen with respect to this Biozoom

10  stock were inappropriate, that he brought it to his superiors.

11  They did nothing.

12          He then reached out to FINRA, so not only was he a

13  leaker, if you want to use that term, though I think it's a

14  little pejorative -- not only was he Mr. Meagher's source, but

15  he brought this information to FINRA's attention.  And shortly

16  thereafter, the SEC filed a complaint against the shareholders

17  of Scottsdale Capital Advisors regarding the Biozoom trading

18  that he -- the information that he conveyed.

19          Now --

20          THE COURT:  Now that the -- now that Mr. Miller, I

21  guess is the tipster, has come forward with this information,

22  is Mr. Meagher now going to testify to what was said?

23          MR. DAVIS:  I have had no communications with

24  Mr. Meagher.  My expectation, though, just based on the very

25  little experience I have with California shield law, is that he

1    will likely still maintain that he cannot be compelled to

2    identify his source, even though his source has chosen to

3    identify himself.

4              THE COURT:  And California's shield law applies here

5    in Arizona?

6              MR. DAVIS:  Frankly, I don't know, Your Honor.

7              THE COURT:  Okay.

8              MR. DAVIS:  I know we'd have a problem getting --

9              THE COURT:  And it is -- they are the local

10   privileges, so I leave that to both of you to resolve.  I know

11   we have a shield law here in Arizona.  Okay.

12             MR. ESPER:  Can I speak to that for a moment, just

13   to --

14             THE COURT:  Yes.

15             MR. ESPER:  I think I can be of a little assistance,

16   at least on the procedural background of that.

17             Mr. Meagher -- Mr. Meagher, excuse me, is located in

18   California, so when we subpoenaed him, he contested his

19   subpoena --

20             THE COURT:  In California.

21             MR. ESPER:  -- in the local district court there.

22             THE COURT:  Yes.

23             MR. ESPER:  And the local district court, for better

24   or worse, applied California law.

25             THE COURT:  Yeah.  Well, good for you; right?  Or not.

1          Okay.  Well, I'm not -- certainly not going to

2    preclude anybody from filing a motion for summary judgment.  By

3    the way, what is the -- what is the status of the Scottsdale

4    corporation or -- I think it's -- yeah.  What is the status of

5    the company now, Scottsdale Capital Advisors, and the Hurrys?

6          MR. ESPER:  As of now, Scottsdale Capital Advisors and

7    the Hurrys are open for business and operating.

8          THE COURT:  And the Hurrys?

9          MR. ESPER:  They are living here in Scottsdale,

10   Arizona.

11         THE COURT:  And they're still part of the business?

12         MR. ESPER:  Yes.

13         THE COURT:  So they are still operating as securities

14   advisers?

15         MR. ESPER:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. ESPER:  They're operating -- I just want to be

18   clear here, because you've used a term, "securities advisers,"

19   which might be a term of art.  I'm not sure.

20         They are -- whatever capacity they were operating in,

21   they are still operating in.  Whether that constitutes a

22   securities adviser under securities law is not necessarily

23   something that I want to --

24         THE COURT:  Okay.  I just want to make sure that --

25   there's been so much publicity about this, as we all know, that

1  there hasn't been any adverse action that had been taken

2  against the company or against the Hurrys.

3          MR. ESPER:  There has been an adverse action taken

4  against the company that was publicized.

5          THE COURT:  Okay.

6          MR. ESPER:  It is --

7          THE COURT:  But it's still an ongoing concern.

8  There's no --

9          MR. ESPER:  Yeah.  My -- there's an ongoing appeal

10  within FINRA.  And I don't know if my opposing counsel wants to

11  say anything about it or not.  He represents FINRA.

12          But my understanding is as long as there is ongoing

13  administrative appeals within FINRA, the FINRA decision is not

14  final.

15          THE COURT:  And there also is -- there's been no

16  Securities and Exchange action against Scottsdale or against

17  the Hurrys?

18          MR. ESPER:  I am not aware of any Securities and

19  Exchange Commission --

20          THE COURT:  All right.  So, you know, that obviously

21  would -- could make a difference here, I don't know, on a

22  motion for summary judgment.  Just want to make sure that

23  somebody doesn't come forward and tell me, "Well, this is all

24  over" after the -- I am -- I have it under advisement to

25  determine whether summary judgment should be granted.

1          So, now, let me -- let me hear -- I have heard quite a
2     bit from plaintiffs' counsel.  So let me hear from -- it's
3     Mr. Davis; right?
4          MR. DAVIS:  Yes.  Thank you, Your Honor.
5          THE COURT:  Okay.  Do you have anything to respond
6     to -- the idea here, motion for summary judgment, you're going
7     to file.  And you've heard what, in broad strokes, will be the
8     response as to why there is a genuine issue of material fact.
9     What's your response?
10         MR. DAVIS:  Well, first, we have, of course, the -- I
11    mean, I guess let's start backwards, because there's been some
12    suggestion that arguments that -- or points that you are making
13    are not arguments that we're going to raise.  I don't think
14    that's accurate.
15         FINRA's position from the outset has been that
16    plaintiffs are going to be unable to present any evidence that
17    would allow a reasonable juror to conclude that it is more
18    likely than not that FINRA is the source of the defamatory
19    statements, which are the only statements that should be at
20    issue in this lawsuit.  And the only defamatory articles that
21    Mr. Meagher has been alleged to publish are the December,
22    March, and April articles.  Much of the discussion that
23    opposing counsel has had and much of the discussion that we
24    have had relates to a September 2013 article.
25         And if I -- Your Honor would just indulge me a little

1    bit, I can give you some background.  The September 2013

2    article, I will admit, it is apparent that Mr. Meagher either

3    obtained or was conveyed or read a confidential document that

4    is prepared by FINRA's Office of Fraud Detection and Market

5    Intelligence, which FINRA conveyed to the SEC.

6           That document, according to Mr. Meagher's article,

7    relates to the trading in a security called Goth.  Has nothing

8    to do with the December articles.

9           Now, as far as -- I don't think the source of that

10   information is relevant at all, frankly, because I don't think

11   that a reasonable jury could conclude that even if there's a

12   question about how a reporter obtains truthful information

13   about Security A, that would allow them to conclude that it's

14   more likely than not that FINRA conveyed untruthful information

15   about Security B, especially in light of Mr. Miller's admission

16   that he was the source.

17          But even if, you know, even if there was a question,

18   plaintiffs can't even narrow down the scope -- or plaintiffs

19   can't present any evidence suggesting that it's more likely

20   than not that FINRA conveyed truthful information to

21   Mr. Meagher and not the SEC.

22          To answer the question that you asked earlier, no, no

23   FINRA witness is going to say that the SEC told them that the

24   SEC completed its investigation and that the investigation

25   showed that FINRA is the source.  That's not what they're going

1    to say.

2         There are e-mails where FINRA is recounting hearsay

3    conversations, and Mr. Esper asked FINRA employees about those

4    e-mails.  And frankly, most of them lacked memory about it, but

5    all of them confirmed that they did not have any communications

6    with the SEC in which the SEC told them the results of the

7    investigation, let alone that the investigation was complete

8    and concluded that FINRA was the source.

9         And the reason that none of them had that

10   communication is because there would be no way for that

11   communication to be accurate because the SEC, during discovery

12   in this case, when they were asked to give a deposition by

13   opposing counsel, asserted the privilege and said that their

14   investigation is ongoing.

15        So the whole September 13 article, as far as I'm

16   concerned, is a red herring, as I indicated.

17        With respect to the December, March, and

18   April articles, the only articles that have been alleged to

19   contain defamatory information, plaintiffs can't identify any

20   facts at all tying FINRA to any of the communications.  And

21   with respect to nearly every single statement in the December,

22   March, and April articles, you have one or two things occurring

23   or sometimes both.

24        You have Mr. Miller admitting that he was the source,

25   and you have --

1              THE COURT:  Does he admit that he's the source of all

2      of the alleged defamatory statements?

3              MR. DAVIS:  No.  And it's tough for me to answer that

4      question because it's not even clear to me what the alleged

5      defamatory statements are.

6              THE COURT:  That's what I started -- I started with

7      that.

8              MR. DAVIS:  Yeah.

9              THE COURT:  That's an assumption that I think that

10     you're both making, which is fine with me.  If, in fact, they

11     are defamatory, then the question is who made it.

12             MR. DAVIS:  It's not clear to me what the -- even

13     taking the question of truth aside, it's just not clear to me

14     from the pleadings in this case or from the disclosure

15     statements in this case or from my communications with counsel

16     about what specific statements in the articles they're

17     contending are defamatory.  In the pleadings, there's kind of

18     seven general catch-all paragraphs in the defamation/false

19     light.

20             But I think to answer the spirit of your question,

21     Mr. Miller was deposed.  We went by -- we frankly went

22     paragraph by paragraph, you know, where the reporter would say,

23     you know, some -- a source stated blank.  We'd ask Mr. Miller:

24     "Are you the source of that?"

25             "Yes, I was."

1          Including, by the way, including that he was the
2   source of the statement that red flags were disregarded, which
3   plaintiff in the joint -- in the joint status report said,
4   well, this wasn't public information.
5          It may not have been public information, but
6   Mr. Miller admitted that he was the source, so I don't
7   understand the relevance of that.
8          But there are some instances, like with respect to
9   the -- there was a heading, you know, "FBI Investigating
10  Scottsdale Capital Advisors."  And he was asked at deposition,
11  "Are you the source for this?"
12         He goes, "I don't think that I said that."
13         Now, he testified that he had a very, very short phone
14  call with the FBI.  He had a conversation with FINRA, the
15  SEC -- this is a telephone call -- and the FBI.  And he said
16  shortly after the call started, the FBI individuals hung up.
17  But, of course, there's no evidence, though, that FINRA told
18  Mr. Meagher that the FBI was investigating Scottsdale Capital
19  Advisors.
20         Mr. Meagher himself wrote an e-mail to Nancy Condon,
21  the vice president of media relations -- oh, I'm sorry, it was
22  Michelle Ong, the director of media relations -- where he said
23  that, "You are right.  FINRA is not my source for Biozoom.  In
24  fact, you know, I have some other source."
25         That source obviously was Mr. -- was Mr. Miller.

1          Let me -- just so I don't misstate this for the

2     record.  He said, "You are certainly correct in that I did not

3     learn about a probe tied to trading in Biozoom from FINRA.

4     Rather, I have spoken with someone who has knowledge of the

5     investigation."

6          Presumably, that someone was Mr. Miller, the SCA

7     employee who had knowledge of the investigation and who

8     admitted that he had conveyed this information to Mr. Meagher.

9          And so you have Mr. Miller admitting that he's the

10    source.  You have Mr. Meagher, the reporter, admitting that

11    FINRA is not the source.  You have FINRA's investigation

12    concluding that --

13         THE COURT:  Wait.  Mr. Meagher, I thought he claimed

14    the privilege.

15         MR. DAVIS:  No.  Mr. Meagher, this is a -- so there's

16    an e-mail that -- Mr. Meagher, in his -- I guess his diligence

17    in writing these articles, would reach out to FINRA for

18    comment.  And you'll see this attached to the motion.  Every

19    time he reached out for comment, FINRA said, "We are not going

20    to comment on this information.  We don't comment on this

21    information.  This is confidential information, and we can't be

22    tied to it."

23         And so with respect to -- that was in December.

24    March, when he's preparing to write this third article, but the

25    second defamatory article, he calls Nancy Condon seeking a

1   comment.  Her colleague, Michelle Ong, responds back to him via

2   e-mail.  Says, "I'm responding to your message to Nancy Condon.

3   We are not going to comment."  Something -- something to that

4   effect, like, "You need to drop this."

5          And in response to that, it's where Mr. Meagher says,

6   "You are certainly correct that I did not learn about a probe

7   tied to trading in Biozoom from FINRA.  Rather, I've spoken to

8   someone who has knowledge of the investigation."

9          That's not the entire quote.  He goes on to say, "but

10  you need to understand, I have to solicit comment from FINRA as

11  part of my obligation as a reporter."

12         So the reporter himself is denying that FINRA's the

13  source.  Of course, in his -- every single article, he says

14  FINRA denies comment.

15         You then have that the alleged defamatory information

16  was publicly available for six months, five to six months,

17  prior to publication of the first alleged defamatory article,

18  and that the reporter himself, in the December article --

19  you'll notice that's the longest one.  That's the most

20  comprehensive one.

21         And in that article he's saying, you know:  According

22  to an SEC complaint, blank.  Which is, you know, an allegation

23  that plaintiffs are suggesting came from FINRA.  He says:

24  According to the declaration of Ricky Sachar filed in the

25  Biozoom action, blank.  So -- and then you have the FINRA

1    internal investigation.

2            So that is all of the evidence that -- or the

3    significant evidence that a -- that the jury will be shown

4    demonstrating that it is not FINRA.  So against all of that --

5    I mean, that tips the scales, and against all of that,

6    plaintiffs have to come forward with something, and I'd submit

7    they haven't come forward with anything.  Nothing relating to

8    the three defamatory articles.

9            Rather, they keep saying, "We'll focus on this

10   non-defamatory article."  But even there, they can't tie FINRA

11   to it.  It could just as easily be the SEC.  In fact, in the

12   evidence in the record, it's more likely the SEC because FINRA

13   performed an internal investigation that showed FINRA didn't do

14   it.  The SEC's internal investigation is still ongoing.

15           THE COURT:  Does FINRA during this time have a public

16   information officer?

17           MR. DAVIS:  Nancy Condon is the vice president of

18   media relations.  So it's not public --

19           THE COURT:  Well, a media office, okay.

20           MR. DAVIS:  Yeah, they did, and she was deposed.  And

21   Michelle Ong, who's her subordinate, though her title is

22   director of media relations, was also deposed.  And both of

23   them said they didn't give him any -- give Mr. Meagher any

24   information.

25           THE COURT:  Most of the time at these hearings I try

1    to persuade defense counsel where the evidence is -- and

2    usually motion for summary judgment comes from defense

3    counsel -- that the case is factually dense and there's all

4    sorts of credibility issues.

5         And sometimes I do and sometimes I don't persuade

6    them, but I never preclude them from filing a motion for

7    summary judgment.  And -- but I will tell you, Mr. Esper and

8    Mr. Adams, that I think based upon what I've heard here today,

9    that FINRA has a very good claim for summary judgment in this

10   case.  And it's up to you to file a response and to establish a

11   genuine issue of material fact on every issue and every claim

12   and every element of every claim.

13        So I don't preclude you, of course, obviously, from

14   filing a response.  I am sure after this long that you have

15   made every effort to settle this case, and it's not going to

16   settle.  Is that right, Mr. Esper?

17        MR. ESPER:  Your Honor, there haven't been, since the

18   beginning of the case, a lot of discussions in that regard.

19   And I --

20        THE COURT:  Well, that's always open.  I leave it to

21   you.  I'm not going to force you to try to settle the case.  If

22   it can't be settled, fine.  If it's at my doorstep on motions

23   for summary judgment, I will deal with it.

24        All right.  Anything else, Mr. Adams?

25        MR. ADAMS:  Not for plaintiffs, Your Honor.

```
1              THE COURT:  All right.  And Mr. Davis?

2              MR. DAVIS:  No, Your Honor.  Thank you.

3              THE COURT:  So let's see.  Do we have a date for

4    filing motions for summary judgment?

5              MR. DAVIS:  The 7th of July, Your Honor, though I did

6    receive a note that electronic filing may not be available on

7    the 7th of July after 5:00 p.m., so I guess I have to only say

8    that to myself.  So it may be filed -- it may be filed on the

9    6th of July.

10             THE COURT:  That -- well, okay.  Or, if necessary, you

11   can -- let's see.  The 7th is --

12             MR. DAVIS:  Friday.

13             THE COURT:  Friday.  You'll have -- I'll be merciful.

14   The 10th.

15             MR. DAVIS:  Thank you, Your Honor.

16             THE COURT:  All right.  And remember -- remember, it

17   has to be admissible evidence.

18             We are adjourned.

19             (Proceedings concluded at 3:30 p.m.)

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3            I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12           DATED at Phoenix, Arizona, this 20th day of June,

13   2018.

14

15

16
                         s/Jennifer A. Pancratz_____  ____
17                       Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25